**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

OCT 28 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: CLIVEN D. BUNDY, _____ CLIVEN D. BUNDY, AKA Cliven Bundy, Petitioner, v. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, LAS VEGAS, Respondent, UNITED STATES OF AMERICA, Real Party in Interest. | No. 16-72275 D.C. No. 2:16-cr-00046-GMN-PAL-1 OPINION |

Petition for Writ of Mandamus
Argued and Submitted October 21, 2016

Before: W. FLETCHER, GOULD, and BYBEE, Circuit Judges.

Opinion by Judge Bybee

BYBEE, Circuit Judge:

Attorney Larry Klayman applied to be admitted *pro hac vice* in the high-profile criminal trial of Cliven Bundy. The district court denied his application without prejudice. Bundy has now asked this court for a writ of mandamus to force the district court to admit Klayman. We decline to do so. Under our decisions, the district court had more than ample cause to turn down Klayman's application: he is involved in an ethics proceeding before the District of Columbia Bar, and he was not candid with the court about the status of those proceedings; he disclosed that he was twice barred *in perpetuity* from appearing *pro hac vice* before judges in the Central District of California and the Southern District of New York, but he failed to list numerous cases—all available on Westlaw or LEXIS—in which he has been reprimanded, denied *pro hac vice* status, or otherwise sanctioned for violating various local rules; and he has a record of going after judges personally, and shortly after Chief Judge Gloria Navarro denied his application, Bundy filed a frivolous *Bivens* action against her in her own court. This litany of reasons for denying Klayman *pro hac vice* status demonstrates that the district court did not abuse its discretion, much less commit clear error.

## I. FACTUAL BACKGROUND AND PROCEEDINGS

A. *Factual Background*

According to the indictment, in early April 2014, Petitioner Bundy and his codefendants were involved in an armed stand-off around Bunkerville, Nevada, with agents of the Bureau of Land Management ("BLM"). Following a more than twenty-year legal battle over grazing fees on public lands, the federal courts authorized the BLM to remove some 400 head of Bundy's cattle from public lands. *See, e.g.*, *United States v. Bundy*, 2013 WL 3463610 (D. Nev. July 9, 2013). In response to the BLM's attempts to settle the dispute peacefully, Bundy said that he was "ready to do battle" and "do whatever it takes" to keep the cattle. Over the course of a week, hundreds of Bundy's supporters congregated near Bunkerville to prevent the BLM from removing Bundy's cattle. Many of Bundy's supporters were armed, and the BLM agents ultimately withdrew from the area. The incident attracted national, and even international, attention.[1]

On March 2, 2016, a federal grand jury in the District of Nevada returned a sixteen-count superseding indictment against Bundy, four of his sons, and fourteen others. The indictment charged them with Conspiracy to Commit an Offense Against the United States, 18 U.S.C. § 371; Conspiracy to Impede or Injure a Federal Officer, 18 U.S.C. § 372; Use and Carry of a Firearm in Relation to a

---

[1] The incident has its own Wikipedia page. *Bundy Standoff*, Wikipedia (Oct. 27, 2016, 1:54 PM), https://en.wikipedia.org/wiki/Bundy_standoff.

Crime of Violence, 18 U.S.C. § 924(c); Assault on a Federal Officer, 18 U.S.C.

§ 111(a)(1), (b); Threatening a Federal Law Enforcement Officer, 18 U.S.C.

§ 115(a)(1)(B); Obstruction of the Due Administration of Justice, 18 U.S.C.

§ 1503; Interference with Interstate Commerce by Extortion, 18 U.S.C. § 1951; and

Interstate Travel in Aid of Extortion, 18 U.S.C. § 1952.

B.    *Proceedings Before the District Court*

1.    Klayman's Petition for *Pro Hac Vice* Admission

Following his indictment, Bundy secured local counsel, Joel Hansen.[2]  He

also secured the services of Larry Klayman, a member of the District of Columbia

and Florida Bars.  Under Local Rules for the United States District Court of

Nevada, an attorney who has been retained to appear in a particular case but is not

a member of the bar of the district court "may appear only with the court's

permission . . . by verified petition on the form furnished by the clerk."  Nev. Dist.

Ct. Local R. IA 11-2(a).  The Rule further states that "[t]he court may grant or

deny a petition to practice under this rule."  *Id.* 11-2(h); *see also id.* 11-2(i) ("When

---

[2] Due to health concerns, Hansen requested permission to withdraw from the case.  The district court approved his request upon the condition that Bundy find substitute local counsel.  On October 24, 2016, Nevada attorney Bret Whipple entered his appearance on behalf of Bundy.

4

all the provisions of this rule are satisfied, the court may enter an order approving the verified petition for permission to practice in the particular case.").

On March 22, 2016, Klayman filed a Verified Petition stating that he had been retained by Bundy in connection with the Nevada indictment and requesting *pro hac vice* admission to practice before the district court. Of relevance to this petition for a writ of mandamus is the fifth question on the district court's form, which reads:

> That there are or have been no disciplinary proceedings instituted against petitioner, nor any suspension of any license, certificate or privilege to appear before any judicial, regulatory or administrative body, or any resignation or termination in order to avoid disciplinary or disbarment proceedings, except as described in detail below.

Klayman wrote in response: "The only disciplinary case pending is in the District of Columbia" and that he has "responded to a few complaints." He elaborated in an attached statement.

With respect to the disciplinary case in the District of Columbia, Klayman stated that he had represented clients, pro bono, against his former employer,

5

Judicial Watch.[3]  He represented that "[t]he matter is likely to be resolved in my favor and there has been no disciplinary action."

As to other complaints, he explained that he "agreed to a public reprimand before The Florida Bar" for failing to timely pay a mediated settlement to a client, but that there was "no showing of dishonesty" and he was never suspended from the practice of law.  Separately, Klayman revealed that, roughly twenty years ago, "two judges vindictively stated that I could not practice before them after I challenged rulings they had made on the basis of bias and prejudice."  He explained that those exclusions applied only to the two judges themselves, Judge William D. Keller of the U.S. District Court for the Central District of California and Judge Denny Chin of the U.S. District Court for the Southern District of New York.  Moreover, he advised that the "bars of the District of Columbia and Florida reviewed these rulings and found that I did not act unethically" and that he was currently in good standing in both jurisdictions.

2.    The District Court's March 31 Order

---

[3] Klayman was the CEO and General Counsel of Judicial Watch.  Klayman founded Judicial Watch in 1994 and left in 2003.  According to its current website, Judicial Watch is a "conservative, non-partisan educational foundation[] [that] promotes transparency, accountability and integrity in government, politics and the law."  *About Judicial Watch*, Judicial Watch, http://www.judicialwatch.org/about (last visited Oct. 25, 2016).

6

The district court denied the Verified Petition "for failure to fully disclose disciplinary actions and related documents."  The district court found that Klayman's statement that the matter regarding Judicial Watch from the District of Columbia "is likely to be resolved in my favor and there has been no disciplinary action" was "misleading and incomplete."  Referring to the evidence it had found on its own initiative, the district court pointed out that the District of Columbia Court of Appeals Board on Professional Responsibility had received an Affidavit of Negotiated Discipline from Klayman and a Petition for Negotiated Discipline, signed by Klayman and counsel for the D.C. Bar, in which Klayman consented to public censure.  Neither of these documents had been disclosed by Klayman.  Because these documents were "admissions of three separate incidents of stipulated misconduct that were not clearly disclosed in Klayman's Verified Petition," the district court denied the petition, but without prejudice.  The district court then explained:

> Should Klayman wish to file a new Verified Petition with the Court, the following information should be included:  (1) the case numbers for the cases before Judge William D. Keller and Judge Denny Chin that resulted in these judges precluding Klayman's practice before them; (2) verification of the review by the Bar Associations of the District of Columbia and Florida finding that Klayman did not act unethically before Judges Keller and Chin; (3) an updated Certificate of Good Standing from the Supreme Court of Florida; (4) the Florida Bar Association's reprimand verifying that there was no showing of

7

dishonesty in connection with their disciplinary action; (5) the Exhibits attached to this Order; and (6) verification that the matter in the District of Columbia disciplinary case referenced in the Verified Petition has been resolved with no disciplinary action.

3.    Klayman's Supplemental Petition

Klayman filed a "Supplement to and Renewed Petition" on April 7, 2016.[4] Klayman provided evidence and explanations for items (1)–(5) of the district court's requirements as follows:  (1) he provided the case names and citations for the actions regarding Judges William D. Keller and Denny Chin; (2) he provided a letter from the D.C. Bar finding no ethical violation in the Keller and Chin matters, but said that the Florida Bar's files were no longer accessible; (3) he provided an updated letter of good standing from the Supreme Court of Florida; (4) he provided a copy of Florida's reprimand; and (5) he provided the exhibits attached to the March order.

As to the district court's sixth requirement, Klayman disputed the conclusion the district court drew from the documents it had identified.  The court, he said, "appears to have misunderstood the nature and current posture of the disciplinary proceeding underway" in the District of Columbia.

---

[4] The district court noted that, contrary to its order, Klayman did not file a new Verified Petition.  Thus, it construed Klayman's Renewed Petition as a request for reconsideration of the original Verified Petition.

> [T]he prior attempted negotiated discipline never entered into effect . . . . Bar Counsel and Mr. Klayman had attempted to resolve the matter by agreement, but Mr. Klayman later thought the better of having signed the affidavit and agreeing to negotiated discipline it [sic] since he feels strongly that he acted ethically at all times.

He also supplied a copy of a letter opinion prepared by Professor Ronald Rotunda of Chapman University School of Law. Rotunda, who is well known in academic circles for his expertise in legal ethics and constitutional law, stated that it "is [his] expert opinion that in the [D.C. matter] Mr. Klayman has not committed any offense that merits discipline." Klayman attached what he characterized as "a post-hearing brief" that he had filed with the D.C. Bar. Klayman, however, did not explain what the "hearing" was to which he had appended his "post-hearing brief," and the brief itself did not explain the procedural posture of the proceedings before the D.C. Bar. Klayman repeated that he was "confident of ultimately prevailing . . . . since the ultimate finding of the Committee which heard the evidence is simply a recommendation." Again, Klayman did not identify what the "Committee" was, what the "evidence" was, or to what the "ultimate finding" or "recommendation" referred.

### 4. The District Court's April 19 Order

The district court treated Klayman's renewed filing as a request for reconsideration and denied it on April 19, 2016. The district court said nothing

about five of the six conditions it imposed in the March 31 Order. It only

discussed the matter before the D.C. Bar. The court noted that Klayman "admits

that [the D.C. matter] is still pending," and thus there was "no error with its prior

ruling." The court ordered that "Klayman's Verified Petition shall remain denied

without prejudice until such time as Klayman can provide proof that the ethical

disciplinary proceeding in the District of Columbia has been resolved in his favor."

B.   *Mandamus Proceedings*

On July 6, 2016, Bundy filed an emergency petition with this court for a writ

of mandamus requesting that the district court be ordered to admit Klayman *pro

hac vice*. Bundy argued that his Sixth Amendment right to counsel would be

violated if he were forced to go to trial without his attorney of choice. He claimed

that the district court "mechanistically" required that Klayman could not be

admitted until the outcome of the D.C. Bar proceeding was known. Bundy

represented that Klayman had "correctly informed the judge that the proceeding

was underway and would not be finished for another few years and that Mr.

Klayman had not been found liable of any ethics violations by the District of

Columbia Bar." He further represented that the "slow pace of the District of

Columbia Bar should not create any assumption that that case is in any way

serious, complex, or difficult." He repeated that Klayman has "continuously been

10

a member in good standing of the District of Columbia Bar for over 36 years and has never been disciplined" and that even if the D.C. Bar complaint were decided against him, "that would still not justify denial of Klayman's application to appear *pro hac vice*."

We ordered expedited review of the petition and directed the United States, as the real party in interest, to file an answer; we invited the district court to address the petition "if it so desires." We received separate responses from the United States and the district court.

The United States "respectfully decline[d] to opine on the ultimate question whether Klayman should be allowed to represent [Bundy]." The government nevertheless defended the district court's judgment as "within its discretion." It catalogued other cases in which Klayman was reprimanded by various courts for speaking after the judge requested silence, making misrepresentations to the court, ignoring court-imposed procedures and deadlines, pursuing meritless claims, making accusations related to a judge's race, and refusing to comply with local rules.

The district court not only defended the grounds on which it had issued its prior orders, it offered new evidence and grounds for refusing to grant Klayman *pro hac vice* status. First, the district court reiterated that the still-pending

11

disciplinary proceedings in the District of Columbia raised ethical concerns. The court then challenged the veracity of how Klayman described the current status of the proceedings. Rather than "withdraw[ing] his affidavit because he felt strongly that he had acted ethically," as Klayman claimed, the district court unearthed evidence that

> the District of Columbia Hearing Committee reviewed Klayman's Petition for Negotiated Discipline and rejected it. The Hearing Committee rejected Klayman's affidavit because it determined that the "agreed-upon sanction of public censure is unduly lenient." As such, Klayman failed to disclose the actual current disposition of his pending District of Columbia disciplinary case, and instead provided false information to this Court by stating that he withdrew his affidavit when, in fact, the Hearing Committee rejected it.

Second, the district court also felt that Klayman had filed an incomplete and inaccurate Verified Petition because he had failed to mention "numerous other courts' findings that he is unfit to practice," and the court cited eight cases in which courts had commented on his "inappropriate and unethical behavior." Third, the district court pointed to a Second Circuit decision in which that court dismissed his challenge to the district court's impartiality because it was "insulting and smacked of intimidation." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998). The district court then observed that Bundy recently filed a "similar[]" civil suit against the district judge individually, President Obama, and Senator Harry Reid, alleging a conspiracy. *See Bundy v. Obama*, No. 2:16-cv-1047-JCM-

GWF (D. Nev. dismissed with prejudice Oct. 12, 2016). The district court thus

argued that it did not abuse its discretion because Klayman's record shows a "total

disregard for the judicial process" and his admission *pro hac vice* would thus

"impede the orderly administration of justice."

Klayman did not respond to the district court's new evidence that he had

misrepresented the proceedings in the District of Columbia, nor did he address the

cases cited by the district court or the United States in which he had been

reprimanded by the courts for his conduct during the litigation. Instead, he claimed

that this evidence was "not on the record before the District Court" and was

"simply an *ex post facto*, non-meritorious attempt to justify the denial now that this

Court has granted expedited review of the mandamus petition." Klayman then

repeated his claim that the affidavit had been withdrawn and that "he has a strong

case for ultimately prevailing on the merits."

We held oral argument on an expedited basis and heard from Klayman and

the United States.

## II.  STANDARDS FOR ISSUING A WRIT OF MANDAMUS

Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really

extraordinary causes.'"  *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004)

(quoting *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947)).  "As the writ is one of

13

'the most potent weapons in the judicial arsenal,' three conditions must be satisfied before it may issue." *Id.* (citation omitted). "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires . . . .'" *Id.* (first alteration in original) (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976)). Second, the petitioner must show that "[his] right to issuance of the writ is 'clear and indisputable.'" *Id.* at 381 (alteration in original) (quoting *Kerr*, 426 U.S. at 403). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

To determine whether mandamus relief is appropriate, we weigh the five factors that we originally enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977):

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Id.* at 654–55 (citations omitted).[5] These factors are not exhaustive, *see In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982), and "should not be mechanically applied," *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). However, "the absence of factor three—clear error as a matter of law—will always defeat a petition for mandamus." *In re United States*, 791 F.3d 945, 955 (9th Cir. 2015) (quoting *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000)). Because our conclusion that the district court did not commit "clear error as a matter of law" precludes issuance of the writ, we address only that *Bauman* factor.[6]

"The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'" *In re United States*, 791 F.3d at 955 (quoting *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 708 (9th Cir. 2009)). Because, on direct appeal, we

---

[5] Even though *Bauman* was decided before the Supreme Court's most recent discussion of mandamus in *Cheney*, 542 U.S. 367, we continue to apply the *Bauman* factors without separately considering the three conditions described above in *Cheney*. *In re United States*, 791 F.3d 945, 955 n.7 (9th Cir. 2015).

[6] "Clearly erroneous as a matter of law" is a standard that is not familiar to us in any other context. "Clearly erroneous" is the standard we associate with reviewing findings of fact. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact . . . must not be set aside unless clearly erroneous . . . ."). We assume that by "clear error" in law, we mean something like "plain error," the standard we use to identify when a district court has committed an obvious error of law, but one that was not preserved for appeal by a timely objection. *See* Fed. R. Crim. P. 52(b); *Puckett v. United States*, 556 U.S. 129, 135 (2009).

15

"normally review a denial of a motion to appear *pro hac vice* for abuse of discretion," *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002), our review in mandamus proceedings is "especially deferential," *In re United States*, 791 F.3d at 955. On petition for a writ of mandamus, we look to see if the district court abused its discretion in a manner so obvious that the error is "clear" to all.

## III.   ANALYSIS

A.    *The Standards for Granting* Pro Hac Vice *Status*

A criminal "defendant's [Sixth Amendment] right to the counsel of his choice includes the right to have an out-of-state lawyer admitted *pro hac vice*." *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002) (citation omitted). But because counsel from other jurisdictions "may be significantly more difficult to reach or discipline than local counsel," *United States v. Ries*, 100 F.3d 1469, 1471 (9th Cir. 1996), this right is "circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, "[t]here is no right of federal origin that permits [out-of-state] lawyers to appear in state courts without meeting that State's bar admission requirements." *Leis v. Flynt*, 439 U.S. 438, 443 (1979) (per curiam).

Federal courts have long had the authority to "establish criteria for admitting lawyers to argue before them." *United States v. Gonzalez-Lopez*, 548 U.S. 140,

16

151 (2006). They have "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession." *Wheat*, 486 U.S. at 160; *see Ries*, 100 F.3d at 1471 (courts may regulate attorneys appearing before them to "[e]nsur[e] the ethical and orderly administration of justice"); *see also In re United States*, 791 F.3d 945, 957 (9th Cir. 2015) ("[A] court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice or some other legitimate policy of the courts." (citation omitted)). Where an out-of-state attorney suggests through his behavior that he will not "abide by the court's rules and practices," the district court may reject his *pro hac vice* application. *Ries*, 100 F.3d at 1471.

The Local Rules for the United States District Court for the District of Nevada provide that an attorney who has been retained to appear in a particular case but is not a member of the bar of the district court "may appear only with the court's permission . . . by verified petition on the form furnished by the clerk." Nev. Dist. Ct. Local R. IA 11-2. Among other things, that petition must state

(4) [t]hat the attorney is not currently suspended or disbarred in any court;
(5) [w]hether the attorney is currently subject to any disciplinary proceedings by an organization with authority to discipline attorneys at law; [and]
(6) [w]hether the attorney has ever received public discipline including, but not limited to, suspension or disbarment, by any organization with authority to discipline attorneys at law.

17

*Id.* 11-2(b)(4)–(6).  After receiving this information on a verified petition, "[t]he court may grant or deny a petition to practice."  *Id.* 11-2(h).

B.     *Klayman's* Pro Hac Vice *Status*

The district court here did not abuse its discretion—much less commit clear error—when it denied Klayman's *pro hac vice* application.  In its answer to Bundy's petition for a writ, the district court laid out a compelling case for doubting Klayman's ability to abide by local rules of comportment or ethics.  It pointed to three separate categories of activities that made it doubt Klayman's willingness to advance the ethical and orderly administration of justice in Bundy's case:  (1) the pending D.C. disciplinary proceedings involving three separate cases of conflict of interest, including the omissions and misrepresentations he made in the verified petition regarding those proceedings; (2) numerous other cases in which federal district courts have cited him for inappropriate and unethical behavior; and (3) his pattern of perverting the judicial process with insults and intimidation against judges personally.  The district court concluded, based on these three categories, that Klayman's record shows a "total disregard for judicial process" and his admission *pro hac vice* would thus "impede the orderly administration of justice."  We will address the evidence for each of these grounds.

