

Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

July 06, 2016

No.: 16-72275
D.C. No.: 2:16-cr-00046-GMN-PAL-1
Short Title: Cliven Bundy v. USDC-NVL

Dear Petitioner/Counsel

A petition for writ of mandamus and/or prohibition has been received in the Clerk's Office of the United States Court of Appeals for the Ninth Circuit. The U.S. Court of Appeals docket number shown above has been assigned to this case. Always indicate this docket number when corresponding with this office about your case.

If the U.S. Court of Appeals docket fee has not yet been paid, please make immediate arrangements to do so. If you wish to apply for in forma pauperis status, you must file a motion for permission to proceed in forma pauperis with this court.

Pursuant to FRAP Rule 21(b), no answer to a petition for writ of mandamus and/or prohibition may be filed unless ordered by the Court. If such an order is issued, the answer shall be filed by the respondents within the time fixed by the Court.

Pursuant to Circuit Rule 21-2, an application for writ of mandamus and/or prohibition shall not bear the name of the district court judge concerned. Rather, the appropriate district court shall be named as respondent.

CASE NO. _____

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In Re: CLIVEN D. BUNDY, *Petitioner*

v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Lloyd D. George U.S. Courthouse
333 S. Las Vegas Boulevard South
Las Vegas, Nevada 89101

*Respondent*

From the United States District Court For the District of Nevada
The Honorable Gloria Navarro, Presiding
Case No. 2:16-CR-00046-GMN-PAL-1

**<u>EMERGENCY PETITION FOR WRIT OF MANDAMUS</u>**

ORAL ARGUMENT REQUESTED

Larry Klayman, Esq.
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com
Counsel for Petitioner

Joel F. Hansen, Esq.
Hansen Rasmussen, LLC
1835 Village Center Circle
Las Vegas, Nevada 89134
Tel: (702) 385-5533
Email: joelh@hrnvlaw.com
Co-Counsel for Petitioner

Attorneys for Petitioner-Defendant Cliven D. Bundy
July 6, 2016

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT  .................................................... iii

CERTIFICATE AS TO NAMED PARTIES AND INTERESTED PARTIES ....  iv

TABLE OF AUTHORITIES  ................................................................  v

INTRODUCTION  ..................................................................  2

JURISDICTIONAL STATEMENT ........................................................  6

STATEMENT OF FACTS ................................................................  7

THE LAW  ..................................................................  11

    A. Petitioner has Right to Counsel, Even *Pro Hac Vice*  ..........................  11

    B. Pro Hac Vice Cannot be Postponed Indefinitely or Denied Based
       on Still-Pending, Undecided, and Unproven Accusation ....................  16

    C. This Ninth Circuit Has Conceded that Pro Hac Vice Standards in this
       Circuit Have Been Misapplied  ...........................................  16

    D. Mandamus is Appropriate Remedy for *Pro Hac Vice* Admission  ........  18

    E. Mandamus "Bauman" Standards are Met Here  ...................................  19

CONCLUSION AND REQUEST FOR RELIEF  ...............................................  23

## CORPORATE DISCLOSURE STATEMENT

The Petitioner-Defendant Cliven D. Bundy is a natural person and is not an officer, director, or majority shareholder of any publicly traded corporation. Mr. Bundy operates a private ranching business. There is no parent corporation or publicly-held corporation that owns more than ten percent of its stock, or any of the stock.

## <u>CERTIFICATE AS TO NAMED PARTIES</u>
## <u>AND INTERESTED PARTIES</u>

Petitioner certifies pursuant to Circuit Rule 28-2.1 that:

**A. PartiesPetitioner**

1) Cliven D. Bundy is a natural person

**B. PartiesRespondent**

1) The Honorable Gloria Navarro

2) U.S. District Court for the District of Nevada

**C. Interested Parties Participating**

Although there are 19 defendants in the case being prosecuted together, the

present matter concerns the legal defense team for only Cliven D. Bundy.

Therefore, there are no other interested persons to identify for this specific matter.

**D. Amicus Curiae**

The Petitioner is not aware of any amicus curiae participating.

**E. Related Cases**

Cliven Bundy has also filed an appeal here from the District Court's

detention order in Appeal No. 16-10264.

# TABLE OF AUTHORITIES

**Cases**

*Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977).....................................19

*Birt v. Montgomery*, 725 F.2d 587, 592 (11th Cir.)....................................................15

*Christensen v. United States Dist. Court*, 844 F.2d 694, 696-99 (9th Cir. 1988) .......21

*D.H. Overmeyer Co., Inc. v. Robson*, 750 F.2d 31, 34 (6th Cir. 1984) ......................17

*In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982)..........................19

*In re Evans*, 524 F.2d 1004, 1007 (1975) .................................................................17

*Medhekar v. United States Dist. Court*, 99 F.3d 325, 327 (9th Cir. 1996)................21

*Panzardi-Alvarez v. United States*, 879 F.2d 975, 980 (1st Cir.1989) ......................14

*Sanders v. Russell*, 401 F.2d 241, 247-48 (5th Cir. 1968)...........................................17

*Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997)..............17

*Thomas v. Cassidy*, 249 F.2d 91, 92 (4th Cir. 1957) ....................................................17

*U.S. v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir.1982) ...........................................15

*U.S. v. Nichols*, 841 F.2d 1485, 1502 (10th Cir.1988) ...............................................14

*United States of America v. Cliven D. Bundy* .........................................................7, 10

*United States v. Garrett*, 179 F.3d 1143 (9th Cir.1999) .............................................13

*United States v. Gonzalez-Lopez*, 399 F.3d 924, 932 (8th Cir. Mo. 2005) ................15

*United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir.1993)........................................12

*United States v. U.S. Dist. Court for the Dist. of Nevada*

(In re United States), 791 F.3d 945, 956-957 (9th Cir., June 29, 2015)........18

*United States v. Walters,* 309 F.3d 589, 592 (9th Cir. Cal. 2002),.............15

*Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140,

108 S. Ct. 1692 (1988);............................................................11

*Wilson v. Mintzes*, 761 F.2d 275, 278-79 (6th Cir. 1985)...........................15

**LARRY E. KLAYMAN, Esq.**
Washington, D.C. Bar No. 334581
2020 Pennsylvania Ave N.W., Suite 800
Washington, D.C. 20006
(310) 595-0800
leklayman@gmail.com
*Attorney for Petitioner*

**JOEL F. HANSEN, Esq.**
Nevada Bar No. 1876
**HANSEN RASMUSSEN, LLC**
1835 Village Center Circle
Las Vegas, Nevada 89134
(702) 385-5533
joelh@hrnvlaw.com
*Attorney For Petitioner*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In Re: CLIVEN D. BUNDY

                 Petitioner,

     v.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Lloyd D. George U.S. Courthouse
333 S. Las Vegas Boulevard South
Las Vegas, Nevada 89101

              Respondent.

Case No.

_____

## EMERGENCY PETITION FOR WRIT OF MANDAMUS
## FOR ADMISSION OF PETITIONER'S ATTORNEY PRO HAC VICE
## FOR CRIMINAL DEFENSE

## I.    INTRODUCTION

Pursuant to 28 U.S.C. § 1651,  Federal Rules of Appellate Procedure ("FRAP") Rule 21, and Local Circuit Rules 21-1, 21-2, 21-3, and 21-4, Petitioner Cliven D. Bundy ("Petitioner") respectfully petitions for a writ of mandamus to compel the Respondent, the U.S. District Court for the District of Nevada ("District Court"), by the Honorable Gloria Navarro, to enter the admission *pro hac vice* of the Petitioner's attorney, Larry Klayman, Esq.

This Court is asked to protect and implement the right of a criminal defendant to counsel under the Sixth Amendment and to due process provision under the U.S. Constitution.  The Petitioner, Defendant below, is being denied his right to the assistance of the counsel of his choice.  Mandamus is required to prevent that violation of the Defendant's constitutional rights.

Defendant Cliven Bundy has been indicted on 17 counts of alleged criminal conduct and if convicted faces life imprisonment. The alleged reasons for his indictment stem from a successful stand-down of government agents in and around late March to early April 2014.

After the stand-off, which was roundly reported and cheered by land rights advocates, U.S. Senators like Rand Paul and other senators and congressmen, and the so-called conservative media like Fox News, Defendant Bundy made what was viewed by the mainstream media and others as a politically incorrect and offensive

statement. He stated generally that he and his family, whose lives had been threatened at gun point by federal agents of the Bureau of Land Management in an attempt to force them to leave their land in Bunkerville, Nevada, for alleged non-payment of grazing fees to the federal government which his family had ranched for nearly 150 years, had been treated like the "Negro" in the old South -- that is, enslaved by the federal government, -- since the land his cattle grazed on belongs to the State of Nevada and not the United States.

In response, everyone from President Barack Obama to Fox News then vilified Defendant Bundy by misrepresenting his intended use of the word "Negro." Defendant Bundy, who did not know, due to his isolated living conditions as a rancher, that the use of this word was offensive to some (although civil rights icon Martin Luther King had used the same phraseology), was attacked, and even abandoned by some of his government and media supporters.

Nevada Senator Harry Reid, who reportedly had involvement in efforts to sell Petitioner's land to other interests, even went so far as to call Defendant Bundy and his family "domestic terrorists," and called on law enforcement authorities to arrest and indict Mr. Bundy and his family and the courts to convict them of crimes. In short, Defendant Bundy suddenly became in effect "radioactive" and all of his popular support as a peaceful protestor dried up not only at Fox News, but also elsewhere.

Speaking at the White House Correspondents' Dinner on May 2, 2014, broadcast on national and international television, President Barack Obama publicly stated:

> "Michelle and I watched the Olympics – we cannot believe what these folks do – death-defying feats – haven't seen somebody pull a "180" like that fast **since Rand Paul disinvited that Nevada rancher from this dinner.** (Laughter.) **As a general rule, things don't end well if the sentence starts, "Let me tell you something I know about the negro."** (Laughter.) You don't really need to hear the rest of it. (Laughter and Applause). Just a tip for you – don't start your sentence that way. (Laughter)."

TRANSCRIPT: President Obama speaks at the White House Correspondents' Association Dinner," <u>The Washington</u> Post, May 4, 2014, (emphases added).[1]

About two years later, Defendant Bundy was indeed indicted, imprisoned in solitary confinement, denied bail and the right to a speedy trial. The government prosecutors have argued that the case is complicated;[2] and the court accepted this. As a result, rather than being tried in 60 days, Defendant Bundy is set to be tried in February 2017, over a year after his arrest and imprisonment, with 18 other defendants who participated in the stand-off. Four of Defendant Bundy's sons are among these defendants and they are currently in prison as well awaiting trial. The Bundy ranch is thus being held down by Defendant Bundy's wife and some of his

---

[1] Accessible at: https://www.washingtonpost.com/lifestyle/style/transcript-president-obama-speaks-at-the-white-house-correspondents-association-dinner/2014/05/04/2dd52518-d32f-11e3-95d3-3bcd77cd4e11_story.html

[2] It is complicated only because the government insists on trying all 19 defendants together, in a "guilt by association" trial.

daughters as the men are all in prison. The family is nearly bankrupt because of these circumstances.

Local Nevada attorney Joel Hansen entered a notice of appearance for Defendant Bundy, Petitioner here, shortly after his indictment and arraignment. However, Mr. Hansen practices in a small firm, is not by trade a federal criminal defense lawyer, and lacks the resources to defend Mr. Bundy on his own. Moreover, Defendant Bundy lacks the financial resources to hire high powered criminal defense lawyers. For these reasons, public advocate Larry Klayman, a former federal prosecutor at the U.S. Department of Justice and the founder of Judicial Watch and Freedom Watch, was asked to step in by Mr. Bundy and his wife, Carol, in his private capacity to defend Mr. Bundy as no one else would touch this defendant who had been made radioactive over his use of the word "Negro" although it was actually used in sympathy for the mistreatment of African Americans and not in a negative tone.

The presiding judge, the Honorable Gloria Navarro, denied without prejudice two applications *pro hac vice* for Mr. Klayman's entry into the case as co-counsel, claiming that because a ten year old retaliatory bar complaint by Klayman's former group which he founded and ran for a decade, which Klayman had sued for breach of his severance agreement after he left to run for the U.S. Senate in Florida, remained pending before the District of Columbia Board of Professional Responsibility she would not consider his application until and unless Mr. Klayman received a favorable

finding from the D. C. Board of Professional Responsibility -- years into the future.

Judge Navarro ruled:  "Accordingly, Klayman's Verified Petition shall remain denied without prejudice until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia has been resolved in his favor."  Order, Judge Gloria Navarro, April 19, 2016, Exhibit E at 2.

The bottom line is this:  Petitioner Bundy, Defendant below, risks life imprisonment in a criminal prosecution.  Time is ticking for Defendant Bundy to have a defense team in place, the government and Judge Navarro have justified denying him a speedy trial based on the complexity of the case.  After designation as a complex case, the Petitioner's need for a full defense team cannot be denied.  If Mr. Bundy does not have Mr. Klayman to work with Mr. Hansen Mr. Bundy will not have an experienced and full defense team with sufficient resources to adequately defend him. At a minimum, as set forth below, Defendant Bundy deserves his Sixth Amendment right of counsel.  He has chosen Mr. Klayman to be on his defense team with local counsel Hansen, as one lawyer cannot handle the defense on his own.

## II.    JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1651. "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651.

Venue is proper in the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") as the subject District Court is within the Ninth Circuit of the federal judicial system.

## III.    STATEMENT OF FACTS

The Petitioner Cliven D. Bundy, Defendant in the trial court below, was arrested on February 11, 2016, and indicted on 17 counts of alleged criminal conduct in the case of ***United States of America v. Cliven D. Bundy, et. al.,***  Criminal Action No. 2:16-CR-00046-GMN-PAL-1, U.S. District Court for the District of Nevada. Bundy has pled not guilty and seeks the dismissal of all charges.

Attorney and former federal prosecutor Larry Klayman, Esq. through local counsel Joel Hansen, Esq., submitted two applications for admission *pro hac vice* to appear in defense of Cliven Bundy with the sponsorship and able assistance of the attorney of record.[3]

On March 22, 2016, the Petitioner submitted an application for admission of Klayman *pro hac vice*.  See, **Exhibit A**, attached.

On March 28, 2016, the Petitioner submitted a supplement to the application, including a designation of local counsel.  See, **Exhibit B**, attached.

On March 31, 2016, Judge Navarro denied -- explicitly _without prejudice_ -- Klayman's *pro hac vice* application.  See, **Exhibit C**, attached.

---

[3]    Attorney Larry Klayman is admitted to practice here in the U.S. Court of Appeals for the Ninth Circuit.

On April 12, 2016, the Petitioner submitted a renewed application *pro hac vice*, responding to the opportunity to reapply in the earlier denial without prejudice.  See, **Exhibit D**, attached.

On April 19, 2016, Judge Navarro again denied Klayman's *pro hac vice* application, on grounds which lack legal foundation and are thus invalid.  See, **Exhibit E**, attached.  The grounds identified by Judge Navarro consist of a pending, undecided complaint before the District of Columbia Bar.  Judge Navarro wrote:

> The Court's prior Order (ECF No. 215) required that if Klayman filed a new Verified Petition, it ***must include, inter alia, "verification that the matter in the District of Columbia disciplinary case referenced in the Verified Petition (Verified Pet. 7) has been resolved with no disciplinary action."*** (Order 2–3, ECF No. 215). Although Klayman alleges that he is "confident of ultimately prevailing [in the District of Columbia matter]," he also specifically states in his Response that "this matter is far from resolved." (Resp. 2:3–8, ECF No. 229). As such, Klayman admits that this ethical complaint is still pending in the District of Columbia, as the pending disciplinary matter has not been denied, dismissed, or withdrawn.

Order, April 19, 2016, Exhibit E at 1 (emphasis added).

At the same time, Judge Navarro also conceded and stated:

> As the Court explained in its prior Order, a defendant's "choice of counsel must be respected unless it would . . . burden the court with counsel who is incompetent or unwilling to abide by court rules and ethical guidelines." *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002).

Order, April 19, 2016, Exhibit E at 2.  The District Court concluded:

> Accordingly, Klayman's Verified Petition shall remain denied without prejudice until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia has been resolved in his favor.

*Id.*

However, the complaint referred to is 10 years old and on-going, with no finding of liability.[4] As Klayman and Hansen informed the District Court, resolution of the pending issue before the District of Columbia Board on Professional Responsibility will take years if there are any appeals and by that time Defendant Cliven Bundy will already have been tried, possibly convicted, and sentenced to life imprisonment.

The judge mistakenly stated in the first order on March 31, 2016, attached as **Exhibit C**, that Mr. Klayman had admitted to the charges, which is incorrect. In the second application on April 12, 2016, attached as **Exhibit D**, Mr. Klayman and co-counsel Hansen correctly informed the judge that the proceeding was underway and would not be finished for another few years and that Mr. Klayman had not been found liable of any ethics violations by the District of Columbia Bar.

Indeed, Mr. Klayman has continuously been a member in good standing of the

---

[4] The slow pace of the District of Columbia Bar should not create any assumption that that case is in any way serious, complex, or difficult. In fact Petitioner has a motion to dismiss pending not just on the merits but also as a result of the bar failing to proceed timely, as the doctrine of laches applies. The expert opinion of Professor Ronald Rotunda, one of the premier legal ethics experts in the United States, attached in Exhibit F demonstrates that the matter is in fact simple and should be dismissed.

District of Columbia Bar for over 36 years and has never been disciplined, much more suspended, by the District of Columbia Bar for even one day. Documentation from the bar showing this was submitted to Judge Navarro.

As set forth in the expert opinion of Professor Ronald Rotunda, a renowned expert on attorney ethics, conduct, and discipline, Klayman did nothing wrong. Rodunda's affidavit is attached as **Exhibit F**, qualifications attached as **Exhibit G**. Even if the complaint were in the unlikely event ultimately decided years down the line against Klayman, that would still not justify denial of Klayman's application to appear *pro hac vice*, for the legal reasons set for herein. *Id.*

Because the criminal case *United States of America v. Cliven D. Bundy, et al* Criminal Action No. 2:16-CR-00046-GMN-PAL-1, U.S. District Court for the District of Nevada, is very controversial within Nevada, and seems to pit the Petitioner against the rich and powerful in the establishment of that state and the nation, and because this case is very controversial if not "radioactive," Cliven Bundy has faced great difficulty securing effective assistance of counsel under the Sixth Amendment  -- especially since Judge Navarro apparently had him committed to solitary confinement for several months which limited his ability to communicate. Furthermore, the size of the case and number of other Defendants further limits the available, suitable criminal defense attorneys in Nevada, as virtually the entire Las Vegas criminal defense bar and Federal Public Defender are representing other

defendants or are conflicted out.

## IV. THE LAW

### A. Petitioner has Right to Counsel, Even *Pro Hac Vice*

A criminal defendant's Sixth Amendment rights insure the right to be represented by the attorney selected by the defendant. *Wheat v. United States*, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 108 S. Ct. 1692 (1988); *Powell v. Alabama*, 287 U.S. 45, 53, 77 L. Ed. 158, 53 S. Ct. 55 (1932). "It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama,* 287 U.S. at 53.

In this case, the Petitioner has chosen to have a criminal defense team that includes a former federal prosecutor, Larry Klayman, out of necessity and whom he believes will be aligned with his needs and with his chosen strategy in his defense. The Petitioner's choice is no less than a constitutional right which also implicates the validity of the criminal prosecution pursuant to the Fifth and Sixth Amendments of the U.S. Constitution.

As this Court has firmly ruled in the course of its analyses of related issues:

> Finally, that Cohan isn't a member of the Oregon bar was
> not an adequate reason to deny substitution. A defendant's
> right to the counsel of his choice includes the right to have
> an out-of-state lawyer admitted pro hac vice. *Collins*, 920
> F.2d at 626.

*United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993) (citation omitted),

overruled on other grounds by *United States v. Garrett*, 179 F.3d 1143 (9th Cir.1999).

This Court in *United States v. Lillie*, 989 F.2d 1054, 1056 (9th Cir. 1993) also

explained:

> A criminal defendant is entitled to the retained counsel of
> his choice (though not to the appointed counsel of his
> choice). U.S. Const. amend. VI; *Wheat v. United States*,
> 486 U.S. 153, 159, 108 S.Ct. 1692 1697, 100 L.Ed.2d 140
> (1988). This isn't an absolute right; it may be abridged to
> serve some compelling purpose. ***But the defendant can't
> be denied his choice of retained counsel just because the
> request comes late, or the court thinks current counsel is
> doing an adequate job.*** See, e.g., *United States v. Torres-
> Rodriguez*, 930 F.2d 1375, 1380 n. 2 (9th Cir.1991); *United
> States v. Kelm*, 827 F.2d 1319, 1322 (9th Cir.1987); *United
> States v. Collins*, 920 F.2d 619, 626 (10th Cir.1990), cert.
> denied, --- U.S. ----, 111 S.Ct. 2022, 114 L.Ed.2d 108
> (1991).

*Id.* at 1055-1056 *(emphasis added)*.

In *United States v. Lillie*, this Court also stated:

> In the absence of any finding counsel is ethically unfit, it's
> irrelevant that the district judge would be more comfortable
> with another lawyer. It's the client's comfort, not the judge's,
> that the Sixth Amendment protects.

*Id.* at 1056. *In United States v. Lillie*, this Court reversed the lower court's denial of

the substitution of the criminal defendant's court-appointed counsel with out-of-state

counsel appearing *pro hac vice*, even though the substitution was on the eve of trial

and threatened to delay the trial schedule. This Court found the right to chosen

counsel so strong that it outweighed even delay of the trial for the assistance of an out-of-state attorney appearing *pro hac vice*.