18

Before we do so, we must address Bundy's argument about the scope of the record. Bundy points out that a district court "must articulate some reasonable basis for [ethical] doubts before denying the attorney's admissions for pro hac vice admission." *In re United States*, 791 F.3d at 957; *see also Ries*, 100 F.3d at 1472 ("In denying a pro hac vice application, the judge must articulate his reason for the benefit of the defendant and the reviewing court."). Bundy takes this to mean that any reason not articulated by the district court in its order cannot be considered by a reviewing court. In this case, Bundy argues that we may not consider any reasons or evidence not found in the district court's March 31 or April 19 Orders. However, we have never gone that far, and Bundy fails to point to any case in which we have excluded a district court's justifications that were provided after the fact as, for example, in a response to a mandamus petition.

A rule barring after-acquired evidence or later-supplied rationales might well make sense in the ordinary appeal after trial, where the district court has issued its order denying *pro hac vice* status and is not heard from again on the matter. There, we do not want to allow the opposing party, several months or years down the line, to conjure up reasons that the district court could have given for denying *pro hac vice* status, but failed to actually give—or even know of. But mandamus proceedings in which the district court chooses to submit an answer detailing the

district court's concerns about the attorney's ethical transgressions are quite different.  We no longer need to speculate as to the district court's possible motivations or lament over whether to give deference to reasons the district court might not have found persuasive in the first instance.  Instead, we know exactly why the district court would deny *pro hac vice* status.  Moreover, allowing Bundy to force us to limit our review only to the matters Klayman revealed in his petition would give attorneys an incentive to mislead the courts—exactly the type of conduct in which Klayman engaged in this case.  Confirming our conclusion that we may consider material supplied after the denial of *pro hac vice* status is the fact that if we thought we were limited to considering only the district court's stated reasons, we would vacate and remand to permit the district court to put its additional findings on the record and amend its order.

This has been a fluid and fast-moving proceeding.  We conclude that the entirety of the district court's reasoning—both from its orders denying *pro hac vice* status as well as its response to the petition for a writ—should be taken into account.

1.     Disciplinary Proceedings Before the D.C. Bar

The district court denied Klayman's request "until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia

20

has been resolved in his favor." Klayman concedes that he is still the subject of ongoing disciplinary proceedings by the D.C. Bar, but he strenuously argues that they will be resolved in his favor.

The contested proceedings in the District of Columbia may or may not turn out to be serious. Even if we had the full record before us, that question would not be for us to answer. It is enough for us to know that the proceedings have been going on for several years and are current. A committee held hearings in Klayman's case in January 2016, and Klayman submitted additional briefing to the Bar in March 2016—contemporaneous with his application for *pro hac vice* status in this case.

We do know that the charges—conflicts of interest—are serious enough that in 2015 Klayman was willing to stipulate to "public censure." More recently, on January 13, 2016, a D.C. Bar Hearing Committee rejected the stipulated censure as "unduly lenient" and, following hearings held that same month, a different Hearing Committee made a preliminary, nonbinding finding that Klayman had violated D.C. Rules 1.9 (conflict of interest) and 8.4(d) (conduct that seriously interferes with the administration of justice) by "clear and convincing evidence." It is this preliminary finding that Klayman has disputed in his March 2016 briefing. Although he contests whether the Bar Counsel has shown by clear and convincing

21

evidence that he has violated the rules of professional responsibility, he has argued

to the D.C. Bar that even if there was a "technical violation," the only appropriate

sanction should be an "informal admonition."

If the only reason the district court had offered was the bare fact of an open

disciplinary proceeding in D.C., the district court might have abused its discretion

in denying *pro hac vice* status to Klayman.  At a minimum, the district court would

have had to make further inquiry—something beyond requiring Klayman to show

that the proceedings have been finally resolved in his favor.

But the district court laid out a second, very good reason for its decision:

although he had several opportunities to clear the record, Klayman was not

forthcoming about the nature and status of those proceedings.  In his application,

Klayman—properly—disclosed that there was a "disciplinary case pending . . . in

the District of Columbia," that the charge was conflict of interest, and that he

expected the matter to be "resolved in his favor."  The district court denied his

petition "for failure to fully disclose disciplinary actions and related documents,"

and the district court supplied documents filed in the proceeding that showed that

Klayman had agreed to "public censure."  Even then, the district court only denied

the application without prejudice to Klayman refiling.  At that point Klayman was

fully on notice that he needed to be transparent about the D.C. Bar proceedings.

Klayman was not forthcoming with the district court. In his "renewed application," Klayman corrected the record—but only in part. He told the district court that the stipulation was of no effect because he had "thought the better of having signed the affidavit and agreeing to negotiated discipline." Klayman may have had second thoughts about stipulating to his "public censure," but his statement was woefully misleading. In fact, a Hearing Committee for the D.C. Bar had rejected that stipulation on behalf of the Bar because it was "unduly lenient." That prompted the hearings in January 2016, a Hearing Committee recommendation, and Klayman's March 2016 brief to the D.C. Bar.

Klayman thus was on notice in the March 31 Order that his initial disclosure of the facts was "misleading and incomplete," yet Klayman offered only a partial correction of the record. As the district court told us, he was not forthcoming about the status of the D.C. proceedings: "Klayman failed to disclose the actual correct disposition of his pending District of Columbia disciplinary case, and instead provided false information to this Court by stating that he withdrew his affidavit when, in fact, the Hearing Committee rejected it." That finding is not clearly erroneous.

Indeed, Klayman had a full and fair opportunity to correct the record when we allowed him to respond to the district court's filing and when we held oral

argument.  He offered no explanation whatsoever for his failure to disclose the current status of his case.  He never advised the district court that the Hearing Committee rejected the stipulation, that there was a recent hearing in January 2016, and that the Hearing Committee made a recommendation to the D.C. Bar.  In fact, we still do not have the most recent documents filed in Klayman's disciplinary case.[7]

These reasons more than justify the district court's decision to deny Klayman *pro hac vice* admission to practice in the district court in Nevada.  We have previously held on direct review that it was not an abuse of discretion to deny *pro hac vice* status because of "pending disciplinary proceedings," a "failure to state in his *pro hac vice* application that [the attorney] was subject to pending disciplinary proceedings and . . . his failure to directly address those proceedings when so requested."  *United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007). When the district court follows our cases, it cannot abuse its discretion.

> 2.      Sanctionable Conduct in Other Proceedings

---

[7] Klayman did submit his March 2016 brief to the district court, and some of these facts may be gleaned from his brief.  But to date, we have not seen any recommendation or briefing papers filed by the Hearing Committee following the three days of hearings in January 2016.  Submitting the papers from one side in a contested matter is not full disclosure.

Klayman failed to mention, but the district court found quite relevant, "numerous other courts' findings that he is unfit to practice" based on his "inappropriate and unethical behavior." The district court supplied us with a 2007 order of the Supreme Court of New York, which denied Klayman's petition to proceed *pro hac vice* because "Klayman's record demonstrates more than an occasional lapse of judgment, it evinces a total disregard for the judicial process." Order Denying Pro Hac Vice Application at 4, *Stern v. Burkle*, 867 N.Y.S.2d 20 (Sup. Ct. 2008). The New York court collected examples from other courts, and the district court referred to these instances of Klayman's sanctioned, sanctionable, or questionable behavior:

- The Federal Circuit affirmed the district court's revocation of Klayman's ability to appear before the district court *pro hac vice* in perpetuity and its sanctioning of Klayman for accusing the trial judge of anti-Asian bias and "unreasonably and vexatiously multiplying the proceedings." *Baldwin Hardware Corp. v. FrankSu Enter. Corp.*, 78 F.3d 550, 555 (Fed. Cir. 1996).

- The Second Circuit affirmed the district court's revocation of Klayman's ability to appear before the district court *pro hac vice* in perpetuity and its sanctioning of Klayman for "undignified and discourteous conduct that was degrading to the [district court] and prejudicial to the administration of justice" by, among other things, making accusations of racial and political bias and acting "abusive[ly] and obnoxious[ly]." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 994 F. Supp. 447, 455 (S.D.N.Y. 1997), *aff'd*, 138 F.3d 33 (2d Cir. 1998).

- Klayman was sanctioned for filing an untimely complaint and opposing the government's motion with "frivolous filings" that "wasted time and

resources of defendants as well as of the court." *Wire Rope Importers'
Ass'n v. United States*, 18 C.I.T. 478, 485 (Ct. Int'l Trade 1994).

- Klayman exhibited "often highly inappropriate behavior" and his
performance "was episodically blighted by rude and unprofessional behavior
which was directed toward the presiding judge and opposing counsel."
*Material Supply Int'l, Inc. v. Sunmatch Indus., Co.*, No. Civ. A. 94-1184,
1997 WL 243223 at *8, *10 n.7 (D.D.C. May 7, 1997), *aff'd in part and
reversed in part*, 146 F.3d 983 (D.C. Cir. 1998).

- Klayman "apparently misread (or never read) the local rules" and the district
court threatened sanctions for any future failures to comply with local rules.
*Alexander v. FBI*, 186 F.R.D. 197, 199 (D.D.C. 1999). The district court
"gr[ew] weary of [Klayman's] use—and abuse—of the discovery process"
and "ha[d] already sanctioned [Klayman] for making misrepresentations to
the court, allowing the court to rely upon those representations in a favorable
ruling, and then later contravening those very (mis)representations."
*Alexander v. FBI*, 186 F.R.D. 188, 190 (D.D.C. 1999).

- Klayman responded to the district court's orders with a "forked tongue" and
made arguments with "malicious glee." *Judicial Watch of Fla., Inc. v. U.S.
Dep't of Justice*, 159 F. Supp. 2d 763, 764 (D.D.C. 2001).

- Klayman made arguments regarding the conduct of the district court that
were "bizarre" and "beyond the far-fetched." *Dely v. Far E. Shipping Co.*,
238 F. Supp. 2d 1231, 1241 (W.D. Wash. 2003).

Of these eight instances of revocations or denial of *pro hac vice* status,

sanctions for ignoring local and federal rules, and complaints of misrepresentations

and omissions, Klayman mentioned only two to the district court. And in doing so,

the district court noted, Klayman still failed to accept any responsibility for his

actions. Instead, he claimed that the judges were being "vindictive" in their orders

forever barring him from appearing *pro hac vice* in their courtrooms. He failed, however, to mention that these two "vindictive" district court judges' orders were affirmed by their respective federal appellate courts, both of which commented on Klayman's inappropriate behavior. *See MacDraw*, 138 F.3d at 37–38; *Baldwin Hardware*, 78 F.3d at 555.

The district court went on to highlight specifically a more recent case, which Klayman failed to mention, in which the district court's summary judgment order noted how Klayman "has routinely shown a disregard for [the district court's] Local Rules." *Klayman v. City Pages*, No. 5:13-cv-143-Oc-22PRL, 2015 WL 1546173, at *8 n.7 (M.D. Fla. Apr. 3, 2015), *aff'd*, 650 F. App'x 744 (11th Cir. 2016). The Florida district court had "become quite frustrated with [Klayman's] various tactics to avoid Court rules throughout the course of this litigation. Unfortunately, the Court learned early on in this case that this approach to litigation is the norm and not the exception for [Klayman]." *Id.*

Moreover, a quick Westlaw search has found three *additional* cases, bringing the grand total to twelve, in which Klayman's ability to practice law in an ethical and orderly manner was called into question:

- Klayman's "fail[ure] to comply with even the most basic of discovery requirements" was "not simply an unexplained hiccup in an otherwise diligently prosecuted case" and thus warranted sanctions. *Klayman v.*

27

*Barmack*, No. 08-1005 (JDB), 2009 WL 4722803, at *1 (D.D.C. Dec. 4, 2009).

- After "the patent failure of the Court's use of lesser sanctions in the past to have any discernible effect on Klayman' conduct," Klayman's "consistent pattern of engaging in dilatory tactics, his disobedience of Court-ordered deadlines, and his disregard for the Federal Rules of Civil Procedure and the Local Rules of this Court" necessitated further, more severe, sanctions. *Klayman v. Judicial Watch, Inc.*, 802 F. Supp. 2d 137, 138–39 (D.D.C. 2011).

- Klayman repeatedly did not "attempt to comply" with local rules, and the district court threatened sanctions for any further violations. *Montgomery v. Risen*, No. 15-cv-02035-AJB-JLB, 2015 WL 12672703, at *1 (S.D. Cal. Oct. 2, 2015).

Klayman has a reputation as a vigorous litigator, but this is not a flattering record, and not one that the district court should ignore. When a district court admits an attorney *pro hac vice*, the attorney is expected to follow local rules. *See In re United States*, 791 F.3d at 957 n.8 ("A district court would clearly act within its discretion in denying *pro hac vice* admission if, for example, an attorney's actions led the court to conclude the attorney would not 'abide by the court's rules and practices' . . . ." (quoting *Ries*, 100 F.3d at 1471)). Klayman has shown an unwillingness or inability to do that. The dilemma for a district court presented with such a record is that, once an out-of-state attorney is admitted, the district court has limited tools in its arsenal for maintaining order in the courtroom. Repeated and willful violations of court rules must be dealt with by the district

28

court alone.  The district court can refer the attorney to a bar, but has no means to follow up its referral.  Instead, the district court is limited to its own powers. Those powers are not insubstantial, *see, e.g.*, 18 U.S.C. § 401; 28 U.S.C. § 1927; *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991) (discussing the inherent powers of the courts), but the exercise of those powers can be disruptive to trial proceedings and, in an extreme case, may call into question the fairness of the trial itself.

We fully acknowledge that "attorney[s] may with impunity take full advantage of the range of conduct that our adversary system allows"—they have "a right to be persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious when acting in their client's behalf."  *In re Dellinger*, 461 F.2d 389, 400 (7th Cir. 1972).  However, the district courts must carefully balance that vigorous advocacy against the need for order and decorum in the proceedings. *See In re McConnell*, 370 U.S. 230, 236 (1962).  Wherever that line lies, Klayman has crossed it more than once, and the district court did not abuse its discretion—and certainly did not come close to committing clear error—in taking account of Klayman's past behavior and denying him *pro hac vice* status.

3.    Attempts to Intimidate the District Court

29

Finally, the district court expressed concern that Klayman has shown disregard for district judges in the past by confronting them personally. The district court pointed to the Second Circuit's finding that Klayman had challenged U.S. District Judge Denny Chin's impartiality because he was Asian-American[8] and had been appointed by President Clinton. The court found the challenge to the judge's racial and ethnic heritage "extremely serious." *MacDraw*, 138 F.3d at 37. "Nor should one charge that a judge is not impartial," the court emphasized, "solely because an attorney is embroiled in a controversy with the administration that appointed the judge." *Id.* at 38. The Second Circuit found that these charges were "discourteous" and "degrading" to the court, "prejudicial to the administration of justice," and "insulting and smacked of intimidation." *Id.* at 37–38. The court "[did] not hesitate to hold that the suggestions regarding Judge Chin's impartiality violated the Code of Professional Responsibility." *Id.* at 38.

These lessons have not been learned. After the district court denied Klayman's *pro hac vice* petition, but before Bundy asked this court for mandamus relief, Bundy filed a *Bivens* suit against Chief Judge Gloria Navarro, President

---

[8] The Second Circuit noted that in proceedings in the Central District of California, "[d]isturbingly, Klayman . . . accused the district judge of being anti-Asian." *MacDraw*, 138 F.3d at 38 n.3 (citing *Baldwin Hardware*, 78 F.3d at 555, 562).

Barack Obama, U.S. Senator Harry Reid, and others, in their personal capacities, alleging a conspiracy to violate his civil rights. *See Bundy v. Obama*, No. 2:16-cv-1047-JCM-GWF (D. Nev. dismissed with prejudice Oct. 12, 2016).[9]  He dismissed the suit on October 12, 2016, only after we asked for briefing in this mandamus petition.  Reasonably, the district court found these two cases "similar[]."  As in the case involving Judge Chin, Klayman's participation in the suit against Chief Judge Navarro personally "smack[s] of intimidation" and retaliation.

C.    *The Dissent's Reasons for Granting the Writ of Mandamus*

The dissent offers two reasons for why Bundy's request for Klayman to be admitted *pro hac vice* outweigh the district court's concerns:  (1) "the complexity of the proceeding against [Bundy] and his controversial political views raise concerns about his ability to retain competent counsel," Dissenting Op. at 10, and (2) "denying Klayman admission raises troubling concerns about the fairness of Bundy's coming trial," *id.* at 13.  We do not think that either of these reasons withstands scrutiny.

---

[9] The suit was filed by attorney Hansen.  It does not list Klayman as counsel. In response to questions at oral argument about the suit, Klayman displayed knowledge of the content of the lawsuit and at first admitted to being a plaintiff before clarifying that he wasn't.  It is apparent that Klayman played some role in the preparation and filing of that suit.

First, there is nothing in the record about Bundy's efforts to secure competent counsel. The dissent declares that "only a fraction of the bar nationwide—*let alone in Nevada*—has the experience and resources necessary to give Bundy a vigorous defense." *Id.* at 10 (emphasis added). Additionally, the dissent claims that "[o]ut of that fraction of qualified practitioners, there is likely an even smaller proportion that would actually accept Bundy's representation. Bundy's anti-government views and high-profile status among those who oppose federal hegemony make the prospect of representing him daunting for many seasoned defense attorneys." *Id.* at 10–11.[10]

Nothing in the record remotely supports these statements. For example, we do not have an affidavit from anyone—Bundy, Klayman, Hansen, or anyone else—telling us of unsuccessful efforts to find counsel. The dissent can only state

---

[10] The dissent also focuses on the fact that the trial is scheduled for February, "a little over three months from now." Dissenting Op. at 6–7. That is not the district court's fault. Klayman filed his *pro hac vice* application in March; the district court denied it without prejudice nine days later. He filed a renewed application in April; the district court denied it without prejudice twelve days later. Bundy then waited three months before filing his petition for a writ of mandamus. Our Clerk's Office, after discussions with Bundy's counsel, held the petition until September and presented it to us in October. The six-month delay in seeking extraordinary relief from the district court's March and April Orders must be laid at the feet of Bundy and this court, not the district court.

If Bundy thinks he cannot be prepared for his February 2017 trial, he may ask the court to delay the trial. *See* 18 U.S.C. § 3161(h)(8)(B)(iv).

that since the district court's denial in March 2016, "Bundy *seems* to have failed at finding suitable replacement trial counsel." *Id.* at 11 (emphasis added). That is not evidence. And if even there were *some* evidence to suggest this, the district court could not have anticipated the problem. There is no clear error in the district court's orders.

Second, the dissent has questioned the fairness of the trial before it even begins: but for Klayman's "capable representation, there will be serious doubts about the fairness of the proceeding." *Id.* at 13. Again, with all due respect, there is nothing in the record but the dissent's speculation about "this risk of fundamental unfairness" in a forthcoming trial. *Id.* at 13–14. There is no abuse of discretion or clear error in the district court's order.

The dissent acknowledges that Klayman might have "been selective in his disclosures" to the district court and there might have been a "relevant omission" resulting in Klayman "com[ing] near the line." *Id.* at 14, 15. For the reasons we have described in some detail, *supra* at 20–31, Klayman engaged in selective disclosures, made relevant omissions, and crossed the line, but if even the dissent thinks Klayman came "near the line," that is not clear error justifying a writ of mandamus.

Finally, the dissent dismisses the rulings by Judges Keller and Chin because they were "issued 22 and 18 years ago" and may be "poor predictors of Klayman's likely behavior today." Dissenting Op. at 16–17. If Klayman had acted responsibly in the time since then, we might be inclined to agree with the dissent that conduct twenty-years in the past is outdated. But, as the district court properly advised us in her filing, Klayman has not changed. Judges have sanctioned, chastised, and rebuked Klayman repeatedly over the past twenty years: in 1997, 1999, 2001, 2003, 2009, 2011, and *twice* in 2015. As the Middle District of Florida observed last year: "[T]his approach to litigation is the norm and not the exception for [Klayman]." *City Pages*, 2015 WL 1546173, at *8 n.7. The Eleventh Circuit affirmed that judgment in 2016. 650 F. App'x 744.

## V.  CONCLUSION

Klayman has made misrepresentations and omissions to the district court regarding the ethics proceedings before the District of Columbia Bar; he has shown a pattern of disregard for local rules, ethics, and decorum; and he has demonstrated a lack of respect for the judicial process by suing the district judge personally. By any standard, the district court properly denied his petition to be admitted *pro hac vice*. Bundy is entitled to a fair trial, defended by competent, vigorous counsel of his choosing. But his right to such counsel does not extend to counsel from outside

the district who has made it a pattern or practice of impeding the ethical and orderly administration of justice.