That is, the District Court cannot deny a defendant's right to counsel without extreme circumstances and grounds. Furthermore, the involvement of local counsel does not satisfy the Sixth Amendment right of the Defendant: "***But the defendant can't be denied his choice of retained counsel just because ... the court thinks current counsel is doing an adequate job.***" *Id.*

The short citation "*Collins*" mentioned in the quote from *United States v. Lillie*, *supra*, is actually to *United States v. Collins*, 920 F.2d 619, 626 (10th Cir.1990), cert. denied, 500 U.S. 920**,** 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991), in which this Court further confirmed:

> Before reaching the merits of defendant's sixth amendment claim, we address the effect of Dickstein's pro hac vice admission. Although the admission of attorneys pro hac vice is committed to the discretion of the district courts, denial of admission pro hac vice in criminal cases ***implicates the constitutional right to counsel of choice***. *Panzardi-Alvarez v. United States*, 879 F.2d 975, 980 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990); *Fuller*, 868 F.2d at 607; *Panzardi Alvarez*, 816 F.2d at 816.

*Id.* at 626 (emphasis added).

In every State within the Ninth Circuit, to Petitioner's knowledge, the admission of an attorney *pro hac vice* requires affiliating with local counsel admitted in the State. *Pro hac vice* admission is always the choice of a particular attorney in

addition to local counsel.  Here, the Defendant has a Sixth Amendment constitutional right to a team of his chosen out-of-state attorney Larry Klayman as a former federal prosecutor and a criminal defense lawyer and the local expertise of Joel Hansen as a Nevada attorney.

 "[A] decision denying a pro hac vice admission necessarily implicates constitutional concerns." *Panzardi-Alvarez v. United States*, 879 F.2d 975, 980 (1st Cir.1989).  The right to retain particular counsel of his own choosing stems from a defendant's right to decide what kind of case he wishes to present in his defense.  *U.S. v. Nichols*, 841 F.2d 1485, 1502 (10th Cir.1988).

The Petitioner's right to defend himself under his constitutional right of due process and right to an attorney unavoidably includes how he chooses to present a legal defense, on what grounds, and emphasizing the concepts, issues, facts, and approach he deems best so as to preserve his liberty interest against a possible criminal conviction.  Therefore, the choice of a defendant's attorney(s) is a constitutionally-protected right, because the choice of the attorney(s) can have a significant effect upon how the criminal defendant's defense is organized and presented.

Therefore, here, the District Court may not lightly deny the Petitioner's attorney's *pro hac vice* application, arguably subject to constitutional strict scrutiny.

A person's right to retain counsel of his choice therefore represents " 'a right of

constitutional dimension'" *U.S. v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir.1982) (citing *U.S. v. Wisniewski*, 478 F.2d 274, 285 (2d Cir.1973)), the denial of which may rise to the level of a constitutional violation. *Birt v. Montgomery*, 725 F.2d 587, 592 (11th Cir.) (*en banc*), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984); *Wilson v. Mintzes*, 761 F.2d 275, 278-79 (6th Cir. 1985).

This right of counsel is so sacrosanct, that In *United States v. Gonzalez-Lopez*, 399 F.3d 924, 932 (8th Cir. Mo. 2005), the Court vacated the conviction against the defendant because the trial court had improperly denied the *pro hac vice* application of defendants' counsel of choice by relying on improper evidence.

In *United States v. Walters,* 309 F.3d 589, 592 (9th Cir. Cal. 2002), even though a *pro hac vice* attorney there may have properly been denied due to the fact that he resided and had an office in California,[5] yet in a <u>criminal</u> context, the tribunal found that denial was improper because "the district court applied the local rule mechanistically, without discussion of whether the interest of the fair, efficient, and orderly administration of justice required denial of the application." *Id.*

Here, Judge Navarro erred even more than in *United States v. Walters*, by "mechanistically" applying an arbitrary and erroneous standard that an attorney's application must wait until the outcome of a bar proceeding; a "catch 22" that if allowed to stand would result in Petitioner being tried and potentially convicted and

---

[5]    I.e., the attorney there was not actually out-of-state and should have pursued admission generally to the California bar rather than *pro hac vice* admission.

sentenced to life imprisonment before the District of Columbia Bar proceeding had

even, with all appeals, being concluded. That ruling amounts to an abuse of discretion

and is clear error as a matter of constitutional and related law.

 Therefore, Judge Navarro's ruling leaves Cliven Bundy in jail, without bond,

without a full criminal defense team, denied his Sixth Amendment right to counsel.


### B. Pro Hac Vice Cannot be Postponed Indefinitely or Denied Based on Still-Pending, Undecided, and Unproven Accusation

 Judge Navarro denied the Petitioner's second, April 12, 2016, application for

admission *pro hac vice* because of an unresolved bar proceeding that was retaliatory

in nature and has languished for nearly 10 years.    The District Court should not and

cannot presume Mr. Klayman guilty until proven innocent, even were this the proper

standard for pro hac vice admission, which it is clearly not.  There has not been any

finding against Mr. Klayman in that proceeding and Petitioner has a right to a full

defense team of his choosing, as set forth above.

### C. This Ninth Circuit Has Correctly Concluded that Pro Hac Vice Standards in this Circuit Had Been Misapplied Some Lower Court Judges

 In 2015, this Court stated that lower courts in the Ninth Circuit have been

inadequate in applying consistent standards for a *pro hac vice* attorney admission

application:

> We have offered little guidance about what constitutes a
> valid reason for denying pro hac vice admission in a civil
> case. Some of our sister circuits permit district courts to

deny an application for pro hac vice admission only in rare circumstances. For instance, the Fifth Circuit has held that

> [a]n applicant for admission pro hac vice who is a member in good standing of a state bar may not be denied the privilege to appear except "on a showing that in any legal matter, whether before the particular district court or in another jurisdiction, he has been guilty of unethical conduct of such a nature as to justify disbarment of a lawyer admitted generally to the bar of the court."

*In re Evans*, 524 F.2d at 1007 (quoting *Sanders v. Russell*, 401 F.2d 241, 247-48 (5th Cir. 1968)). The Eleventh Circuit has continued to apply this stringent standard following its split from the Fifth Circuit. See *Schlumburger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) ("Absent a showing of unethical conduct rising to a level that would justify disbarment, the court must admit the attorney.").

In other circuits, district courts have broader discretion to refuse pro hac vice admission. For instance, the Sixth Circuit has held that an attorney's pro hac vice admission may be revoked where conflicts of interest exist, or where "some evidence of ethical violations was present." *D.H. Overmeyer Co., Inc. v. Robson*, 750 F.2d 31, 34 (6th Cir. 1984). And the Fourth Circuit has held that a district court may deny an attorney permission to appear pro hac vice based on the attorney's "unlawyer-like conduct in connection with the case in which he wished to appear." *Thomas v. Cassidy*, 249 F.2d 91, 92 (4th Cir. 1957) (per curiam).

We need not announce specific factors that should inform a district court's exercise of its discretion to deny pro hac vice admission. To resolve this case, we need only define the outer limits of that discretion. At minimum, a court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the

- 17 -

orderly administration of justice, see *Ries*, 100 F.3d at 1471, or some other legitimate policy of the courts, see *Roma Constr. Co.*, 96 F.3d at 577 (concluding that a district court abused its discretion where its decision to deny pro hac vice admission was "based on criteria that are not set forth in writing, that do not reasonably support its action, and that do not appear to respond to any general policy of the District . . . .").

We recognize that "counsel from other jurisdictions may be significantly more difficult to reach or discipline than local counsel." *Ries*, 100 F.3d at 1471. However, "[a]dmission to the state bar is the essential determinant of professional ethics and legal competence," ***and, in practice, "the application process for admission before the federal district courts is generally perfunctory and pro forma*."** *Zambrano*, 885 F.2d at 1483. ***Therefore, if a court has ethical doubts about an attorney who is in good standing with a state bar, it must articulate some reasonable basis for those doubts before denying the attorney's application for pro hac vice admission.***

We conclude that the district court's decision to deny pro hac vice admission to Lowe was arbitrary, and therefore lay outside the district court's discretion.

*United States v. U.S. Dist. Court for the Dist. of Nevada* (In re United States), 791 F.3d 945, 956-957 (9th Cir., June 29, 2015) attached as Exhibit H, (emphasis added).

## D. **Mandamus is Appropriate Remedy for *Pro Hac Vice* Admission**

This Ninth Circuit previously approved of the use of a petition for writ of mandamus for the denial of admission of attorneys *pro hac vice* -- also from the same District Court in Nevada. However, the trial court in that case withdrew its objection to the *pro hac vice* admissions.

The United States has filed a petition for a writ of

- 18 -

mandamus challenging a district judge's policy restricting the pro hac vice admission of government attorneys. After the petition was filed, the district judge reversed his previous order denying an attorney in this case pro hac vice admission. The United States contends that the district judge's reversal of his previous order did not render this controversy moot, and requests that we exercise our supervisory and advisory mandamus power to issue guidance to the district court. We agree that the controversy remains live, conclude that the district court erred, and find that guidance to the district court is appropriate.

*United States v. U.S. Dist. Court for the Dist. of Nevada,* at 949.

E. **Mandamus "Bauman" Standards are Met Here**

This Court analyzes whether a writ of mandamus is warranted by weighing five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977):

To determine whether mandamus relief is appropriate, we weigh five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650, 654-55 (9th Cir. 1977):

(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Id.* (citations omitted). The Bauman factors are not exhaustive, see *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982) (listing additional

considerations), and "should not be mechanically applied," *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). While all the factors need not be present to issue the writ, id., "the absence of factor three-clear error as a matter of law-will always defeat a petition for mandamus . . . ." *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000) (internal quotation marks omitted).

*United States v. U.S. Dist. Court for the Dist. of Nevada* at 955; *Credit Suisse v. United States Dist. Court*, 130 F.3d 1342, 1345 (9th Cir. 1997).

Guidelines for issuing a writ are more flexible when the court of appeals exercises its supervisory mandamus authority, which is invoked in cases "involving questions of law of major importance to the administration of the district courts." *Arizona v. United States Dist. Court (In re Cement Antitrust Litig.)*, 688 F.2d 1297, 1303, 1307 (9th Cir. 1982) (showing of actual injury and ordinary error may suffice).

Failure to seek certification under 28 U.S.C. § 1292(b) does not preclude mandamus relief. *See Executive Software North Am., Inc. v. United States Dist Court*, 24 F.3d 1545, 1550 (9th Cir. 1994) (stating that permissive appeal under § 1292(b) is not a "contemporaneous ordinary appeal"), *overruled on other grounds by California Dep't of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008). Clearly here Judge Navarro given her two arbitrary denials of Mr. Klayman's pro hac vice applications would not certify her arbitary rulings in any event.

Mandamus relief may be appropriate to settle an important question of first impression that cannot be effectively reviewed after final judgment. *See Medhekar v.*

*United States Dist. Court*, 99 F.3d 325, 327 (9th Cir. 1996) (per curiam) (noting that where the fifth *Bauman* factor is present, the third and fourth factors generally will not be present).

Here, the factors are present calling for a writ of mandamus under Bauman:

1)      Criminal prosecution has already begun and is now occurring. Denial of chosen counsel has already had effects on the Petitioner's legal rights and is having an impact on a daily basis. The damage from not having adequate legal advice and representation now cannot be undone later.

2)      The damage cannot be corrected on appeal, including because effective assistance of counsel is necessary to preserve issues for appeal and there are many other actions that may complete the record that would be reviewed on appeal.

This court in *Christensen v. United States Dist. Court*, 844 F.2d 694, 696-99 (9th Cir. 1988) observed that an inability to be represented during trial by chosen counsel cannot be effectively reviewed on appeal from final judgment. This Court granted a petition for writ of mandamus where lawyer had been excluded from representing the defendant.

The lack of an effective legal team functioning at every stage of criminal prosecution can directly impact whether issues can be appealed.

FRAP Rule 28-2.5 reminds us of the general rule that an appellate court will not hear an appeal of an error that was not properly objected to, perhaps with an

appropriate proffer and/or documentation of asserted facts.

**[Rule 28: Contents of Brief]  28-2.5. Reviewability and Standard of Review**

> As to each issue, appellant shall state where in the record on appeal the issue was raised and ruled on and identify the applicable standard of review.
>
> In addition, if a ruling complained of on appeal is one to which a party must have objected at trial to preserve a right of review, e.g., a failure to admit or to exclude evidence or the giving of or refusal to give a jury instruction, the party shall state where in the record on appeal the objection and ruling are set forth.

Thus, denial of a defendant's chosen attorney in a criminal prosecution cannot be cured later.  What issues are raised, how they are documented in the record, and how appeals are preserved can prevent appellate review under appellate rules.

3)     As shown elsewhere, the District Court's decision to wait until the conclusion of proceedings years later before the District of Columbia Bar  presents a clear constitutional error and an abuse of discretion.  Basing the denial of the right to counsel on sheer speculation about what might happen in a case that has not gone to a decision is an erroneous standard.

4)     As shown by the prior precedent in this Court (See Section D, *infra*), the District Court in Nevada has demonstrated uncertainty about the application of sound discretion for attorney *pro hac vice* admission applications.  Furthermore, the issue is likely to arise repeatedly in the future such that this Court's guidance would be

helpful for the administration of justice in the future.

5)    The District Court's order raises important problems to the extent that the District Court by this judge and in previous Nevada cases believes that a trial court *pro hac vice* applications may be denied without relevant and lawful constitutional criteria being met.  As this Court explained in *United States v. U.S. Dist. Court for the Dist. of Nevada*:

> However, that discretion is not unbounded. Local Rule IA 10-3 does not empower a district court to refuse pro hac vice admission arbitrarily. *See Zambrano v. City of Tustin*, 885 F.2d 1473, 1483 (9th Cir. 1989) ("***Admission to a state bar creates a presumption of good moral character that cannot be overcome at the whims of the District Court***." (quoting *In re Evans*, 524 F.2d 1004, 1007 (5th Cir. 1975) (internal quotations marks omitted))); *cf. Munoz*, 439 F.2d at 1179 (expressing confidence that the district judge "will not exercise his discretionary power arbitrarily" and therefore declining to "fix precise guidelines" governing pro hac vice admission under a district's local rules). Therefore, a district court must articulate a valid reason for its exercise of discretion. *See Roma Constr. Co. v. Russo*, 96 F.3d 566, 577 (1st Cir. 1996); *cf. United States v. Ries*, 100 F.3d 1469, 1472 (9th Cir. 1996) (holding, in a criminal case, that "[i]n denying a pro hac vice application, the judge must articulate his reasons, for the benefit of the defendant and the reviewing court").

*United States v. U.S. Dist. Court for the Dist. of Nevada* at 956 (emphasis added).

## V.    <u>CONCLUSION AND REQUEST FOR RELIEF</u>

Respectfully, this Court should issue a writ of mandamus ordering the District Court to admit attorney Larry Klayman *pro hac vice* as counsel for Defendant Cliven

D. Bundy immediately, before further constitutional and other rights are abridged. If the lower court's denial of pro hac vice are not reversed, the criminal case against Defendant Cliven Bundy will already be tried long before the District Court decides on the *pro hac vice* application.

This petition for a writ of mandamus thus respectfully requests that the later, April 12, 2016, application be ordered granted. Judge Navarro admitted in her April 19, 2016, Order that "In this Order [earlier on March 31, 2016], the Court denied the Verified Petition *without prejudice* … (*Id.*)." *Id.* (emphasis added). However, the District Court must respectfully now be ordered to act upon and grant the application immediately, not years in the future after the prosecution is over.

Dated: July 6, 2016                          Respectfully submitted,

                                             _____/s/ Larry Klayman, Esq._____.
                                             Larry Klayman, Esq.
                                             KLAYMAN LAW FIRM
                                             Washington, D.C. Bar No. 334581
                                             2020 Pennsylvania Avenue N.W.
                                                 Suite 800
                                             Washington, D.C. 20006
                                             (310) 595-0800
                                             leklayman@gmail.com
                                             Attorney for Petitioner

                                             _____/s/ Joel F. Hansen, Esq._____.
                                             **JOEL F. HANSEN, ESQ.**
                                             Nevada Bar No. 1876
                                             **HANSEN RASMUSSEN, LLC**
                                             1835 Village Center Circle
                                             Las Vegas, Nevada 89134

1
(702) 385-5533
joelh@hrnvlaw.com
2
Co-Counsel for Petitioner

3

4
## CERTIFICATE OF SERVICE

5

6
      I hereby certify that on July 6, 2016, I electronically filed the foregoing
Petition for Writ of Mandamus document with the Clerk of the Court by using the
7
CM/ECF system, which will send a notice of electronic filing to opposing counsel
registered on CM/ECF.

8

9
Courtesy Copy per as directed by
Federal Rules of Appellate Procedure
10
Rule 21(a)(1) to:
11
The Honorable Gloria Navarro
U.S. District Court for the District of Nevada
12
333 S. Las Vegas Blvd.
13
Las Vegas, Nevada 89101

14
Steven W. Myhre, Esq.
15
U.S. Attorney's Office
501 Las Vegas Blvd South , Suite 1100
16
Las Vegas, Nevada 89101
17
702-388-6336
702-388-6296 (fax)
18
Steven.Myhre@usdoj.gov
19
Attorney representing Plaintiff United States of America

20
Erin M Creegan, Esq.
21
United States Attorney District of Nevada
501 Las Vegas Blvd. South, Suite 1100
22
Las Vegas, Nevada 89101
23
702-388-6336
Erin.Creegan@usdoj.gov
24
Attorney representing Plaintiff United States of America

25
Nicholas D Dickinson, Esq.
26
US Attorneys' Office
27
501 Las Vegas Blvd. South, Suite 1100

28

Las Vegas, Nevada 89101
702-388-6336
nicholas.dickinson@usdoj.gov
Attorney representing Plaintiff United States of America

Nadia Janjua Ahmed, Esq.
U.S. Attorney's Office
501 Las Vegas Blvd South, Suite 1100
Las Vegas, Nevada 89101
702-388-6336
nadia.ahmed@usdoj.gov
Attorney representing Plaintiff United States of America

Chris Arabia, Esq.
601 S. 10th Street
Las Vegas, Nevada  89101
702-701-4391
877-858-7893 (fax)
chrisarabia@gmail.com
Attorney representing Defendant Micah L. McGuire

William C. Carrico, Esq.
Federal Public Defender
411 E Bonneville, Suite 250
Las Vegas, Nevada  89101
(702) 388-6577
(702) 388-6261 (fax)
William_Carrico@fd.org
Attorney representing Defendant Ryan W. Payne

Angela H. Dows, Esq.
Premier Legal Group
1333 North Buffalo Drive, Suite 210
Las Vegas, Nevada  89128
702-794-4411
702-794-4421 (fax)
adows@premierlegalgroup.com
Attorney representing Defendant Ryan C. Bundy

Craig W Drummond, Esq.

Drummond Law Firm, P.C.
810 S Casino Center Boulevard, Suite 101
Las Vegas, Nevada 89101
702-366-9966
702-508-9440 (fax)
craig@drummondfirm.com
Attorney representing Defendant O. Scott Drexler

Lucas Gaffney, Esq.
Oronoz, Ericsson & Gaffney LLC
1050 Indigo Drive, Suite 120
Las Vegas, Nevada 89145
702-878-2889
702-522-1542 (fax)
Luke@oronozlawyers.com
Attorney representing Defendant Melvin D. Bundy

Julian R Gregory, Esq.
Law Office of Julian Gregory, L.L.C.
324 S. 3rd Street, Suite 200
Las Vegas, Nevada  89101
702-625-1183
julian@jglawlv.com
Attorney representing Defendant Todd C. Engel

Daniel Hill, Esq.
Wolf, Rifkin, Shapiro & Schulman
3556 E. Russel Road, 2nd Floor
Las Vegas, Nevada  89120
702-341-5200
702-341-5300 (fax)
dhill@wrslawyers.com
Attorney representing Defendant Ammon E. Bundy

Terrence M Jackson, Esq.
Law Office of Terrence M. Jackson
624 South Ninth Street
Las Vegas, Nevada  89101
(702)386-0001
(702)386-0085 (fax)

Terry.Jackson.Esq@gmail.com
Attorney representing Defendant Gregory P. Burleson

Shari L. Kaufman, Esq.
Federal Public Defender
411 E Bonneville, Suite 250
Las Vegas, Nevada 89101
Shari_Kaufman@fd.org
Attorney representing Ryan W. Payne

Kristine M Kuzemka, Esq.
Kuzemka Law Group
9345 W. Sunset Road, Suite 100
Las Vegas, Nevada 89148
702-949-9990
kristine@kuzemkalaw.com
Attorney representing Defendant Jason D. Woods

Dennis Matthew Lay, Esq.
Nguyen & Lay
732 S. Sixth Street, Suite 102
Las Vegas, Nevada 89101
702-383-3200
702-675-8174 (fax)
dml@lasvegasdefender.com
Attorney representing Defendant Blaine Cooper

Andrea Lee Luem, Esq.
Law Offices of Andrea L Luem
499 South 4th Street, Suite 280
Las Vegas, Nevada 89101
702-600-8403
Andrea@luemlaw.com
Attorney representing Joseph D. O'Shaughnessy

Jess R. Marchese, Esq.
Law Office of Jess R. Marchese
601 South Las Vegas Boulevard
Las Vegas, Nevada 89101
702-385-5377

702-474-4210 (fax)
marcheselaw@msn.com
Attorney representing Eric J. Parker

Ryan Norwood, Esq.
Federal Public Defenders
411 E. Bonneville Avenue
Las Vegas, Nevada 89101
702-388-6577
Ryan_Norwood@fd.org
Attorney representing Defendant Ryan W. Payne

Shawn R Perez, Esq.
Law Office Of Shawn R. Perez
626 South Third Street
Las Vegas, Nevada 89101
(702)485-3977
shawn711@msn.com
Attorney representing Defendant Richard R. Lovelien

Cal J. Potter, III, Esq.
Potter Law Offices
1125 Shadow Lane
Las Vegas, Nevada 89102
info@potterlawoffices.com
Attorney representing  David H. Bundy

Chris T Rasmussen, Esq.
Rasmussen & Kang LLC.
330 S Third Street, Suite 1010
Las Vegas, Nevada 8910
702-464-6007
702-464-6009 (fax)
chris@rasmussenkang.com
Attorney representing Defendant Peter T. Santilli, Jr.