    The writ of mandamus is **DENIED.**

FILED

OCT 28 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*In re Cliven D. Bundy*, No. 16-72275

**GOULD**, Circuit Judge, dissenting:

We confront in this case an unusual confluence of circumstances. A highly controversial criminal defendant is a few months away from an enormous trial effort in which he and eighteen other individuals are defendants. The defendant's chosen attorney has been denied admission pro hac vice to the district court, raising in my mind serious concerns about the defendant's ability to mount a vigorous defense and receive a fair trial. Despite the majority's expressed apprehensions about the chosen attorney's willingness to follow the rules of professional conduct and the orders of the district court, while recognizing the high standards for mandamus relief, I would hold that the writ should issue. My concerns about the defendant's ability to present a strong defense and receive a fundamentally fair trial are simply too great, leading to my dissent.

## I

On March 2, 2016, Cliven D. Bundy and eighteen others were indicted on various federal charges for their alleged involvement in a "massive armed assault" on federal officials near Bunkerville, Nevada nearly two years prior. The now-unsealed Superseding Indictment alleges that on April 12, 2014, Bundy led "hundreds of people, including gunmen armed with assault rifles" in a coordinated assault against the government officials.

The events that day grew out of a dispute between Bundy and the federal Bureau of Land Management.  According to the Superseding Indictment, for over 20 years Bundy, a rancher, had refused to obtain permits or pay the required fees for his cattle to graze on federal public lands.  As a result, since 1998 Bundy had been under a federal court order to remove his trespassing cattle.  He never complied with the order, and in 2013 federal officials received authorization to seize and remove Bundy's cattle from the land.  They began the process of seizure and removal on April 5, 2014.

While the removal process was ongoing, it is alleged that Bundy and his co-defendants used the internet and other means of interstate communication to recruit gunmen and "Followers" to travel to Nevada to help Bundy make a show of force against the federal government.  The defendants' online communications allegedly included requests for help from members of anti-government militia groups.  The content of the communications referred to the federal government as corrupt and to government officials as thieves.  Bundy was portrayed as a victim of government abuse whose sovereign rights had been violated.  Other statements alleged in the Superseding Indictment show that Bundy viewed himself as involved in a "range war" with federal officials.

By the morning of April 12, 2014, more than 400 people had allegedly

2

shown up to help Bundy, many of them allegedly armed with assault rifles or other weapons. Approaching from two different vantage points, Bundy and these Followers allegedly used firearms to threaten federal officers into giving up Bundy's cattle. The Government also claims that after getting his cattle back, Bundy organized his Followers into armed security patrols and checkpoints for the purpose of protecting his cattle against future government seizures.

## II

A writ of mandamus is an extraordinary writ used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Will v. United States*, 389 U.S. 90, 95 (1967) (internal quotation marks omitted). We have jurisdiction to grant such writs under 28 U.S.C. § 1651.

For a writ of mandamus to issue, the party seeking the writ must satisfy three requirements. First, the petitioner must have no other means of attaining the desired relief. *In re United States*, 791 F.3d 945, 954 (9th Cir. 2015). Second, the right to issuance of the writ must be "clear and indisputable." *Id.* (quotations omitted). Third, even if the first two prerequisites are met, we must be satisfied in the exercise of our discretion that the writ is appropriate under the circumstances. *Id.* at 955. In assessing whether the writ is appropriate, we examine five factors:

3

(1) whether the party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires; (2) whether the petitioner will be damaged or prejudiced in a way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems, or issues of law of first impression. *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654–55 (9th Cir. 1977). These factors should be viewed as guidelines, not requirements, and should be weighed together, as appropriate to the facts of the case. *DeGeorge v. U.S. Dist. Court.*, 219 F.3d 930, 934 (9th Cir. 2000). Typically, the absence of the third factor, clear error as a matter of law, will defeat the petition. *Id.*

In my view, both the first and second *Bauman* factors weigh solidly in favor of granting relief. We have previously recognized that parties denied pro hac vice admission are unable to obtain immediate relief through an appeal because the denial of admission is neither a final appealable order under 28 U.S.C. § 1291 nor an interlocutory order appealable under 28 U.S.C. § 1292. *See In re United States*, 791 F.3d at 958. Losing counsel of choice through a denial of pro hac vice admission also produces a harm that is not correctable on a later direct appeal. *Id.*

4

at 959.  I view the fourth *Bauman* factor as weighing against granting the writ.  As I discuss below, this case is unusual in that Bundy faces an imminent, massive and complex trial, as well as difficulties in retaining qualified counsel.  These circumstances make any error by the district court of a type not likely to be repeated often.  And I view the fifth factor as weighing slightly in favor of granting relief.  The central issue in this case—whether denying Klayman's admission significantly impairs Bundy's ability to present a strong defense—is vastly important, but is only an issue of first impression in the sense that the circumstances Bundy finds himself in are relatively atypical.  I more fully discuss these circumstances below.

The outcome of this case turns not on the first, second, fourth, or fifth *Bauman* factors, but on the third: whether the district court clearly erred in denying Klayman's pro hac vice application.  In assessing this factor, I maintain a keen awareness of the deference we give to the district court.  We grant mandamus petitions only sparingly, as writs of mandamus are an "extraordinary or drastic remedy."  *Calderon v. U.S. Dist. Court for Cent. Dist. of California*, 163 F.3d 530, 534 (9th Cir. 1998) (en banc) (internal quotation marks omitted), *abrogated on other grounds by Woodford v. Garceau*, 538 U.S. 202 (2003).  The task of looking for clear error is a manifestation of this deference: "clear error" requires a more

significant mistake than "mere error." In addition, a district court's decision to accept or deny a pro hac vice application is itself reviewed only for abuse of discretion. *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002). We do not find an abuse of discretion unless the district court committed legal error, or made a factual determination that was illogical, implausible, or without support in inferences that may be drawn from the record. *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

We face then a dose of double deference: we review the district court order under the abuse of discretion standard; and we grant mandamus relief in only exceptional circumstances, looking for evidence of clear error. *See In re United States*, 791 F.3d at 955. There are also pragmatic reasons for deferring to a district court decision denying pro hac vice admission. After all, it is the district court judge, not an appellate panel, that is on the front lines in the courtroom, dealing closely with lawyers and having to do so in a way that ensures the orderly administration of justice.

Yet, even in this highly deferential setting, there are limits on trial court discretion, and there are times when we should act.

## III

An overriding consideration, in my view, is that a little over three months

6

from now, Bundy is scheduled to go to trial on sixteen serious federal charges, and may do so without a lawyer of his choice; either without representation at all, or with a different lawyer, not of Bundy's first choice, who comes into the case so late that there should be concern that the quality of representation may be substantially impaired.  The charges against Bundy include conspiracy to commit an offense against the United States, 18 U.S.C. § 371, conspiracy to impede and injure a federal officer, *id.* § 372, assault on a federal officer, *id.* § 111 (a)(1) and (b), threatening a federal law enforcement officer, *id.* § 115(a)(1)(B), use and carry of a firearm in relation to a crime of violence, *id.* § 924(c), obstruction of the due administration of justice, *id.* § 1503, interference with interstate commerce by extortion, *id.* § 1951, and interstate travel in aid of extortion, *id.* § 1952.  If convicted on some or all of the charges, Bundy, who is 70 years old, could spend the rest of his life in prison.

The trial promises to be especially long and complex.  The Superseding Indictment alleges that Bundy led "hundreds of people" in "a massive armed assault."[1] Along with Bundy, the government seeks to prosecute 18 other

---

[1]     While I mention the subject matter of the allegations against Bundy because they are relevant to his ability to retain capable counsel, I express no view on the merits of the underlying case.  The merits of the criminal charges are not before us, and I have not reviewed any evidence relating to them.

7

individuals involved in that alleged assault, all in one proceeding. This enormous trial effort is the product of a longer-than-two-year investigation that involved government interviews with more than 150 witnesses. The Government ultimately expects to produce about 1.4 terabytes of digital discovery to the defendants. The litigation is sufficiently complicated that the district court designated the proceeding a complex case under the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(7)(B)(ii).

In addition to its size and complexity, the trial effort against Bundy and his cohorts is unusual in that Bundy's political views, hostile to the United States federal government, will likely be center-stage. The allegations in the indictment portray Bundy as being strongly opposed to the federal government and as considering himself involved in a "range war" with federal officials. The Government alleges that Bundy and his Followers communicated with members of anti-government militias, recruiting them to Bundy's cause. Bundy also allegedly made statements referring to the government's seizure as "abuse," and to government agents as "thieves," among other similar refrains. While Bundy's trial and any potential conviction will not, and must not, be based on politics, it is likely that the evidence at trial will put his controversial political views in the courtroom with him.

8

The unique circumstances surrounding Bundy's prosecution bring with them a likelihood of constitutional problems. Like any defendant, Bundy's Sixth Amendment "right to the counsel of his choice includes the right to have an out-of-state lawyer admitted *pro hac vice*." *Walters*, 309 F.3d at 592 (quotations omitted). While that right is not absolute, it may only be abridged to serve a "compelling purpose." *Id.* (quotations omitted). We have not specified the factors that a district court must consider in determining what satisfies a compelling purpose for pro hac vice denial. *In re United States*, 791 F.3d at 957. However, case law on pro hac vice admission indicates that we should evaluate the district court's exercise of discretion in part based on the particular needs of the party seeking representation.

*In re United States* is instructive. There, we held that a district court's general rule prohibiting the pro hac vice admission of Justice Department attorneys amounted to clear error. *Id.* at 958. In reaching that conclusion, we emphasized the special needs of the party before the court—the United States. *See id.* ("[A] district court should consider the unique position of the government as a litigant in determining whether to exercise its discretion." (internal quotation marks

9

omitted)).[2]  In *United States v. Ensign*, a case in which we ultimately affirmed the district court's pro hac vice denial, we likewise based our decision in part on the particular needs of the party—a criminal defendant who was already well into trial with different counsel at the time of the pro hac vice application.  491 F.3d 1109, 1115 (9th Cir. 2007).  That we would give considerable weight to the needs of the party makes sense: whether a purpose for denying pro hac vice admission is "compelling" depends both on the importance of the purpose and the effect of the denial.

Looking to Bundy's needs and circumstances, both the complexity of the proceeding against him and his controversial political views raise concerns about his ability to retain competent counsel in a timely fashion.  With so many defendants, documents, and potential witnesses in the case, only a fraction of the bar nationwide—let alone in Nevada—has the experience and resources necessary to give Bundy a vigorous defense.  Out of that fraction of qualified practitioners, there is likely an even smaller proportion that would accept Bundy's representation.  Bundy's anti-government views and high-profile status among

---

[2]        Though the United States was not a criminal defendant in *In re United States*, and so the Sixth Amendment did not apply, the case still supports considering the needs of the party when deciding on pro hac vice admission generally.

10

those who oppose federal hegemony make the prospect of representing him
daunting for many seasoned defense attorneys. It is unsurprising, then, that not
only has Bundy sought out-of-state counsel, but that he has found himself retaining
an attorney with a controversial reputation of his own. It may be the case here that
a controversial advocate is the best chance at a competent defense for a
controversial defendant.

This point is made stark by the fact that since Klayman's initial pro hac vice
denial on March 31, 2016, Bundy seems to have failed to find suitable replacement
trial counsel. This is so despite Bundy's impending trial date and Klayman's
second pro hac vice denial. Instead, Bundy is currently represented before the
district court by his local counsel, Nevada attorney Joel Hansen, who is by
Hansen's own admission unable to provide Bundy with an adequate defense.
Hansen is part of a small Nevada firm lacking the resources to try this massive
case. Moreover, Hansen has attempted to withdraw from Bundy's defense on the
ground that he suffers from a spine and neck injury. According to the
Government's representations at oral argument before us, Hansen's motion has
been granted on the condition that Hansen find replacement counsel. Shortly prior
to argument, Nevada attorney Bret O. Whipple filed a notice of appearance on
Bundy's behalf, but only for the limited purpose of filing certain pretrial motions.

11

Government counsel stated at argument that Whipple was currently in negotiations with Bundy over his representation.  After our oral argument on the mandamus petition, the Government advised us that Whipple entered another appearance on behalf of Bundy, this time "for the purpose of full representation throughout the duration of the trial."  But Klayman responded that despite this new language from Whipple, Bundy is still considering whether to hire Whipple and has not paid Whipple any retainer, and that regardless of the additional appearance of Whipple, Klayman's assistance is still needed by Bundy on the defense team.  At this point, I am not confident that Bundy presently has retained counsel adequate to represent him vigorously through trial.

Klayman appears ready and qualified to represent Bundy at trial.  He is a former federal prosecutor with experience litigating high-profile cases.  He has worked, in part during his time at Judicial Watch, in bringing lawsuits over significant public policies.  *See, e.g.*, *Klayman v. Obama*, 957 F. Supp. 2d 1 (D.D.C. 2013) (challenge to government telephone metadata collection), *vacated and remanded*, 800 F.3d 559 (D.C. Cir. 2015).  He has almost 40 years of legal experience and is a member in good standing of both the Florida and Washington, D.C. Bars.  Though not currently admitted before the district court, Klayman has been in contact with Bundy about this case since around the time of Bundy's

12

indictment. Klayman presumably faces a much shorter learning curve than other potential counsel, including, for example, Whipple.

Given Klayman's present familiarity with this case and the difficulties Bundy likely faces in retaining other capable counsel, denying Klayman admission raises troubling concerns about the fairness of Bundy's coming trial. The right to counsel clause of the Sixth Amendment "was designed to assure fairness in the adversary criminal process." *Wheat v. United States*, 486 U.S. 153, 158 (1988). In the typical choice of counsel case, concerns about fairness are present, but they do not predominate, because missing out on the defendant's preferred lawyer does not mean missing out on qualified counsel altogether; the normal assumption is that the defendant will be able to retain some other qualified attorney. *See id.* at 159. But because of Bundy's practical and predictable problems finding capable representation in the time remaining before trial, the denial of his chosen counsel risks leaving him without fully qualified counsel. The powerful concerns about fundamental fairness that animated landmark right-to-counsel (not merely choice-of-counsel) cases like *Powell v. Alabama*, 287 U.S. 45 (1932), and *Gideon v. Wainwright*, 372 U.S. 335 (1963), carry particular weight here. If Klayman's denial of admission results in Bundy going to trial without capable representation, there will be doubts about the fairness of the proceeding. This risk of fundamental

13

unfairness supports concluding that the district court acted outside the range of its permissible discretion.

I recognize that the ethical concerns of the majority and the district court, particularly their concern whether Klayman has been candid and forthcoming in his representations seeking pro hac vice admission, have some weight. Klayman properly disclosed the ongoing disciplinary proceeding in his initial application for pro hac vice admission, saying that the proceeding had not yet been resolved. This disclosure was accurate. But then, after the district court discovered his Petition for Negotiated Disposition, he may have come near the line of lack of candor in explaining it away. He stated that the disposition never went into effect because he "later thought the better of having signed the affidavit . . . since he feels strongly that he acted ethically at all times." Yet, what had happened was a D.C. Board on Professional Responsibility Hearing Committee had rejected the disposition as too lenient for the bar's tastes.[3]

---

[3] This bar committee rejection for undue leniency does not indicate how the merits of the proceeding will come out. The decision rejecting the negotiated disposition said that it did not consider certain "potential mitigation" factors that would be considered in determining whether any ultimate violation was "justified." These potential mitigation factors included that Klayman might not have actually had a conflict in two of the three representations, that he represented two of the individuals because he believed that "they would have no other recourse in their lawsuits," and that the representations were all performed *pro bono*. Moreover, a

(continued...)

At oral argument before us, Klayman explained his view of the difference by saying that after the rejection, he at first continued to negotiate with counsel for the D.C. Bar, but then decided to withdraw from those negotiations. While this shows that Klayman was not lying in his initial explanation, he still seems to have been, at the least, selective in his disclosures to the district court. I agree with Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C. And if his disclosures were selective, still he is an advocate, an advocate representing defendant Cliven Bundy, and after submitting a compliant response to the questions in the pro hac vice application, he had no greater duty to disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests. Yet, for him to tell the district court that it was wrong about the negotiated discipline being in effect and to not also tell the court why the disposition lacked effect—its rejection by the bar committee—may have been a relevant omission.

_____

[3](...continued)
statement of a bar committee in this context is not, in my view, of controlling weight because it is not a final determination of ethical violations. Instead, the committee's views remain subject to other information it could consider, and the whole matter remains subject to review by the federal Court of Appeals for the D.C. Circuit if a final resolution by the bar association was reached that Klayman appealed.

15

The other concerns raised by the district court in its briefing in this court and its two orders denying Klayman admission, in my view, carry less weight. First, the allegations underlying the D.C. proceeding are unproven, and we cannot know what their resolution will be. The district court held this uncertainty against Klayman, stating in its two orders denying his admission that Klayman would need to show that the proceeding was resolved in his favor before the court would admit him. This approach is contrary to the our legal tradition's instinct to presume innocence until finding guilt. Of course, the D.C. proceeding involves attorney discipline and not criminal prosecution, but fundamental principles still have weight—at least in terms of evaluating the district court's exercise of discretion. At this time, Klayman is still a member of the D.C. Bar, and has not been disciplined by its Board on Professional Responsibility. Moreover, Klayman has submitted a letter from Professor Ronald Rotunda, an expert on legal ethics, expressing the opinion that Klayman's actions at issue were ethical. This is all the more reason not uncritically to credit unproven bar allegations.

The district court and the majority also point to the two instances of federal judges banning Klayman from their courtrooms. While serious punishments, these orders were issued 22 and 18 years ago. Two decades—half of Klayman's career—is enough time for the incidents to be relatively poor predictors of

16

Klayman's likely behavior today. The district court, as well as the New York state court that denied Klayman pro hac vice admission, noted that other judges, even recently, have in their written orders expressed irritation or disapproval of Klayman's actions. It may be that Klayman is not an attorney whom all district court judges would favor making an appearance in their courtroom. It seems he has been, and may continue to be, a thorn in the side. Still, concerns about trial judge irritation pale in comparison to a criminal defendant's need for robust defense. In providing a full and fair defense to every criminal defendant, there will by necessity be occasions when the difficult nature of the case evokes sharply confrontational lawyering. In tough cases with skilled prosecutors, aggressive positions by defense lawyers are sometimes an unavoidable part of strong advocacy, and contribute to making the proceeding an ultimately fair one for the defendant.

I do not dismiss lightly the district court's ethical concerns regarding Klayman, especially the issue of candor. The district court had good grounds to be worried about Klayman appearing before it. But the need to provide a vigorous defense for Bundy is a superordinate concern. Bundy faces a very complex trial on serious criminal charges and a potential lack of qualified representation. If convicted, he may spend the rest of his life in prison. We cannot evaluate ethical

17

concerns without considering this context. The district court did not fully consider this bigger picture, and did not ensure that Bundy's need for a vigorous defense was given due weight. In my view, these circumstances should be controlling in our assessment of whether the district court's decision to deny Klayman pro hac vice admission was an abuse of discretion and clear error.

I also do not suggest that district courts generally must blink over ethical concerns. At least two other circuits have held that the only thing a district court may consider in pro hac vice admission is whether the out-of-state attorney is guilty of conduct so unethical as to justify disbarment. *See In re Evans*, 524 F.2d 1004, 1007 (5th Cir. 1975); *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). Our circuit, by contrast, permits denial of pro hac vice admission based on a broader standard—one that grants district courts leeway to consider the facts pertinent to the particular case. *See In re United States*, 791 F.3d at 956 ("We need not announce specific factors that should inform a district court's exercise of its discretion to deny pro hac vice admission."). In holding the view that the district court abused its discretion and clearly erred here, I need not suggest that our circuit's law should be disregarded and should conform with that of the Fifth and Eleventh Circuits. I can agree with the principle reaffirmed in *In re United States* that in appropriate cases, ethical concerns not meriting disbarment

18

may be sufficient to justify pro hac vice denial. 791 F.3d at 956. But the matter before us is not such an appropriate case. Concerns about Bundy receiving a proper defense to ensure a fair criminal trial in my view should be considered controlling by our panel.