Brian James Smith, Esq.
Law Office of Brian J. Smith, Ltd.
9525 Hillwood Drive, Suite 190
Las Vegas, Nevada 89134

702-380-8248
702-868-5778 (fax)
brian@bjsmithcriminaldefense.com
Attorney representing Defendant Gerald A. Delemus

Richard E Tanasi, Esq.
601 South Seventh Street, 2nd Floor
Las Vegas, Nevada  89101
702-906-2411
866-299-5274 (fax)
rtanasi@tanasilaw.com
Attorney representing Defendant Steven A. Stewart

Mace J Yampolsky, Esq.
Mace Yampolsky, Ltd.
625 S. Sixth Street
Las Vegas, Nevada  89101
702-385-9777
702-385-3001 (fax)
Mace@macelaw.com
Attorney representing Defendant Brian D. Cavalier


                              /s/ Larry Klayman, Esq.      .
                          Larry Klayman, Esq.

# **EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| | Case # 2:16-cr-00046-GMN-PAL |
| UNITED STATES OF AMERICA, | |
| Plaintiff(s), | **VERIFIED PETITION FOR PERMISSION TO PRACTICE IN THIS CASE ONLY BY ATTORNEY NOT ADMITTED TO THE BAR OF THIS COURT AND DESIGNATION OF LOCAL COUNSEL** |
| vs. | |
| CLIVEN D. BUNDY, | |
| Defendant(s). | |
| | FILING FEE IS $250.00 |

_____Larry Elliot Klayman_____, Petitioner, respectfully represents to the Court:
(name of petitioner)

1.    That Petitioner is an attorney at law and a member of the law firm of

_____The Klayman Law Firm_____
(firm name)

with offices at _____2020 Pennsylvania Avenue, Suite 800_____,
(street address)

_____Washington_____, _____District of Columbia_____, _____20006_____,
(city)                           (state)                         (zip code)

_____(310) 595-0800_____, _____leklayman@gmail.com_____.
(area code + telephone number)                (Email address)

2.    That Petitioner has been retained personally or as a member of the law firm by

_____Cliven D. Bundy_____ to provide legal representation in connection with
[client(s)]

the above-entitled case now pending before this Court.

Rev. 1/15

3.     That since ____December 7, 1977____, Petitioner has been and presently is a
(date)
member in good standing of the bar of the highest Court of the State of ____Florida____
(state)
where Petitioner regularly practices law.  Petitioner shall attach a certificate from the state bar or
from the clerk of the supreme court or highest admitting court of each state, territory, or insular
possession of the United States in which the applicant has been admitted to practice law certifying
the applicant's membership therein is in good standing.

4.     That Petitioner was admitted to practice before the following United States District
Courts, United States Circuit Courts of Appeal, the Supreme Court of the United States and Courts
of other States on the dates indicated for each, and that Petitioner is presently a member in good
standing of the bars of said Courts.

| Court | Date Admitted | Bar Number |
|---|---|---|
| U.S. Supreme Court | April 25, 1988 | |
| U.S. Court of Appeals for the District of Columbia | April 22, 1988 | |
| U.S. Court of Appeals for the Ninth Circuit | January 12, 2000 | |
| U.S. District Court for the N. District of Texas | August 9, 2002 | |
| The District of Columbia Bar | December 22, 1980 | 334581 |
| The Florida Bar | December 7, 1977 | 246220 |
| U.S. District Court for the S. District of Florida | December 29,1977 | |

5.     That there are or have been no disciplinary proceedings instituted against petitioner,
nor any suspension of any license, certificate or privilege to appear before any judicial, regulatory
or administrative body, or any resignation or termination in order to avoid disciplinary or
disbarment proceedings, except as described in detail below:

The only disciplinary case pending is in the District of Columbia, disclosed in the attached. During
my 39 years as an attorney, I have remained continually in good standing with every jurisdiction
that I have been admitted to, but have responded to a few complaints explained in the attached
statement. I also allowed my bar membership in Pennsylvania to lapse for lack of use by not
completing CLE's there, but remain eligible for reinstatement.  See attached statement.

2

Rev. 1/15

6. That Petitioner has never been denied admission to the State Bar of Nevada. (Give particulars if ever denied admission):

Petitioner has never been denied admission to the State Bar of Nevada.

7. That Petitioner is a member of good standing in the following Bar Associations.

The Florida Bar
The District of Columbia Bar

8. Petitioner has filed application(s) to appear as counsel under Local Rule IA 10-2 during the past three (3) years in the following matters: (State "none" if no applications.)

| Date of Application | Cause | Title of Court Administrative Body or Arbitrator | Was Application Granted or Denied |
| --- | --- | --- | --- |
| none | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(If necessary, please attach a statement of additional applications)

9. Petitioner consents to the jurisdiction of the courts and disciplinary boards of the State of Nevada with respect to the law of this state governing the conduct of attorneys to the same extent as a member of the State Bar of Nevada.

10. Petitioner agrees to comply with the standards of professional conduct required of the members of the bar of this court.

11. Petitioner has disclosed in writing to the client that the applicant is not admitted to practice in this jurisdiction and that the client has consented to such representation.

3

Rev. 1/15

That Petitioner respectfully prays that Petitioner be admitted to practice before this Court FOR THE PURPOSES OF THIS CASE ONLY.

_____
Petitioner's signature

STATE OF _____California_____ )
                              )
COUNTY OF _____Los Angeles_____ )

_____Larry E. Klayman_____, Petitioner, being first duly sworn, deposes and says:

That the foregoing statements are true.

_____
Petitioner's signature

Subscribed and sworn to before me this

_22_ day of _March_, _2016_

_____
Notary Public or Clerk of Court

KIM PAYTON
Commission # 2053723
Notary Public - California
Los Angeles County
My Comm. Expires Dec 29, 2017

## DESIGNATION OF RESIDENT ATTORNEY ADMITTED TO THE BAR OF THIS COURT AND CONSENT THERETO.

Pursuant to the requirements of the Local Rules of Practice for this Court, the Petitioner believes it to be in the best interests of the client(s) to designate _____Joel F. Hansen, Esq._____,
                                                                                    (name of local counsel)
Attorney at Law, member of the State of Nevada and previously admitted to practice before the above-entitled Court as associate resident counsel in this action. The address and email address of said designated Nevada counsel is:

_____Hansen Rasmussen,LLC_____   _____1835 Village Center Circle_____,
                                        (street address)

_____Las Vegas_____,   _____Nevada_____,   _____89134_____,
      (city)                  (state)            (zip code)

_____(702) 385-5533_____,   _____Joelh@hrnvlaw.com_____.
(area code + telephone number)      (Email address)

4

Rev. 1/15

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

# ACKNOWLEDGMENT

State of California

County of Los Angeles

On March 22, 2016 before me, Kim Payton

A Notary Public personally appeared Larry E. Klayman

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Kim Payton

KIM PAYTON
Commission # 2053723
Notary Public - California
Los Angeles County
My Comm. Expires Dec 29, 2017

(Seal)

By this designation the petitioner and undersigned party(ies) agree that this designation constitutes agreement and authorization for the designated resident admitted counsel to sign stipulations binding on all of us.

## APPOINTMENT OF DESIGNATED RESIDENT NEVADA COUNSEL

The undersigned party(ies) appoint(s) _____ Joel F. Hansen, Esq. _____ as
(name of local counsel)
his/her/their Designated Resident Nevada Counsel in this case.

_____
(party's signature)

Cliven D. Bundy — *Incarcerated*
(type or print party name, title)

*Joel F. Hansen has*
(party's signature)
*already appeared for*
*Cliven Bundy*
_____
(type or print party name, title)

### CONSENT OF DESIGNEE
The undersigned hereby consents to serve as associate resident Nevada counsel in this case.

_____
Designated Resident Nevada Counsel's signature

*1876*          Joelh@hrnvlaw.com
Bar number          Email address

APPROVED:

Dated: this _____ day of _____, 20___.

_____
UNITED STATES DISTRICT JUDGE

5

Rev. 1/15

## ADDITIONAL INFORMATION FOR APPLICATION OF LARRY E. KLAYMAN IN RESPONSE TO QUESTION 5

I agreed to a public reprimand before The Florida Bar several years ago. There was no showing of dishonesty, just that having been in poor financial condition in large part as result of the recession of 2008, as I could not fully pay timely a mediated settlement with a client. I was also going through a difficult personal period with my former spouse and my children. There was no suspension to practice law for even one day.

There is a disciplinary proceeding pending before the District of Columbia Board of Professional Responsibility that was filed almost 8 years ago over a claim by Judicial Watch, my former public interest group that I founded and was Chairman and General Counsel, after I left Judicial Watch to run for the U.S. Senate in Florida in 2003-04, that by representing a former client, employee and donor that it had abandoned, sexually harassed and defrauded that I was in conflict of interest. I represented these persons pro bono, did not breach any confidences with Judicial Watch, and did so only to protect their interests in an ethical fashion. I did not seek to break any agreements with Judicial Watch but rather to have them enforced to help these persons. The matter is likely to be resolved in my favor and there has been no disciplinary action. I recently obtained a jury verdict and court judgment in the U.S. District Court for the Southern District of Florida against Judicial Watch for having maliciously defamed me in the amount of $181,000 USD, including punitive damages. The current directors feel competitive with me and attempted to harm my reputation.

Many years ago, 22 and 18 years respectively two judges vindictively stated that I could

not practice before them after I challenged rulings they had made on the basis of bias and

prejudice. These judges were William D. Keller and Denny Chin of the U.S. District Court of the

Central District of California and the U.S. District Court for the Southern District of New York.

The rulings applied to them not to to the tribunal or judicial body as a whole. The bars of the

District of Columbia and Florida reviewed these rulings and found that I did not act unethically.

     I have been engaged in the practice of law for going on 40 years and have been a member

in good standing continuously of The Florida Bar and the District of Columbia Bar. See attached

Certificates of Good Standing.



# The Florida Bar

JOHN F. HARKNESS, JR.
EXECUTIVE DIRECTOR

651 EAST JEFFERSON STREET
TALLAHASSEE, FLORIDA 32399-2300

850/561-5600
WWW.FLORIDABAR.ORG

State of Florida      )

County of Leon        )

In Re:      246220
            Larry Elliot Klayman
            2020 Pennsylvania Ave, N.W., #345
            Washington, DC

I HEREBY CERTIFY that I am the duly appointed custodian of membership records of The Florida Bar.

I FURTHER CERTIFY that the records in the office of the Clerk of the Supreme Court of Florida indicate that said attorney was admitted to practice law in the State of Florida on December 7, 1977.

I FURTHER CERTIFY that the records in the office of The Florida Bar indicate that the above attorney is an active member of The Florida Bar in good standing.

Dated this 15th day of March, 2016.

Pam Gerard, Manager
Membership Records Dept.
The Florida Bar

PG/JM:ksm1:R10



District of Columbia Court of Appeals
Committee on Admissions
430 E Street, N.W. — Room 123
Washington, D. C. 20001
202 / 879-2710

I, *JULIO A. CASTILLO*, Clerk of the District of Columbia Court of Appeals, do hereby certify that

## LARRY E. KLAYMAN

was on **DECEMBER 22, 1980** duly qualified and admitted as an attorney and counselor entitled to practice before this Court and is, on the date indicated below, an active member in good standing of this Bar.

In Testimony Whereof, I have hereunto subscribed my name and affixed the seal of this Court at the City of Washington, D.C., on **March 11 , 2016**.

JULIO A. CASTILLO
Clerk of the Court

By: _____
Deputy Clerk

# United States District & Bankruptcy Courts
## for the District of Columbia
### CLERK'S OFFICE
### 333 Constitution Avenue, NW
### Washington, DC 20001

---

I, **ANGELA D. CAESAR,** Clerk of the United States District Court for the

District of Columbia, do hereby certify that:

### LARRY E. KLAYMAN

was, on the  6th  day of  May  A.D.  1985  admitted to practice as an Attorney

at Law at the Bar of this Court, and is, according to the records of this Court, a

member of said Bar in good standing.


In Testimony Whereof, I hereunto subscribe my name and affix the seal of said Court

in the City of Washington this  11th  day of  March  A.D. 2016.


ANGELA D. CAESAR, CLERK

By: _____

Public Operations Administrator

# Supreme Court of Florida
## Certificate of Good Standing

*I JOHN A. TOMASINO, Clerk of the Supreme Court of the State of Florida, do hereby certify that*

### LARRY ELLIOT KLAYMAN

*was admitted as an attorney and counselor entitled to practice law in all the Courts of the State of Florida on* December 7, 1977, *is presently in good standing, and that the private and professional character of the attorney appear to be good.*

*WITNESS my hand and the Seal of the Supreme Court of Florida at Tallahassee, the Capital, this November 24, 2015.*

_____

*Clerk of the Supreme Court of Florida.*

# EXHIBIT B

1  **JOEL F. HANSEN, ESQ.**
   Nevada Bar No. 1876
2  **HANSEN RASMUSSEN, LLC**
   1835 Village Center Circle
3  Las Vegas, Nevada  89134
   (702) 385-5533
4  Attorney for Defendant Cliven D. Bundy

5

6                      **UNITED STATES DISTRICT COURT**

7                          **DISTRICT OF NEVADA**

8  UNITED STATES OF AMERICA,              CASE NO.       2:16-cr-00046–GMN-PAL

9                      Plaintiff,

10 vs.

11 CLIVEN D. BUNDY, et al,

12                      Defendants

13

14    **SUPPLEMENT TO VERIFIED PETITION FOR PERMISSION TO PRACTICE IN THIS
     CASE ONLY BY ATTORNEY NOT ADMITTED TO THE BAR OF THIS COURT AND**
15                      **DESIGNATION OF LOCAL COUNSEL**

16        Moving counsel Joel Hansen and Defendant Cliven Bundy respectfully request the honorable

17 court consider and grant the pro hac vice application of co-counsel Larry Klayman at this time. This is

18 important as this case is currently on a short time track, this is a complex case which is very fact and

19 law intensive, and moving counsel and Mr. Bundy need his co-counsel to help prepare a defense. In

20 addition, the government when asked suggested that it would not object to the entry of Mr. Klayman

21 into the case.

22        In sum, as this is a criminal case and Defendant  Bundy has a right to choose his counsel, and,

23 in the interest of justice, moving counsel respectfully requests that the honorable Court grant pro hac

24 vice

25 / / /

26 / / /

27 / / /

28 / / /

1   status so that co-counsel can participate fully in an upcoming discovery conference on Tuesday, March

2   29, 2016 at 2:00 p.m. and begin to prepare a defense in this very complex case. as one counsel is not

3   enough to represent Defendant Bundy under these exigent and complex circumstances

4           DATED this 28th day of March, 2016.

5                                   Respectfully submitted,

6                           BY:     /s/ Joel F. Hansen
                                    JOEL F. HANSEN, ESQ.
7                                   Nevada Bar # 1876
                                    1835 Village Center Circle
8                                   Las Vegas, NV 89134
                                    Attorney for Defendant Cliven D. Bundy
9

10                          **CERTIFICATE OF SERVICE**

11          Pursuant to NRCP 5 (b), I hereby certify that on this 28th day of March, 2016, I served a copy
    of the foregoing SUPPLEMENT TO VERIFIED PETITION FOR PERMISSION TO PRACTICE IN
12  THIS CASE ONLY BY ATTORNEY NOT ADMITTED TO THE BAR OF THIS COURT AND
    DESIGNATION OF LOCAL COUNSEL as follows:

13

14          X       Electronic Service - via the Court's electronic service system; and/or

15          ☐       U.S. Mail – By depositing a true copy thereof in the U.S. mail, first class postage
                    prepaid and addressed as listed below; and/or

16          ☐       Facsimile – By facsimile transmission pursuant to EDCR 7.26 to the facsimile
                    number(s) shown below and in the confirmation sheet filed herewith. Consent to service
17                  under NRCP 5(b)(2)(D) shall be assumed unless an objection to service by facsimile
                    transmission is made in writing and sent to the sender via facsimile within 24 hours of
18                  receipt of this Certificate of Service; and/or

19          ☐       Hand Delivery – By hand - delivery to the address listed below.

20
    DANIEL G. BOGDEN
21  United States Attorney
    STEVEN W. MYHRE
22  NICHOLAS D. DICKINSON
    Assistant United States Attorneys
23  NADIA J. AHMED
    ERIN M. CREEGAH
24  Special Assistant United States Attorneys
    333 Las Vegas Blvd. South, Suite 5000
25  Las Vegas, NV 89101

26
                                    /s/ Lisa M. Sabin
27                                  An Employee of HANSEN ◊ RASMUSSEN

28

# EXHIBIT C

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No.: 2:16-cr-046-GMN-PAL |
| vs. ) | |
| ) | **ORDER** |
| CLIVEN D. BUNDY, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

Pending before the Court is Petitioner Larry Elliot Klayman's ("Klayman's") Verified Petition for Permission to Practice in the case of Defendant Cliven D. Bundy ("Verified Petition"). (ECF No. 166). As explained below, this Verified Petition is **DENIED** for failure to fully disclose disciplinary actions and related documents.

A defendant's "choice of counsel must be respected unless it would . . . burden the court with counsel who is incompetent or unwilling to abide by court rules and ethical guidelines." *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002). Criminal defendants have a Sixth Amendment "qualified constitutional right to hire counsel of their choice but the right is qualified in that it may be abridged to serve some compelling purpose." *Id.* (internal quotation marks omitted). Such compelling purpose includes "the fair, efficient and orderly administration of justice." *Id.* (citation omitted). "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

Klayman's Verified Petition discloses a "disciplinary case pending . . . in the District of Columbia." (Verified Pet. 2, ECF No. 166). In his attachment describing the matter in more detail, Klayman explains that the "matter is likely to be resolved in my favor and there has been no disciplinary action." (*Id.* at 7). The Court finds that this disclosure is misleading and incomplete.

On June 23, 2014, the District of Columbia Court of Appeals Board on Professional Responsibility received an Affidavit of Negotiated Disposition ("Affidavit") and signed Petition for Negotiated Discipline, attached to this Order as Exhibits 1 and 2, respectively. The Petition for Negotiated Discipline relates to three different cases and contains three counts for violations, including Rule Governing the Florida Bar 4-1.9(a) and District of Columbia Rule of Professional Conduct 1.9 and 8.4(d). (Ex. 2 at 2–6). This matter was resolved with an "Agreed Upon Sanction" of a "public censure." (*Id.* at 6). The Petition for Negotiated Discipline is signed by Klayman. (*Id.* at 14). Further, Klayman's Affidavit states: "I affirm that the stipulated facts in the accompanying petition and this affidavit are true and support the stipulated misconduct and the agreed upon sanction." (Ex. 1 ¶ 4). These documents were not provided by counsel, and they are admissions of three separate incidents of stipulated misconduct that were not clearly disclosed in Klayman's Verified Petition.

Accordingly, Klayman's Verified Petition is denied without prejudice. Should Klayman wish to file a new Verified Petition with the Court, the following information should be included: (1) the case numbers for the cases before Judge William D. Keller and Judge Denny Chin that resulted in these judges precluding Klayman's practice before them; (2) verification of the review by the Bar Associations of the District of Columbia and Florida finding that Klayman did not act unethically before Judges Keller and Chin; (3) an updated Certificate of

Good Standing from the Supreme Court of Florida;[1] (4) the Florida Bar Association's reprimand verifying that there was no showing of dishonesty in connection with their disciplinary action; (5) the Exhibits attached to this Order; and (6) verification that the matter in the District of Columbia disciplinary case referenced in the Verified Petition (Verified Pet. 7) has been resolved with no disciplinary action.

     **IT IS HEREBY ORDERED** that Petitioner Larry Elliot Klayman's Verified Petition (ECF No. 166) is **DENIED without prejudice**.

     **DATED** this __31__ day of March, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Court

---

[1] The Certificate of Good Standing from the Supreme Court of Florida attached to Klayman's Verified Petition is dated November 24, 2015, over five months ago. (Verified Pet. 12, ECF No. 166).

Page 3 of 3

# EXHIBIT  1

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of               :

       LARRY E. KLAYMAN, ESQUIRE,    :    Bar Docket No. 2008-D048

       Respondent               :

Member of the Bar of the District of    :
   Columbia Court of Appeals        :
Bar Number: 334581             :
Date of Admission: December 22, 1980   :

RECEIVED

JUN 2 3 2014

Board on Professional Responsibility

### AFFIDAVIT OF NEGOTIATED DISPOSITION

I, Larry E. Klayman, affiant, pursuant to D. C. Bar Rule XI, §12.1(b)(2) and Board Rule 17.3(b), and in furtherance of my wish to enter into a negotiated disposition, declare as follows:

1.     I understand that I have the right to the assistance of counsel in this matter. I am not represented by counsel.

2.     I am aware that there is currently pending a petition and specification of charges alleging misconduct, which is also set forth in the petition for negotiated discipline.

3.     I have carefully reviewed both the petition for negotiated discipline and this affidavit.

4.     I affirm that the stipulated facts in the accompanying petition and this affidavit are true and support the stipulated misconduct and the agreed upon sanction.

5.     I am agreeing to this negotiated discipline because I believe that I could not successfully defend against disciplinary proceedings based on the stipulated misconduct.

6.     I am freely and voluntarily entering into the negotiated disposition. I am not being subjected to coercion or duress.

7.     I acknowledge that Bar Counsel has made no promises or inducements other than what is contained in the accompanying petition for negotiated discipline.

8.     I understand that the petition for negotiated discipline and this affidavit shall become public once they are filed with the Executive Attorney for the Board on Professional Responsibility, at which time all proceedings before the Hearing Committee shall become open to the public, and any exhibits introduced into evidence, any pleadings filed by the parties, and any transcript of the proceeding shall be available for public inspection.