I also emphasize that district courts have available to them many tools short of denying admission that allow them to keep unruly lawyers in check. Through the power of sanctions, and in extreme cases even contempt proceedings, district courts can expect to be able to control a lawyer who is considered by the court to be recalcitrant, tricky, or deceptive, subject to the normal legal standards governing sanctions. At oral argument, Klayman advised us that he would follow all orders issued by the district court regarding the orderly administration of justice, and that he would abide by any other orders of the district court. I accept his representation and expect that if he were admitted and then deviated from it, the district court would be well-equipped through its sanction power to take corrective action.[4]

I acknowledge that we grant mandamus relief sparingly, particularly in cases challenging the denial of pro hac vice admission. Yet given the number of serious

---

[4]     The Government made clear at oral argument that it does not challenge Klayman's representation, does not urge that Klayman not be admitted, and generally suggests that Bundy is entitled to a vigorous defense.

19

charges Bundy faces, the complexity of his trial, his likely difficulty in finding other qualified counsel, and Klayman's own qualifications, I conclude that the district court's concerns over Klayman's practice history and candor are outweighed by Bundy's need for adequate representation in this important and complex case. Based on the unusual facts of this case and the considerations that I have voiced, I would hold that the district court abused its discretion, resulting in clear error. If, as the majority holds, our circuit's law on abuse of discretion and clear error for mandamus relief requires its conclusion to deny the mandamus petition, then in my view that law stands as a barrier to justice and should be altered. In an unusual case such as this, involving a massive federal prosecution of many persons and allegations that their sentiments and alleged criminal conduct were sharply opposed to our federal government, it is particularly important to ensure that target defendants are able to be represented and defended vigorously. There is doubtless some merit to the bright-line views of the Fifth and Eleventh Circuits that a counsel of choice should not be eliminated through the pro hac vice admission process absent an ethical violation that could merit disbarment. But even accepting our circuit's broader view that ethical problems short of those may be pertinent to a district court's decision on whether a lawyer should be admitted pro hac vice, there are nonetheless limits on a district court's exercise of discretion,

20

and I think they are transgressed here.

To give a metaphorical example, we would not need a finely-tuned judicial scale to determine that a district court abused its discretion if it found that a mouse outweighed an elephant. That would be an abuse of discretion, and clear error. And here, even if the purported ethical flaws marshaled by the majority and the district court are beyond "mouse" proportions, they are still relatively small in this special context, where the elephant is Bundy's general entitlement to the counsel of his choice and to a vigorous defense at trial. In my view, concerns about whether at this stage Bundy will have adequate and vigorous representation, absent Klayman, outweigh the ethical concerns that have been expressed by the district court and the majority.

I respectfully dissent.

Not logged in  Talk  Contributions  Create account  Log in

Article  Talk

Read  Edit  View history

Search Wikipedia  Go

# Bundy standoff

From Wikipedia, the free encyclopedia

Coordinates : 🌐 36°43′00″N 114°14′19″W

*For the 2016 standoff in Harney County, Oregon, see* Occupation of the Malheur National Wildlife Refuge.

The **Bundy standoff** was an armed confrontation between protesters and law enforcement that developed from a 20-year legal dispute between the United States Bureau of Land Management (BLM) and cattle rancher Cliven Bundy, over unpaid grazing fees on federally owned land in southeastern Nevada.

The ongoing dispute started in 1993, when, in protest against changes to grazing rules, Bundy declined to renew his permit for cattle grazing on BLM-administered lands near Bunkerville, Nevada. According to the BLM, Bundy continued to graze his cattle on public lands without a permit. In 1998, Bundy was prohibited by the United States District Court for the District of Nevada from grazing his cattle on an area of land later called the Bunkerville Allotment. In July 2013, the BLM complaint was supplemented when federal judge Lloyd D. George ordered that Bundy refrain from trespassing on federally administered land in the Gold Butte area of Clark County.

On March 27, 2014, 145,604 acres of federal land in Clark County were temporarily closed for the "capture, impound, and removal of trespass cattle". BLM officials and law enforcement rangers began a roundup of such livestock on April 5, and an arrest was made the next day. On April 12, 2014, a group of protesters, some of them armed,

| Bundy standoff | |
|---|---|
| **Date** | • Legal process: 1993 – present [1]<br>• Confrontation: April 5, 2014 – May 2014 |
| **Location** | Bunkerville , Clark County , Nevada , United States<br>🌐 36°43′00″N 114°14′19″W |
| **Causes** | • Protest over Bureau of Land Management roundup of trespass cattle pursuant to court order<br>• Unpaid cattle grazing fees on public domain lands |
| **Goals** | • BLM seeks to round up and remove from the range trespass cattle owned by Bundy<br>• ATF to oversee operations<br>• Cliven Bundy seeks to prevent roundup of cattle and have his claim of grazing rights recognized |
| **Result** | • The BLM suspends the roundup of trespassing cattle<br>• Protesters disperse<br>• Incident defused<br>• Cliven Bundy and 18 others indicted for federal felonies |

| Parties to the civil conflict | |
|---|---|
| • 🇺🇸 United States<br>   • 🏛 Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)<br>   • 🏛 Bureau of Land Management (BLM)<br>   • 🏛 Federal Bureau of Investigation (FBI)<br>   • 🏛 Governor of | • 🏴 3 Percenters<br>• 🏴 Constitutional Sheriffs and Peace Officers Association (CSPOA)<br>• 🏴 Oath Keepers<br>• 🏴 Praetorian Guard<br>• 🏴 White Mountain Militia<br>• Various unarmed protesters |

only in Bundy v. USDC-NVDC No. 16-72251
archived on October 31, 2016

Main page
Contents
Featured content
Current events
Random article
Donate to Wikipedia
Wikipedia store

Interaction

Help
About Wikipedia
Community portal
Recent changes
Contact page

Tools

What links here
Related changes
Upload file
Special pages
Permanent link
Page information
Wikidata item
Cite this page

Print/export

Create a book
Download as PDF
Printable version

Languages

Français

Edit links

advanced on what the BLM described as a "cattle gather." Sheriff Doug Gillespie negotiated with Bundy and newly confirmed BLM director Neil Kornze, who elected to release the cattle and de-escalate the situation. As of the end of 2015, Cliven Bundy continued to graze his cattle on Federal land and had not paid the fees.

Bundy was at first praised by Republican politicians and conservative personalities. Later, after Bundy suggested that "the Negro" would have been better off to be a slave than to be a recipient of government subsidies, he was widely condemned, and was repudiated by conservative politicians and talk-show hosts who had previously supported him. Many condemned his remarks as racist.

On February 10, 2016, Cliven Bundy traveled to Portland, Oregon, in response to federal law enforcement moving to end a standoff led by his sons Ammon and Ryan at the Malheur National Wildlife Refuge. He was arrested at the airport by the FBI, and was incarcerated at the Multnomah County Jail. He was indicted for 16 federal felonies on February 17, along with Ammon and Ryan Bundy, militia leader Ryan Payne and broadcaster Peter Santilli, who were already under arrest for their role in the Malheur standoff. Another 14 individuals were charged on March 3, 2016. Their trials are scheduled for 2017.

### Contents [hide]

1 Background
2 *United States v. Bundy*
3 Court judgments against Bundy's claims
4 Bureau of Land Management actions
5 Confrontations and protests in April 2014
6 Events following April 2014 cattle gather
7 Aftermath
8 Criminal charges against standoff participants
9 See also
10 Notes

Nevada
- Lieutenant Governor of Nevada
- Las Vegas Metropolitan Police Department (LVMPD)
- Nevada Highway Patrol (NHP)

**Lead figures**

- Brian Sandoval (Governor)
- Brian Krolicki (former Lieutenant Governor)
- Mark Hutchison (current Lieutenant Governor and former state senator)
- Douglas C. Gillespie (former Clark County Sheriff)
- Joseph Lombardo (former Clark County Under Sheriff and current Clark County Sheriff)
- Kevin C. McMahill (current Clark County Under Sheriff)

- Chuck Baldwin
- Ammon Bundy
- Cliven Bundy
- Cliven Lance Bundy
- Ryan Bundy
- Brian Cavalier
- Blaine Cooper
- Richard Mack
- Gordon Martines
- Ryan Payne
- Stewart Rhodes
- Jon Ritzheimer
- Pete Santilli
- David Lory VanDerBeek
- Neil Wampler



Approximate location of Bunkerville

- ◉ Show map of Nevada
- ○ Show map of the US
- ○ Show all

11 References

12 External links

## Background [edit]

> *See also: Cliven Bundy*

### History [edit]



Map of all federally owned land in the United States. The area in yellow represents land managed by the Bureau of Land Management

The land to which Cliven Bundy claims ancestral rights was originally inhabited by the Moapa Paiute people.[2] In 1848, as part of the Treaty of Guadalupe Hidalgo, the United States purchased from Mexico land that is now the southwestern region of the United States. Since then, the government has continuously owned land in what is now Nevada, including the Bunkerville Allotment.[3][4] The Nevada Territory, which was partitioned in 1861 from the Utah Territory, became a state in 1864. The original settlers in the 1840s and 1850s were Mormons from Utah and southern small-time farmers and ranchers from Louisiana, Arkansas, and Mississippi. After the end of the American Civil War, much of the land was settled by rural farmers, squatters and small-time cattle ranchers from Oklahoma, Texas, Arkansas, Louisiana, Missouri and Kansas, escaping from the post-Civil War Reconstruction and the associated violence and displacement.[citation needed] Since 1934 federal rangelands in Nevada have been managed principally by either the Bureau of Land Management or its predecessor, the United States Grazing Service, or the United States Forest Service. As of 2010, 47.8 million acres[5] (more than two-thirds of Nevada's 70.3 million acres) were managed by the BLM. Throughout the nation, the BLM manages nearly 18,000 grazing permits and leases,[6] of which about 700 are in Nevada.[7] The season of use and the details of forage are stipulated in permits and leases; thus federal control can be exerted on the land used for grazing.[6]

### Permits [edit]

Under Bureau of Land Management permits that had first been issued in 1954, Bundy grazed his cattle legally and paid his grazing fees on the Bunkerville Allotment until 1993. In that year, as a protest, Bundy did not pay renewal fees. His permit was canceled in 1994.[8][9] Although the agency made several attempts to have Bundy renew the permit, the rancher declared that he no longer recognized the BLM's authority to regulate his grazing, and he asserted that he had "vested rights" to graze cattle on the land.[3] Federal courts consistently ruled against Bundy, concluding that he was a trespasser with no right to graze on federal land. The courts authorized the BLM to remove Bundy's cattle and to levy damages for unauthorized use.[3][10]

Bundy accumulated more than $1 million of unpaid grazing fees and court-ordered fines.[11][12] The Portland *Oregonian* newspaper reported in May 2014 that the amount that Bundy owed stood in "stark contrast" to the situation in Oregon, where just 45 of the state's roughly 1,100

grazing permit holders collectively owed $18,759 in past-due payments to the BLM, and only 2 ranchers having left their bills unpaid more than 60 days.[13] Excluding Bundy's unpaid fees, the total of all late grazing fees owed nationwide to the BLM was only $237,000.[14]

## Bundy's worldview   [edit]

Bundy has said he does not recognize federal police power over land that he believes belongs to the "sovereign state of Nevada".[15][16] He also denied the jurisdiction of the federal court system over Nevada land and he filed an unsuccessful motion to dismiss the Bureau of Land Management case against him, claiming that the federal courts have no jurisdiction because he is a "citizen of Nevada, not the territory of Nevada".[16] Bundy also claimed that federally owned land in Nevada actually belongs to the state.[17][18] According to *The Guardian,* Bundy told his supporters



Cliven Bundy in 2014

that "We definitely don't recognize [the BLM director's] jurisdiction or authority, his arresting power or policing power in any way," and in interviews he used the language of the sovereign citizen movement, thereby gaining the support of members of the Oath Keepers, the White Mountain Militia and the Praetorian Guard militias.[19] The movement is considered by the FBI as the nation's top domestic terrorism threat.[20][21]

J. J. MacNab, who writes for *Forbes* about anti-government extremism, described Bundy's views as inspired by the sovereign citizen movement, whose adherents believe that the county sheriff is the most powerful law-enforcement officer in the country, with authority superior to that of any federal agent, local law-enforcement agency or any other elected official.[22] On April 12, 2014, Bundy "ordered" Clark County Sheriff Doug Gillespie to confront the federal agents, disarm them and deliver their arms to Bundy within an hour of his demand, and later expressed disappointment that Gillespie did not comply.[22][23][24]

The Southern Poverty Law Center has described Bundy's views as closely aligned with those of the Posse Comitatus organization, and it has also asserted that such self-described "patriot" groups were focused on secession, nullification, state sovereignty and the principles of the Tenther movement.[25][26]

In May 2014, Bundy changed his political affiliation from the Republican party to the Independent American Party.[27]

## Cancellation of 1996 cattle removal   [edit]

Alan O'Neill, superintendent of the Lake Mead National Recreation Area from 1987 through 2000, is a retired National Park Service official whose tenure at Lake Mead included the early years of the Bundy dispute.[28] He wrote that he was "told to back off at one point because of concern for violence."[28] In 1996, the National Park Service made plans to remove cattle that were illegally trespassing in Lake Mead NRA.[29] O'Neill recalls veiled threats similar to those made against government workers during the 2014 round-up.[29] Against this background, he says, "the U.S. attorney's office told us to back off," and the operation was canceled.[29]

### Grazing on federal rangeland in Nevada [edit]

*Main article: Grazing rights in Nevada*

The Taylor Grazing Act of 1934 (TGA) regulates grazing on public lands (excluding Alaska) to improve rangeland conditions. The Bureau of Land Management (BLM) managing about 167 million acres (676,000 km²) of publicly owned rangeland in the United States, with the United States Forest Service managing approximately 95 million acres (380,000 km²) more.[30] Permittees on federal rangelands are required to pay a fee, and the permit cannot exceed ten years but is renewable.[31]

## *United States v. Bundy* [edit]

The case of *United States v. Bundy* played out over many years in the United States District Court for the District of Nevada. It involved court orders, injunctions, and notices. Bundy argued *pro se* (without a lawyer) that the land belongs to the state. The Bureau of Land Management was represented by the U.S. Attorney's Office for Nevada and the United States Department of Justice.[12] District Judge Larry R. Hicks ruled that the land on which Bundy was grazing his cattle was indeed owned by the federal government, that Bundy had not been paying to use it as he should have been, that Bundy was trespassing, and that the government had the right to enforce the injunctions against trespass. Hicks found that Bundy had repeatedly violated court orders.[12][32]

### 1998–2012: Legal actions [edit]

*United States v. Bundy* "arose out of Bundy's unauthorized grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM and the National Park Service."[32] On November 3, 1998, United States District Judge Johnnie B. Rawlinson "permanently enjoined (Bundy) from grazing his livestock within the Bunkerville Allotment ("The Allotment"), and shall remove his livestock from this allotment on or before November 30, 1998... (and) ordered that Plaintiff shall be entitled to trespass damages from Bundy in the amount of $200.00 per day per head for any livestock belonging to Bundy remaining on the



**United States v Bundy**

United States District Court for the District of Nevada

| | |
|---|---|
| **Full case name** | *UNITED STATES OF AMERICA, Plaintiff, v. CLIVEN BUNDY, Defendant.* |
| **Date decided** | July 9, 2013 and October 8, 2013 |
| **Transcripts** | • May 2012 -Complaint<br>• June 2012 - Answer by Defendant<br>• Dec 2012 - Plaintiff's Motion for Summary Judgment<br>• January 2013 - Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion to Dismiss<br>• February 2013 - Plaintiff's Reply in Further Support of its Summary Judgment Motion and in Opposition to Defendant's Cross-Motion to Dismiss<br>• February 2013 - Defendant's Reply in Further Support of His Cross-Motion to Dismiss; Evidentiary Hearing Requested<br>• February 2013 - Plaintiff's |

cited in Bunkerville USBCr No. 186/verits archived on October 31, 2016

Bunkerville Allotment after November 30, 1998."[3] Rawlinson wrote that "[t]he government has shown commendable restraint in allowing this trespass to continue for so long without impounding Bundy's livestock."[3] This sentence was restated on October 8, 2013, by District Judge Larry R. Hicks.[32] On September 17, 1999, after Bundy failed to comply with the court's earlier order(s), the court issued another order directing Bundy to comply with the 1998 permanent injunction and modifying the trespass damages owed.[12][32][33]

## 2012–15: Legal actions [edit]

Bundy's cattle expanded into additional public land over the years. A planned April 2012 roundup of his cattle was called off when Bundy made violent threats against the Bureau of Land Management. The bureau's requests for assistance from the Clark County Sheriff's Department were met by a demand of Sheriff Doug Gillespie that the bureau seek a new warrant because, he said, the original 1998 order had become "stale."[34]

Because of Gillespie's demand, in May 2012 the government filed a second *United States v. Bundy* case,[a] seeking renewed enforcement authority for the original court orders along with relief for Bundy's trespassing on a new set of additional lands not covered by the original 1998 ruling: "including public lands within the Gold Butte area that are administered by the BLM, and National Park System land within the Overton Arm and Gold Butte areas of the Lake Mead National Recreation Area."[35] On December 21, 2012, the United States moved for summary judgment in this new case, and this motion was granted in an order signed by Senior District Judge Lloyd D. George on July 9, 2013.[35] The ruling permanently enjoined Bundy and his cattle from trespassing on the New Trespass Lands.[35] Another order was issued by Judge Larry R. Hicks on October 8, 2013, which stemmed from the earlier 1998 civil action against Bundy. The order allows the United States to "protect the ... Bunkerville Allotment against ... trespass" by Bundy and "to seize and remove to impound" any of his cattle that remain in those areas.[32]

## Court judgments against Bundy's claims [edit]

The Cliven Bundy family owns a 160-acre farm southwest of Bunkerville, which serves as headquarters and base property for the family's ranching operation on nearby public domain lands. The farm property was purchased by the Bundy family in 1948, after they moved from Bundyville, Arizona, and Bundy has claimed that he inherited "pre-emptive grazing rights" on public domain land because some of his maternal grandmother's ancestors had kept cattle in the Virgin Valley beginning in 1877.[12][36] Bundy alternatively argued in legal cases that federal

- Opposition to Defendant's Request for Evidentiary Hearing
- February 2013 - Defendant's Reply in Further Support of Request for Evidentiary Hearing
- July 2013 - Court Order Granting Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion to Dismiss as Moot
- Oct 2013 Court Order

| | |
|---|---|
| **Judge sitting** | 1. Lloyd D. George<br>2. Larry R. Hicks |
| **Prosecutor(s)** | 1. Ignacia S. Moreno<br>2. Daniel G. Bogden |
| **Defendant(s)** | Cliven Bundy, *pro se* |
| **Case history** | |
| **Prior actions** | 1998, order by the same court |
| **Case holding** | |

Bundy is permanently enjoined from trespass, Bundy shall remove livestock within 45 days, The United States is entitled to seize and impound cattle.

grazing rules infringe on Nevada's rights.[12]

### Claim of inherited grazing rights   [edit]

There are no legally recognized inherited grazing rights, preemptive rights, special rights, or grandfathered public-domain land-use rights held by the Bundy family or Bundy's ancestors.[37] Bundy lost his special-rights arguments in the *United States v. Bundy* cases.[3] Bundy had only base property and normal AUM grazing-allotment permits, like the permits of thousands of other ranchers throughout the western United States. The court found that Bundy and his father actually first began grazing their cattle on the Bunkerville Allotment in 1954 and used it for several years. They paid for cattle grazing again from 1973 until 1993, when Bundy paid the last fees for his final grazing application for the period from December 1, 1992, through February 28, 1993. On January 24, 1994, the Bureau of Land Management delivered a *Proposed Decision Order to Remove and Demand for Payment* to Bundy by placing it on the dashboard of Bundy's vehicle while he was in the vehicle. BLM officials allege that Bundy became agitated, descended from his truck and accused the BLM of harassing him. He then returned to his truck, threw the proposed order out of the window and drove away. One of Bundy's sons then picked up the document, tore it to pieces and threw it on the ground. On February 17, 1994, the BLM issued a final decision canceling Bundy's range-grazing permit. Bundy subsequently informed the BLM in several administrative notices that he intended to graze cattle "pursuant to my vested grazing rights." Bundy failed to demonstrate the existence of any such special rights when given an opportunity to do so in court.[3]

### Claim of states' rights   [edit]

Bundy lost in U.S. District Court on all his arguments regarding states' rights and jurisdiction in the *United States v. Bundy* cases. He had argued that the U.S. District Court for Nevada lacked jurisdiction because the U.S. did not own the public lands in question. The court ruled that "the public lands in Nevada are the property of the United States because the United States has held title to those public lands since 1848, when Mexico ceded the land to the United States." Bundy had argued that the Disclaimer Clause of the Nevada Constitution carries no legal force.[3]

Bundy also argued that the United States' exercise of ownership over public-domain lands violated the Equal Footing Doctrine, that Article Four of the United States Constitution (the Property Clause) applied only to federal lands outside the borders of states, that the government had based its authority to sanction him on the Endangered Species Act (as opposed to an action for trespass) and that Nevada's open-range statute excused Bundy's trespass. These arguments were rejected by the court.[3]

## Bureau of Land Management actions   [edit]

The BLM was tasked with environmental assessment[38] and various enforcement issues regarding the cattle-trespass injunctions. During March and April 2014, it closed some areas of government lands during the planning for roundup of the trespass cattle owned by Bundy. In early April, "just before the roundup got

BLM Trespass Cattle Closure Map
Apr 11, 2014

underway, a survey conducted by helicopter counted 908 head of cattle scattered across roughly 1,200 square miles of remote mountains and desert managed by the Bureau of Land Management and the National Park Service."[39] The BLM stated on its website:[10]

> Cattle have been in trespass on public lands in southern Nevada for more than two decades. This is unfair to the thousands of other ranchers who graze livestock in compliance with federal laws and regulations throughout the West. The Bureau of Land Management and the National Park Service have made repeated attempts to resolve this matter administratively and judicially. An impoundment of cattle illegally grazing on public lands is now being conducted as a last resort.