9.     I am fully aware of the implications of this negotiated discipline including, but not limited to, that by entering into this negotiated discipline I am giving up the following rights:

        (a)     My right to a contested hearing before a Hearing Committee at which I could cross-examine adverse witnesses and compel witnesses to appear on my behalf;

        (b)     My right to require that Bar Counsel prove each and every charge by clear and convincing evidence;

        (c)     My right to seek review of an adverse determination by a Hearing Committee by filing exceptions with the Board to the Hearing Committee's report and recommendations; and

        (d)     My right to appeal to the District of Columbia Court of Appeals ("Court") by filing exceptions to the Board's report and recommendations.

10.    I understand that the negotiated disposition, if approved, may affect:

        (a)     My present and future ability to practice law, and

        (b)     My bar memberships in other jurisdictions.

2

11.     I understand that this negotiated disposition could be rejected by the Hearing Committee pursuant to D.C. Bar Rule XI, § 12.1(c) and Board Rule 17.7, or by the Court pursuant to D.C. Bar Rule XI, § 12.1(d).

12.     I understand that any sworn statement made by me in the petition for negotiated discipline, the accompanying affidavit, or the limited hearing may be used for purposes of impeachment at any subsequent hearing on the merits.

13.     I understand that the negotiated discipline proposes that, for my stipulated misconduct, I should receive a public censure.

14.     In mitigation of my misconduct, I submit the following:

      (a)     I accept full responsibility for my misconduct;

      (b)     I have fully cooperated with Bar Counsel; and

      (c)     My conduct did not involve dishonesty or personal gain.

Larry E. Klayman, Esquire
Respondent

SUBSCRIBED and affirmed before me this 23rd day of June 2014.

My Commission Expires: 12/31/2018

Notary Public

Larry E. Klayman, Esquire
Respondent

# EXHIBIT  2

Case 2:16-cc-00046-CMN-PAL Document 231-5 Filed 07/31/16 Page 63 of 234

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of                                              :
                                                              :
    LARRY E. KLAYMAN, ESQUIRE,          :   Bar Docket No. 2008-D048
                                                              :
    Respondent                           :
                                                              :
Member of the Bar of the District of                          :
  Columbia Court of Appeals               :
Bar Number: 334581                                            :
Date of Admission: December 22, 1980       :
                                                              :

**RECEIVED**

**JUN 2 3 2014**

Board on Professional Responsibility

## PETITION FOR NEGOTIATED DISCIPLINE

Bar Counsel and Respondent, Larry E. Klayman, Esquire, agree to enter into a negotiated discipline pursuant to D.C. Bar Rule XI, § 12.1 and Board Rule 17.3. Respondent is the subject of the above-referenced investigations by Bar Counsel pursuant to D.C. Bar Rule XI §§ 6(a)(2), 8(a) and Board Rule 2.1.

Respondent is an attorney admitted to practice before the District of Columbia Court of Appeals, having been admitted on December 22, 1980.

### I.   STATEMENT OF THE NATURE OF THE MATTER

This matter was docketed for investigation January 28, 2008, upon Bar Counsel's receipt and review of an ethical complaint filed by Mr. Thomas J. Fitton, President of Respondent's former client, Judicial Watch, reporting that Respondent engaged in a conflict of interest in three different matters.

### II.   STIPULATION OF FACTS AND CHARGES

1.    From or about July 29, 1994, until September 19, 2003, Respondent, who founded Judicial Watch, served as the Chairman and General Counsel of Judicial Watch. As General

Counsel, Respondent served as the organization's lead attorney and observed all legal matters associated with or affecting Judicial Watch.

## A. COUNT I

2.      Sandra Cobas was formerly employed as the Director of Judicial Watch's Miami Regional Office.

3.      While employed with Judicial Watch, Ms. Cobas claimed she was in a hostile work environment. The conduct she complained of occurred between June 5 through August 29, 2003, prior to the time that Respondent ended his employment as General Counsel of Judicial Watch.

4.      Also prior to ending his employment as General Counsel of Judicial Watch, Respondent was aware of Ms. Cobas's concerns giving rise to her claim of a hostile work environment, and was requested by Ms. Cobas to intercede.

5.      On or about August 25, 2005, Ms. Cobas filed a civil complaint against Judicial Watch through an attorney other than Respondent in the Circuit Court of the 11th Judicial Circuit in and for Miami, Dade County, Florida, styled *Cobas v. Fitton, et al*. The lawsuit alleged, *inter alia*, a hostile work environment.

6.      On or about July 31, 2006, the trial court dismissed Ms. Cobas's case.

7.      Ms. Cobas's original attorney did not continue with the case. On or about August 7, 2006, Respondent entered his appearance on behalf of Ms. Cobas. Respondent did not seek or obtain Judicial Watch's consent to Respondent's representation of Ms. Cobas. Respondent filed a motion with the trial court to vacate its order of dismissal. The trial court denied the motion.

8.      On August 25, 2006, Respondent filed a Notice of Appeal on behalf of Ms. Cobas.

2

9.      On or about December 1, 2006, Respondent filed an appellate brief on behalf of Ms. Cobas with the Third District Court of Appeals for the State of Florida.

10.     On May 2, 2007, the appellate court affirmed the trial court's dismissal of Ms. Cobas's law suit.

11.     Respondent's conduct violated the following Rule Governing the Florida Bar:

Rule 4-1.9(a), in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation.

## B. COUNT II

12.     In or about November, 2002, Judicial Watch initiated a campaign to raise funds to purchase a building in Washington, D.C., to serve as its headquarters ("Building Fund").

13.     On November 15, 2002, Respondent, as Chairman and General Counsel for Judicial Watch, directly solicited a donation from Louise Benson for the Building Fund.

14.     In or about December, 2002, in response to Respondent's solicitation, Ms. Benson pledged to donate $50,000 to Judicial Watch for the Building Fund. Thereafter, Ms. Benson paid $15,000 of her $50,000 pledge to Judicial Watch.

15.     After Respondent left Judicial Watch in September 2003, Judicial Watch's management did not purchase a building for its headquarters.

16.     On or about April 12, 2006, Ms. Benson joined Respondent as a plaintiff in the matter styled, *Klayman, et al. v. Judicial Watch, et al.*, in the United States District Court for the District of Columbia. Respondent and   Ms. Benson alleged, *inter alia*, fraudulent misrepresentation, breach of contract, and unjust enrichment in connection with her donation to

3

Judicial Watch for the Building Fund. Both Respondent and Ms. Benson were represented by other counsel and had separate claims.

17.     On January 17, 2007, the District Court dismissed Ms. Benson's claims in *Klayman v. Judicial Watch* for lack of subject matter jurisdiction because the amount in controversy did not exceed $75,000, as required in federal diversity matters under 28 U.S.C. § 1332(a).

18.     On January 25, 2007, Ms. Benson filed a lawsuit, individually, against Judicial Watch in the Superior Court for the District of Columbia, alleging, *inter alia*, breach of contract, unjust enrichment, and fraudulent misrepresentation in connection with her donation to Judicial Watch for the Building Fund. That matter was styled, *Benson v. Judicial Watch, et al.*

19.     On or about May 29, 2007, Judicial Watch voluntarily returned $15,000 to Ms. Benson in settlement of her unjust enrichment claim.

20.     On June 15, 2007, Respondent entered his appearance as co-counsel for Ms. Benson in the *Benson v. Judicial Watch* matter. Respondent did not seek or obtain Judicial Watch's consent to the representation of Ms. Benson.

21.     On June 28, 2007, Judicial Watch filed a motion to disqualify Respondent as counsel for Ms. Benson, citing, *inter alia*, Respondent's ethical obligations to it pursuant to Rule 1.9.

22.     On August 24, 2007, the parties filed with the court a stipulation of dismissal of Ms. Benson's case.

23.     Respondent's conduct violated the following District of Columbia Rule of Professional Conduct ("DCRPC"):

> Rule 1.9, in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or

4

substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation.

## C. COUNT III

24.     On or about March 20, 2001, Mr. Peter Paul retained Judicial Watch to evaluate his legal claims and defenses concerning his communications with certain law enforcement authorities in connection with his fundraising activities for the 2000 New York State Senate Campaign. The retainer agreement was executed by Mr. Paul and Respondent. Respondent signed the retainer agreement as the Chairman and General Counsel of Judicial Watch.

25.     On or about April 23, 2001, the March 20, 2001, retainer agreement was modified such that Judicial Watch undertook to provide legal representation for Mr. Paul for, *inter alia*, alleged criminal securities violations arising from his above-described fundraising activities. The modified retainer agreement further contemplated the pursuit of civil litigation on behalf of Mr. Paul. The modified retainer agreement was also executed by Mr. Paul and Respondent. Respondent signed the retainer agreement as the Chairman and General Counsel of Judicial Watch.

26.     In 2003, Judicial Watch filed a lawsuit on behalf of Mr. Paul, styled *Paul v. Clinton*, in the Los Angeles (California) Superior Court, and hired criminal defense counsel to defend Mr. Paul in connection with the criminal matter.

27.     On or about April 11, 2005, Judicial Watch withdrew from the representation of Mr. Paul in *Paul v. Clinton*. Judicial Watch also withdrew from the criminal matter.

28.     On or about February 5, 2007, Mr. Paul filed a lawsuit against Judicial Watch, alleging breach of contract, breach of fiduciary duty and unjust enrichment, based in part, upon Judicial Watch's withdrawal from the representation of Mr. Paul in the *Paul v. Clinton* matter,

5

allegedly in derogation of the retainer agreement(s). That matter was styled *Paul v. Judicial Watch, et al.*, and filed in the United States District Court for the District of Columbia.

29.     On or about March 19, 2008, Respondent entered his appearance as counsel for Mr. Paul in the *Paul v. Judicial Watch* matter. Respondent did not seek or obtain Judicial Watch's consent to the representation of Mr. Paul.

30.     On April 22, 2008, Judicial Watch filed with the court a motion to disqualify Respondent from representing Mr. Paul against it arguing, *inter alia,* Respondent's ethical obligations to them pursuant to Rule 1.9.

31.     On June 19, 2008, Respondent filed an opposition to Judicial Watch's motion to disqualify, and on June 25, 2008, Respondent filed a supplement to his opposition to Judicial Watch's motion to disqualify.

32.     On July 16, 2008, the District Court entered an order disqualifying Respondent as counsel for Mr. Paul for, *inter alia*, representing a client against a former client in the same or substantially related matter.

33.     Respondent's conduct violated the following DCRPC:

    a.     Rule 1.9, in that Respondent formerly represented a client in a matter and thereafter represented another person in the same or substantially related matter in which the person's interests were materially adverse to the interests of the former client, and the former client did not consent to the new representation; and

    b.     Rule 8.4(d), in that Respondent engaged in conduct that seriously interfered with the administration of justice.

## IV.     AGREED UPON SANCTION

The parties agree that the appropriate sanction in this matter is a public censure.

## V.    RELEVANT PRECEDENT

### A.    Conflict of Interest

Rule 4-1.9 of the Rules Governing the Florida Bar (the "RGFB") provides:

> "A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> > (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."

DCRPC 1.9 which is virtually identical to RGFB 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

Comment [2] to DCRPC 1.9 provides pertinently:

> The scope of a "matter" for purposes of this rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other client's with materially adverse interests clearly is prohibited.

Comment [3] to DCRPC 1.9 provides pertinently:

> Matter are "substantially related" for purposes of this Rule if they involved the same transaction or legal dispute or if there otherwise is a substantial risk that confidential information as would normally have been obtained in the prior representation would materially advance the client's position in a subsequent matter . . . . In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; *on the other hand, knowledge of specific facts gained in the prior representation that are relevant to the matter in question ordinarily will preclude such a representation* . . . [emphasis added].[1]

---

[1]    Comments [2] and [3] to RGFB, while different in some respects, nonetheless repeat substantially verbatim, the above-quoted text of Comments [2] and [3] to DCRPC 1.9.

## B.  Conduct That Seriously Interferes With the Administration of Justice

Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to engage in conduct that seriously interferes with the administration of justice."

To establish a violation of the rule, Bar Counsel must prove that Respondent's conduct was (1) improper; (2) bore directly upon the judicial process with respect to an identifiable a case or tribunal; and (3) tainted the judicial process in more than a de minimus way, *i.e.,* it had or potentially had an impact upon the process to a serious and adverse degree. *In re Hopkins*, 677 A.2d 55, 60-61 (D.C. 1996).  The Rule is violated, *inter alia,* where the attorney's conduct causes the unnecessary expenditure of time and resources in a judicial proceeding.  *In re Cole*, 967 A.2d 1264, 1266 (D.C. 2009).

## COUNT I - Cobas

Respondent violated RGFB 1.9.  Stipulations of Fact ("SOF") 1-10.  While Respondent served as General Counsel for Judicial Watch, Ms. Cobas, an employee of Judicial Watch, complained to him about her working in a "hostile work environment" in the Miami Region Office of Judicial Watch.  Indeed, Ms. Cobas directly requested Respondent to intercede in the matter.

Thereafter Ms. Cobas sued Judicial Watch in a Florida state court alleging, *inter alia,* a "hostile work environment."  Ms. Cobas's case was dismissed by the court.  No longer working for Judicial Watch, Respondent entered his appearance on behalf of Ms. Cobas in the matter and adverse to Judicial Watch before the trial court and an appellate court.  Respondent neither sought nor obtained the permission of Judicial Watch to represent Ms. Cobas against it.

## COUNT II - Benson

Respondent violated DCRPC 1.9.  SOF 1, 12-22.

8

As the Chairman and General Counsel for Judicial Watch, Respondent directly solicited a donation from Ms. Louise Benson for Judicial Watch's Building Fund. In response to the solicitation, Ms. Benson remitted to Judicial Watch $15,000 of her $50,000 pledge. Subsequent to Respondent's separation from Judicial Watch, the organization did not purchase the building.

Thereafter, Respondent and Ms. Benson became co-plaintiffs in a federal civil action against Judicial Watch. In that case, Ms. Benson alleged, *inter alia*, fraudulent misrepresentation, breach of contract and unjust enrichment in connection with her donation to the Building Fund. Ms. Benson's claims were dismissed by the United States District Court for the District of Columbia for lack of diversity.

Thereafter, Ms. Benson filed another lawsuit against Judicial Watch, individually, in the Superior Court for the District of Columbia, alleging, *inter alia*, fraudulent misrepresentation, breach of contract and unjust enrichment in connection with her donation to the Building Fund. Several months later, Respondent entered his appearance as co-counsel for Mr. Benson and adverse to Judicial Watch in the lawsuit. Respondent did not seek or obtain the consent of Judicial Watch to represent Ms. Benson against it.

Judicial Watch filed a motion to disqualify Respondent from representing Ms. Benson against them, citing Respondent's ethical responsibilities to it under Rule 1.9. The case was settled and dismissed before the trial court ruled on the motion.

## COUNT III - Paul

Respondent violated DCRPC 1.9 and 8.4(d). SOF 1, 24-30.

As the Chairman and General Counsel for Judicial Watch, Respondent executed two retainer agreements with Mr. Peter Paul. The agreements provided that Judicial Watch would provide legal representation for Mr. Paul in connection with alleged securities violations incident

to his fundraising activities. In 2003, Judicial Watch filed a lawsuit on behalf of Mr. Paul. In April 2005, Judicial Watch withdrew from the representation.

Thereafter, Mr. Paul through other counsel filed a lawsuit against Judicial Watch in the United States District Court for the District of Columbia alleging breach of contract and breach of fiduciary duty, based in part upon Judicial Watch's withdrawal from the representation and in derogation of the above-described retainer agreements.

On or about March 19, 2008, Respondent entered his appearance as counsel of record for Mr. Paul in the matter adverse to Judicial Watch. Respondent did not seek or obtain the consent of Judicial Watch to represent Mr. Paul against it.

Respondent was on notice since June 28, 2007, that Judicial Watch objected to his representation of clients against it when it filed the motion to disqualify him in the Benson matter. Nonetheless, ten months later Respondent again entered his appearance on behalf of Mr. Paul against Judicial Watch, and opposed his former client's motion to disqualify him from the case. On July 16, 2008, the court entered an order disqualifying Respondent from the case. Respondent's conduct was (1) improper; (2) bore directly upon the judicial process before the United States District Court for the District of Columbia; and (3) caused an unnecessary expenditure of the time and resources of the District Court.

## VI. **MITIGATION**

Respondent has cooperated with Bar Counsel's investigation of this matter and has accepted responsibility for his misconduct. Respondent's misconduct did not involve dishonesty.

Respondent has been a member in good standing of the District of Columbia Bar continuously for nearly thirty-seven (37) years, and has never been disciplined in the District of

Columbia in any way or had his license suspended. In addition, Respondent is a public interest attorney who founded Judicial Watch and now Freedom Watch.

In these matters, Respondent stepped in to represent Ms. Cobas and Mr. Paul (Counts I and III) when their original attorneys no longer represented them, and they lacked the financial resources to pay for other counsel. A Hearing Committee may well find that Respondent believed, on the advice of counsel, that he did not have a conflict of interest in the Benson and Paul matters (Counts II and III). Respondent will testify that he did not realize a financial gain in representing Benson, Cobas, and Paul, and in fact represented these persons pro bono at his own time and expense. A Hearing Committee may well find that Respondent did so because he believed that Cobas and Paul would have no other recourse in their lawsuits against his former organization, Judicial Watch.

## VII.  AGGRAVATION

Witnesses for Judicial Watch would testify, and a Hearing Committee may well find that Respondent's decision to represent Cobas, Benson, and Paul against Judicial Watch was a product of ongoing acrimony in connection with his separation from Judicial Watch in 2003, and that those adverse representations were vindictive in nature. Witnesses for Judicial Watch would testify that Respondent did realize a financial gain in his representation of Cobas, Benson, and Paul because these lawsuits were featured in Respondent's fundraising campaign titled "Saving Judicial Watch."

## VIII.  PUBLIC CENSURE

The range of sanction for attorneys found to have engaged in a conflict of interest is from an Informal Admonition to a suspension from the practice of law. The parties have agreed that Respondent should receive a public censure for his misconduct in this matter.

11

In *In re Sofaer*, 728 A.2d 625 (D.C. 1999), the Court affirmed the report and recommendation of the Board that the attorney be informally admonished for violating the revolving door proscription of Rule 1.11(a). In that matter, the attorney had served as Legal Advisor for the United States Department of State at the time that Pan American Flight 103 was downed over Lockerbie, Scotland, as a result of Libyan terrorism. The attorney thereafter was retained by the government of Libya to represent it in connection with criminal and civil actions arising from the downing of the airplane.

In *In re Butterfield*, 851 A.2d 513 (D.C. 2004), the Court affirmed the report and recommendation of the Board that the attorney be suspended for 30 days, where the attorney engaged in a conflict of interest in violation of Rule 1.7(b)(1) and (2). There, the attorney failed to conduct a conflict check that would have revealed that his new client matter was in conflict with an existing client of the firm. After learning of the conflict, the lawyer failed to either obtain the appropriate consents or withdraw from the representation.

Longer suspensions from the practice of law have been imposed in cases where the conflict of interest were accompanied by other rules violations, including dishonesty. *See In re Shay*, 756 A.2d 465 (D.C. 2000) (90-day suspension for conflict of interest and dishonesty); *In re Jones-Terrell*, 712 A.2d 496 (D.C. 1998) (60-day suspension for conflict of interest along with other violations including dishonesty).

In this matter, Respondent has engaged in three separate violations of Rule 1.9, by representing parties against his former client. Respondent may have arguably been unaware of his ethical obligations in connection with his representation of Sandra Cobas in Count I. However, in Count II, which involved his representation of Louise Benson, Respondent was the subject of a motion to disqualify on the grounds that the representation was inconsistent with his

12

ethical obligations to his former client, Judicial Watch, in violation of Rule 1.9. Respondent did not immediately withdraw from the case, but instead opposed the motion. The underlying case was settled and dismissed before the trial court ruled on the motion to disqualify. In Count III, the Peter Paul representation, Respondent's 1.9 conflict of interest occurred approximately 10 months after the motion to disqualify him was filed in the Benson matter (Count II). In the Paul matter, Judicial Watch again filed a motion to disqualify Respondent, which Respondent opposed. The trial court granted Judicial Watch's motion and entered an order disqualifying Respondent from representing Mr. Paul in the matter.

In sum, Respondent violated Rule 1.9 on three separate occasions. Moreover, he did so intentionally and over his former client's objections in Counts II and III. Respondent also violated Rule 8.4(d) in Count III. Accordingly, Respondent's conduct is more serious than that in *Sofaer*. On the other hand, there is no evidence that Respondent was remunerated by Cobas, Benson, or Paul, for his services in these cases. Moreover, there is no evidence of dishonesty and Respondent has accepted responsibility for his misconduct. Accordingly, Respondent need not be suspended for his misconduct.

The parties agree that a public censure strikes the correct balance of protecting the public and deterring future misconduct.

**WHEREFORE**, the Office of Bar Counsel requests that the Executive Attorney assign a Hearing Committee to review the petition for negotiated disposition pursuant to D.C. Bar Rule XI, § 12.1(c).