A page on the BLM website, since removed, listed the impacts of Bundy's trespass cattle. Among these were risks to people driving on roadways, destruction of crops on private property, damage to community property in the city of Mesquite, negative impacts on city facilities in Bunkerville, destruction of archaeological artifacts and unauthorized reservoir construction.[40] The regional off-site mitigation strategies of non-governmental organizations were also delayed for the Dry Lake Solar Energy Zone,[41] and a matching $400,000 grant from the Walton Family Foundation to restore habitat for the southwest willow flycatcher along the Virgin River was delayed on the condition that Bundy remove the trespass cattle.[42]

## BLM preparations and execution  [edit]

A closure of the public lands known as Gold Butte, Mormon Mesa, and Bunkerville Flats Areas was approved by the Department of the Interior on March 24, 2014 and was to be effective March 27 to May 12, 2014. Additionally, the *Federal Register* stated that: "This temporary closure is necessary to limit public access, use, and occupancy during an impoundment of illegally grazing cattle to ensure the safety and welfare of the public, contractors, and government employees."[43]

The project area consisted of 802,571 acres, primarily composed of the Bunkerville Allotment (145,604 acres) and the New Trespass Lands (451,775 acres). Portions of the project area are

managed under the Bureau of Land Management, the Bureau of Reclamation, and the National Park Service.[38]:3 Not all of the public areas would be closed at the same time if operations were moved to another location.[43]

No 30-day comment period or public scoping was conducted due to the confidential nature of law enforcement actions.[38]:5

**Involvement of state and local authorities; attempts to negotiate**  [edit]

Before the round-up, the Bureau of Land Management contacted state and local authorities.[2] The bureau advised Nevada Governor Brian Sandoval and Nevada Attorney General Catherine Cortez Masto of the agency's proposed actions.[2] Clark County sheriff Doug Gillespie relayed information from the BLM and helped negotiate an end to the standoff.[44] In 2012 and again during the 2014 roundup, the BLM had reportedly offered to buy Bundy's cattle and give him proceeds from their eventual sale. According to Cliven Bundy's son, Ammon Bundy, Gillespie also delivered an offer for the bureau to leave the area and keep the cattle.[2]

**First Amendment zones**  [edit]

The Bureau of Land Management designated two First Amendment zones "...for members of the public to express their First Amendment rights: Interstate 15 and Exit 112 for Riverside and State Route 170 and White Rock Road"[45][46] with just one of the two First Amendment zones open at any one time at the daily discretion of the "Incident Command staff". A third area, Interstate 15 and Toquap Wash (between mile marker 114 and 115),[47] was designated as a media area and "...BLM/NPS credentialed media..." could request tours by appointment inside the enclosure area to obtain b-roll video, no live feed and satellite trucks allowed.[38]:10[43]

**Roundup yield**  [edit]

Government contractors using horses and a small helicopter succeeded in penning almost 400 trespass cattle from April 5 to 9, 2014. "According to state brand inspectors, almost 90 percent of the cattle rounded up by midweek bore Bundy's brand. Of the remaining animals, five belonged to a neighboring rancher, four were marked with brands that couldn't be read, and the rest were *slicks*, a ranching term for unmarked livestock."[39] Six animals died, four were euthanized. One, a bull "posed a significant threat," while another ran into a fence, injuring its spine. The circumstances for the other two were not explained.[48] A state brand inspector said the bull "might have got frightened, but that's no reason to shoot a bull." Another said that bulls sometimes charge at people, adding that it takes "a pretty good-size weapon" to kill Bundy's breed of bull.[49]

After the roundup was suspended because of safety concerns, BLM spokesman Craig Leff said the agency would try to resolve the matter "administratively and judicially." Leff said: "The door isn't closed. We'll figure out how to move forward with this." He added: "The BLM and National Park Service did not cut any deal and negotiate anything."[50]

## Confrontations and protests in April 2014  [edit]

In late March, Bundy sent letters entitled "Range War Emergency Notice and Demand for Protection" to county, state, and federal officials.[51] In media interviews, Bundy used the

cited in Bundy v. USDC-NVL, No. 16-72275 as cited on October 21, 2016

language of the sovereign citizen movement as a rallying call, beckoning support from members of the Oath Keepers, the White Mountain Militia, and the Praetorian Guard.[52]

At a March 27 meeting of the Bunkerville Town Advisory Board, Cliven Bundy's son, Ryan Bundy, spoke on state sovereignty and land-ownership matters: "This is an issue of state sovereignty ... These large tracts of land that Bureau of Land Management, Forest Service, monuments, parks and, you know, National Parks, et cetera, et cetera, there is no constitutionality to them at all."[53][54][55] He also described his family's position:

> If they are going to be out in the hills stealing our property, we will put measures of defense. And they have always asked us, "What will you do, what will you do?" and our stance has always been we will do whatever it takes. Open-ended. And because of that, that's why they are scared, because they don't know to what level we will go to protect, but we will protect.[53][55]

In early April, armed people and private militia members from across the United States joined peaceful protesters against the trespass-cattle roundup in what has become known as the Battle of Bunkerville (evoking an association with the Battle of Bunker Hill).[12][56] BLM enforcement agents were dispatched in response to what were seen as threatening statements by Bundy, such as calling the events a "range war".[57]

With many roads closed to ensure safety during the cattle removal, controversial designated First Amendment zones where protesters could safely congregate or exercise their First Amendment right to peaceably assemble were marked with signs and orange plastic fences adjacent to the road.[58][59] On April 8, 2014, Nevada Governor Brian Sandoval issued a statement calling for the removal of the First Amendment restrictions he described as offensive.[60] After stating that peaceful protests had crossed into illegal activity, the federal agencies allowed protesters to go anywhere on the public land as long as they were peaceful.[61]

## April 10 confrontations and protests [edit]

On April 10, protesters blocked a BLM truck and demanded to know why a backhoe and dump truck were being used in the operation.[12] The BLM's director in Nevada later said that the equipment was being used for field restoration.[12] According to a statement from the BLM, the blocked truck "was struck by a protester on an ATV (all-terrain vehicle).[12] Officers protecting the truck driver had Tasers and police dogs. The protesters angrily confronted the rangers. According to CNN, "Federal officials say a police dog was kicked and officers were assaulted. Bundy family members say they were thrown to the ground or jolted with a Taser."[12][62]

## April 12 confrontations and suspension of roundup [edit]

On the morning of April 12, an armed crowd rallied under a banner that read "Liberty Freedom For God We Stand". Most had signs, many of which chided "government thugs". Addressing the protesters, Bundy said, "We definitely don't recognize [the BLM director's] jurisdiction or authority, his arresting power or policing power in any way" and "We're about ready to take the country over with force!" After the BLM announced a suspension of the roundup, Bundy

[52]

suggested blocking a highway.     Armed protesters blocked a portion of Interstate 15 for more than two hours, causing traffic backups for three miles in both directions.[63] Protesters also converged at the mouth of Gold Butte, the preserve where the cattle were corralled, and a tense, hour-long standoff ensued. BLM rangers warned over loudspeakers that they were prepared to use tear gas.[52] Former Arizona Sheriff Richard Mack, who was with the protesters, said that they were "strategizing to put all the women up at the front. If they are going to start shooting, it's going to be women that are going to be televised all across the world getting shot by these rogue federal officers".[9] Protestors with rifles took positions on a highway overpass, seemingly offering cover as horse-mounted wranglers led protesters to face off against heavily equipped BLM rangers and snipers.[52] Utah Lt. Gov. Spencer Cox, who officially traveled to the Bundy standoff to convey that Utah did not want the cattle, put the number of federal agents present at over 200.[64] According to Las Vegas assistant sheriff Joe Lombardo, there were 24 BLM rangers and Las Vegas deputy sheriffs present at the standoff.[65] Las Vegas police were not allowed to wear protective gear because of fear that it would be seen as a provocation.[66] Clark County Sheriff Gillespie blames the escalation of the situation on the BLM, stating to the *Las Vegas Review-Journal* that the BLM has lied to him about having a place to take the cattle and the BLM did not attend town-hall meetings and disregarded his advice as County Sheriff.[67]

The *Las Vegas Review-Journal* reported that tensions reached a "critical level" during the standoff, "with rifles pointing toward each side."[68][69] Las Vegas station KLAS-TV also reported that guns were pointed at officers.[66] Assistant Sheriff Lombardo recounted that "they were in my face yelling profanities and pointing weapons," and said, "We were outgunned, outmanned, and there would not have been a good result from it."[66]

A photojournalist for Reuters wrote that armed supporters had "taken up tactical positions on government officers," and that one man pointing a rifle in the direction of BLM employees said, "I've got a clear shot at four of them."[70] Another man said, "I'm ready to pull the trigger if fired upon."[70]

Las Vegas Metro Deputy Chief Tom Roberts defused the situation by announcing that Bundy's cattle would be returned within 30 minutes.[52] The BLM announced that it would suspend the mass roundup,[1][71] citing safety reasons. Clark County Sheriff Gillespie mediated the agreement between the Bundy family and the BLM, saying, "[W]hen a group of protesters threaten civil unrest or violence in this county -- it is my job to step in and ensure the safety of citizens."[63] BLM Director Neil Kornze said that "Based on information about conditions on the ground, and in consultation with law enforcement, we have made a decision to conclude the cattle gather because of our serious concern about the safety of employees and members of the public."[68][69][72][73]

BLM spokesman Craig Leff stated on April 14 in an email that "The gather is over" but that the agency planned to seek a solution "administratively and judicially" and intended to pursue court action to collect more than $1 million in back grazing fees owed by Bundy.[74]

Las Vegas police stated that business owners in Mesquite had received threats because of the conflict.[68][69] Militiamen were reportedly seen carrying rifles, keeping a round-the-clock security detail on Bundy, and setting up checkpoints.[75]

## Unmet demands to disarm federal agents and destroy entrance stations

Used in Bundy v. USDC-NVa 16-72275 and filed on October 31, 2016

[edit]

After the BLM announced that it would release the gathered cattle, Bundy demanded that the county sheriff disarm the National Park Service "at Lake Mead and Red Rock park and all other parks where the federal government claims they have jurisdiction over."[76] He requested that the arms be delivered within one hour.[76] Bundy further demanded that county bulldozers or loaders be used to "tear down that entrance places where they ticket us and where they injure us and make us citizens pay their fees."[77] The demands, which he described as a "mandate from we the people",[78] were not met.

Bundy made similar statements two days later when he appeared on Glenn Beck's radio show[78] and the Fox News program *Hannity*.[79] He reiterated the demands on Sean Hannity's program: "The demand on the sheriff was de-arm the Park Service rangers, and de-arm Red Rock rangers — that's two parks very close to the Lake Mead area. And then the demand was, tear down the toll booth shacks."[80] After expressing disappointment that the demands had not been met, he requested to "every county sheriff across the United States" that they "disarm the federal bureaucrats."[79][81]

Bundy is reported to have described these demands as "a revelation that I received."[82] According to *Esquire,* Bundy told a crowd, "The good Lord said, 'Bundy, it's not your job, it's their job.' ... This morning, I said a prayer, and this is what I received. I heard a voice say, 'Sheriff Gillespie, your work is not done. Every sheriff across the United States, take the guns away from the United States bureaucrats."[82]

## Events following April 2014 cattle gather  [edit]

### BLM attempts to communicate with Bundy  [edit]

After the roundup was suspended, Cliven Bundy received several certified letters from the BLM that he refused to open.[83][84] A BLM spokesperson said that the letters included notices that "provide Mr. Bundy the opportunity to buy back the gathered cattle." The spokesperson did not explain why the agency had sent Bundy notices regarding cattle that had been released to him.[85]

### Cliven Bundy statements and actions  [edit]

Bundy alleged that the federal government wants to kill him for challenging its authority.[83] During a press conference, he made controversial racial statements that were widely repudiated.[11]

On May 2, 2014, Bundy and his family filed a complaint with the Las Vegas Metropolitan Police Department alleging crimes committed by federal agents, including illegally blocking roads, harassing photographers, using attack dogs, pointing weapons and threatening people.[86][87]

During a June 3, 2014, radio program Cliven Bundy spoke with a small group of candidates for Clark County sheriff. He did not endorse any candidate, but he said that he did not want a peacemaker in that position. "You gonna be a peacemaker," said Bundy, "you're gonna be on the BLM's side."[88]

cited in Bundy v. USDC-NVLV, 273275 archived on October 31, 2016

## Continued presence of Bundy supporters [edit]

At a "Patriot Party" after the standoff, supporters were treated to music from Ron Keel, a singer who worked with Black Sabbath for a short while in 1984.[89]

In late April, Nevada Congressman Steven Horsford contacted Clark County sheriff Doug Gillespie regarding complaints from community members. The reported complaints alleged that Bundy militia supporters had established a persistent presence along roads, that they had set up checkpoints for citizens to prove residence, and that they had established an armed presence around churches, a school, and other community locations.[90][91] One local resident said that neighbors on their way to an Easter Sunday church service were greeted by armed militia members, causing some of them not to enter "for fear and disgust of having their church basically held captive."[2] According to the Associated Press, Cliven Bundy acknowledged "creating a stir", saying that there may have been weapons in the parking lot, but there were none in the church.[92]

Las Vegas station KLAS-TV reported that armed protestors had blocked a county road and attempted to prevent a news crew from passing.[93] The station also reported that "some poured lighter fluid around our news vehicle while others got physical."[94] Bundy says that armed guards screen visitors at his ranch, but says that militia have not set up checkpoints on public property.[92]

Mike Vanderboegh, a militia leader who remained in Nevada after the standoff, accused Senator Harry Reid of provoking a "civil war" and said not to "poke the wolverine with a sharp stick, Harry, unless you want your balls ripped off."[95] Vanderboegh is the author of a novel that allegedly inspired a domestic terror plot[96][97] and the leader of the Three Percenters Group,[96] which the Anti-Defamation League characterizes as "part of an anti-government extremist movement".[98]

Media outlets reported on conflict between different factions of Bundy supporters.[99] A "wild, paranoid rumor" that Attorney General Eric Holder was preparing a drone strike against them caused Oath Keepers founder Stewart Rhodes to remove his men from the supposed "kill zone".[99][100] In a recorded video, other Bundy supporters talked openly of shooting Rhodes for what they viewed as "desertion" and "cowardice".[99][100] Rhodes later described one situation as "this close from being a gunfight".[101] He recounted another situation in which he said a man drew a gun on a member of another militia.[101]

*Esquire* has described an assortment of fringe beliefs held by individual Bundy supporters who remained at the ranch: That Barack Obama is "a Muslim Kenyan", that the BLM works for the United Nations, that people born in or after 1980 may be implanted with microchips, and that bar-certified lawyers have sworn allegiance to Britain and regularly have sex with clients.[82]

Militia members have attempted to crowdfund their continued stay at the Bundy ranch. The site GoFundMe took down campaigns by Blaine Cooper and Christopher E. Ferrell.[102] According to Nevada representative Steven Horsford, only about 15 armed militia remained as of early June.[88]

## FBI and U.S. Capitol Police investigations [edit]

On May 8, Clark County sheriff's officials said that they were interviewed by the FBI as part of an

investigation into armed Bundy supporters who confronted federal officers during the standoff.[103] The investigation was confirmed by Clark County Sheriff Doug Gillespie, who stated "I've said all along there has to be accountability for what took place on April 12."[104]

Joe Lombardo, who was in charge of police officers at the scene and who was interviewed on May 1, said the FBI agents were primarily interested in who was pointing weapons at federal agents, and that he expected the FBI to be poring over videotapes and photos taken during the standoff in order to identify people making threats.[65]

After Senator Harry Reid criticized Bundy supporters, *Politico* reported that sources said the Senator had been the subject of threats and consequently had increased his security detail. A spokesman for the US Capitol Police, without commenting on the nature of any threats against Harry Reid, said, "We are currently looking into threatening statements made against Sen. Reid as part of an ongoing investigation."[105]

## 2014 Las Vegas shootings  [edit]

Main article: *2014 Las Vegas shootings*

On June 8, 2014, Jerad and Amanda Miller killed two Las Vegas police officers and a civilian before Amanda Miller took her life. Jerad Miller was fatally wounded and died during a shootout with police.[106] During the attacks, they shouted "this is a revolution", and they covered the bodies of the officers in a Gadsden flag and left a copy of a manifesto bearing a swastika.[107][108] Their original plan may have been to take over a courthouse and execute public officials.[109] The Millers had moved from Indiana to the Las Vegas area in January.[107][110] They were quoted on Reno television KRNV: "I feel sorry for any federal agents that want to come here and try to push around or anything like that. I really don't want violence toward them but if they're gonna come and bring violence to us, well, if that's the language they want to speak, we'll learn it."[110] Miller commented on the issues involved in greater length in social media, and interviewed other protesters at the Bundy ranch.[111][112]

Interior Secretary Sally Jewell reacted to the shootings, saying, "It's very important to bring lawbreakers to justice. There's no question that my colleagues back here, the governors of Western states, do not want people riding roughshod over the landscape ... [Bundy] put our people in grave danger by calling in armed civilians from around the country, and that's not okay." Carol Bundy said, "I have not seen or heard anything from the militia and others who have came to our ranch that would, in any way, make me think they had an intent to kill or harm anyone."[113] Bundy's son said that the couple had been asked to leave the ranch after a few days because they were "very radical" and did not align themselves with the protest's main issues.[107] According to Mark Potok, a spokesperson for the Southern Poverty Law Center, Jerad and Amanda Miller considered the outcome of the standoff as "a huge victory against the federal government", which reportedly motivated them to commit the shooting spree.[114]

## 2016 Burns, Oregon standoff  [edit]

Main articles: *Occupation of the Malheur National Wildlife Refuge* and *Citizens for Constitutional Freedom*

In January 2016, armed men led by Ammon and Ryan Bundy seized control of the headquarters of the Malheur National Wildlife Refuge near Burns, Oregon. The occupation ended 40 days

later on February 11, when the final occupier willingly went into custody.[115] On his way to Burns to rally support, Cliven Bundy was arrested at Portland International Airport on February 10.[116]

# Aftermath [edit]

## Reactions by public officials [edit]

### Senators [edit]

Republican Senator Dean Heller of Nevada complained of federal actions during the standoff, saying, "I told him [BLM Director Neil Kornze] very clearly that law-abiding Nevadans must not be penalized by an over-reaching BLM".[57] Heller said of the Bundy supporters, "These people are patriots." Heller made that statement during the same television interview in which Senator Harry Reid described the Bundy supporters as "domestic terrorists." [117] After the resolution he stated, "emotions and tensions are still near the boiling point."[63] Later on he said that Bundy should pay the BLM the more than $1 million in grazing fees owed to the agency.[118]

After the BLM left the area for safety concerns, Nevada's senior U.S. Senator and then Senate Majority Leader Harry Reid said, "Well, it's not over. We can't have an American people that violate the law and then just walk away from it. So it's not over."[119] Reid also referred to the militia supporting Bundy as "domestic terrorists".[120][121]

### Congressional representatives [edit]

Republican Representative Chris Stewart (R-Utah) decried the BLM and other agencies for staffing their departments with what he called "paramilitary units" and "SWAT team[s]". However, the Bureau of Land Management does not have a SWAT team, according to The Salt Lake Tribune, which editorialized that Stewart's views "may be one of the worst ideas in the history of bad ideas."[122] In response, a BLM agency's spokeswoman said that the BLM doesn't have any SWAT or tactical teams. An Interior Department representative said that the BLM "had law enforcement personnel present to provide safety for their employees and the public".[123]

On April 19, 2014, Texas Republican Steve Stockman sent a letter to President Barack Obama, Department of the Interior Secretary Sally Jewell, and BLM Director Neil Kornze, stating that the BLM was overreaching its law enforcement authority with what he called a "paramilitary raid."[124][unreliable source?]