13

Wallace E. Shipp, Jr.    *by pmission*
Bar Counsel

Larry E. Klayman, Esquire
Respondent

H. Clay Smith, III
Assistant Bar Counsel

OFFICE OF BAR COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501

14

# EXHIBIT D

JOEL F. HANSEN, ESQ.
Nevada Bar No. 1876
HANSEN RASMUSSEN, LLC
1835 Village Center Circle
Las Vegas, Nevada 89134
Telephone: (702) 385-5533
Facsimile: (702) 382-8891
joelh@hrnvlaw.com
*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  2:16-cr-00046–GMN-PAL |
| Plaintiff, | ) | |
| vs. | ) | |
| CLIVEN D. BUNDY, et al, | ) | |
| Defendants | ) | |

**SECOND SUPPLEMENT TO PRO HAC VICE RE PETITIONER'S AND APPLICANT'S COMPLIANCE WITH COURT ORDER OF APRIL 2, 2016 AND SUPPLEMENT TO AND RENEWED VERIFIED PETITION FOR PERMISSION TO PRACTICE IN THIS CASE ONLY BY ATTORNEY NOT ADMITTED TO THE BAR OF THIS COURT AND DESIGNATION OF LOCAL COUNSEL PREVIOUSLY FILED ON MARCH 22, 2016**

The undersigned counsel hereby again supplements Pro Hac Vice application of Attorney Larry Klayman with the resume of renowned expert ethics Professor Ronald Rotunda, which was inadvertently left off the prior filing. The prior filing stated that the expert report of Dr. Rotunda was being submitted as an attachment to Exhibit 2, which was Dr. Rotunda's expert opinion that Mr. Klayman had not committed any ethical violation before the District of Columbia Board of Professional Responsibility. This proceeding is still pending. In addition, the prior filing contains a written brief as Exhibit 1 to that filing, referencing Dr. Rotunda's sworn testimony in which he also opined that Mr. Klayman had committed no ethical violation. The resume which is being submitted herewith underscores Dr. Rotunda's impressive qualifications to render this expert opinion.

1

2          Further, the undersigned counsel is attaching a recent Las Vegas Review Journal report of April

3   8, 2016, which raises significant concerns.  See Exhibit 3.  It shows that Senate Minority leader Harry

4   Reid, through his nationally televised statements on the Senate floor, is seeking to prejudice this

5   criminal proceeding by branding my client Cliven Bundy, and his family, domestic terrorists, and, by

6   implication, that they should spend the rest of their lives in federal prison.  In this regard, Cliven Bundy

7   is now in solitary confinement and has been denied bail pending appeal to this Court.  Senator Reid, on

8   the Senate floor, proclaimed that "Cliven Bundy is where he should be–in jail."  Further, Senator Reid

9   called Cliven Bundy an "outrageous lawbreaker."

10          As it has been reported that Senator Harry Reid recommended this Court's appointment to the

11  bench to President Obama, and because President Obama has previously attacked and mocked Cliven

12  Bundy in a nationally televised White House Correspondents' Dinner, see

13  https://www.youtube.com/watch?v=rveNp7f57H, undersigned Counsel, with complete respect to this

14  Court, requests that the Court address these concerns at an appropriate time.

15          DATED this 12th day of April, 2016.

16

17                                                Respectfully submitted,

18                        BY:    /s/ Joel F. Hansen
                                 JOEL F. HANSEN, ESQ.
19                               Nevada Bar # 1876
                                 1835 Village Center Circle
20                               Las Vegas, NV 89134
                                 Attorney for Defendant

21

22

23

24

25

26

27

28

LAW OFFICES
HANSEN RASMUSEN, LLC
1835 Village Center Circle
Las Vegas, Nevada 89134
Telephone: (702) 385-5533
Facsimile: (702) 382-8891

# CERTIFICATE OF SERVICE

Pursuant to NRCP 5 (b), I hereby certify that on this 12th day of April, 2016, I served a copy of the foregoing SECOND SUPPLEMENT TO PRO HAC VICE RE PETITIONER'S AND APPLICANT'S COMPLIANCE WITH COURT ORDER OF APRIL 2, 2016 AND SUPPLEMENT TO AND RENEWED VERIFIED PETITION FOR PERMISSION TO PRACTICE IN THIS CASE ONLY BY ATTORNEY NOT ADMITTED TO THE BAR OF THIS COURT AND DESIGNATION OF LOCAL COUNSEL PREVIOUSLY FILED ON MARCH 22, 2016 as follows:

X     Electronic Service - via the Court's electronic service system; and/or

□     U.S. Mail – By depositing a true copy thereof in the U.S. mail, first class postage prepaid and addressed as listed below; and/or

□     Facsimile – By facsimile transmission pursuant to EDCR 7.26 to the facsimile number(s) shown below and in the confirmation sheet filed herewith. Consent to service under NRCP 5(b)(2)(D) shall be assumed unless an objection to service by facsimile transmission is made in writing and sent to the sender via facsimile within 24 hours of receipt of this Certificate of Service; and/or

□     Hand Delivery – By hand - delivery to the address listed below.

DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAH
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV 89101

/s/ Lisa Sabin
An Employee of HANSEN ◊ RASMUSSEN

LAW OFFICES
HANSEN RASMUSSEN, LLC
1835 Village Center Circle
Las Vegas, Nevada 89134
Telephone: (702) 385-5533
Facsimile: (702) 382-8891

- 3 -

# **EXHIBIT E**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,    )
        )
        Plaintiff,    )     Case No.: 2:16-cr-046-GMN-PAL
     vs.     )
        )     **ORDER**
CLIVEN D. BUNDY,    )
        )
        Defendant.    )
_____)

     The Court entered an Order on March 31, 2016, denying Petitioner Larry Elliot Klayman's ("Klayman's") Verified Petition for Permission to Practice in the case of Defendant Cliven D. Bundy ("Verified Petition"). (ECF No. 215).  In this Order, the Court denied the Verified Petition without prejudice, allowing Klayman to file a new Verified Petition. (*Id.*).  On April 7, 2016, Klayman filed a Renewed Verified Petition[1] (ECF No. 229) in response to the Court's Order, along with two related Supplements (ECF Nos. 230, 234) (collectively, hereinafter "Response").  The Court construes Klayman's Response as a request for the Court to reconsider his original Verified Petition. (ECF No. 155).

     "A district court may reconsider its prior rulings so long as it retains jurisdiction over the case." *United States v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004).  The Local Rules of Practice for the United States District Court for the District of Nevada provide that an attorney who is not a member of the bar of this court may only appear with permission of the court. *See* Local Rule IA 10-2.  "The granting or denial of a petition to practice under [LR IA 10-2] is

---

[1] The Court notes that this document is actually titled "Pro Hac Vice Petitioner's and Applicant's Compliance with Court Order of April 2, 2016 and Supplement to and Renewed Verified Petition for Permission to Practice in this Case Only by Attorney Not Admitted to the Bar of this Court and Designation of Local Counsel Previously Filed on March 22, 2016." (ECF No. 229).  As such, Klayman failed to follow the Court's instruction to file a new Verified Petition.

discretionary." LR IA 10-2(h).  As the Court explained in its prior Order, a defendant's "choice of counsel must be respected unless it would . . . burden the court with counsel who is incompetent or unwilling to abide by court rules and ethical guidelines." *United States v. Walters*, 309 F.3d 589, 592 (9th Cir. 2002).

The Court's prior Order (ECF No. 215) required that if Klayman filed a new Verified Petition, it must include, *inter alia*, "verification that the matter in the District of Columbia disciplinary case reverenced in the Verified Petition (Verified Pet. 7) has been resolved with no disciplinary action." (Order 2–3, ECF No. 215).  Although Klayman alleges that he is "confident of ultimately prevailing [in the District of Columbia matter]," he also specifically states in his Response that "this matter is far from resolved." (Resp. 2:3–8, ECF No. 229).  As such, Klayman admits that this ethical complaint is still pending in the District of Columbia, as the pending disciplinary matter has not been denied, dismissed, or withdrawn.

The Court finds no error with its prior ruling.  Accordingly, Klayman's Verified Petition shall remain denied without prejudice until such time as Klayman can provide proof that the ethical disciplinary proceeding in the District of Columbia has been resolved in his favor.

**IT IS HEREBY ORDERED** that Petitioner Larry Elliot Klayman's request for reconsideration (ECF No. 229) is **DENIED**.

**DATED** this ___19___ day of April, 2016.

_____
Gloria M. Navarro, Chief Judge
United States District Court

Page 2 of 2

# EXHIBIT F



## CHAPMAN UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dee Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/

2 June 2014

Board on Professional Responsibility
430 E Street, NW
Suite 138
Washington, DC 20001

RE: *In the matter of* Larry Klayman, Esq. (Bar Docket No. 2008-D048)

My name is Ronald D. Rotunda. I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law. I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review. I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.

During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee. I am the co-author of Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 12th ed. 2014), the most widely used legal ethics course book in the United States. It has been the most widely used since I coauthored the first edition in 1976. In addition, I have authored or coauthored several other books on legal ethics, including Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (ABA/Thompson, 11th ed. 2013).

In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume. State and federal courts at every level have cited my treatises and articles over 1000 times. From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

I have reviewed the facts of the above referenced bar complaint against Larry Klayman. It is my expert opinion that in the present situation Mr. Klayman has not committed any offense that merits discipline. In fact, he, to the best of his ability, simply pursued an obligation that he knew that he owed to Sandra Cobas, Peter Paul, and Louise Benson.

1

Mr. Klayman, whose organization, Judicial Watch, was once engaged as attorneys for Paul (it never was engaged for Benson or Cobas), reasonably believed he had an ethical obligation to represent them, and chose to uphold his duty to these clients. District of Columbia Rule of Professional Conduct 1.3 states that, "(a) A lawyer shall represent a client zealously and diligently within the bounds of the law." Further, Rule 1.3(a) (comment 1) provides guidance on this issue and the duties of an attorney. "This duty requires the lawyer to pursue a matter on behalf of a client despite opposition, obstruction, or personal inconvenience to the lawyer, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."

Recall *Maples v. Thomas*, 132 S.Ct. 912 (2012). In that case, two lawyers working in the firm of Sullivan & Cromwell entered an appearance for a client. These two associates worked pro bono and sought state habeas corpus for a defendant sentenced to death. A local Alabama lawyer moved their admission pro hac vice. Later, the two associates left the firm and their "new employment disabled them from representing" the defendant (one became a prosecutor and one moved abroad). Neither associate sought the trial court's leave to withdraw (which Alabama law required), nor found anyone else to assume the representation. Moreover, no other Sullivan & Cromwell lawyer entered an appearance, moved to substitute counsel, or otherwise notified the court of a need to change the defendant's representation. When Mr. Klayman left Judicial Watch, no other lawyer for Judicial Watch stepped up to the plate, because in fact Judicial Watch had taken actions adverse and harmful to Paul, Benson and Cobas. No lawyer stepped up to the plate in *Maples v. Thomas*.

The issue before the U.S. Supreme Court was whether the defendant showed sufficient "cause" to excuse his procedural default. Justice Ginsburg, for the Court, acknowledged that the usual rule is that even a negligent lawyer-agent binds the defendant. Here, however, the lawyers "abandoned" the client without notice and took actions which in fact harmed them thus severing the lawyer-client relationship and ending the agency relationship. This made the failure to appeal an "extraordinary circumstance" beyond the client's control and excused the procedural default. In the view of Mr. Klayman, he could not abandon the clients.

In applying these principles, it is reasonable and understandable that Mr. Klayman believed that had an ethical obligation, in accordance with perhaps the most important principle of this profession, to zealously and diligently represent his clients. More importantly, comment 7 observes that **"[n]eglect of client matters is a serious violation of the obligation of diligence."** Note that there is no credible claim that he used any confidence of Judicial Watch against Judicial Watch.

One should also consider Mr. Klayman's actions in light of the doctrine of necessity. We know that judges can decide cases even if they are otherwise disqualified if there is no other judge available to decide the case. For example, the Court of Claims applied the "rule of necessity" and held that, under that rule, its judges could hear the case involving their own salaries. Otherwise, no judge would be available to decide some important legal questions. The court then turned to the judges' substantive claim and denied it. *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam), cert. denied, 434 U.S. 1009 (1978). See also, *United States v. Will*, 449 U.S. 200 (1980). The *Will* Court explained: "The Rule of Necessity had its genesis at

2

least five-and-a-half centuries ago. Its earliest recorded invocation was in 1430, when it was held that the Chancellor of Oxford could act as judge of a case in which he was a party when there was no provision for appointment of another judge."

Faced with the dilemma of either representing Cobra, Paul, and Benson, or allowing them to lose their legal rights, Mr. Klayman sided with the rights of the clients, in accordance with Rule 1.3, and thus, justifiably, chose to represent them. Judicial Watch attempted, and succeeded, at disqualifying Mr. Klayman from the lawsuits because it knew no one else would be able to represent Cobas, Paul, and Benson, and that Judicial Watch would escape liability for the wrongs that they had caused. The trial judge did disqualify Mr. Klayman in representing Paul in a new case after Paul's previous lawyers withdrew representation because he could not pay them, but note that the trial judge did *not* refer this case to the disciplinary authorities for further discipline. It appears reasonable to believe that the trial judge imposed all the discipline (in the form of a disqualification) that he believed should be imposed. The situation involving these particular clients provided a unique set of circumstances, one that the D.C. Rules of Professional Conduct do not expressly take into account. Given this unprecedented situation, Mr. Klayman, out of necessity, attempted to correct the wrongs caused by Judicial Watch, so that he would not violate D.C. RPC Rule 1.3. Further establishing Mr. Klayman's ethical intentions is the fact that he represented these aggrieved individuals pro bono and paid court and other costs out of his own pocket simply to protect the rights of Cobas, Paul, and Benson.

There has been an unusual delay in instituting these proceedings against Mr. Klayman. If this were civil litigation, Bar Counsel's Petition would obviously not pass muster under the District of Columbia statute of limitations. The general statute of limitations for most civil causes of actions in the District of Columbia is three (3) years. D.C. Code § 12-301 *et seq*. "The purpose of statutes of limitation is 'to bring repose and to bar efforts to enforce stale claims as to which evidence might be lost or destroyed.'" *Medhin v. Hailu*, 26 A.3d 307, 313 n.7 (D.C. 2011) citing *Hobson v. District of Columbia*, 686 A.2d 194, 198 (D.C. 1996). "By precluding stale claims, statutes of limitations not only protect against 'major evidentiary problems which can seriously undermine the courts' ability to determine the facts,' but also protect[] a potential defendant's 'interest in security . . . and in planning for the future without the uncertainty inherent in potential liability,' and 'increase the likelihood that courts will resolve factual issues fairly and accurately.'" *Id.* Granted, the D.C. Rules of Professional Conduct do not expressly create a statute of limitations, the indisputable fact remains however that these proceedings — if they should have been brought at all — should have been brought years ago.

That brings up the problem of laches. The doctrine of laches bars untimely claims not otherwise barred by the statute of limitations. As held by the District of Columbia Court of Appeals, laches is the principle that "equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant. It was developed to promote diligence and accordingly to prevent the enforcement of stale claims." *Beins v. District of Columbia Bd. of Zoning Adjustment*, 572 A.2d 122, 126 (D.C. 1990). Laches applies to bar a claim when a plaintiff has unreasonably delayed in asserting a claim and there was undue prejudice to the defendant as a result of the delay. *Jeanblanc v. Oliver Carr Co.,* 1995 U.S. App. LEXIS 19995, *9 (D.C. Cir. June 21, 1995). Among the inequities that the doctrine of laches protects against is the loss of or difficulty in resurrecting pertinent evidence. *Id.*

3

Note that Mr. Klayman left Judicial Watch on September 19, 2003. He filed his appearance on behalf of Ms. Cobas on August 7, 2006 — long after he left Judicial Watch. There is no claim that he violated any confidences of Judicial Watch or that he earlier represented Judicial Watch against Ms. Cobas. This Bar Complaint was filed on May 1, 2014. The delay in filing the complaint was nearly 8 years.

The conduct alleged by Bar Counsel occurred between seven and eight years ago. Given the substantial delay in bringing the present Petition before the Board, Mr. Klayman's ability to defend this case has been detrimentally prejudiced, particularly as recollection and memory fade over the course of approximately seven to eight years and witnesses and the individuals involved may be unavailable in support of Mr. Klayman's defense. In Paul's case, for instance, he is in federal prison in Texas. Ms. Cobas has health problems and Ms. Benson is now an 83-year-old woman. The Bar should not use this unique factual situation to discipline Mr. Klayman given the equitable doctrine of laches. Such discipline, if the courts uphold it, can ruin his career.

This Petition also raises issues regarding the application of Mr. Klayman's Fifth Amendment due process rights. Lawyers in attorney discipline cases are entitled to procedural due process. In *Ruffalo*, the respondent appealed his disbarment after records of his employments were brought up into his disciplinary proceedings at a late stage in the proceedings without giving him the opportunity to respond. In reversing, the U.S. Supreme Court held that the attorney's lack of notice that his full employment record would be used in the proceedings caused a violation of procedural due process that "would never pass muster in any normal civil or criminal litigation." *In the Matter of John Ruffalo, Jr.,* 390 U.S. 544, 550 (1968).

In *Kelson*, the Supreme Court of California similarly held that it was a violation of procedural due process for the State Bar of California to amend its charges on the basis of Mr. Kelson's testimony without having given Mr. Kelson notice of the charge and an opportunity to respond. *Kelson v. State Bar,* 17 Cal. 3d. 1, 6 (Cal. 1976). *Kelson* is directly on point. Judicial Watch submitted boxes full of voluminous documents to the Bar Counsel's office in secret, none of which were ever served to Mr. Klayman until the Petition was filed and then served. It appears that Judicial Watch and Mr. Klayman have had a parting of the ways that has not been amicable. One can understand why, even after all these years, a former employer who is very upset might wish to use the discipline process to punish a former employee, but that does not mean that the discipline authorities should aid and abet (even unintentionally) what appears to be a vendetta by one private group against its former lawyer. Discipline, after all, exists to protect future clients and the public; it does not exist for one party to wreak punishment against another.

Further, these alleged ethical violations have already been dealt with by the Honorable Royce C. Lamberth in his Memorandum Opinion and Order in *Paul v. Judicial Watch, et al.,* No. 1:07-CV-00279 (D.D.C. filed Feb. 5, 2007). In his Memorandum Opinion, Judge Lamberth specifically addressed the issue of D.C. Bar Rule 1.9 in regard to disqualifying Mr. Klayman from continuing to represent Paul in the lawsuit. Judge Lamberth, in his ruling, found that "A survey of relevant case law in this and other circuits reveals some ambiguity with respect to the standard for disqualification in the face of a violation of Rule 1.9 (or its equivalent)." *Id.* at 6. Indeed, given the circumstances, and the harm that would be caused to Paul, it was ambiguous whether Rule 1.9 required Mr. Klayman's disqualification. Judge Lamberth took "note of Paul's

argument that he will suffer prejudice if Mr. Klayman is disqualified." *Id.* at 14. Judge Lamberth emphasized that "[t]he essence of the hardship that Paul asserts will result from disqualification of Mr. Klayman is an inability to obtain alternate counsel for lack of financial resources" and ultimately apologetically found that "[t]he Court is not unsympathetic to this concern." *Id* at 14.

Immediately following Judge Lamberth's order, Mr. Klayman ceased all legal representation of Mr. Paul. No harm was caused by the limited and short-term representation that Mr. Klayman had provided. In fact, the harm was only done when Judicial Watch ceased representation of Paul, who as a result has been convicted of the alleged crimes and has since been incarcerated. Judge Lamberth did not sanction Mr. Klayman, or even report his actions to the Bar Counsel or the Board. Judge Lamberth recognized that the D.C. RPC was not clear when disqualification was necessary under Rule 1.9 and thus took no further action.

Given the delay in instituting these proceedings, it appears that Judicial Watch has targeted Mr. Klayman for selective prosecution. Seldom in the history of the District of Columbia Bar has someone been the subject of such an investigation for such a technical violation. To prevail on a defense of selective prosecution, one must simply prove that he was singled out for prosecution among others similarly situated and that the decision to prosecute was improperly motivated. *See, e.g. United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982). Here, Mr. Klayman is being investigated, and even charged, with an alleged ethical violation that otherwise would have been resolved as a result of Judge's Lamberth's decision to disqualify Mr. Klayman from the case.

For the foregoing reasons, it is my expert opinion that this bar complaint should not be pursued. Mr. Klayman, faced with what Judge Lamberth concluded was an "ambiguous" rule, understood that Mr. Klayman did not take on a case for personal profit but simply to protect the rights of those who could otherwise not pursue justice in the court system. Further justifying dismissal of this bar complaint is the unreasonably delay by the Office of Bar Counsel in bringing these allegations against Mr. Klayman. Mr. Klayman's defense of these alleged ethical violations has been severely prejudiced by the length of time that has passed since the events leading up to the bar complaint took place.

In sum, Mr. Klayman should not be disciplined. He did what he believed he had an ethical obligation to do by protecting his clients, at his expense.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence

# **EXHIBIT G**

RONALD D. ROTUNDA                                                          May 2, 2014
Email: rrotunda@chapman.edu               Home Page ☎ http://www1.chapman.edu/~rrotunda

**Office Address:**

> Chapman University
> Dale E. Fowler School of Law
> Room 406
> One University Drive
> Orange, CA 92866-1005
> ☎: (714) 228-2698
> Fax: (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

- 2 -

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

**Education:**

**Legal:** HARVARD LAW SCHOOL (1967- 1970)
Harvard Law Review, volumes 82 & 83
J.D., 1970 Magna Cum Laude

**College:** HARVARD COLLEGE (1963- 1967)
A.B., 1967 Magna Cum Laude in Government

**Member:**

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

- 4 -                                    Ronald D. Rotunda

LIST OF PUBLICATIONS:
BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

- 5 -                                              Ronald D. Rotunda

**MODERN CONSTITUTIONAL LAW: CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 1981).

> 1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

> 1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

> 1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

> 1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

> 1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

> 1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

**THE UNITED STATES FEDERAL SYSTEM: LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE** (Giuffrè, Milan, 1982) (with Peter Hay).

**SIX JUSTICES ON CIVIL RIGHTS** (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., 1984, Black Letter Series).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

> 1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

> 1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

- 6 -                                          Ronald D. Rotunda

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

MODERN CONSTITUTIONAL LAW: CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

THE POLITICS OF LANGUAGE: LIBERALISM AS WORD AND SYMBOL (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

- 7 -                                              Ronald D. Rotunda

1988 Pocket Part to Constitutional Law (West Publishing Co., 1988) (with John E. Nowak).

Joseph Story's Commentaries on the Constitution (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

Constitutional Law:  Principles and Cases (West Publishing Co., St. Paul, Minnesota, 1987).