In a July 20, 2014 Washington Post column titled Nevada: Burned by the Rants of Hotheads, Representative Steven Horsford (D-Nevada) described recent incidents of violence in his district and nearby states, and criticized the "nonstop attention and demagoguery from media and politicians alike," saying: "There can be reasonable disagreements about the Bundy Ranch. But we can disagree without offering refuge to dangerous individuals on the fringe."[125]

### Nevada governor and state lawmakers [edit]

Governor Brian Sandoval sided with Bundy, saying, "No cow justifies the atmosphere of intimidation which currently exists nor the limitation of constitutional rights that are sacred to all Nevadans. The BLM needs to reconsider its approach to this matter and act accordingly."[57]

Nevada Assemblywoman Michele Fiore, who supported Bundy, aiding him with his returned calves, said, "It's time for Nevada to stand up to the federal government and demand the return of the BLM lands to the people of Nevada."[74]

**Arizona state lawmakers**  [edit]

On April 15, 2014, a group of Republican state legislators from Arizona, including Representatives Bob Thorpe (R-Flagstaff), David Livingston (R-Peoria), Kelly Townsend (R-Mesa), Senators Judy Burges (R-Sun City West), and Kelli Ward (R-Lake Havasu City) traveled to Mesquite, Nevada, to support Bundy in his standoff with the BLM.[126][127]

Arizona Representative Kelly Townsend said that the scenes at the ranch amid the dispute gave her a "visceral reaction... It sounds dramatic, but it reminded me of Tiananmen Square. I don't recognize my country at this point." Her colleague, Bob Thorpe of Flagstaff, said that he was one of about three dozen state legislators who had sent a letter about the standoff to Nevada and federal officials.[128]

## Reactions from media   [edit]

Media personalities have weighed in on the confrontations. During the standoff, Bundy was interviewed (via remote link) by television host Sean Hannity. Hannity stated that some fear events could wind up mirroring the Waco siege and Ruby Ridge and said, "This is public land, and it's not being used, in my mind, and I'm not a rancher, (but) I would think the federal government might be thankful because you're cutting the lawn for free, and they're charging huge amounts of money, right, to let your cattle graze there with these fees".[129] In contrast, a comparison of BLM grazing fees with private land market prices demonstrated the Bundy's are getting a 93% discount by grazing on BLM land.[130]

Editorial responses from newspapers have been mixed. The Las Vegas Review-Journal wrote that the BLM was right to defuse the situation, but that the confrontation showed the problems of federal land ownership in the state and called for the federal government to sell off the land in question.[131] The Las Vegas Sun wrote that "Bundy hit a trifecta of sorts: He violated the laws Congress made, ignored the judicial branch's orders, and defied the executive branch's efforts to enforce those laws and orders ... In the end, Bundy isn't the victor; anarchy is. The rule of law, and society as a whole, lost."[132] The Casper Star-Tribune wrote that Bundy was cheating taxpayers, an "embarrassment to ranchers in Wyoming and across the West who work hard, pay their taxes and maintain good relationships with managers of federal land on which their cattle graze."[133]

In response to Bundy supporter Mike Vanderboegh's comment, "Don't poke the wolverine with a sharp stick, Harry [Reid], unless you want your balls ripped off," a writer for The Nation framed the remark as part of a larger, right-wing obsession with castration.[96] Gawker lampooned militia crowdfunding attempts as a "welfare drive" to "sit around doing nothing".[134]

## Reactions by Bundy and supporters   [edit]

About 1,500 Bundy supporters attended a celebration on April 18, where they ate Bundy beef, read cowboy poetry, and wore "domestic terrorist" name tags,[11] referencing a comment made by Nevada Senator Harry Reid.[120] Bundy said he would continue holding a daily news

Received in Bundy v. SDC-NV, 16-72275, carried on the bar 31, 2016

conference.[11]

Some protesters termed the standoff as the Battle of Bunkerville,[135] although there was actually no armed battle.

Some Tea Party Movement supporters expressed solidarity with the Bundys, including three Southern Nevada Tea Party groups that organized a protest outside Las Vegas police headquarters on April 11, 2014, claiming that Sheriff Doug Gillespie had failed in his duty to protect Nevadans from abuse by the federal government.[136]

The Bundy family claimed victory on having its cattle returned.[137] In an interview after the BLM's withdrawal, Sean Hannity asked Bundy if he had a reply to Senator Harry Reid's comment that the situation was not over. Bundy said, "I don't have a response for Harry Reid, but I have a response for every county sheriff across the United States. Disarm the federal bureaucrats."[119][138]

An Oklahoma militia with members present in Nevada stated their support for Cliven Bundy.[139] Scott Shaw, a co-founder of the Oklahoma Volunteer Militia, said the militia was prepared to use deadly force, but that its members would not fire unless fired upon.[140] When an interviewer asked about a situation in which the government might use rubber bullets, which are designed to incapacitate and not kill,[141] Shaw responded, "How are we supposed to know that they're firing rubber bullets when it has been fired?"[140] During an appearance on *The O'Reilly Factor*, host Bill O'Reilly asked Shaw what made Cliven Bundy different from Occupy Wall Street supporters. Shaw replied that Cliven Bundy is "providing the country with beef" and that the two groups have different methods of dissent.[142]

In Texas, Michael Joseph Kearns, a convicted felon with alleged ties to the sovereign citizen movement who describes himself as a "self-taught paralegal", filed a motion seeking to overturn a 2013 ruling allowing the BLM to seize Bundy's cattle.[143] After the judge ruled that Kearns had no standing, Kearns filed another motion.[143] He wrote that the judge's "orders, judgments and mandates, have no rightful or lawful force and effect upon the people of the United States." Describing Kearns as an "abusive filer", the judge directed the federal clerk to return, "without docketing," any future documents Kearns tries to file.[143] Kearns, who has denied that he is part of the sovereign citizen movement,[143] was convicted in 1996 of one count conspiracy to defraud the United States and seven counts of aiding and abetting mail fraud.[144] Kearns was released from federal prison on May 3, 2006.[145]

## Legal and rule-of-law reactions   [edit]

*Atlantic* reporter Matt Ford pointed out that Bundy's claim, "I abide by all of Nevada state laws. But I don't recognize the United States government as even existing," is at odds with Nevada's law, specifically the state's constitution. Framed during the Civil War, Nevada's constitution specifically mentions the rights of the federal government, stating in Article 1, Section 2, "The Paramount Allegiance of every citizen is due to the Federal Government in the exercise of all its Constitutional powers as the same have been or may be defined by the Supreme Court of the United States...whensoever any portion of the States, or people thereof attempt to secede from the Federal Union, or forcibly resist the Execution of its laws, the Federal Government may, by warrant of the Constitution, employ armed force in compelling obedience to its Authority."[146]

USDCAN 16-72275 archived on October 31, 2076 used in Bundy v. obama

The Salt Lake City *Tribune* published an editorial on April 15 entitled "Bundy is a lawbreaker, not a hero", in which it said, "Don't let him get away with it" and "The only winner in this was a scofflaw who has twice lost in the courts for running cattle where they don't belong and skipping out on grazing fees. Some 20,000 ranchers in Western states abide by BLM regulations, so what makes Bundy special?" To sum it up, the *Tribune* said, "When some manage to avoid justice by extralegal means, the rule of law is weakened for all Americans."[147]

Some of Bundy's neighbors were not impressed by his actions.[9] "I feel that the rule of law supersedes armed militias coming in from all over the country to stand with a law-breaking rancher, which is what he is", Mesquite resident Elaine Hurd told local television station KLAS.[9][50]

Roger Taylor, a retired BLM district manager in Arizona, said the agency's decision to release the cattle would have repercussions. "The (agency) is going to be in a worse situation where they will have a much more difficult time getting those cattle off the land and getting Bundy in compliance with regulations," he said.[148]

Dallas Hyland, in his column in Utah's *St. George News*, wrote, "The stand-down was necessary to prevent bloodshed, but it must be recognized that if Bundy and a multitude of his supporters, militia friends, and even family members who broke the law, are allowed to go unpunished, anarchy will follow.[149][150] In the case of Bundy and the Gold Butte designations, the government did it right. They continued to do it right in the face of the lawless behavior of a rancher and his militia henchmen."[149]

## Reactions related to American Indian history [edit]

*Indian Country Today Media Network* wrote that government treatment of Cliven Bundy "stands in stark contrast to what was done to the Dann sisters and other Indigenous Peoples on Shoshone territory"[151] and that "United Nations Committee on the Elimination of Racial Discrimination found "credible information alleging that the Western Shoshone indigenous people are being denied their traditional rights to land."[152] An editorial in the *Las Vegas Review-Journal* also contrasted Bundy's dispute with that of the Dann Sisters.[153]

A Las Vegas news outlet reported that the Moapa band of Paiute Indians had provided them with a map indicating that a federal treaty had promised them the land on which the Bundy ranch is situated."[154]

## Political commentary reactions [edit]

David Damore, a political science professor at the University of Nevada, Las Vegas, said that there is "a great ability on the part of these folks to overlook the reality of how much the federal government subsidized Nevada in terms of big projects – the Hoover Dam, the mining subsidies. It's a welfare cowboy mindset."[52]

Brad Knickerbocker of the *Christian Science Monitor* saw the events as echoing the Sagebrush Rebellion, a 1970s movement to transfer control of public domain lands to the states.[155][156]

## Environmentalist reactions [edit]

The nonprofit Center for Biological Diversity stated, "Despite having no legal right to do so, cattle

cited in Gray v. Uber, No. 16-72510 (9th Cir.) archived on October 31, 2016

from Bundy's ranch have continued to graze throughout the Gold Butte area, competing with tortoises for food, hindering the ability of plants to recover from extensive wildfires, trampling rare plants, damaging ancient American Indian cultural sites and threatening the safety of recreationists."[10]

Rob Mrowka, also with the Center for Biological Diversity, said that the BLM "is allowing a freeloading rancher and armed thugs to seize hundreds of thousands of acres of the people's land as their own. It's backing down in the face of threats and posturing of armed sovereignists."[74]

Environmentalists held that the BLM's withdrawal sent the wrong message to law-abiding ranchers who do secure grazing permits and operate within the law.[74]

### Aftermath from Bureau of Land Management  [edit]

Twenty months after the incident, Bundy had not paid the fees and continued to graze cattle on Federal land.[157][158] A spokesperson for the Bureau of Land Management wrote in response to a reporter's inquiry: "Our primary goal remains to resolve this matter safely and according to the rule of the law." The response added "The Bureau of Land Management remains resolute in addressing issues involved in efforts to gather Mr. Bundy's cattle and we are pursuing the matter through the legal system."[158] The BLM spokesperson also said "The Department of Justice has the lead on any investigation of federal crimes that may have been committed." The US Attorney's Office in Las Vegas would neither confirm or deny that there was a criminal investigation.[159]

## Criminal charges against standoff participants  [edit]

Cliven Bundy was arrested in Portland, Oregon on February 10, 2016. On February 17, Bundy, his sons Ammon and Ryan, the Montana militia leader Ryan Payne and the Ohio-based independent broadcaster Peter Santilli were all indicted for 16 federal felonies. A further 14 individuals were charged on March 3, 2016. Those under indictment as of March 3, 2016,[160] are:

- Ammon Bundy, 40, of Emmett, Idaho
- Cliven Bundy, 69, of Bunkerville, Nevada
- David Bundy, 39, of Delta, Utah
- Melvin Bundy, 41, of Round Mountain, Nevada
- Ryan Bundy, 43, of Bunkerville, Nevada
- Gregory Burleson, 52, of Phoenix, Arizona
- Brian Cavalier, 44, of Bunkerville, Nevada
- Blaine Cooper, 36, of Dewey-Humboldt, Arizona
- Gerald DeLemus, 61, of Rochester, New Hampshire
- Scott Drexler, 44, of Challis, Idaho
- Todd Engel, 48, of Boundary County, Idaho
- Richard Lovelien, 52, of Westville, Oklahoma
- Micah McGuire, 31, of Chandler, Arizona
- Joseph O'Shaughnessy, 43, of Cottonwood, Arizona

cited in Bundy v. USDOI et al, No. 16-72275 archived on October 3rd, 2016

- Eric Parker, 32, of Hailey, Idaho
- Ryan Payne, 32, of Anaconda, Montana
- Peter Santilli, 50, of Cincinnati, Ohio
- Steven Stewart, 36, of Hailey, Idaho
- Jason Woods, 30, of Chandler, Arizona

They have all been charged with the following federal felonies:

- Conspiracy to commit an offense against the United States – maximum penalty 5 years' imprisonment, $250,000 fine
- Conspiracy to impede and injure a federal law enforcement officer – 6 years, $250,000 fine
- Assault on a federal law enforcement officer – 20 years, $250,000 fine
- Threatening a federal law enforcement officer – 10 years, $250,000 fine
- Use and carry of a firearm in relation to a crime of violence – 5 years minimum, life sentence maximum, and consecutive
- Obstruction of the due administration of justice - 10 years, $250,000 fine
- Interference with interstate commerce by extortion - 20 years, $250,000 fine
- Interstate travel in aid of extortion – 20 years, $250,000 fine

Their trials have been postponed from May 2, 2016 to February 6, 2017.[161]



US District Court of Nevada indictment against Gerald A. DeLemus and others

# See also   [edit]

- Occupation of the Malheur National Wildlife Refuge
- Bureau of Land Management
- Grazing rights
- Militia organizations in the United States
- Recapture Canyon
- Sagebrush Rebellion
- Tenther movement

# Notes   [edit]

a. ^ Case No. 2:12-cv-0804-LDG-GWF

# References   [edit]

1. ^ *a b* Knapp, George; Lauren Rozyla.  "BREAKING NEWS: BLM ends roundup of Bundy cattle"  . KLAS-TV Las Vegas. Retrieved April 12, 2014 .
   *a b c d e*

2. ^ Ralston, Jon (April 28, 2014). "The Not-So-Jolly Rancher: How federal officials botched the Bundy cattle roundup". *Politico*. Archived from the original on May 16, 2014. Retrieved May 16, 2014. "Bundy's family bought property there after World War II, and that the Moapa Paiute Indians actually were there first ... By the beginning of this month, the BLM was ready to make its move, once again involving state and local authorities. In the run-up to what occurred on April 5, I have confirmed, Gov. Brian Sandoval and Attorney General Catherine Cortez Masto were kept apprised of the federal agency's actions."

3. ^ *a b c d e f g h i* *Decision and Order - United States v Bundy - 1998*. United States District Court for the District of Nevada. November 3, 1998. p. 5.

4. ^ Gray, Tom. "Teaching With Documents: The Treaty of Guadalupe Hidalgo". National Archives and Records Administration. Retrieved April 24, 2014.

5. ^ Ross W. Gorte; Carol Hardy Vincent; Laura A. Hanson; Marc R. Rosenblum (February 8, 2012). "Federal Land Ownership: Overview and Data" (PDF). *Table 2. Federal Acreage in Each State Administered by the Four Federal Land Management Agencies and the Department of Defense, 2010.* Congressional Research Service. Retrieved April 28, 2014 .

6. ^ *a b* "Fact Sheet on the BLM's Management of Livestock Grazing". United States Department of the Interior Bureau of Land Management. March 28, 2014 . Retrieved April 24, 2014 .

7. ^ "Public Land Statistics 2012" (PDF). United States Department of the Interior Bureau of Land Management. June 2013. Retrieved May 17, 2014 .

8. ^ ROGERS, KEITH (April 20, 2014). "Environmentalists: Bunkerville rancher Bundy is freeloading". LAS VEGAS REVIEW-JOURNAL. Retrieved March 29, 2015 . "1993 - The BLM modifies Bundy's grazing permit by reducing the size allowed for his herd to 150 and restricts where his cattle can graze in the Gold Butte area. He refuses the permit and stops paying grazing fees. The BLM cancels his permit."

9. ^ *a b c d* Fuller, Jaime (April 15, 2014). "Everything you need to know about the long fight between Cliven Bundy and the federal government". *The Washington Post*. Retrieved April 15, 2014 .

10. ^ *a b c* Glionna, John. "BLM seizes cattle in range war with stubborn Nevada rancher". *Los Angeles Times*. Retrieved April 12, 2014 .

11. ^ *a b c d* Nagourney, Adam (April 23, 2014). "A Defiant Rancher Savors the Audience That Rallied to His Side". *The New York Times*. Retrieved April 24, 2014 .

12. ^ *a b c d e f g h i j k* Martinez, Michael (April 10, 2014). "Showdown on the range: Nevada rancher, feds face off over cattle grazing rights". CNN . Retrieved April 10, 2014 .

13. ^ Zaitz, Les (May 12, 2014). "Rancher Cliven Bundy's grazing debt has no equal among Oregon cattlemen". *The Oregonian*. Archived from the original on May 13, 2014 . Retrieved May 13, 2014 . "Past-due bills owed by cattlemen for grazing on Oregon's federal lands aren't enough to cover the price of a new pick-up truck. The Bureau of Land Management said that as of late April 2014, 45 cattlemen owed a collective $18,759. And most of that is barely past due, with just two ranchers leaving their bills unpaid 60 days or more, considered a truly delinquent account in private business ... Jeff Clark, BLM public affairs officer in Portland, said the agency has 1,100 permit holders."

14. ^ Morgan, Whitaker (June 6, 2014). "Bundy owes the government more than all other ranchers combined". MSNBC . Retrieved June 7, 2014 . "Nevada rancher Cliven Bundy owes more money to the federal government for outstanding grazing fees than all other ranchers combined, according to the Bureau of Land Management. While Bundy owes more than a $1 million to the BLM, the total sum of all other late grazing fees totals a comparatively small $237,000, according to BLM data first reported by E&E News."

15. ^ Strasser, Max. "For Militiamen, the Fight for Cliven Bundy's Ranch Is Far From Over". *Newsweek*. Retrieved April 27, 2014 .

16. ^ *a b* "A rancher's armed battle against the US government is standard libertarian fare". *The Guardian*. Retrieved April 27, 2014 .

cited in RWV, USDC/NVL, No: 7E872275 archived on October 31, 2016

17. ^ "Nevada rancher Cliven Bundy: "The citizens of America" got my cattle back". CBS / Associated Press. April 27, 2014. Retrieved April 27, 2014 .

18. ^ Bundy doesn't understand Constitution , Ian Bartrum, Las Vegas Review-Journal, April 27, 2014

19. ^ Henandez, Daniel (April 3, 2014). "Federal rangers face off against armed protesters in Nevada 'range war' ". *The Guardian.* Retrieved May 2, 2014 .

20. ^ "Examining the Sovereign Citizen Movement in the Obama Era". Politics & Policy . Retrieved May 2, 2014.

21. ^ "Sovereign Citizens: A Growing Domestic Threat to Law Enforcement". FBI. Retrieved May 2, 2014.

22. ^ *a b* MacNab, JJ. "Context Matters: The Cliven Bundy Standoff -- Part 3". *Forbes.* Retrieved May 6, 2014.