Problems and Materials on Professional Responsibility (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

> 1988 Selected Standards on Professional Responsibility (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

> 1989 Selected Standards on Professional Responsibility (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

> 1990 Selected Standards on Professional Responsibility (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

Professional Responsibility (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

Modern Constitutional Law: Cases and Notes (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

> 1989 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1989).

> 1990 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1990).

> 1991 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1991).

> 1992 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1992).

Problems and Materials on Professional Responsibility (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

> 1991 Selected Standards on Professional Responsibility (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

- 8 -                                    Ronald D. Rotunda

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation
Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation
Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation
Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation
Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume
treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992,
Black Letter Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Publishing Co.,
St. Paul, Minnesota, 2d ed. 1992) (four volume treatise) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul,
Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota,
1999) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul,
Minnesota, 4th ed. 1993).

- 9 -                                      Ronald D. Rotunda

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law: Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

- 10 -                                    Ronald D. Rotunda

1998 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1998).

1999 Supplement to Modern Constitutional Law (West Publishing Co., St. Paul, Minnesota, 1999).

**Treatise on Constitutional Law: Substance and Procedure** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 Pocket Part to Treatise on Constitutional Law: Substance and Procedure (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

**헌법: 개인의 자유와 절차** [American Constitutional Law: Individual Liberties and Procedure; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**Problems and Materials on Professional Responsibility** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 Selected Standards on Professional Responsibility (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 Selected Standards on Professional Responsibility (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 Selected Standards on Professional Responsibility (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

.

- 11 -                                        Ronald D. Rotunda

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

> 2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

> 2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

> 2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

> 2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

- 13 -                                             Ronald D. Rotunda

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

PRINCIPLES OF CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

Ronald D. Rotunda

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PRINCIPLES OF CONSTITUTIONAL LAW (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

   2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

   2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

   2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

- 17 -                                          Ronald D. Rotunda

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND
PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-
Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly
published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn.,
11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and
Thomson/West) (with John S. Dzienkowski).

- 18 -                                      Ronald D. Rotunda

**ARTICLES:**

*The "Liberal" Label: Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant: Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions: An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74,* 2 ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE: A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE
LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal
Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable
Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW
1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley
Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence
Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the
American Assembly of Columbia University).

*When the Client Lies: Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34
(1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78
COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases: Damage Actions versus Injunctive
Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information: The Duty to Convey and the
Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time: Can the E.R.A. Be Saved*, 64 AMERICAN BAR ASSOCIATION JOURNAL
1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C.
Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C.
Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C.
Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3
CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW
252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4
CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

Ronald D. Rotunda

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH
    CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE
    PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW
    REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the
    Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS
    ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW
    REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6
    CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication
    of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL
    COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment
    Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12,
    1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the
    Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in,
    1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14
    (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and
    Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL
    EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter
    de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1
    INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161
    (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

- 21 -                                            Ronald D. Rotunda

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews: The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism: A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights: A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox: What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

- 22 -                                     Ronald D. Rotunda

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court:  A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud:  Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

- 23 -                                      Ronald D. Rotunda

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE
    JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited
    remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5
    ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2,
    1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's
    Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35
    (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb.
    1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS
    BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p.
    B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law
    Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4,
    1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK
    OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1,
    1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991),
    32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH
    (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW
    JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

- 24 -                                  Ronald D. Rotunda

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised*?, 4 ILLINOIS
  QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug.
  12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-
  2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF
  EXPRESSION AND THE CHARTER 319 (David Schneiderman, ed. Carswell, Canada 1991),
  a collection of papers presented at the Edmonton, Alberta Conference on the Canadian
  Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS
  LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION
  571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES
  896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16,
  1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law: An Unpublished Letter to Francis Lieber*,
  10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993)
  (reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

- 25 -                                         Ronald D. Rotunda

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

- 26 -                                    Ronald D. Rotunda

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions: An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act: Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

- 27 -                                        Ronald D. Rotunda

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)*
[The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP:
EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and
English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR
JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE
UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col. 4 [reprinted in,
BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col. 4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col.
2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It,
Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS'
LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No.
11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW
REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER
1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing
Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION
NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF
WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21,
1997).

- 28 -                                Ronald D. Rotunda

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking: A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display*: *Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

- 30 -                                    Ronald D. Rotunda

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000, http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000, http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

Ronald D. Rotunda

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine*, 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution*, CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City*, NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?*, 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

- 32 -                              Ronald D. Rotunda

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions: Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money: IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

- 33 -                                    Ronald D. Rotunda

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

- 34 -                                         Ronald D. Rotunda

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
    LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
    Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
    2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
    (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
    FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
    (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008,
    http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
    ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
    STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
    Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
    DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
    (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

- 35 -                                    Ronald D. Rotunda

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN
    SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15,
    2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University
    Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

*The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30,
    2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510
    (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the
    Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE
    LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010,
    http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD
    QwMzczYWU=

*Repealing    the    First    Amendment*,    WASHINGTON    EXAMINER,    April    14,    2010,
    http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-
    First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2,
    http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21,
    http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-
    20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law?*, PAJAMAS MEDIA, Sept. 16, 2010,
    http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-
    law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010, http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran?*, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment?*, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution*, NATIONAL REVIEW ONLINE, March 24, 2011, http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară*, REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same: Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training*, 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare*, WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

- 38 -                                        Ronald D. Rotunda

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

*'What did he know, and when did he know it?'*, WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

- 39 -                                        Ronald D. Rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* FORBES MAGAZINE, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 HOFSTRA LAW REVIEW 175 (2013).

*On Deep Background 41 Years Later: Roe v. Wade*, CHICAGO TRIBUNE, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, THE HILL: THE HILL'S FORUM FOR LAWMAKERS AND POLICY PROFESSIONALS, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* DAILY CALLER, April 10, 2014.

*Using the State to Bully Dissidents*, VERDICT: LEGAL ANALYSIS AND COMMENTARY FROM JUSTIA, April 24, 2014.

*Endangering Jurors in a Terror Trial*, WALL STREET JOURNAL, May 2, 2014, at p. A13.

- 40 -                                    Ronald D. Rotunda

**Other Activities:**

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
    CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA. I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary. The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic. I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.) This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

- 42 -                                                    Ronald D. Rotunda

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

# EXHIBIT H

Case 2:16-cv-00046-GMN-PAL Document 841 Filed 07/06/16 Page 134 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)
(134 of 154)

**IN RE UNITED STATES OF AMERICA,**

**UNITED STATES OF AMERICA,**
**Petitioner,**
**v.**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA,**
**RENO, Respondent,**
**PAUL J. MALIKOWSKI; BANK OF**
**AMERICA, NA, Real Parties in Interest.**

**No. 14-70486**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Argued: January 16, 2015**
**June 29, 2015**

**FOR PUBLICATION**

D.C. No. 3:13-cv-00470-RCJ-VPC

OPINION

On Petition for Writ of Mandamus to the United States District Court for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued January 16, 2015 Submitted June 29, 2015 San Francisco, California

Page 2

Before: J. Clifford Wallace, Milan D. Smith, Jr., and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.; Concurrence by Judge Wallace

**SUMMARY**[*]

**Mandamus**

The panel denied without prejudice a petition for a writ of mandamus brought by the United States challenging District Judge Robert C. Jones's policy of denying the applications for pro hac vice admission of U.S. Department of Justice attorneys who are not admitted to the Nevada Bar.

After the United States filed its petition for a writ of mandamus, Judge Jones reversed his previous order denying the United States attorney permission to appear. The panel held that this did not render the controversy moot because the challenged conduct can reasonably be expected to recur. The panel held that the controversy remains live, and the court had jurisdiction to consider the petition.

The panel held that while the reversal of the challenged order did not render the controversy moot, it rendered a formal writ of mandamus a superfluous or ineffective remedy. The panel further held that the court was not categorically precluded from opining on the merits of the

Page 3

mandamus petition when issuance of the writ would no longer be effective.

The panel considered whether mandamus relief would have been appropriate at the time the petition was filed, and applied the five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650, 654-55 (9th Cir. 1977). The panel held that at a minimum, a court's decision to deny pro hac vice admission must be based on criteria reasonably related to promoting the orderly administration of justice, or some other legitimate policy of the courts. The panel concluded that Judge Jones acted outside his discretion by failing to provide a valid reason to deny the United States attorney's application for pro hac vice admission, and held that the requirement of clear error was satisfied. The panel further held that the United States had no other means to obtain relief, and the United States was harmed when the United States attorney was denied pro hac vice admission. The panel also held



-1-

(135 of 154)

Case 2:16-cv-00046-GMN-PAL Document 94-1 Filed 07/06/16 Page 135 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)

that the fact that Judge Jones' order was not an isolated occurrence weighed in favor of granting mandamus relief when the petition was filed. Finally, the panel held that the district court order raised important issues. After weighing the *Bauman* factors, the panel concluded that it was appropriate to offer guidance to the district court.

Judge Wallace concurred only in the judgment to deny the writ of mandamus because Judge Jones's reversal of his prior order denying admission to United States attorneys rendered unnecessary the government's petition for a writ of mandamus. Judge Wallace stated that the proper, and more effective, place from which the government may obtain assurances that Judge Jones would discontinue his practice of routinely denying admission to the government's out-of-state attorneys, and then reversing course when such denials

Page 4

became subject to appellate review, was the Judicial Council of the Circuit.

## COUNSEL

Kathryn Keneally, Assistant Attorney General; Tamara W. Ashford, Principal Deputy Assistant Attorney General; Gilbert S. Rothenberg (argued), Michael J. Haungs, and Ivan C. Dale, Attorneys, Tax Division, United States Department of Justice, Washington, D.C., for Petitioner.

No appearance for Respondent.

No appearance for Real Parties in Interest.

## OPINION

M. SMITH, Circuit Judge:

The United States has filed a petition for a writ of mandamus challenging a district judge's policy restricting the pro hac vice

admission of government attorneys. After the petition was filed, the district judge reversed his previous order denying an attorney in this case pro hac vice admission. The United States contends that the district judge's reversal of his previous order did not render this controversy moot, and requests that we exercise our supervisory and advisory mandamus power to issue guidance to the district court. We agree that the controversy remains live, conclude that the district court erred, and find that guidance to the district court is appropriate. We decline to issue a formal writ of

Page 5

mandamus because it would not be an effective remedy in this case, and accordingly deny the petition without prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

This is one of at least two cases in which the United States has filed petitions for writs of mandamus to the district court challenging District Judge Robert C. Jones's policy of denying the applications for pro hac vice admission of attorneys for the Department of Justice (DOJ) who are not admitted to the Nevada bar.

## I. Proceedings Before The District Court

The underlying litigation in *United States v. Malikowski*, No. 13-cv-470-RCJ-VPC (D. Nev.), involves an action brought by the United States to collect income taxes from an individual. The DOJ Tax Division designated attorney Virginia Cronan Lowe, a member of the Massachusetts bar, to litigate the case, and the local U.S. Attorney's Office filed a motion to permit Lowe to appear. Judge Jones denied the motion. The order cited District of Nevada Local Rule IA 10-3[1] and stated "[b]efore the Court will permit Ms. Lowe to practice before this Court, the Court



Case 2:16-cv-00045-GMN-PAL Document 43 Filed 07/06/16 Page 136 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)
(136 of 154)

requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter."

It appears that Judge Jones has a policy of denying out-of-state government attorneys pro hac vice admission. Judge Jones described this policy to attorneys in *United States v.*

Page 6

*Walker River Irrigation District* (*Walker River*), No. 3:73-cv-00127-RCJ-VPC (D. Nev.), a case involving claims of the United States and the Walker River Paiute Tribe (the Tribe) to water rights in the Walker River basin. Andrew Guarino and David Negri, DOJ Environment and Natural Resources Division attorneys based in Denver, Colorado and Boise, Idaho, respectively, appeared by telephone at one of the first status conferences in *Walker River* held before Judge Jones. Both had previously filed notices of appearance in the case. After Guarino and Negri introduced themselves at the status conference, Judge Jones stated: "You folks will see in other cases . . . that I am entering orders disapproving Washington, D.C., counsel appearance, in particular in tax cases and in some environmental cases, and insisting upon appearance only by the local U.S. Attorney or adjacent districts of the U.S. Attorney." Judge Jones assured Guarino and Negri that "those orders will not apply to this case[,] at least to the appearances so far."

Approximately two months later, Guarino and Negri appeared in person before Judge Jones. Judge Jones asked whether Guarino and Negri had been granted pro hac vice status, and cited Local Rule IA 10-3. Judge Jones again stated that he was "developing a policy" of "disallowing" or "debarring" U.S. Attorneys from Washington, D.C. because of concerns about their adherence to "ethical standards," but once

again assured Guarino and Negri that he would allow them to appear in this case.

Soon thereafter, the lead counsel for the United States, who had handled *Walker River* for over a decade, filed a notice of withdrawal stating that Guarino would replace her as lead counsel. The local U.S. Attorney's Office filed a motion to allow Guarino and Negri to practice before the

Page 7

court. While the motion was pending, Guarino and Negri appeared before Judge Jones and the magistrate judge to whom the case was assigned.

Several months later, Judge Jones issued an order denying Guarino and Negri permission to practice before the district court. Like the order in *Malikowski*, the *Walker River* order cited Local Rule IA 10-3 and stated "[b]efore the Court will permit Mr. Negri and Mr. Guarino to practice before this Court, the Court requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter."

The orders in *Malikowski* and *Walker River* were not isolated occurrences. In at least four other cases, Judge Jones has refused to allow appearances by attorneys for the federal government who were not admitted to the Nevada bar.[2]

## II. Mandamus Proceedings

The United States filed petitions for writs of mandamus in *Malikowski* and *Walker River*. The petitions sought an

Page 8

order directing Judge Jones to grant the motions for pro hac vice admission he had denied.



Case 2:16-00045-GMN-PAL Document 243 Filed 07/06/16 Page 137 of 154
Case: 16-70045, 04/26/2016, ID: 9949843, DktEntry: 1, Page 137 of 154
United States v. U.S. Dist. Court for the Dist of Nev. (In re United States) (9th Cir, 2015)

(137 of 154)

The Ninth Circuit panels to which the petitions were initially assigned issued orders requesting Judge Jones to respond to the petitions if he so desired. In response, Judge Jones granted the United States' motions in *Malikowski* and *Walker River*, allowing Lowe, Guarino, and Negri to appear.[3]

Because the specific relief the United States requested in its petitions had been provided, the United States was ordered to file supplemental briefing regarding whether the petitions were moot. In its supplemental briefing, the United States argues that the petitions are not moot, and requests that we exercise our "supervisory mandamus authority to correct the district judge's improper interference with the government's choice of counsel and the judge's usurpation of responsibilities for conducting and supervising litigation that Congress has expressly delegated to the Attorney General."

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to issue writs of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651. We assess whether a writ of mandamus is warranted by weighing five factors enumerated in *Bauman v. U.S. District Court*, 557 F.2d 650 (9th Cir. 1977).

Page 9

## DISCUSSION

The United States contends that the district court exceeded its authority "[b]y imposing its own standard as to when and under what circumstances Justice Department officers may litigate a case in the District of Nevada . . . ."

Before we may reach the merits of the United States' arguments, we must first resolve whether this controversy was rendered moot when the district court reversed the orders from which the original

mandamus petitions sought relief. If the controversy remains live, we must also decide whether it is appropriate to offer guidance to the district court when there are no longer any orders we may reverse or vacate by issuing a writ of mandamus.

We find that the controversy remains live. We conclude that the district court committed clear error and that guidance is necessary. However, because we expect that the district court will follow this guidance without our issuing a formal writ, and because the district court has already done the act the petition asks us to compel it to do, we deny the petition without prejudice.

## I. Mootness

After the United States filed its petition for a writ of mandamus, Judge Jones reversed his previous order denying Lowe permission to appear. We conclude that this did not render this controversy moot.

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally

Page 10

cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)). "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)) (internal quotation marks omitted). It is true that a petition for a writ of mandamus directed to a district judge will ordinarily be rendered moot when the judge performs the act the petitioner seeks to compel through the writ. *Compare Penn-Central Merger and*



Case 2:16-cv-00046-GMN-PAL Document 41 Filed 07/06/16 Page 138 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)
(138 of 154)

*N&W Inclusion Cases*, 389 U.S. 486, 503 (1968), *and Williams v. Simons*, 355 U.S. 49, 57 (1957) (per curiam), *with Armster v. U.S. Dist. Court*, 806 F.2d 1347, 1360-61 (1986) (observing that "[a] finding of mootness would be particularly inappropriate" in an advisory mandamus proceeding, the purpose of which "is to provide guidance to all district court judges . . . ."). However, the traditional exceptions to mootness also apply to mandamus proceedings. *See Phoenix Newspapers, Inc. v. U.S. Dist. Court*, 156 F.3d 940, 945-46 (9th Cir. 1998) (finding that a petition for mandamus was not moot where issue was capable of repetition, yet evading review). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). A case is not moot if the challenged conduct can "reasonably be expected to recur." *Id.*

We find it is reasonably likely that Judge Jones will again deny the pro hac vice applications of attorneys for the United

Page 11

States because he has done so at least once after he reversed his order denying pro hac vice admission in this case. In *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 13-cv-00078-RCJ-VPC (D. Nev.), Judge Jones denied a motion requesting that a DOJ attorney who was a member of the North Dakota Bar be allowed to appear. The United States filed a motion for reconsideration, which Judge Jones denied on July 23, 2014, *after* he allowed Lowe to appear in this case.

Judge Jones's reasoning in the *Great Basin* order leads us to conclude that his decision to reverse course in the present case was not an acknowledgment that his previous orders were wrongly decided. *See Knox v.*

*Serv. Employees Intern. Union*, 132 S. Ct. 2277, 2287 (2012) (holding that a union's voluntary cessation of the challenged conduct did not render the case moot, in part because the union continued to defend the practice's legality); *Armster*, 806 F.2d at 1359 ("It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct."). The *Great Basin* order asserted that a district court has "inherent authority to determine that an out-of-state, unadmitted lawyer may not properly appear before it." It also stated that Judge Jones was willing to admit out-of-state government lawyers only if the local United States Attorney "affirmatively represents, at oral argument, that he is unable to effectively litigate this case without the assistance of out-of-state counsel . . . ." This order leaves us with little doubt that Judge Jones may continue to deny the pro hac vice applications of attorneys for the United States. For this reason, this controversy remains live, and we have jurisdiction to consider the petition.

Page 12

## II. Whether We May Review Issues Raised in the Petition if the Writ Is No Longer An Effective Remedy

While the reversal of the challenged order did not render this controversy moot, it rendered a formal writ of mandamus a superfluous or ineffective remedy here. Historically, a writ of mandamus was an order compelling a court or officer to act. *See Marbury v. Madison*, 5 U.S. 137, 147 (1803) ("[A] writ of mandamus is 'a command . . . directed to any person, corporation or inferior court, requiring them to do some particular thing therein specified, which appertains to their office and duty . . . .'" (emphases omitted) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *110)). There is no specific act the United States would have us compel the district court to do,



Case 2:16-cv-00246-GMN-PAL Document 243 Filed 07/06/16 Page 139 of 154

(139 of 154)

United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2013)

either in this case or another case, nor is there any order we may vacate. The challenged order has already been reversed. We recognize the United States has a continuing interest in receiving assurances that Judge Jones will not deny its attorneys pro hac vice admission in the future. But we do not believe we can craft a formal writ of mandamus that would provide such assurances. *Cf. United States v. Hall*, 145 F.2d 781, 784 (9th Cir. 1944) ("[W]e have no power to consider the petition in the broad and general nature of the prayer but . . . we have such power to the extent that the petition applies to the specific case out of which [the judge's] rulings arose."[4]). Therefore, while there may be a continuing need to decide this case, "issuance of a writ would

Page 13

be an empty gesture." *United States v. Brooklier*, 685 F.2d 1162, 1173 (9th Cir. 1982). *But see In re Washington Post Co.*, 807 F.2d 383, 393 (4th Cir. 1986) (issuing a writ of mandamus to vacate a district court's orders closing hearings even though the hearings had already been held).

To provide the assurances the United States seeks, we must opine on the merits of the issues raised in the petition, with confidence that the district court will follow our guidance in future cases even if no writ issues. In cases where intervening events have rendered the writ an ineffective or superfluous remedy, but where the controversy nonetheless remains live, we have occasionally reviewed the district court's decision for error while withholding a formal writ. *See Phoenix Newspapers*, 156 F.3d at 952; *Brooklier*, 685 F.2d at 1173. In *United States v. Brooklier*, we considered a petition for a writ of mandamus brought by a newspaper company and a reporter challenging a number of orders by a district court closing criminal proceedings to the press and refusing to release transcripts.[5] 685 F.2d at 1165. We reviewed the challenged

orders in a mandamus proceeding after the trial had concluded and the transcripts had been released, *id.* at 1165, 1173, and concluded that the district court erred in a number of respects. *Id.* at 1165-73. We found, however, that these errors were "far from clear" at the time the district court ruled, and determined that mandamus should not issue. *Id.* at 1173. We observed that "although the controversy is not moot under controlling authority, in view of the completion of the trial and the release of the transcripts, issuance of a writ would be an empty gesture." *Id.*

Page 14

We confronted similar issues in *Phoenix Newspapers, Inc. v. U.S. District Court*. There we reviewed, on a petition for a writ of mandamus, whether a district court erred by sealing a hearing transcript. 156 F.3d at 943. At the time of our review, the transcripts had been released. *Id.* at 945. We nonetheless concluded that the controversy was not moot, *id.*, proceeded to address the issues raised in the petition, and found that the district court erred. *Id.* at 951. We did not, however, issue a writ of mandamus because we were not "persuaded that mandamus [was] the appropriate remedy," in part because the transcripts had already been released. *Id.* at 952.