23. ^ "I-Team: Political cause growing in Bundy's dispute with BLM". KLAS-TV Las Vegas. Archived from the original on May 7, 2014. Retrieved May 6, 2014 .

24. ^ Kavanaugh, Shane Dixon (April 14, 2014). "American Militias Emboldened by Victory at Bundy Ranch". Vocativ . Retrieved April 29, 2014 .

25. ^ "Bundy saga reveals the risk of cozying up to extremists" . *The Washington Post.* Retrieved April 27, 2014 . "The SPLC puts "patriot" groups in a separate category from white supremacists and others organized around hate. The patriot groups make a constitutional argument to justify antipathy toward the federal government; this can be seen in the noise about secession, nullification, "state sovereignty" and the primacy of the 10th Amendment."

26. ^ "Antigovernment 'Patriots' Gather Near Scene of Nevada Rancher's Dispute Over Cattle Grazing Rights". SPL . Retrieved April 27, 2014 .

27. ^ "Cliven Bundy drops Republican affiliation". Associated Press. Retrieved May 27, 2014 .

28. ^ *a b* O'Neill, Alan (April 6, 2014). "Rancher in land dispute is a bully, not a hero". *Las Vegas Sun.* Archived from the original on April 15, 2014. Retrieved May 13, 2014 . "I served as superintendent of the Lake Mead National Recreation Area for the National Park Service from 1987 to 2000. In 1993, we reduced the number of cows that could be grazed on the Bunkerville allotment to 150 because of the emergency listing of the desert tortoise as an endangered species ... I was one of those public officials who were told to back off at one point because of concern for violence."

29. ^ *a b c* Brean, Henry (May 10, 2014). "BLM's next move against Bundy not a matter of if, but when, former officials say". *Las Vegas Review-Journal.* Archived from the original on May 13, 2015. Retrieved May 13, 2014 . "O'Neill has his own history with Clark County's most well-known rancher. In 1996, in the midst of O'Neill's 13-year stint as superintendent for Lake Mead National Recreation Area, the National Park Service made plans to remove cattle roaming illegally at the northern end of the park. He said the operation was called off at the last minute amid veiled threats similar to those made against government workers last month. 'We were ready to go. The U.S. attorney's office told us to back off. We backed off.'"

30. ^ "Rangelands/Grazing" . Bureau of Land Management . Retrieved April 15, 2014 .

31. ^ 43 *U.S. Code* §§ 315-316o (P.L. 73-482)

32. ^ *a b c d e* "United States v Bundy" (PDF). United States District Court for the District of Nevada. October 9, 2013.

33. ^ Knightly, Arnold M. (April 11, 2014). "Cliven Bundy supporters bring cattle roundup protest to Las Vegas police headquarters". *Las Vegas Review-Journal.*

34. ^ "Trespassing Cattle Set Stage for Federal Land Showdown" . KOLO.

35. ^ *a b c* "United States of America v. Bundy - Document 35 - Court Description: ORDER Granting 18 Motion for Summary Judgment. Denying as moot 28 Motion to Dismiss. Signed by Judge Lloyd D. George on 7/9/2013.". Justia. July 9, 2013.

cited in Bundy v. USC-NVL, No. 72275 archived on October 31, 2016

36. ^ Kanigher, Steve (April 22, 2014). "An abbreviated look at rancher Cliven Bundy's family history". Las Vegas: KLAS-TV. Retrieved April 23, 2014 .

37. ^ "Debunking false claims of Bundy's defenders" . Las Vegas Sun. April 27, 2014. Retrieved April 2014.

38. ^ *a b c d* Bureau of Land Management. "Environmental Assessment Temporary Land Closure Corrals a Cattle Impoundment" (PDF). Retrieved April 13, 2014 .

39. ^ *a b* Brean, Henry (April 11, 2014). "Good progress in cattle roundup to decelerate". *Las Vegas Review-Journal*. Retrieved April 13, 2014 .

40. ^ "Cattle Trespass Impacts" (PDF). Bureau of Land Management. Retrieved February 19, 2016 .

41. ^ "Dry Lake Solar Energy Zone (SEZ) Solar Regional Mitigation Planning Project". Bureau of Land Management. Retrieved April 24, 2014 .

42. ^ "Virgin River Program" . Bureau of Land Management . Retrieved April 24, 2014 .

43. ^ *a b c* Notice of Temporary Closure on Public Lands in the Gold Butte, Mormon Mesa, and Bunkerville Flats Areas in the Northeastern Portion of Clark County, NV, 79 FR 17178 (March 27, 2014).

44. ^ Dobner, Jennifer (April 14, 2014). "Rancher's son says force was necessary to stop cattle seizure". Reuters. Archived from the original on April 15, 2014 . Retrieved May 16, 2014 . "The Clark County sheriff Doug Gillespie had delivered a bureau offer to leave, but keep the cows, and then helped negotiate the eventual end to the standoff, Bundy said."

45. ^ "N+114°14'03.6"W/@36.768903,-114.234328,13 *Free Speech A I–15 and Exit 112 for Riverside* (Map). Google Maps. Retrieved April 30, 2014 .

46. ^ *Free Speech B State Route 170 and White Rock Road* (Map). Google Maps. Retrieved April 30, 2014 .

47. ^ "N+114°11'18.6"W/@36.769903,-114.186806,13 *Media area I–15 and Toquap Wash* (Map). Google Maps. Retrieved April 30, 2014 .

48. ^ "BLM says cattle died in disputed roundup" . *Newspaper*. Las Vegas Sun. 22 April 2014. Retrie 18 February 2016 .

49. ^ Ben Botkin; Keith Rogers (April 17, 2014). "BLM: 2 bulls euthanized during Cliven Bundy cattle roundup". *Las Vegas Review-Journal*. Retrieved April 23, 2014 .

50. ^ *a b* CBS, News (April 14, 2014). "Nevada rancher standoff turns on a states' rights debate". CBS News. Retrieved April 15, 2014 .

51. ^ Donahue, Mike (March 24, 2014). "Bundy declares 'range war', BLM to impound embattled rancher's cattle". *Desert Valley Times*. Retrieved April 16, 2014 .

52. ^ *a b c d e f* Daniel Hernandez, Joseph Langdon and (April 13, 2014). "Federal rangers face off against armed protesters in Nevada range war". *The Guardian*. Retrieved April 14, 2014 .

53. ^ *a b* Weast, Burton (April 3, 2014). "Ryan Bundy tells BTAB his family will protect its cattle from seizure". *Mesquite Local News*. Retrieved May 21, 2014 . "'If they are going to be out stealing our property, we will protect our property,' he said. He also said that he heard the FBI was setting up in the Overton area, and that BLM was bringing in helicopters and trucks to remove the cattle. 'This is an issue of state sovereignty, the state owns the land not the federal government.'"

54. ^ "Bunkerville Town Advisory Board: Thursday, March 27, 2014, at 7 P.M." (PDF). Bunkerville Town Advisory Board. "Ryan Bundy stated they don't agree that the Federal Government controls the land the cattle are on, that should be State land. He said they have used the land since 1887, and they will resist any attempt by the BLM to take their cattle. Some Board members expressed concern that the land would remain closed after the cattle were removed"

55. ^ *a b* March 27, 2014 meeting audio (WMA stream). March 27, 2014. Retrieved May 21, 2014 . "[1:55:25] Because this is our property, we own the cattle, we own the grazing rights, we own the water rights, we own the range improvements. We have the right to access it … Because of these ownership

rights, we say we will protect our property. Now, we delegate to the county sheriff the authority to protect our life, liberty, and property. But we don't relinquish that authority ourself. And so if they are going to be out in the hills stealing our property, we will [pause] put measures of defense. And they have always asked us, 'What will you do, what will you do?' and our stance has always been we will do whatever it takes. Open-ended. And because of that, that's why they are scared, because they don't know to what level we will go to protect, but we will protect ... [2:04:50] This is an issue of state sovereignty. We talked about what is the United States of America. It's a union of states ... [2:06:00] These large tracts of land that Bureau of Land Management, Forest Service, monuments, parks and, you know, National Parks, et cetera, et cetera, there is no constitutionality to them at all ... [2:09:20] The stand is the state sovereignty issue. If this is really not about Cliven Bundy and his cattle on this range, this issue is about is Nevada a state, or is Nevada still a territory?"

56. ^ Jennifer Dobner (April 12, 2014).  "U.S. agency ends Nevada cattle roundup, releases herd after stand-off". Reuters.

57. ^ *a b c* "Nevada officials blast feds over treatment of cattle rancher Cliven Bundy". Fox News Channel. April 10, 2014.

58. ^ Goldstein, Sasha.  "Nevada rancher in tense standoff with federal government over cattle on rural public lands". *Daily News*. New York . Retrieved April 11, 2014 .

59. ^ Niraj Chokshi (April 9, 2014).  "The federal government moved some cows and Nevada's governor isn't happy about it". *The Washington Post*.

60. ^ Brean, Henry (April 10, 2014).  "Bundy vs. BLM: Interest in cattle dispute widens". *Las Vegas Review-Journal*. Retrieved April 14, 2014 .

61. ^ Martinez, Michael (April 10, 2014).  "Showdown on the range: Nevada rancher, feds face off over cattle grazing rights". CNN . Retrieved April 10, 2014 . "In response, federal officials are allowing the protesters to gather on public lands as long as they don't impede the roundup, said Lueders, the BLM's director in Nevada."

62. ^ "Out-of-state groups ride in to stand with Nevada rancher in battle with feds over civil rights". Fox News Channel. Retrieved April 11, 2014 .

63. ^ *a b c* Ralph Ellis; Michael Martinez (April 12, 2014).  "Feds end roundup, release cattle after tense Nevada showdown". CNN . Retrieved April 12, 2014 .

64. ^ Joi O'Donoghue, Amy (June 18, 2014).  "Frustrated Utah lawmakers vent to BLM, Forest Service". *Deseret News*. Utah. Archived  from the original on April 4, 2015 . Retrieved  April 4, 2015 .

65. ^ *a b* "Sheriff: FBI is investigating threats made to law enforcement during Bundy showdown". *Las Vegas Review Journal*. Retrieved  May 9, 2014 .

66. ^ *a b c* Knapp, George (April 30, 2014).  "I-Team: Police faced possible 'bloodbath' at Bundy protest". *KLAS-TV 8 News Now*. Archived from the original  on May 15, 2014 . Retrieved  May 15, 2014 . "'It was a scary point in itself. They were in my face yelling profanities and pointing weapons. The Bundy son himself, that I was negotiating with, Dave, he did not do that, but all the associated people around him did do that,' Lombardo said ... Metro pointedly did not allow officers to put on helmets or protective gear for fear it might be seen as a provocation. At the urging of Cliven Bundy, the crowd moved toward the BLM compound. Rhetoric grew more heated, and guns were pointed at officers."

67. ^ BLASKY, MIKE (July 3, 2014).  "Sheriff: Cliven Bundy should be held accountable for crossing the line". *Las Vegas Review-Journal*. Las Vegas, NV . Retrieved  April 4, 2014 .

68. ^ *a b c* Tom Ragan and Annalise Porter (April 12, 2014).  "BLM releases Bundy cattle after protesters block southbound I-15". *Las Vegas Review-Journal*. Retrieved  April 14, 2014 .

69. ^ *a b c* Turner, Christie (April 11, 2014).  "Rancher vs BLM: a 20-year standoff ends with tense roundup". Retrieved  May 6, 2014 .

70. ^ *a b* Urquhart, Jim (April 23, 2014).  "Nevada showdown" . Reuters. Archived from the original  on May 15, 2014. Retrieved May 16, 2014 . "Then I heard the words, 'I've got a clear shot at four of them,'

cited in USDOJ v. USDOJ NVL No. 16-72275 offered on October 31, 2016

and to my right found one of the men pointing his weapon in the direction of the BLM. For me, time had stopped. 'I'm ready to pull the trigger if fired upon,' said another man on the bridge. That was what other Bundy supporters said too – they wouldn't shoot first, but they would return fire."

71. ^ Turner, Christi. "Rancher vs BLM: a 20-year standoff ends with tense roundup" [⧉]. High Country News. Retrieved April 12, 2014 .

72. ^ Itkowitz, Kolby (April 8, 2014). "Senate confirms Neil Kornze as BLM director" [⧉]. *The Washington Post*. Retrieved   April 29, 2014 .

73. ^ Cattle Gather Operation Concluded [⧉], Bureau of Land Management, April 12, 2014

74. ^ *a b c d* "Nevada rancher Cliven Bundy inspects cattle for damage by feds" [⧉]. CBS News. April 15, 2014.

75. ^ "Sheriff urged to clamp down on armed militiamen around Bundy ranch" [⧉]. Las Vegas Sun  . Retrieved May 1, 2014 .

76. ^ *a b* Baca, Nathan (April 15, 2014).    "I-Team: Political cause growing in Bundy's dispute with BLM" [⧉]. *News Now Las Vegas*. Retrieved May 14,  2014 . "After Sheriff Gillespie announced the BLM would leave Bunkerville, Cliven Bundy looked at the sheriff and delivered his new ultimatum. 'Disarm the park service at Lake Mead and Red Rock park and all other parks where the federal government claims they have jurisdiction over,' Bundy said, 'We want those arms delivered right here under these flags in one hour.'"

77. ^ McNab, JJ (May 9, 2014).    "Cliven Bundy's Son Had Run-In With Park Service Two Decades Ago" [⧉]. *Forbes*. Archived from the original [⧉] on May 13, 2014.   "Cliven Bundy's April 12, 2014 demand that the County Sheriff immediately demolish the entrances of National Parks located in Nevada ... 'Take your county bulldozers … er … loaders and tear down that entrance places where they ticket us and where they injure us and make us citizens pay their fees. You get your county equipment out there and tear those things down this morning.'"

78. ^ *a b* Kopan, Tal (April 14, 2014).   "Cliven Bundy to sheriffs: 'Disarm' the Bureau of Land Management" [⧉]. *Politico*. Archived from the original [⧉] on April 20, 2014 . Retrieved   May 14,  2014 . "I only want to talk to one person in each county across the United States, and here's what I want to say: County sheriffs, disarm U.S. bureaucracy. County sheriffs, disarm U.S. bureaucrats,' Bundy said on Glenn Beck's radio show on TheBlaze on Monday ... 'My Clark County sheriff, Doug Gillespie, didn't finish his job,' Bundy said. 'What the mandate from we the people was, Saturday was to disarm the park service and BLM.'"

79. ^ *a b* Thompson, Catherine (April 15, 2014).    "Harry Reid: Bundy Ranch Standoff 'Not Over' " [⧉]. *Talking Points Memo*. Archived from the original [⧉] on April 19, 2014 . Retrieved   May 14,  2014 . "I don't have a response for Harry Reid, but I have a response for every county sheriff across the United States,' Bundy told host Sean Hannity. 'Disarm the federal bureaucrats.'"

80. ^ Sean Hannity (host) and Cliven Bundy (interviewee) (April 14, 2014). *Hannity* [⧉] (mp3) (Audio recording). Fox News Channel. Event occurs at Statement appears at 18:23. Retrieved   May 15,  2014 . "The demand on the sheriff was de-arm the Park Service rangers, and de-arm Red Rock rangers — that's two parks very close to the Lake Mead area. And then the demand was, tear down the toll booth stacks."

81. ^ "Nevada Rancher's Son: Harry Reid 'Needs To Be Kicked Out Of Office' " [⧉]. CBS Las Vegas  . Retrieved May 15, 2014 .

82. ^ *a b c* Enders, Caty (April 25, 2014).    "Life at The Bundy Ranch, Uncensored" [⧉]. Archived from the original [⧉] on May 17, 2014  . Retrieved May 17,  2014 . "They failed, for example, to follow his instruction to tear down the toll booths at Lake Mead and disarm the Park Service. 'The message I gave to you all was a revelation that I received. And yet not one of you can seem to even quote it.' ... 'It come to my mind real plain — the good Lord said, "Bundy, it's not your job, it's THEIR job." So we come back over here and heard that they had brought some cattle back. So I want you to understand,' he said. 'This is not my job, it's YOUR job. This morning, I said a prayer, and this is what I received. I heard a voice say, "Sheriff

cited in Brandt, USDC/Nev., No. 16-72275 archived on October 21, 2016

Gillespie, your work is not done. Every sheriff across the United States, take the guns away from the United States bureaucrats.'" Lots of clapping for this."

83. ^ [a] [b] Glionna, John M.; Simon, Richard (April 24, 2014). "At scene of Nevada ranch standoff, 'citizen soldiers' are on guard". *Los Angeles Times*. Retrieved May 13, 2014. "Since the roundup ended, he said he has refused to even open five certified letters from the BLM. 'I've challenged the federal government's authority,' he said. 'That's why they want to kill Cliven Bundy.'"

84. ^ Botkin, Ben (April 16, 2014). "BLM tries to contact Cliven Bundy, but the rancher won't take the message". *Las Vegas Review-Journal*. Retrieved May 13, 2014. "The Bureau of Land Management has tried to contact Cliven Bundy ever since the federal agency released the rancher's cattle Saturday while facing a horde of protesters, but Bundy hasn't opened any of the written messages. His son, Ammon Bundy, said four certified letters from the BLM arrived at the ranch Tuesday. So far, the 67-year-old Bunkerville resident has chosen not to open the envelopes."

85. ^ Botkin, Ben (April 21, 2014). "BLM confirms six Bundy cattle died in roundup". *Las Vegas Review-Journal*. Retrieved May 13, 2014. "The BLM last week sent four certified letters to Cliven Bundy, which he hadn't opened last week. Leff said the letters 'include public sale notices of the impounded cattle.' 'These notices provide Mr. Bundy the opportunity to buy back the gathered cattle, determined to be his,' Leff said in a statement. 'These notices do not absolve Mr. Bundy from his trespass fees for grazing cattle on public lands without a permit.' Leff didn't answer follow-up questions from the Review-Journal about why the agency sent notices to Bundy to buy back cattle that had been returned to him."

86. ^ "Cliven Bundy's Family Takes Grazing Fight to Sheriff". Associated Press. May 2, 2014. Retrieved May 2, 2014.

87. ^ "Bundy family, supporters file criminal complaints against BLM". ABC13 News. Retrieved May 2, 2014.

88. ^ [a] [b] Treanor, John (June 3, 2014). "Bundy poses questions for candidates on local radio station". News 3 HD. Retrieved June 9, 2014.

89. ^ Rogers, Keith (April 18, 2014). "Bundy supporters party, welcome 'domestic terrorist' label". *Las Vegas Review-Journal*. Archived from the original on May 12, 2014. Retrieved May 16, 2014. "He made the statement before a "Patriot Party" that started at 5 p.m. with music by Madison Rising and Ron Keel, who sang with Black Sabbath briefly in 1984. A party atmosphere among a few hundred people grew as more supporters trickled in. Some people were cooling off in the river while dozens of armed militia members wearing camouflaged fatigues patrolled in and around the area."

90. ^ Craig, Huber. "NV lawmaker presses sheriff to probe Bundy militiamen". Fox5Vegas-KVVU. Retrieved April 30, 2014.

91. ^ Horsford, Steven. "Horsford Urges Sheriff Gillespie To Investigate Armed Militia Presence In Bunkerville". Rep Horsford press release. Retrieved April 30, 2014.

92. ^ [a] [b] Ritter, Ken (May 1, 2014). "Neighbors grow weary of 'militia' remaining with Nevada cattle rancher in federal land dispute". *Associated Press, appearing in the Minneapolis StarTribune*. Retrieved May 19, 2014. "Bundy acknowledged creating a stir when he and his family showed up at the Mormon church with armed bodyguards for Easter Sunday services. 'The militia have been going with me everywhere,' Bundy said Tuesday. 'When I got to church, I said, "Leave your weapons in the car." They did. I guess there could have been weapons in the parking lot, but there were no weapons in the church house.' Bundy denies that militia members set up checkpoints on public property. He said armed guards do stop and screen visitors at the gate to his ranch."

93. ^ Rozyla, Lauren (April 17, 2014). "Cliven Bundy snubs letters from BLM". *KLAS-TV 8 News Now*. Retrieved May 16, 2014. "Supporters say they're waiting for the feds to react. Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. 'You're

cited in United States v. USDC-NVL, No. 4:72275 archived on October 31, 2016

trying to start trouble and you're standing with that camera in my face,' one protester said. The armed men say they'll be at the site for weeks to come to defend the Bundy family."