*Brooklier* and *Phoenix Newspapers* establish that we are not categorically precluded from opining on the merits of a mandamus petition when issuance of the writ would no longer be effective.[6] Our cases do not offer guidance about when it is appropriate to reach the merits if no formal writ may issue. But we think it clear that we should only offer guidance to the district court if the writ would have been an appropriate remedy at the time the petition was filed. This insures that mandamus proceedings do not supplant the normal appeals process. In addition, we should be satisfied



(140 of 154)
Case 2:16-cv-00045-GMN-PAL Document 41 Filed 07/06/16 Page 140 of 154
United States v. U.S. Dist. Court for the Dist of Nev. (In re United States) (9th Cir. 2015)

Page 15

that there is a compelling reason to review the district court's decision for error when the specific relief sought has already been granted. *Cf. Armster*, 806 F.2d at 1361 (declining to withdraw prior mandamus opinion where "a strong public interest in having the legality of the challenged procedure determined remains" (internal quotation marks omitted)). This allows for review of important issues that would otherwise escape review, while insuring that such review is limited to truly extraordinary circumstances.

## III. Whether Mandamus Was Available When the Petition Was Filed

We now consider whether mandamus relief would have been appropriate at the time the petition was filed. Mandamus "is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258. 259-60 (1947)). "As the writ is one of 'the most potent weapons in the judicial arsenal,' [*Will v. United States*, 389 U.S. 90, 107 (1967)], three conditions must be satisfied before it may issue." *Id.* "First, 'the party seeking issuance of the writ [must] have no other adequate means to attain the relief he desires . . . .'" *Id.* (quoting *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976)). Second, the petitioner's right to issuance of the writ must be "clear and indisputable." *Id.* at 381 (quoting *Kerr*, 426 U.S. at 403) (internal quotations marks omitted). "Third, even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

Page 16

To determine whether mandamus relief is appropriate, we weigh five factors

enumerated in *Bauman v. U.S. District Court*,[7] 557 F.2d 650, 654-55 (9th Cir. 1977):

> (1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal. (This guideline is closely related to the first.) (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Id.* (citations omitted). The *Bauman* factors are not exhaustive, *see In re Cement Antitrust Litig.*, 688 F.2d 1297, 1301 (9th Cir. 1982) (listing additional considerations), and "should not be mechanically applied," *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004). While all the factors need not be present to issue the writ, *id.*, "the absence of factor three-clear error as a matter of law-will always defeat a petition for mandamus . . . ." *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 934 (9th Cir. 2000) (internal quotation marks omitted).

Page 17

### A. Clear Error

We begin with the third *Bauman* factor, whether "[t]he district court's order is clearly erroneous as a matter of law," *Bauman*, 557 F.2d at 654-55, since "failure to show clear error may be dispositive of the petition." *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 708 (9th Cir. 2009). "The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and



(141 of 154)

Case 2:16-cv-00246-GMN-PAL Document 94-1 Filed 07/06/16 Page 141 of 154
United States v. U.S. Dist. Court for the Dist of Nev. (In re United States) (9th Cir., 2015)

firm conviction that a mistake has been committed.'" *Id.* (quoting *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 623 (1993)) (internal quotation marks omitted). "We normally review a denial of a motion to appear *pro hac vice* for abuse of discretion," *United States v. Walters*, 309 F.3d 589, 591 (9th Cir. 2002), and therefore our review of a decision to deny pro hac vice admission is especially deferential in a mandamus proceeding. *See Munoz v. Hauk*, 439 F.2d 1176, 1179 (9th Cir. 1971) (per curiam). Notwithstanding the high degree of deference appropriate here, it is clear to us that the district court acted outside its discretion in denying Lowe's application for pro hac vice admission.

We begin by determining whether the district court properly interpreted the District of Nevada's standards governing the pro hac vice admission of government attorneys. The court denied the motion to admit Lowe pursuant to Nevada Local Rule IA 10-3. The rule provides:

> [u]nless otherwise ordered by the Court, any nonresident attorney who is a member in good standing of the highest court of any state, commonwealth, territory or the District of Columbia, who is employed by the United

Page 18

States as an attorney and, while being so employed, has occasion to appear in this Court on behalf of the United States, shall, upon motion of the United States Attorney or the Federal Public Defender for this District or one of the assistants, be permitted to practice before this Court during the period of such employment.

(emphasis added). The court interpreted the first clause of the rule to confer discretion to deny pro hac vice admission to attorneys for the United States who are not members of the Nevada bar. We generally defer to a district court's interpretation of its local rules, *Bias v. Moynihan*, 508 F.3d 1212, 1223 (9th Cir. 2007), and agree that the rule appears to give district judges discretion to deny attorneys for the United States permission to appear pro hac vice.

However, that discretion is not unbounded. Local Rule IA 10-3 does not empower a district court to refuse pro hac vice admission arbitrarily. *See Zambrano v. City of Tustin*, 885 F.2d 1473, 1483 (9th Cir. 1989) ("Admission to a state bar creates a presumption of good moral character that cannot be overcome at the whims of the District Court." (quoting *In re Evans*, 524 F.2d 1004, 1007 (5th Cir. 1975) (internal quotations marks omitted))); *cf. Munoz*, 439 F.2d at 1179 (expressing confidence that the district judge "will not exercise his discretionary power arbitrarily" and therefore declining to "fix precise guidelines" governing pro hac vice admission under a district's local rules). Therefore, a district court must articulate a valid reason for its exercise of discretion. *See Roma Constr. Co. v. aRusso*, 96 F.3d 566, 577 (1st Cir. 1996); *cf. United States v. Ries*, 100 F.3d 1469, 1472 (9th Cir. 1996) (holding, in a criminal case, that "[i]n

Page 19

denying a pro hac vice application, the judge must articulate his reasons, for the benefit of the defendant and the reviewing court").

We have offered little guidance about what constitutes a valid reason for denying pro hac vice admission in a civil case. Some of our sister circuits permit district courts to deny an application for pro hac vice admission only in rare circumstances. For instance, the Fifth Circuit has held that



Case 2:16-cv-00245-GMN-PAL Document 43 Filed 07/06/16 Page 142 of 154

(142 of 154)

United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)

> [a]n applicant for admission pro
> hac vice who is a member in
> good standing of a state bar may
> not be denied the privilege to
> appear except "on a showing
> that in any legal matter,
> whether before the particular
> district court or in another
> jurisdiction, he has been guilty
> of unethical conduct of such a
> nature as to justify disbarment
> of a lawyer admitted generally
> to the bar of the court."

*In re Evans*, 524 F.2d at 1007 (quoting *Sanders v. Russell*, 401 F.2d 241, 247-48 (5th Cir. 1968)). The Eleventh Circuit has continued to apply this stringent standard following its split from the Fifth Circuit. *See Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) ("Absent a showing of unethical conduct rising to a level that would justify disbarment, the court *must* admit the attorney."). In other circuits, district courts have broader discretion to refuse pro hac vice admission. For instance, the Sixth Circuit has held that an attorney's pro hac vice admission may be revoked where conflicts of interest exist, or where "some evidence of ethical violations was present." *D.H. Overmeyer Co., Inc. v. Robson*, 750 F.2d 31, 34 (6th Cir. 1984). And the Fourth Circuit has held that a district court may deny an

Page 20

attorney permission to appear pro hac vice based on the attorney's "unlawyerlike conduct in connection with the case in which he wished to appear." *Thomas v. Cassidy*, 249 F.2d 91, 92 (4th Cir. 1957) (per curiam).

We need not announce specific factors that should inform a district court's exercise of its discretion to deny pro hac vice admission. To resolve this case, we need only define the outer limits of that discretion. At minimum, a court's decision to deny pro hac vice admission must be based on criteria

reasonably related to promoting the orderly administration of justice, *see Ries*, 100 F.3d at 1471, or some other legitimate policy of the courts, *see Roma Constr. Co.*, 96 F.3d at 577 (concluding that a district court abused its discretion where its decision to deny pro hac vice admission was "based on criteria that are not set forth in writing, that do not reasonably support its action, and that do not appear to respond to any general policy of the District . . . .").

We recognize that "counsel from other jurisdictions may be significantly more difficult to reach or discipline than local counsel." *Ries*, 100 F.3d at 1471. However, "[a]dmission to the state bar is the essential determinant of professional ethics and legal competence," and, in practice, "the application process for admission before the federal district courts is generally perfunctory and pro forma." *Zambrano*, 885 F.2d at 1483. Therefore, if a court has ethical doubts about an attorney who is in good standing with a state bar, it must articulate some reasonable basis for those doubts before

Page 21

denying the attorney's application for pro hac vice admission.[8]

We conclude that the district court's decision to deny pro hac vice admission to Lowe was arbitrary, and therefore lay outside the district court's discretion. In the order denying Lowe's motion, the district court found that she was an active member in good standing of the Massachusetts bar. The district court nonetheless denied the motion, stating: "[b]efore the Court will permit Ms. Lowe to practice before this Court, the Court requires a showing that the Nevada admitted Assistant United States Attorneys in our judicial district are incapable of handling this matter." The district court cited no reason, except its own policy, for refusing to admit Lowe. We note that Judge Jones has explained in other cases that he adopted his



Case 2:16-cv-00046-GMN-PAL Document 941 Filed 07/06/16 Page 143 of 154
(143 of 154)
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2016)

policy of refusing to admit government attorneys pro hac vice based on doubts about "the ethical commitments" of government attorneys. Generalized doubts about all government attorneys' ethical commitments are not valid grounds for denying an individual attorney's application for pro hac vice admission. We therefore conclude that Judge Jones acted outside his discretion by failing to provide a valid reason to deny Lowe's application for pro hac vice admission.

It is particularly important that a district court provide a valid reason for denying pro hac vice admission where, as here, the attorney seeking admission represents the United States. The Attorney General has clear statutory authority to choose which attorneys will represent the United States in

Page 22

litigation. *See* 28 U.S.C. §§ 515(a), 517; *Hall*, 145 F.2d at 783-84. That authority does not mandate that district courts automatically grant government attorneys' applications for pro hac vice admission. *See United States v. U.S. Dist. Court*, 694 F.3d 1051, 1059 (9th Cir. 2012) ("When the United States stands as a party before the court, the authority of the Attorney General is no greater than that of any other party. The Attorney General is not independent of the court's authority, including its authority over a settlement conference."). But "the federal government, though not independent of the court's authority, is also not like any other litigant," *id.*, and a district court should "consider the unique position of the government as a litigant in determining whether to exercise its discretion," *In re Stone*, 986 F.2d 898, 903 (5th Cir. 1993). For example, "[i]t is not open to serious dispute that the Government is a party to a far greater number of cases on a nationwide basis than even the most litigious private entity . . . ." *United States v. Mendoza*, 464 U.S. 154, 159 (1984). Given the volume of litigation in which the government is a party, arbitrary interference with the government's

choice of counsel risks burdening the executive branch in the discharge of its duties.

Such interference also risks creating the impression that the courts are intruding upon the traditional prerogatives of the political branches. "[C]ourts should not risk becoming 'monitors of the wisdom and soundness of Executive action.'" *In re Stone*, 986 F.2d at 904 (quoting *Laird v. Tatum*, 408 U.S. 1, 15 (1972)). That risk is particularly acute where, as here, a court adopts a policy that singles out attorneys from specific departments and offices for greater scrutiny. Moreover, some of Judge Jones's comments risked giving the impression that his admission policy was motivated by his disagreement with the enforcement priorities

Page 23

of specific federal agencies. For instance, during a proceeding in *In re Hofsaess*, No. 2:13-cv-01161-RCJ (D. Nev.), Judge Jones stated:

> My experience has been, in a number of cases, that when I admit out-of-state licensed attorneys for the U.S. Government, that they feel no obligation to me under the ethical standards of the Nevada Bar. . . . *And some of the directions taken by the Internal Revenue Service and attorneys out of and licensed out of Washington with respect to that is just abhorrent to me.*

(emphasis added). Similarly, an order denying a motion for reconsideration in *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 13-cv-00078-RCJ-VPC (D. Nev.), stated: "[t]he local United States Attorney, Mr. Daniel G. Bogden, serves under an Attorney General who, *under the guise of prosecutorial discretion, selectively*



(144 of 154)

*enforces laws to further political objectives that ought to be left to the legislature.* There is simply no presumption that his subordinates are above ethical reproach." (emphasis added). Because Judge Jones did not articulate a valid reason for his pro hac vice admission policy, comments like these created a real risk that the policy would, rightly or wrongly, be viewed as an encroachment on the domain of the political branches.

Because the requirement of clear error is satisfied here, we turn to the other four *Bauman* factors.

Page 24

**B. Whether the United States Has No Other Means to Obtain Relief And Whether the United States Will Be Harmed in a Way Not Correctable on Appeal**

"The first *Bauman* factor highlights the need for mandamus to be used only when no other realistic alternative is (or was) available to a petitioner." *Cole*, 366 F.3d at 817; *see also Cheney*, 542 U.S. at 367 (describing absence of "adequate means to attain . . . relief" as a "prerequisite" to issuance of the writ). The United States could not have obtained relief through an appeal in this case because "the denial of a petition for admission to a district court bar is neither a final order appealable under 28 U.S.C. § 1291 . . . nor an interlocutory order appealable under 28 U.S.C. § 1292." *Gallo v. U.S. Dist. Court*, 349 F.3d 1169, 1176 (9th Cir. 2003); *see also Cohen*, 586 F.3d at 710 ("lost choice of counsel cannot be adequately remedied through means other than mandamus . . . ."). We are therefore satisfied that the writ is not being "used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380-81.

It is true that the United States could have filed a formal complaint against Judge Jones with the Judicial Council of the Ninth

Circuit before seeking a writ of mandamus. *See* 28 U.S.C. §§ 351-53. But the United States could not have obtained the relief it seeks by filing a misconduct complaint. As Judge Wallace's concurrence in the judgment notes, the Judicial Council's procedures "are not intended to provide an alternative avenue for appealing a judge's rulings in a particular case . . . ." *In re Charge of Judicial Misconduct*, 613 F.2d 768, 769 (9th Cir. 1980). The United States could have complained that Judge Jones's "pattern and practice of arbitrarily and deliberately disregarding prevailing legal standards" amounted to "misconduct." *See In re Judicial*

Page 25

*Conduct & Disability*, 517 F.3d 558, 562 (U.S. Jud. Conf. 2008). However, the Judicial Conference of the United States has cautioned that "the characterization of such behavior as misconduct is fraught with dangers to judicial independence." *Id.* For this reason,

> a cognizable misconduct complaint based on allegations of a judge not following prevailing law or the directions of a court of appeals in particular cases must identify clear and convincing evidence of willfulness, that is, clear and convincing evidence of a judge's arbitrary and intentional departure from prevailing law based on his or her disagreement with, or willful indifference to, that law.

*Id.* Indeed, because "[t]he Judicial Council is not a court and thus cannot determine whether a judge's rulings are erroneous," "a complainant must at a minimum allege that the rulings in question have been reversed on appeal." *In re Judicial Misconduct*, 631 F.3d 961, 962 (9th Cir. 2011). Because the government's requested relief relates to the merits of Judge Jones's rulings, and those



Case 2:16-cv-00045-GMN-PAL Document 243 Filed 07/06/16 Page 145 of 154
(145 of 154)
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir. 2016)

rulings have not been reversed on appeal, it appears that the Judicial Council could not provide the relief that the government seeks in its mandamus petition. Judge Wallace's point is well taken that Judge Jones's practice of reversing himself after the government has filed a petition for a writ, thereby insulating his rulings from review, may itself qualify as the type of conduct properly addressed by the Judicial Council. However, by its terms, the government's mandamus petition challenges a particular order denying a particular motion, not a pattern and practice of routinely reversing his orders to

Page 26

insulate them from appellate review. We do not see why the government should be forced to recharacterize the relief it seeks in order to seek relief from the Judicial Council. Indeed, the prospect that the government would be forced to request different relief from the Judicial Council strongly suggests that pursuing a misconduct complaint was not an adequate alternative means to obtain relief.

With respect to the related second *Bauman* factor, we have recognized that a lost choice of counsel produces "harm [that] is not correctable on appeal." *Cohen*, 586 F.3d at 710 (citing cases). The United States was harmed when Lowe was denied pro hac vice admission. This immediate harm was remedied when Judge Jones granted Lowe's application for pro hac vice admission after the petition was filed. However, we recognize that the United States also has interests in avoiding uncertainty and delay in securing pro hac vice admission of government attorneys in the future. It cannot adequately protect these interests by filing successive petitions for writs of mandamus, even if the petitions again cause Judge Jones to admit the attorneys. The United States will still be inconvenienced by the delay.

The first and second *Bauman* factors weighed in favor of issuing mandamus when

the petition was filed, and weigh in favor of offering guidance to the district court.

### C. Whether the District Court's Order Is An Oft-Repeated Error

There are several other cases in which Judge Jones has issued similar orders. The fact that Judge Jones's order in this case was not an isolated occurrence weighed in favor of granting mandamus relief when the petition was filed. We

Page 27

place significant weight on this factor in this case because it demonstrates that the United States has a continuing need for relief, and that guidance is therefore warranted, even though Lowe has been admitted.

### D. Whether the District Court's Order Raises Important Problems or Issues of First Impression

The order at issue here raises important problems. We find it highly relevant that the conduct complained of could, if allowed to continue, burden the Executive in the performance of its duties. *See Cheney*, 542 U.S. at 382 ("Accepted mandamus standards are broad enough to allow a court of appeals to prevent a lower court from interfering with a coequal branch's ability to discharge its constitutional responsibilities."). We also note that this dispute resembles a handful of other cases in which we issued mandamus to clarify the authority of the district courts in litigation overseen by the Attorney General. *See United States v. U.S. Dist. Court*, 694 F.3d 1051 (9th Cir. 2012); *Hall*, 145 F.2d 781. This factor weighed in favor of mandamus relief when the petition was filed and weighs in favor of offering guidance to the district court even though a formal writ is no longer necessary.



(146 of 154)

Case 2:16-cv-00045-GMN-PAL Document 41 Filed 07/06/16 Page 146 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir. 2015)



**E. Mandamus Relief Would Have Been Appropriate, But a Formal Writ Is No Longer Necessary**

After weighing the *Bauman* factors, we are convinced that it is appropriate to offer guidance to the district court. Issuing a formal writ would have been an appropriate remedy but for Judge Jones's voluntary cessation, and there is a continuing need to decide the issues the petition raises. It is true, as Judge Wallace notes in his concurrence in the judgment, that

Page 28

it will often be possible to resolve disputes about judicial administration informally through, for instance, the involvement of chief district judges. Informal efforts have been undertaken in this case. The record does not disclose whether those efforts have caused Judge Jones to modify or abandon his pro hac vice policy. However, it is clear to us that, by one important measure, the informal efforts undertaken here have not proven effective, because they have not produced a public record upon which the government may rely if the challenged conduct recurs. Absent a record memorializing the resolution of the issues presented by the petition, the government will continue to face considerable uncertainty about whether its attorneys will be admitted pro hac vice.

For reasons discussed *supra*, it is not necessary to issue a formal writ in this case. We are confident that the district court will conform its decisions to the principles we announce here. *See Phoenix Newspapers*, 156 F.3d at 952; *Armster v. U.S. Dist. Court*, 792 F.2d 1423, 1431 (9th Cir. 1986) (*Armster I*); *Brooklier*, 685 F.2d at 1173. We accordingly deny the petition without prejudice.

**CONCLUSION**

For the above reasons, we **DENY** the petition without prejudice.

Page 29

WALLACE, Circuit Judge, concurring in the judgment:

I concur only in the judgment to deny the writ of mandamus. Judge Jones's reversal of his prior order denying admission to government attorneys renders unnecessary the government's petition for a writ of mandamus. This is where our analysis should end. *See In re Am. Fed'n of Gov't Emps., AFL-CIO*, 837 F.2d 503, 507 (D.C. Cir. 1988) (denying petition for writ of mandamus and observing that "[w]here there's no remedy, there's no need to decide if there was a wrong"). In my view, our statutory writ authority is an improper vehicle for providing hopeful but non-binding assurances that Judge Jones will discontinue his practice of routinely denying admission to the government's out-of-state attorneys, and then reversing course when such denials become subject to appellate review. The proper, and frankly more effective, place from which the government may obtain such assurances is the Judicial Council of the Circuit (Circuit Council).

I.

In 1939, Congress passed legislation instituting a comprehensive plan of decentralized judicial administration. The Administrative Office Act of 1939 (Act) created the Administrative Office of the United States Courts, and thereby effectively transferred responsibility for supervising court administration from the Department of Justice to the courts themselves. The primary purpose of the Act was "to furnish to the Federal courts the administrative machinery for self-improvement, through which those courts will be able to scrutinize their own work and develop efficiency and promptness in their administration of justice." H.R. Rep. No. 76-702, at 2 (1939).

Page 30



Case 2:16-cr-00046-GMN-PAL Document 941 Filed 07/06/16 Page 147 of 154

United States v. U.S. Dist. Court for the Dist of Nev. (in re United States) (9th Cir., 2015)

(147 of 154)

Integral to this goal was the creation of a Circuit Council in each circuit to act as a local "board of directors" for the circuit. *See Chandler v. Judicial Council of the Tenth Circuit of the United States*, 398 U.S. 74, 86 n.7 (1970). Presently, the Circuit Council consists of the chief judge of the circuit, who presides, and an equal number of circuit and district judges of the circuit. 28 U.S.C. § 332(a)(1). Unlike the Judicial Conference of the Circuit, whose "purely advisory" function is "to provide an opportunity for friendly interchange among judges and between bench and bar, out of which might grow increased understanding of problems of judicial administration and enhanced cooperation toward their solution," the Circuit Council is "designed as an actual participant in the management of the judicial work of the circuit." *Chandler*, 398 U.S. at 98 (Harlan, J., concurring).