94. ^ Knapp, George (April 30, 2014). "I-Team: Police say Bundy ranch protesters not off the hook" ⧉. *KLAS-TV 8 News Now.* Retrieved May 16, 2014 . "They were equally hostile to journalists covering the story. Pistol-packing militia men have blocked 8 News NOW's access to public roads. Some poured lighter fluid around our news vehicle while others got physical."

95. ^ Feldman, Josh (April 30, 2014). "Bundy Supporter Warns Reid: 'You Want Your Balls Ripped Off'?" t *Mediaite.* Archived from the original ⧉ on May 3, 2014 . Retrieved May 16, 2014 . "Vanderboegh presented an award 'for incitement to civil war' in Reid's honor and warned the senator, 'Don't poke the wolverine with a sharp stick, Harry, unless you want your balls ripped off.'"

96. ^ ᵃ ᵇ ᶜ Savan, Leslie (May 2, 2014). "Why Is the Right Obsessed With Castration?" ⧉. *The Nation.* Archived from the original ⧉ on May 16, 2014. Retrieved May 16, 2014 . "'All over this country, we are still staring civil war in its bloody face,' said Mike Vanderboegh, leader of the militia group Three Percenters and author of a novel that allegedly inspired a domestic terrorist plot in 2011 ... Bundy's boys weren't the first to thrust the image of torn-off testicles onto the 2014 political stage."

97. ^ Mencimer, Stephanie (November 2, 2011). "Alleged Waffle House Terror Plotters Inspired By Form Militia Author" ⧉. *Mother Jones.* Archived from the original ⧉ on January 21, 2013 . Retrieved May 2014. "The Georgia seniors meeting at Waffle House who were recently apprehended by the FBI for allegedly plotting to kill millions of Americans to save the Constitution also seem to have had a literary influence: Mike Vanderboegh, and his novel, *Absolved.*"

98. ^ "Oath Keepers and Three %ers Part of Growing Anti-Government Movement" ⧉. Anti-Defamation League. October 26, 2009. Archived from the original ⧉ on February 15, 2014 . Retrieved May 16, 2014 . "The Oath Keepers and Three Percenters, both part of an anti-government extremist movement that has grown since President Obama took office, promote the idea that the federal government is plotting to take away the rights of American citizens and must be resisted. The two groups are apparently trying to make inroads in the U.S. military."

99. ^ ᵃ ᵇ ᶜ Rosenberg, Paul (May 14, 2014). " 'You need to die': Cliven Bundy and violent militias still terrorizing Utah, Nevada" ⧉. *Salon.* Archived from the original ⧉ on May 16, 2014 . Retrieved May 16 2014. "round the same time, a wild, paranoid rumor spread throughout the camp that Attorney General Eric Holder was preparing a drone strike against them ... And on May 2, Neiwert reported further on how the two factions nearly came to a shoot-out."

100. ^ ᵃ ᵇ David, Neiwart (April 30, 2014). "Back at the Bundy Ranch, It's Oath Keepers vs. Militiamen as Wild Rumors Fly" ⧉. Southern Poverty Law Center. Archived from the original ⧉ on May 16, 2014. Retrieved May 16, 2014 . "When a wild and paranoid rumor began circulating – that Attorney General Eric Holder was preparing a drone strike on the armed militiamen who gathered at Cliven Bundy's ranch in Nevada – it unleashed a rift within the camp ... Apparently, someone within one of the major factions at the camp, the Oath Keepers, relayed word of the imminent drone attack to his leaders. Oath Keepers founder Stewart Rhodes responded by pulling his people out of what they called 'the kill zone' (the area the supposed drone would be striking). When the other militiamen learned that the Oath Keepers had pulled out, they were outraged ... They openly talk about shooting Rhodes and other Oath Keepers leaders – because in their view, the Oath Keepers' actions constituted 'desertion' and 'cowardice' – and describe how 'the whole thing is falling apart over there.' At the end, they vote unanimously to oust the Oath Keepers, or at least its leadership, from the Bundy Ranch camp."

101. ^ ᵃ ᵇ David, Neiwart (May 2, 2014). "Militiamen and Oath Keepers Drew Weapons, Threatened to Kill Each Other" ⧉. Southern Poverty Law Center. Archived from the original ⧉ on May 16, 2014. Retrieved May 16, 2014 . "The situation at the ranch, where armed militiamen and 'Patriots' are camped out, has deteriorated so badly that competing factions apparently drew weapons on one another during heated arguments ... The team that primarily circulated the drone-strike rumor – Stewart Rhodes' Oath Keepers –

also began advising people to pull out, which sparked the wrath of militiamen. Those militiamen voted to oust the Oath Keepers, and a couple even spoke of shooting Rhodes and his men in the back, which they deemed the proper battlefield treatment of 'deserters' ... [RHODES]: 'Guys with hands on their guns threatening them. That's why we told them to get out of there. We knew the situation was this close from being a gunfight, right there inside the camp.' [RHODES]: 'One of our guys from Montana, Rick Delap, who was there from the beginning — he's been out there for two weeks in the dirt – the day of this confrontation, I come to find out he had to draw on somebody.'"

102. ^ Schoenmann, Joe (May 15, 2014).   "Cliven Bundy's supporters seek crowdfunding to sustain militia". *Las Vegas Sun*. Retrieved May 16,  2014 .

103. ^ "Official: FBI investigating Bundy Ranch showdown"   🔗. *USA Today*. May 8, 2014  . Retrieved   May 8, 2014.

104. ^ "FBI investigating Bundy Ranch showdown, Clark County sheriff's officials say". Fox News Channel. Retrieved May 9,  2014 .

105. ^ Raju, Manu (April 28, 2014).   "Police investigating Cliven Bundy-related threats to Harry Reid"🔗. Politico. Retrieved  May 2, 2014 .

106. ^ Cynthia Johnston (June 9, 2014).      "Killers of Las Vegas cops harbored anti-government ideology"🔗. Reuters.

107. ^ *a b c* Michelle Rindels & Martin Griffith (June 9, 2014).      "Bundy's Son: Las Vegas Shooters Kicked off Ranch"🔗. Associated Press via ABC News.

108. ^ Michael Pearson; Saeed Ahmed & Kevin Conlon (June 9, 2014). "Source: Possible 'manifesto' found in Las Vegas shootings"🔗. CNN.

109. ^ Mike Blasky & Colton Lochhead (June 9, 2014).      "Indiana couple who killed Las Vegas police also had plans to attack courts"🔗. *Las Vegas Review-Journal*.

110. ^ *a b* "Nevada rancher versus the federal government: Who's in the right?"🔗. Al Jazeera. April 22, 2014.

111. ^ "Video Emerges of Vegas Cop-Killer Jerad Miller Speaking at Bundy Ranch"🔗. Mediaite. June 9, 2014.

112. ^ David Corn; Dana Liebelson & Asawin Suebsaeng (June 9, 2014). "The Chilling Anti-Government, Cliven Bundy-Loving Facebook Posts of the Alleged Las Vegas Shooters"🔗. *Mother Jones*.

113. ^ Reid Wilson (June 9, 2014).      "Interior Secretary Jewell connects Las Vegas shooting to Bundy ranch"🔗. *The Washington Post*.

114. ^ Catherine E. Shoichet, Kyung Lah and Ashley Fantz, CNN (June 9, 2014).   "Killer Las Vegas couple posted anti-government views online - CNN"🔗. CNN.

115. ^ "FBI, U.S. attorney statement on end to Malheur Refuge standoff"🔗. USA Today. February 11, 2016   . Retrieved February 11,  2016 .

116. ^ Nevada rancher Cliven Bundy arrested by FBI in Portland

117. ^ Hurd, Elaine.   "Senator Dean Heller on The Bundys and the BLM"🔗. *Let's Talk Nevada*. Retrieved 25 September  2016 .

118. ^ "Heller says Bundy should pay BLM grazing fees"   🔗. Associated Press. May 1, 2014. Retrieved   May 2, 2014.

119. ^ *a b* Steve Benen (April 15, 2014).   "Reid says Bundy Ranch standoff 'not over' "🔗.

120. ^ *a b* Pleasance, Chris (April 18, 2014).   "Domestic terrorists. Senator Harry Reid brands Nevada cattle rancher Cliven Bundy and his supporters enemies of the US"🔗. *The Daily Mail, Newspaper, UK*. Retrieved April 19, 2014 .

121. ^ Macneal, Caitlin.   "Harry Reid Calls Bundy Supporters 'Domestic Terrorists' "🔗. Talking Points Memo, TPM Media LLC. Retrieved April 19, 2014 .

122. ^ Editorial: Stewart misses the point on BLM cops🔗, The Salt Lake Tribune, May 1, 2014

123. ^ Burr, Thomas (April 29, 2014).   "Utah's Stewart: BLM doesn't need a "Swat team"."🔗. *Salt Lake Tribune*. Retrieved  May 2, 2014 .

124. ^ "Just In: Obama Accused By Congressman Of Illegal Action At Bundy Ranch"🔗.

cited in U.S. v. Bundy, NVL, No. CR72275 admitted on October 31, 2013

125. ^ Horsford, Stevens   (July 21, 2014).   "Rep. Horsford: Nevada burned by the rants of hotheads". *The Salt Lake Tribune / Washington Post.* Retrieved  July 24,  2014 .

126. ^ "WATERCOOLER: RANCHER STANDOFF". Arizona Central. Retrieved  April 27, 2014 .

127. ^ "Republican Legislators Caravan To The Bundy Ranch". *Tucson Weekly.* Retrieved  April 27, 2

128. ^ "Tea Party Lawmaker: Nev. Cattle Roundup 'Reminded Me Of Tiananmen Square'". CBS Las Vegas. April 11, 2014.

129. ^ Travis Gettys (April 10, 2014).   "Sean Hannity inflames brewing 'range war' between feds, militia over NV cattle roundup".

130. ^ Leah Libresco (January 4, 2016).   "The Armed Oregon Ranchers Who Want Free Land Are Already Getting A 93 Percent Discount".

131. ^ EDITORIAL: BLM's cattle battle ends — for now, Las Vegas Review-Journal, April 16, 2014

132. ^ "Bundy is no victor: Bunkerville rancher defied the rule of law, picking and choosing what he'd obey". *Las Vegas Sun.* April 20, 2014. Archived from the original  on May 15, 2014 . Retrieved May 16,  2014 .

133. ^ Editorial board: Dismiss Cliven Bundy for what he is -- a guy trying to dodge a bill, Casper Star-Tribune, April 28, 2014

134. ^ Weinstein, Adam (May 12, 2014).   "Bundy Ranch's Armed Defenders Seek Welfare to Sit Around Doi Nothing". *Gawker.* Retrieved  May 16,  2014 . "All those guys hanging out cleaning their guns in Nevada are now begging hard-working Americans to please give them some money ..."

135. ^ Ryan Gorman; Dan Miller; Meghan Keneally; Jessica Jerreat (April 11, 2014).  "Federal agents back down in stand-off with armed cowboys". *Daily Mail.*

136. ^ Arnold M. Knightly (April 11, 2014).   "Cliven Bundy supporters bring cattle roundup protest to Las Vegas police headquarters". *Las Vegas Review-Journal.*

137. ^ Dobson, Jennifer (April 13, 2014).   "Nevada ranching family claims victory as government releases cattle". Yahoo! News.

138. ^ "Cliven Bundy on Harry Reid: 'I Don't Think There's Any Hope for Him, He Needs to Be Kicked Out of Office'". Fox News Channel.

139. ^ Donley, Andrew (April 20, 2014).   "'I blame both sides,' Oklahoma militia members join fight against feds". *KFOR News Channel 4.* Retrieved  May 19,  2014 .

140. ^ *a b* Price, Bob (April 24, 2014).   "Militia to BLM: 'We Are Prepared to Use Deadly Force'". *Breitbar News Network.* Retrieved May 22,  2014 . "Breitbart Texas inquired if they were prepared to use deadly force. 'Yes sir,' Shaw responded, 'we are prepared…We certainly hope it doesn't go that route but, with the track record of the federal government, it doesn't look very promising that that's going to happen.' Shaw describes some of the scenarios that could bring his militia groups to the point of being forced into firing on federal agents. In one situation where the government might use rubber bullets against protesters or the militia, Shaw explained, 'How are we supposed to know that they're firing rubber bullets when it has been fired?'"

141. ^ "What Are Rubber Bullets?". *Salon.* October 4, 2000  . Retrieved May 22,  2014 . "Rubber bullets describe about 75 types of "less than lethal devices" that are designed to deliver a stinging blow that incapacitates but does not kill or penetrate flesh as do regular metal bullets."

142. ^ Isquith, Elias (April 23, 2014).   "Bill O'Reilly to Cliven Bundy supporter: What makes you different from Occupy Wall Street?". *Salon.* Retrieved  May 22,  2014 . "The militia-founding Bundy supporter, Scott Shaw of Oklahoma, who seemed a bit surprised by the question, answered that Bundy, unlike OWS, provides America with beef ... 'Reilly granted that Bundy is indeed outpacing the basically defunct OWS when it comes to beef production, but pushed Shaw, saying, 'But they're both dissenters. They're both dissenting what they feel is an oppressive system. That's what they have in common.' Shaw said this was true but that 'the way they go about it is different,' noting that no Bundy supporters have been arrested, while many OWS protesters were charged by the police for disturbing public order and damaging public

143. ^ a b c d German, Jeff (May 17, 2014). "Federal judge bans Texan from meddling in rancher-versus-BLM case". *Las Vegas Review Journal*. Retrieved May 19, 2014 .

144. ^ Judgment and Commitment, May 10, 1996, entered May 16, 1996, *United States v. Michael J. Kearns*, case no. 5:95-cr-00201-FB-2, U.S. District Court for the Western District of Texas (San Antonio Div.).

145. ^ Michael J. Kearns, inmate # 27170-077, Federal Bureau of Prisons, U.S. Dep't of Justice.

146. ^ Matt Ford (April 14, 2014). "The Irony of Cliven Bundy's Unconstitutional Stand". Atlantic.

147. ^ Salt Lake City Tribune, newspaper. "Editorial: Bundy is a lawbreaker, not a hero". *Salt Lake City Tribune*. Retrieved April 15, 2014 .

148. ^ Dobner, Jennifer (April 13, 2014). "Nevada ranching family claims victory as government releases cattle". Reuters . Retrieved April 16, 2014 .

149. ^ a b Hyland, Dallas (April 13, 2014). "On Kilter: Bundy won, America lost". *St. George News*. Retrieved April 16, 2014 .

150. ^ Sebelius, Steve (April 16, 2014). "Let's be honest about what Bundy is, and is not". *Las Vegas Review-Journal*. Retrieved April 16, 2014 .

151. ^ "Video: Dann Sisters' Battle to Save Their Cattle Is Stark Contrast to That of Cliven Bundy". *Indian Country Today Media Network*. April 19, 2014 . Retrieved May 20, 2014 . "The federal government's treatment of rancher Cliven Bundy, who has invoked land rights in his objection to paying grazing fees for his cattle, stands in stark contrast to what was done to the Dann sisters and other Indigenous Peoples on Shoshone territory when they did the same thing on lands that were unquestionably their own."

152. ^ "No, Ron Paul, Bundy Ranch Is Not Another Wounded Knee: Page 3 of 4". *Indian Country Today Media Network.com*.

153. ^ Smith, John L. (April 24, 2012). "Shoshone sisters also couldn't beat BLM". *Las Vegas Review-Journal*. Retrieved May 17, 2014 . "Mary and Carrie Dann never received a visit from the camouflage cavalry, and I'm not sure whether they would have welcomed the support of armed militia ... If rancher Bundy thinks he has precedence because his family has run cattle in the Gold Butte area since 1877, imagine how the Danns felt."

154. ^ Tim Zietlow (April 15, 2014). "I-Team: Political cause growing in Bundy's dispute with BLM". Archived from the original on October 7, 2014.

155. ^ Brad Knickerbocker (April 13, 2014). "Nevada range fight revises 'Sagebrush Rebellion' ". *The Christian Science Monitor*.

156. ^ "BLM tries to resolve conflict with ranchers" . Associated Press. April 14, 2014.

157. ^ Wiles, Tay (March 7, 2015). "An update on Nevada scofflaw Cliven Bundy". Paonia, CO: High Country News. Retrieved January 5, 2016 .

158. ^ a b Sneed, Tierney (January 5, 2016). "Why Did The Feds Let Cliven Bundy Get Away With His 2014 Showdown?". Talking Points Memo. Retrieved January 5, 2016 .

159. ^ Peralta, Eyder (January 5, 2016). "As Oregon Situation Unfolds, Here's A Quick Update On Cliven Bundy". NPR . Retrieved January 5, 2016 .

160. ^ "Fourteen Additional Defendants Charged For Felony Crimes Related To 2014 Standoff In Nevada". US Department of Justice. March 3, 2016. Retrieved March 4, 2016 .

161. ^ "Nevada trial for Cliven Bundy, 18 others set for 2017" . Oregon Live. Associated Press. April 27, 2016. Retrieved May 1, 2016 .

# External links [edit]

- July 2013 ruling
- Antonio Castelan,"Bundy grandkids pulled from

Wikimedia Commons has media related to *Cliven*

schools after pocketknife dispute," News3, Clark
County, Nevada


*Bundy*.

| Categories: | United States district court cases | 2014 in American politics | 2014 in Nevada |
| | 21st-century controversies in the United States | Anti-Federalism |
| | Armed standoffs in the United States | Bundy standoff |
| | Bureau of Land Management areas in Nevada | Far-right politics in the United States |
| | History of Clark County, Nevada | Law enforcement operations in the United States |
| | Political history of the United States | Politics of Nevada | Sovereign citizen movement |

This page was last modified on 28 October 2016, at 20:13.

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Privacy policy   About Wikipedia   Disclaimers   Contact Wikipedia   Developers   Cookie statement   Mobile view

   

cited in Bundy v. USDC-NVL, No. 16-72275 archived on October 31, 2016

 

# About Judicial Watch

Judicial Watch, Inc., a conservative, non-partisan educational foundation, promotes transparency, accountability and integrity in government, politics and the law. Through its educational endeavors, Judicial Watch advocates high standards of ethics and morality in our nation's public life and seeks to ensure that political and judicial officials do not abuse the powers entrusted to them by the American people. Judicial Watch fulfills its educational mission through litigation, investigations, and public outreach.

The motto of Judicial Watch is "Because no one is above the law". To this end, Judicial Watch uses the open records or freedom of information laws and other tools to investigate and uncover misconduct by government officials and litigation to hold to account politicians and public officials who engage in corrupt activities.

Litigation and the civil discovery process not only uncover information for the education of the American people on anti-corruption issues, but can also provide a basis for civil authorities to criminally prosecute corrupt officials. Judicial Watch seeks to ensure high ethical standards in the judiciary through monitoring activities and the use of the judicial ethics process to hold judges to account.

Judicial Watch's investigation, legal, and judicial activities provide the basis for strong educational outreach to the American people. Judicial Watch's public education programs include speeches, opinion editorials (op-eds), publications, educational conferences, media outreach, radio and news television appearances, and direct radio outreach through informational commercials and public service announcements.

Through its Open Records Project, Judicial Watch also provides training and legal services to other conservatives concerning how to effectively use the Freedom of Information Act and other open records laws to achieve conservative goals of accountability and openness in government.

Through its publication The Verdict and occasional special reports, Judicial Watch educates the public about abuses and misconduct by political and judicial officials, and advocates for the need for an ethical, law abiding and moral civic culture.

Judicial Watch also pursues this educational effort through this Internet site where many of the open records documents, legal filings, and other educational materials are made available to the public and media. This educational effort, which includes direct mailings to millions of

Americans, educates the public about operations of government and the judiciary and increases public awareness if corruption and misconduct exists.

Warm regards,



Tom Fitton

*President, Judicial Watch*

**Make a Contribution**

**DONATE**

WWW.JUDICIALWATCH.ORG

©2016 Judicial Watch, Inc.
Privacy Policy
Terms and Conditions
User Agreement
Contact Information

Judicial Watch is a 501(c)(3) nonprofit organization. Contributions are received from individuals, foundations, and corporations and are tax-deductible to the extent allowed by law.

*425 Third Street SW, Suite 800*
*Washington, DC 20024*
*202-646-5172*