Indeed, the Circuit Council is presently vested with broad authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). In aid of this authority, the Circuit Council may hold hearings, take sworn testimony, and issue subpoenas. *Id*. The Circuit Council also possesses review authority over district courts' local rules to ensure their consistency with the Supreme Court's general rules of practice, procedure, and evidence. *Id*. § 332(d)(4). Importantly, these powers come with teeth:

> All judicial officers . . . of the circuit shall promptly carry into effect all orders of the judicial council. In the case of failure to comply with an order made under this subsection, . . . a judicial council or a special committee . . . may institute a contempt proceeding in any district court in which the

judicial officer . . . who fails to comply with the order . . . shall be ordered to show cause before the court why he or she should not be held in contempt of court.

*Id*. § 332(d)(2).

In 1980, the Judicial Conduct and Disability Act built upon the Administrative Office Act, and augmented the role of the judicial council in investigating judges whose conduct is prejudicial the "effective and expeditious administration of justice." *Id*. The Circuit Council has power to conduct investigations of such alleged conduct so long as the conduct is not "directly related to the merits of a decision or procedural ruling," *id*. § 352(b)(1)(A)(ii), and does not rise to the level of an impeachable offense. *See* J. Clifford Wallace, *Resolving Judicial Corruption While Preserving Judicial Independence: Comparative Perspectives*, 28 Cal. W. Int'l L.J. 341, 348-49 (1998).

Since its institution, the Circuit Council has been the primary administrator of discipline within the federal judiciary. Most of the Circuit Council's work in this regard is performed informally and inconspicuously, and with great effectiveness. *See generally* Charles Gardner Geyh, *Informal Methods of Judicial Discipline*, 142 U. Pa. L. Rev. 243 (1993). As one former chief judge has said: "[W]e believe [the Circuit Council's] success may be measured by its lack of visibility. We suspect that some who have criticized councils for inactivity are unmindful of the saw that still waters run deep, and that the most effective actions are often the most inconspicuous." *In re Imperial "400" Nat'l, Inc.*, 481 F.2d 41, 47 (3d Cir. 1973). Indeed, our own Circuit Council has long been successful in dealing with judicial

Page 32



Case 2:16-cv-00046-GMN-PAL Document 841 Filed 07/06/16 Page 148 of 154

(148 of 154)

United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2016)

misconduct "through an informal mechanism, backed up by [its] power to enter orders if necessary under . . . § 332." U.S. Court of Appeals for the Ninth Circuit, *Report on the Implementation of the Judicial Conduct and Disability Act of 1980 in the Ninth Judicial Circuit* (1987). My own experience as former chief judge and as a current member of the Circuit Council bears this out. Typically, even the most serious judicial problems are resolved successfully without the filing of a formal complaint.

Occasionally, however, it may become necessary to initiate a formal complaint against a judge who (1) has "engaged in conduct," 28 U.S.C. § 351(a); (2) that is not "directly related to the merits of a decision or procedural ruling," *id.* § 352(b)(1)(A)(ii); (3) but is "prejudicial to the effective and expeditious administration of the business of the courts," *id.* § 351(a). The Judicial Code provides that "[a]ny person alleging that a judge has engaged in [such] conduct . . . may file . . . a written complaint containing a brief statement of the facts." *Id.* Alternatively, the chief judge may, on the basis of information available to him or her, "identify" a complaint through a written order "and thereby dispense with the filing of a written complaint." *Id.* § 351(b).

Once a complaint has been filed or identified, the chief judge must expeditiously review it to determine "whether appropriate corrective action has been or can be taken without the necessity for a formal investigation," or whether the facts stated in the complaint are "plainly untrue" or "incapable of being established through investigation." *Id.* § 352(a). During this process, the chief judge may request that the judge whose conduct is the subject of complaint file a written response. *Id.*

Page 33

The chief judge may then issue a final written order (1) dismissing the complaint for

various enumerated reasons, *see id.* § 352(b)(1); or (2) concluding that appropriate corrective action has been taken or that intervening events have rendered the complaint unnecessary, *id.* § 351(b)(2). Failing those, however, the chief judge must appoint a special committee to investigate the allegations in the complaint. *Id.* § 353(a). The committee then conducts an investigation and files a comprehensive written report with the entire Circuit Council, with recommendations for appropriate action. *Id.* § 353(c).

The Circuit Council may conduct additional investigation, dismiss the complaint, or take action against the judge whose conduct is the subject of complaint, including issuance of a private or public reprimand. *Id.* § 354(a)(1)-(2).

II.

Instead of a non-binding advisory opinion, the statutory procedures outlined above provide the proper vehicle by which the United States may potentially obtain the assurances it seeks in this case. The government could, for example, seek a specific order from the Circuit Council under section 332 correcting Judge Jones's alleged pattern and practice of denying, as a matter of course, admission to out-of-state government attorneys, coupled with his subsequent reversal whenever such denial becomes the subject of a petition for a writ of mandamus. *See* J. Clifford Wallace, *Must We Have the Nunn Bill?*, 51 Ind. L.J. 297, 322 (1976) (observing that the Circuit Council's power to issue orders likely includes the "issuance of 'specific orders, directed to individual judges, and limited to the correction of a specific situation for which that judge can be held directly responsible,'" quoting

Page 34

Comment, *The Authority of the Circuit Judicial Councils: Separation of Powers in*



Case 2:16-cv-00045-GMN-PAL Document 341 Filed 07/06/16 Page 149 of 154

(149 of 154)

United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir. 2013)

*the Courts of Appeal*, 5 Seton Hall L. Rev. 815, 860 (1974)). Indeed, "[a]n order by the Council to a district judge . . . involve[s] supervision of a subordinate judicial officer," and "in this regard, [is] not unlike the extraordinary writ of mandamus." *Chandler*, 398 U.S. at 106 (Harlan, J., concurring). Such an order may be especially appropriate given the Circuit Council's authority to review the local rules of district courts, including the local rule upon which Judge Jones relied to deny routinely admission to out-of-state government attorneys. *See* 28 U.S.C. § 332(d)(4).

Alternatively, the government could file a complaint with the Circuit Council against Judge Jones. Indeed, the House Report on the Judicial Conduct and Disability Act contemplated use of the formal complaint procedure in this very circumstance: "If a clear impediment to the administration of justice is shown . . . the circuit council could hear a case brought against a judge who is a litigant in a legal proceeding." H.R. Rep. No. 96-1313, at 8 (1980).

Of course, it bears emphasizing that the Circuit Council is not an alternative appellate forum in which to address the merits of a judge's order. *In re Charge of Judicial Misconduct*, 613 F.2d 768, 769 (1980) (the Circuit Council's procedures "are not intended to provide an alternate avenue for appealing a judge's rulings in a particular case"). Indeed, the Circuit Council does not review "objections to substantive or procedural error" because "in such cases the gravamen of the complaint is not the fitness of the judge, but the merit of his decision." *In re Charge of Judicial Misconduct*, 685 F.2d 1226, 1227 (9th Cir. 1982). Here, however, the gravamen of the government's complaint is not the merits of Judge Jones's decision to deny government attorneys admission in the

present case—otherwise the government would not still be pressing for a writ after Judge Jones reversed course, granting them the particular relief they asked us compel through a writ. Rather, the government seeks an assurance that Judge Jones's pattern and practice of routinely denying out-of-state government attorneys admission—and subsequently reversing himself to insulate such orders from appellate review—will not happen *in the future*. Such forward-looking relief is not within our statutory mandamus power as a three-judge panel, but it falls well within the statutory purview of the Circuit Council.

Indeed, the Committee on Judicial Conduct and Disability, a sub-part of the Judicial Conference of the United States, recently recognized that "a judge's pattern and practice of arbitrarily and deliberately disregarding prevailing legal standards and thereby causing expense and delay to litigants may be misconduct." *In re Judicial Conduct and Disability*, 517 F.3d 558, 562 (U.S. Jud. Conf. 2008). Subsequently, however, Judge Kozinski, during his tenure as chief judge, issued an order clarifying that to avoid the merits-related bar on judicial misconduct complaints by alleging a "pattern or practice," "a complainant must at a minimum allege that the rulings in question have been reversed on appeal," because the Circuit Council "cannot determine whether a judge's rulings are erroneous." *In re Judicial Misconduct*, 631 F.3d 961, 962 (9th Cir. 2011). But here, Judge Jones has insulated himself from appellate review by reversing course whenever a petition has been filed, thus rendering ineffective any petition for a writ of mandamus. The Supreme Court clarified decades ago, quoting our circuit's precedent, that "[a]lthough it is well established that Judicial Councils do not exist to review claims that a particular trial judge's rulings were erroneous, *In re Charge*

Page 35

Page 36



(150 of 154)

Case 2:16-cv-00246-GMN-PAL Document 94 Filed 07/06/16 Page 150 of 154

United States v. U.S. Dist. Court for the Dist of Nev. (In re United States) (9th Cir., 2015)

*of Judicial Misconduct*, 613 F.2d 768 (9th Cir. 1980), they do exist 'to provide an administrative remedy for misconduct of a judge for which no judicial remedy is available.' *In re Charge of Judicial Misconduct*, 595 F.2d 517 (9th Cir. 1979)." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 435 n.2 (1985). *See also* Wright & Miller, Fed. Prac. & Proc. § 3939 ("Judicial council action is most obviously proper even with respect to isolated conduct if there is no apparent remedy by appeal or writ . . . ."). Judge Jones's pattern of denying admission and then reversing himself only after the government files a petition for a writ—which insulates his rulings from "remedy by appeal or writ"—likely qualifies, therefore, as the type of conduct that is most properly addressed by the Circuit Council. Even if the Circuit Council could not opine on the merits of Judge Jones's denial, moreover, it surely could prevent him from engaging in a practice of insulating his denials from appellate review.

The majority concludes that their advisory opinion is necessary because at the time the petition was filed, i.e., before Judge Jones reversed himself, the *Bauman* factors weighed in favor of issuing a writ. But *Bauman*'s first factor—whether the "party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires"— is a *prerequisite*, the Supreme Court has held, to issuance of the writ. *Cheney*, 542 U.S. at 381. The purpose of the first *Bauman* factor is to assess only the "availability" of an adequate alternative means, not to consider whether the petitioner is likely to be successful in employing it. *Bauman*, 557 F.2d 650 at 656. Indeed, *Bauman* states,"the *availability* of a direct appeal would weigh strongly against a grant of mandamus. . . . [E]ven if the grant of an interlocutory appeal from the order is not a foregone conclusion, the possibility remains . . . that a[n] appeal may

be *available*. That possibility, or uncertainty, regarding appealability militates against issuance of a writ here." *Id.* (emphasis added).

The majority is content to assume that "pursuing a misconduct complaint was not an adequate alternative means to obtain relief." However, in this case, as in *Bauman*, even though it was "not a foregone conclusion" that the United States would obtain the relief it seeks through the filing of a formal complaint, it is clear that the "availability" of an adequate alternative means—even if "uncertain[]"—militates against issuance of a writ in this case. I would therefore hold that this "prerequisite" for issuance of mandamus, *Cheney*, 542 U.S. at 381, was not satisfied here, at the time the petition was filed or after. Consequently, even under the majority's own rubric, it should not be issuing an advisory opinion in this case.

In sum, we properly denied the government's petition for a writ of mandamus because Judge Jones's voluntary reversal rendered it unnecessary. However, our denial does not leave the government without an avenue for the relief it seeks. Particularly in the present case, which involves a district judge's pattern and practice across many cases, followed by his voluntary self-reversal in those cases that become subject to appellate review, the government could, if necessary, seek relief from the Circuit Council. If the government deems it necessary to file a future misconduct complaint to address Judge Jones's alleged pattern and practice, the chief judge may determine that further investigation is warranted. In that event, if the Circuit Council's investigation supports the government's allegations, the Circuit Council may, in its discretion, issue a public reprimand providing the assurances that the government seeks.

Page 38

III.

Page 37



Case 2:16-cr-00046-GMN-PAL Document 943 Filed 07/06/16 Page 151 of 154
(151 of 154)
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir. 2016)



In light of the role Congress established for the Circuit Council in resolving the issues the government raises here, our court should abstain from using the blunt instrument of our section 1651 writ authority to offer nonbinding guidance to district courts, especially when subsequent events render issuing the writ unnecessary. *See Richardson-Merrell*, 472 U.S. at 435 n.2 (observing that action by the Circuit Council is appropriate where judicial remedies are unavailable).

Our court has strayed in recent years from the traditional understanding that our mandamus authority is sharply limited to truly extraordinary circumstances in which no alternative remedy—judicial or administrative—is available. As the majority points out, our court has sometimes offered "advice" to district judges on legal issues for which there was no judicial writ remedy when it has concluded that the alleged wrongs were capable of repetition but evaded review. *See, e.g.*, *Phoenix Newspapers, Inc. v. U.S. Dist. Court for the Dist. of Ariz.*, 156 F.3d 940, 948-49 (9th Cir. 1998). This practice appears to be an extension of several earlier cases in which our court invoked a so-called "supervisory mandamus" authority to "provide necessary guidance to the district courts" regarding "questions of law of major importance to the administration of the district courts." *In re Cement Antitrust Litig.*, 688 F.2d 1297, 1307 (9th Cir. 1982); *see also Admiral Ins. Co. v. U.S. Dist. Court for the Dist. of Ariz.*, 881 F.2d 1486, 1491 (9th Cir. 1989) (stating that "exercise of supervisory mandamus authority" was warranted because the case involved an "important question of first impression" that would "elude review"). This in spite of there being no case or controversy before the court.

Page 39

The term "supervisory mandamus" owes its existence to a blip in Supreme Court jurisprudence from the 1957 case of *La Buy v. Howes Leather Co.*, 352 U.S. 249 (1957). In

*La Buy*, over a blistering dissent by Justice Brennan joined by Justices Frankfurter, Burton, and Harlan, the Court stated its belief that "supervisory control of the District Courts by the Courts of Appeals is necessary to the proper judicial administration in the federal system. The All Writs Act confers on the Courts of Appeals the discretionary power to issue writs of mandamus in . . . exceptional circumstances." *Id.* at 259-60.

Two decades later, we observed in *Bauman v. U.S. Dist. Court*, 557 F.2d 650 (9th Cir. 1977), that "[s]ince the advent of the concept of 'supervisory mandamus' in *La Buy* . . . the challenge to the federal appellate courts has been to formulate objective principles to guide the exercise of their section 1651 power." *Id.* at 653. We cautioned against the "obvious" "dangers of unprincipled use of that power," which "could readily subvert the policies underlying the finality rule" or the "congressional scheme governing interlocutory appeals," and which could "undermine the mutual respect . . . between federal trial and appellate courts." *Id.* We pointed out that "without articulable and practically applicable guidelines to govern the issuance of extra-ordinary writs, appellate judges would continually be subject to the temptation to grant such relief merely because they are sympathetic with the purposes of the petitioners' underlying actions, or because they question the trial court's ability to direct the litigation efficiently or impartially." *Id.* at 653-54. In light of those dangers, we instituted a five-factor test to bring principled guidance to the exercise of section 1651 power, recognizing that its "continuing effectiveness . . . depends on its reasoned and principled exercise." *Id.* at 654.

Page 40

Despite the potentially broad interpretations that Courts of Appeals might be tempted to derive from *La Buy*, they would do well to observe that the Court has since



-18-

(152 of 154)

Case 2:16-cv-00245-GMN-PAL Document 41 Filed 07/06/16 Page 152 of 154
United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2016)

retreated considerably from this expanded use of mandamus that it seemed to sanction in 1957. Indeed, in its most recent articulation of our statutory mandamus authority, the Court reiterated that the "traditional use of the writ in aid of appellate jurisdiction . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (alteration in original) (internal quotation marks omitted). Consequently, "only exceptional circumstances amounting to a judicial usurpation of power or a clear abuse of discretion will justify the invocation of this extraordinary remedy." *Id.* (internal quotation marks and citations omitted). This is a far cry from offering advice on administrative issues, i.e., so-called "supervisory mandamus."

The foremost "prerequisite[]" to invoking statutory mandamus authority is that the party seeking issuance of the writ "have no other adequate means to attain the relief he desires." *Id.*, quoting *Kerr v. United States Dist. Court for the N. Dist. of Cal.*, 426 U.S. 394, 403 (1976); *see also Bauman*, 557 F.2d at 654. The purpose of this threshold hurdle is to "ensure that the writ will not be used as a substitute for the regular appeals process." *Cheney*, 542 U.S. at 380-81. In accordance with this principle, our mandamus authority, whether phrased as "supervisory" or not, must not be invoked as a substitute for any "other adequate means" by which the petitioner may "attain the relief he or she desires." *Bauman*, 557 F.2d at 654.

Page 41

Our court should therefore avoid invoking "supervisory mandamus" authority for anything it deems to implicate questions of "major importance" whose "resolution would add importantly to the efficient and orderly administration of the district courts." *In re Cement Antitrust Litig.*, 688 F.2d at

1305. Congress has established extra-judicial mechanisms for dealing with certain issues, and we must defer to Congress, lest our so-called "supervisory" authority become a tool for scattershot resolution of important issues of court administration that Congress directed to be handled outside the normal judicial process, through the judicial administrative organization of the Circuit Council.

For example, we declined a petitioner's invitation to exercise a so-called "inherent supervisory authority" over rules implemented under 28 U.S.C. § 2071 to review certain plans issued by the district court pursuant to the Criminal Justice Act (CJA). *Russell v. Hug*, 275 F.3d 812, 820-21 (9th Cir. 2002). We refused to exercise any so-called supervisory authority over such plans because in the CJA "Congress granted to the Judicial Council a continuing authority to supervise such plans." *Id.* at 821. Because the statutory "provisions ma[d]e clear that the district court's adoption and modification of a plan under the [CJA] is an administrative matter, subject to the governance of the Judicial Council," we held that our appellate review authority under 28 U.S.C. § 1291 "does not authorize us to engage in supervisory oversight of administrative actions of the district courts." *Id.*

The same should be said about our mandamus authority in light of the statutory provisions delegating responsibility over the administrative issues presented in this appeal to the Circuit Council. The Circuit Council has statutory review authority over the local rule invoked by Judge Jones in

Page 42

denying admission to non-local government attorneys. Moreover, as set forth above, the Circuit Council has statutory authority to issue orders to correct judicial conduct that is prejudicial to the "effective and expeditious administration of justice within its circuit."



-19-

Case 2:16-cv-00046-GMN-PAL Document 243 Filed 07/06/16 Page 153 of 154
(153 of 154)
United States v. U.S. Dist. Court for the Dist of Nev. (In re United States) (9th Cir., 2015)

28 U.S.C. § 332(d)(1). Because this authority was given by Congress to the Circuit Council, I cannot join the majority opinion. We should not use our opinion denying the government's petition for a writ of mandamus to offer the guidance of two judges on these administrative matters.

I therefore concur only in the judgment denying the writ of mandamus.

--------

Footnotes:

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

[1] Local Rule IA 10-3 provides that government attorneys shall, on motion of the U.S. Attorney of the District, be permitted to practice, "[u]nless otherwise ordered by the Court . . . ."

[2] For instance, he refused to allow attorneys for the Office of the United States Trustee, each of whom lived and worked in Nevada, to appear in *In re Hofsaess*, No. 2:13-cv-01161-RCJ (D. Nev.), because they were not members of the Nevada bar. He issued an order denying DOJ attorneys from Alaska and Washington D.C. permission to appear in *Great Basin Resource Watch v. U.S. Bureau of Land Management*, No. 3: 13-cv-00078-RCJ-VPC (D. Nev.), absent a showing that the local U.S. Attorney's Office "are incapable of handling the matter." He issued similar orders in *Nevada Association Services, Inc. v. Yanke*, No. 2:13-cv-01386-RCJ-CWH (D. Nev.), and *EEOC v. Wells Fargo Bank*, No. 3:13-cv-00528-RCJ-WCG (D. Nev.).

[3] Judge Jones dismissed the claims of the United States and entered judgment in *Walker River* on May 28, 2015.

[4] The petition in *Hall* requested "that Judge Hall be directed to recognize the authority of the Attorney General to assign condemnation matters to Irl D. Brett and staff, to recognize the authority of Mr. Brett and his assistants to represent the United States in such proceedings, and to assume jurisdiction over all pleadings and motions filed by Mr. Brett and his staff on behalf of the United States in condemnation proceedings." 145 F.2d at 783.

[5] The petitioners also filed an appeal, which we dismissed for lack of standing. *Brooklier*, 685 F.2d at 1165-66.

[6] *Brooklier* and *Phoenix Newspapers* do not authorize the uncabined use of mandamus proceedings to review district court decisions for error where the prerequisites for the issuance of mandamus are not satisfied. In the typical mandamus proceeding, we should avoid identifying errors of law in a district court's order if it is clear that the "writ is not an appropriate remedy. *See In re Am. Fed'n of Gov't Employees*, AFL-CIO, 837 F.2d 503, 507 (D.C. Cir. 1988) (denying petition for writ of mandamus and observing that "[w]here there's no remedy, there's no need to decide if there was a wrong"). Such a practice insures that mandamus proceedings are not used as a substitute for the normal appeals process. *See Ex parte Fahey*, 332 U.S. 258, 260 (1947).

[7] The *Bauman* factors are consistent with the Supreme Court's most recent discussion of mandamus in *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), and incorporate the "conditions" announced therein. We have therefore continued to apply the *Bauman* factors without separately considering the three conditions described in *Cheney*. *See*, *e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1126, 1136-38 (9th Cir. 2009) (citing *Cheney* and applying the *Bauman* factors).

[8] A district court would clearly act within its discretion in denying pro hac vice admission if, for example, an attorney's actions led the court to conclude the attorney would not "abide by the court's rules and



Case 2:16-cv-00246-GMN-PAL Document 40-1 Filed 07/06/16 Page 154 of 154

(154 of 154)

United States v. U.S. Dist. Court for the Dist. of Nev. (In re United States) (9th Cir., 2015)

practices" or "be readily answerable to the court." *Ries*, 100 F.3d at 1471.

--------

