UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00046-GMN-PAL |
| Plaintiff, | ORDER |
| v. | (Mot to Transfer Venue– ECF No. 750) |
| RYAN W. PAYNE, | |
| Defendant. | |

Before the court is Defendant Ryan W. Payne's ("Payne") Motion for Order Transferring Jury Trial to a Different Venue, or Alternatively, to Conduct the Jury Trial in Reno, Nevada (ECF No. 750) which was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A) and LR IB 1-3.   The court has reviewed the motion and Joinders of Woods, McGuire, O'Shaughnessy, Ammon Bundy, Cliven Bundy, Drexler, and Santilli (ECF Nos. 755, 772, 778, 841, 854, 879, 911), Payne's Manual Filings (ECF Nos. 751, 807, 808), the government's Response (ECF No. 934), Payne's Reply (ECF No. 955), and Payne's Manual Filings (ECF Nos. 956, 957)

## **BACKGROUND**

### I.      **The Superseding Indictment**

Payne is charged in a superseding indictment returned March 2, 2016, with:

- Count One – Conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371.  This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Two – Conspiracy to impede or injure a federal officer in violation of 18 U.S.C. § 372.  This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Three – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2.   This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

1

- Count Four – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- Count Five – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and§ 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Six – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Seven – Threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B) and § 2.  This charge arises from conduct that allegedly occurred on April 11, 2014.

- Count Eight – Threatening a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Nine – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Ten – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2.  This charge arises from conduct that allegedly occurred on April 6, 2014.

- Count Eleven – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2.  This charge arises from conduct that allegedly occurred on April 9, 2014.

- Count Twelve – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Thirteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2.  This charge arises from conduct that allegedly occurred between April 2, 2014, and April 9, 2014.

- Count Fourteen – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Fifteen – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2.  This charge arises from conduct that allegedly occurred on April 12, 2014.

- Count Sixteen – Interstate travel in aid of extortion in violation of 18 U.S.C. § 1952 and § 2.  This charge arises from conduct that allegedly occurred sometime between April 5, 2014 and April 12, 2016.

The Superseding Indictment (ECF No. 27) in this case arises out of a series of events related to a Bureau of Land Management ("BLM") impoundment of Cliven Bundy's cattle following a two-decade-long battle with the federal government.  Beginning in 1993, Cliven Bundy continued to graze cattle on land commonly referred to as the "Bunkerville Allotment" without paying required grazing fees or obtaining required permits.  The United States initiated

civil litigation against Cliven Bundy in 1998 in the United States District Court for the District of Nevada.  The court found that Cliven Bundy had engaged in unauthorized and unlawful grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM.  The court permanently enjoined Cliven Bundy from grazing his livestock on the Allotment, ordered him to remove them, and authorized the BLM to impound any unauthorized cattle.  Bundy did not remove his cattle or comply with the court's order and injunction. The United States went back to court.  Subsequent orders were entered in 1999 and 2013 by different judges in this district permanently enjoining Bundy from trespassing on the Allotment and land administered by the Nevada Park Service ("NPS") in the Lake Mead National Recreation Area[1], ordering Bundy to remove his cattle, and explicitly authorizing the United States to seize, remove, and impound any of Bundy's cattle for future trespasses, provided that written notice was given to Bundy.

On February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round up and gather Bundy's trespass cattle.  BLM developed an impoundment plan to establish a base of operations on public lands near Bunkerville, Nevada, about 7 miles from the Bundy ranch in an area commonly referred to as the Toquop Wash.  On March 20, 2014, BLM also entered into a contract with an auctioneer in Utah who was to sell impounded cattle at a public sale.  Bundy was formally notified that impoundment operations would take place on March 14, 2014.  The following day, Bundy allegedly threatened to interfere with the impoundment operation by stating publicly that he was "ready to do battle" with the BLM, and would "do whatever it takes" to protect "his property."  The superseding indictment alleges that after being notified that BLM intended to impound his cattle, Bundy began to threaten to interfere with the impoundment operation, and made public statements he intended to organize people to come to Nevada in a "range war" with BLM and would do whatever it took to protect his cattle and property.

The superseding indictment alleges that, beginning in March 2014, the 19 defendants charged in this case planned, organized, conspired, led and/or participated as followers and

---

[1] By 2012, Bundy's cattle had multiplied and he also began grazing his cattle on land administered by the NPS in the Lake Mead National Recreation Area without obtaining grazing permits or paying grazing fees.

gunmen in a massive armed assault against federal law enforcement officers to threaten, intimidate, and extort the officers into abandoning approximately 400 head of cattle owned by Cliven Bundy. The removal and impoundment operation began on April 5, 2014.  On April 12, 2014, defendants and hundreds of recruited "followers" executed a plan to recover the cattle by force, threats, and intimidation.  Defendants and their followers demanded that officers leave and abandon the cattle and threatened to use force if the officers did not do so.  The superseding indictment alleges armed gunmen took sniper positions behind concrete barriers and aimed their assault rifles at the officers. Defendants and their followers outnumbered the officers by more than 4 to 1, and the potential firefight posed a threat to the lives of the officers, as well as unarmed bystanders which included children.  Thus, the officers were forced to leave and abandon the impounded cattle.

After the April 12, 2014 confrontation with federal officers, the superseding indictment alleges that the leaders and organizers of the conspiracy organized armed security patrols and check points in and around Cliven Bundy's Bunkerville ranch to deter and prevent any future law enforcement actions against Bundy or his co-conspirators, and to protect Bundy's cattle from future law enforcement actions.

**II.    The Motion to Transfer Venue**

In the current motion, Payne argues that because of the pervasive negative publicity generated in this case since April 2014, the court should transfer this case to another federal district in the Ninth Circuit.  Alternatively, if the court does not transfer this case to another federal district, he asks that the court conduct the trial in Reno, or failing that, to use a Reno jury pool to fill the venire for trial.  Finally, if the court denies the motion, he requests leave to revisit the issue at voir dire as new information and evidence on the Las Vegas jury pool is acquired.

The motion argues that on April 12, 2014, individuals gathered in Bunkerville, Nevada, at Cliven Bundy's ranch to protest the government's attempt to seize Mr. Bundy's cattle.  The protest received substantial local and national media attention.  In addition, on January 2, 2016, a group comprised of some of the protesters in a 2014 Bunkerville protest, including many of Mr. Bundy's sons, went to Malheur Wildlife Refuge in Oregon to protest the government's prosecution of two men convicted of starting a fire in the refuge.  The Las Vegas press gave extensive media coverage

1  to the Oregon protest.  At the time this motion was filed, many of the defendants in the Oregon

2  case, including Payne, had pled guilty pursuant to plea agreements, and the trial was in progress.

3        Payne argues that the Sixth Amendment to the Constitution entitles him to trial by an

4  impartial jury.  A motion for a change of venue must be granted when the defendant demonstrates

5  either presumed or actual prejudice.  Citing *Hayes v. Ayers*, 632 F.3d 500, 507-508 (9th Cir. 2011),

6  Payne argues presumed prejudice exists when the record demonstrates that the community where

7  the trial is held was saturated with prejudicial and inflammatory media publicity about the crime.

8  Actual prejudice exists when voir dire reveals that the jury pool harbors actual partiality or hostility

9  against the defendant that cannot be laid aside.  *Id.* at 508.

10       Payne asserts he can demonstrate the Las Vegas community is, and has been since 2014,

11 deeply saturated with inflammatory and prejudicial local media coverage of the 2014 Bunkerville

12 protest, and the 2016 Oregon protest.  The court should therefore presume prejudice.  During voir

13 dire, Payne contends he will be able to show that the jury pool in this community is actually biased

14 against the defendants, and incapable of being impartial.  The motion is supported by numerous

15 examples of the television broadcasts, published articles and editorials, and public comments made

16 by Nevada's senior senator about the Bunkerville events.  Most troubling to Payne are articles and

17 commentary linking a 2014 killing of two police officers and a bystander to the 2014 Bunkerville

18 events.

19       The motion argues that inflammatory editorials and news coverage in Las Vegas gained an

20 even more incendiary tone during the Oregon protest.  The motion cites opinion pieces calling

21 Cliven Bundy a "welfare cowboy," supporters of the protestors delusional, and declaring the

22 protest illegal as recently as January 28, 2016.  The motion cites to letters to the editor in which

23 members of the public called for prosecution of individuals for the 2014 Bunkerville events.

24       Payne also points out that the Las Vegas press has reported that he pled guilty in the Oregon

25 case.  In April 2016, Senator Harry Reid condemned the Bunkerville protestors during a speech

26 on the Senate floor which was reported in the local press.  In his speech, Senator Reid called the

27 protestors "a dangerous group of militants" and repeated his statement that the protestors were

28 domestic terrorists.  Editorials and letters to the editor have continued through 2016, and the local

5

1    press has continued to report on every action taken in the Nevada prosecution.  The media's

2    constant and inflammatory coverage of the Bunkerville protests, the Oregon protest, the Oregon

3    criminal proceedings, and this case demonstrates that the court's must presume prejudice because

4    Payne's rights to a fair trial by an impartial jury cannot be guaranteed in Las Vegas.

5          Payne also argues that the media coverage has tainted the Las Vegas community with

6    evidence and prejudicial connections the government would not be able to present at trial.  Most

7    prejudicial is the media's connection of the April 2014 Bunkerville protest to the June 2014

8    murders of two law enforcement officers and a bystander.  The court must presume that coverage

9    will not only continue, but intensify as the February 2017 trial date approaches.  The only way to

10   protect Payne's right to a fair trial is to transfer the jury trial to another district in the Ninth Circuit.

11         Payne submits that voir dire will demonstrate the jury pool in Las Vegas is actually

12   prejudiced against him and his co-defendants.  If the court denies his request to transfer the trial to

13   another federal district, he requests that the court conduct the trial at the federal courthouse in

14   Reno.  Moving the trial to Reno would reduce some of the prejudice.  The discovery the

15   government has produced in this case indicates the Reno community has been bombarded with

16   inflammatory news coverage less often than Las Vegas.  As an alternative to holding the trial in

17   Reno, the court could select the jury from the Reno jury pool and hold the trial in Las Vegas.

18   **III.    The Government's Response**

19         The government opposes the motion arguing that under Fed. R. Crim. P. 21(a), a court

20   must transfer a proceeding against a defendant moving for a transfer to another district "if the court

21   is satisfied that so great a prejudice against the defendant exists in the transferring district that the

22   defendant cannot obtain a fair and impartial trial there."  The government acknowledges that in

23   the Ninth Circuit, either presumed prejudice, or actual prejudice, may support a motion for change

24   of venue.  Prejudice is presumed if the record shows that the trial venue is "saturated" with

25   prejudicial and inflammatory publicity about the crime.  Actual prejudice exists only when voir

26   dire shows that a jury pool is irreversibly prejudiced against a defendant, and that showing cannot

27   be made until voir dire has begun.  Screening questionnaires and voir dire are normally sufficient

28   to "detect and defuse juror bias" and ensure a fair trial.

In the Ninth Circuit, courts address several factors when considering whether to presume prejudice: (1) whether there was a "barrage" of "inflammatory publicity" that took place "immediately prior to trial," which amounted to a huge "wave of public passion"; (2) whether news accounts were primarily factual or editorial; (3) whether the press accounts included prejudicial material that would not be admissible at trial; (4) the size of the jury pool; and (5) the availability of tools to mitigate the prejudicial effect of publicity, such as jury questionnaires, extensive voir dire, expanding the jury pool, and allowing additional peremptory challenges.

In this case, Payne admits that actual prejudice can only be shown after voir dire. Therefore, the only issue is whether Payne can show presumed prejudice and that voir dire would be a useless task because the jury pool has been so saturated with inflammatory media coverage that it is impossible to find an impartial jury.  Payne has made no such showing.

The government maintains that the jury pool in Southern Nevada consists of more than two million people comprised of racially, ethnically, and culturally diverse communities.  All sectors of the economy are well-represented.  A significant portion of the Southern Nevada population has recently either moved to or from the area.  Additionally, most of the news stories that Payne lists in his motion were reported more than two-and-a-half years ago.  Courts routinely deny venue changes where "peaks of publicity occurred many months before the beginning of the trial." *United States v. Lehder-Rivas*, 955 F.2d 1510 (11th Cir. 1992).

The government also argues that most of the jury pool in Southern Nevada is concentrated in the densely populated urban areas of Las Vegas and Henderson.  However, the events giving rise to the indictment occurred in the rural, sparsely-populated area of Bunkerville, Nevada more than 90 miles north and east of Las Vegas and Henderson.

The government opposes Payne's request for transfer to Reno arguing it has a smaller population than Southern Nevada and is just as likely to have been exposed to media coverage about the April 12, 2014 events in Bunkerville.  The government's opposition provides pages of examples of national coverage of the Bunkerville events, including national and international

reports linking Jared and Amanda Miller's Bundy ranch connections.[2]   The opposition also provides multiple examples of coverage of the takeover of the Malheur Wild Refuge site in Oregon, nationwide and in Reno.

The government argues that at most, Payne shows that there was and is substantial media interest in this case.  Citing *United States v. Tsarnaev*, 157 F. Supp. 3d 57, 59–71 (D. Mass. 2016), the Boston Marathon bombing case, the government argues that courts routinely seat juries in high media-interest cases throughout the country without moving them.  The government's response provides other examples of high profile cases in which courts have denied a motion for change of venue in highly publicized cases.  The government acknowledges that the trial court has broad discretion in deciding venue and its determination is reviewed for an abuse of discretion.  However, the government maintains that the court should conduct voir dire before determining whether it can seat an impartial jury.  The government concludes that the court is capable of conducting voir dire in this case to ferret out any juror bias resulting from media coverage, and therefore asks that the motion be denied.

### IV.    Payne's Reply

Payne replies that he has provided sufficient evidence to establish presumed prejudice to justify moving the trial from Las Vegas before voir dire.  Payne also argues that the government's reliance on out-of-circuit cases holding that a decision on a Rule 21 motion for change of venue should be held in abeyance until conclusion of voir dire is misplaced.  Although the Second and Eleventh Circuits have adopted this approach, the Ninth Circuit has not.  The reply also claims that the government has misrepresented the standard Payne must make to show presumed prejudice.  Payne maintains that he need not show that the Bunkerville protest affected the lives of every member of the jury pool such that it would be impossible to find someone who has no memory of it.  Payne also disputes that he is requesting a venue where members of the venire have never heard of this case.   Rather, he is merely requesting a change of venue where he will receive a constitutionally-assured fair trial by impartial jurors.

---

[2]  Jared and Amanda Miller are the two individuals who shot and killed two police officers and a bystander in June 2014, that Payne refers to in his motion.

The reply also argues that the government's opposition contains numerous unsupported and speculative assertions concerning the jury pool in Southern Nevada and its racial, ethnical, and cultural makeup.  Payne objects to the government's speculative assertions for which it has provided no proof which Payne contends do not rebut the actual evidence of inflammatory news coverage shown in his motion to transfer.

The reply also makes additional arguments about highly prejudicial political campaign commercials and written mailings using images and statements made by Cliven Bundy in the recent November election.  Reuben Kihuen, a candidate for Congressman, used video and other images of Cliven Bundy in his Congressional campaign opposing incumbent Cresent Hardy.  This included a television commercial depicting Cliven Bundy's recorded statements which questioned whether African Americans were "better off as slaves."  The Democratic party also mailed printed advertisements that negatively tied Cliven Bundy to the opposing candidate and President Elect Donald Trump.  The reply cites even more inflammatory sets of printed mailers blaming the Bunkerville protest for the death of two police officers in June 2014.

Additionally, Payne notes that Cliven Bundy recently filed a lawsuit against Congressman Elect Kihuen which has received publicity and media coverage.  The use of Cliven Bundy's statements to influence voters has created an atmosphere in Las Vegas in which Payne cannot receive a fair trial.  Payne asks that at a minimum, the court move the trial to Reno, or alternatively, choose the jury from the Reno jury pool to insure that he receives a fair trial.  Reno is in the same judicial district as Las Vegas, and Payne merely requests that the trial be held in a different courthouse or with jurors chosen from another area within this judicial district.  Although Reno has received news coverage, it is substantially less than that which has flooded the Las Vegas area for two years.

The reply is supported by exhibits documenting the television and online media hits by months of the Bunkerville and Oregon protests in Las Vegas and Reno.  They show the Las Vegas media outlets have flooded the Las Vegas area with substantially more news about the Bunkerville and Oregon protests than Reno with "substantial peaks in coverage" around April 2014 and February 2016.  The government cannot reasonably dispute the saturation of the Las Vegas area

1    with news coverage of the Bunkerville protests, the Oregon protest, and the concurrent federal

2    prosecutions of both protest activities.  The coverage has been more inflammatory than neutral.  If

3    the court denies the motion to transfer, Payne requests leave to renew this issue at voir dire, and

4    as new information and evidence on the Las Vegas jury pool is acquired.

5                                      **DISCUSSION**

6    **I.       Applicable Legal Standards**

7             The Sixth Amendment to the United States Constitution guarantees a criminal defendant

8    "the right to a speedy and public trial, by an impartial jury of the State and district wherein the

9    crime shall have been committed...."  U.S. Const. amend VI.

10            Fed. R. Crim. P. 18 governs the place of prosecution and trial.  It provides: "Unless a statute

11   or these rules permit otherwise, the government must prosecute an offense in the district where the

12   offense was committed."  Rule 21(a) mandates transfer of a trial to another district if the court

13   finds the defendant cannot get a fair and impartial trial because of prejudice.  ("Upon the

14   defendant's motion, the court must transfer the proceeding against the defendant to another district

15   if the court is satisfied that so great a prejudice against the defendant exists in the transferring

16   district that the defendant cannot obtain a fair and impartial trial there.")  Fed. R. Crim. P. 21(a).

17   Payne argues a transfer is required based on prejudicial pretrial publicity.

18            The Ninth Circuit has held that "a trial judge must grant a motion for change of venue if

19   prejudicial pretrial publicity makes it impossible to seat an impartial jury."  *Ainsworth v. Calderon*,

20   138 F.3d 787, 795 (9th Cir. 1998).  To support a motion to transfer venue, a criminal defendant

21   must show either presumed prejudice, or actual prejudice.  *Id.*  "Prejudice is presumed when the

22   record demonstrates that the community where the trial was held was saturated with prejudicial

23   and inflammatory media publicity about the crime."  *Id.*  In *Hayes v. Ayers*, 632 F.3d 500 (9th Cir.

24   2011), the Ninth Circuit held that interference with a defendant's right to a fair trial "is presumed

25   when the record demonstrates that the community where the trial was held was saturated with

26   prejudicial and inflammatory media publicity about the crime."  *Id.* at 508.  The Supreme Court

27   held that prejudice is presumed when a conviction was obtained in a trial atmosphere "utterly

28   corrupted by press coverage."  *United States v. Skilling*, 561 U.S. 358, 380 (2010).  However, the

Supreme Court has flatly rejected the argument that juror exposure to news accounts is sufficient to warrant a presumption of prejudice. *Id.* "Prejudice is presumed when the adverse publicity is so pervasive and inflammatory that the jurors cannot be believed when they assert that they can be impartial." *United States v. Croft*, 124 F.3d 1109, 1115 (9th Cir. 1997). (citations omitted).

The factors the court considers when analyzing a claim of presumed prejudice include: (1) the size and characteristics of the community in which the crime occurred; (2) whether news stories contained confessions or other blatantly prejudicial information of the type readers could not reasonably be expected to ignore; (3) the time elapsed between the alleged crime and trial; and (4) whether the jury's verdict undermines "the supposition of juror bias." *Skilling*, 561 U.S. at 380; *see also Patton v. Yount*, 467 U.S. 1025 (1984); *Shepard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963). The Ninth Circuit has held that the presumption of prejudice is "rarely applicable" and reserved for an "extreme situation". *Croft*, 124 F.3d at 1115 (quoting *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988)).

A criminal defendant may also be entitled to a transfer of venue by making a showing of actual prejudice. Actual prejudice exists when voir dire reveals that the jury pool harbors "actual partiality or hostility" against the defendant that cannot be laid aside. *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011).

A trial court's decision to transfer venue is reviewed for an abuse of discretion. *Skilling v. United States*, 561 U.S. 358, 386 (2010).

Payne'e motion asks the court to find a presumption of prejudice requires a transfer of venue from the unofficial southern division of the District of Nevada to another federal district within the Ninth Circuit or to the unofficial northern division in Reno, or alternatively, that the court select a jury from the northern division jury pool. The court must therefore apply the *Skilling* factors.

## II.  Analysis and Decision

### A.  The size and characteristics of the community

The offenses charged in the superseding indictment occurred in the District of Nevada. The events leading up to, conduct charged on April 12, 2014 and after, charged in the superseding

indictment occurred in Bunkerville, Nevada, approximately 90 miles northeast of Las Vegas. Nevada is one federal district consisting of three unofficial divisions.  The most recent 2010 national census information is used to compile the court's Report on Operation of the Jury Selection Plan pursuant to 18 U.S.C. Section 1863(a).  The 2010 census reported the total population of Nevada was 2, 324,401, of which 1,701,526 were 18 years or older. Division 1 consists of Elko, Eureka, Humboldt, and White Pine counties, with a total population of 70,194, of which 49,497 were 18 years of age or older. The unofficial southern division, Division 2, consists of Clark, Esmeralda, Lincoln and Nye counties.  Las Vegas is in Clark County.  Division 2 has a total population of 1,689,101, of which 1,226,720 were 18 years of age or older.  Clark County has a total population of 1,642,034, of which 1,190,450 are 18 years or older.  Division three consists of Carson City, Churchill, Douglas, Lander, Lyon, Mineral, Pershing, Storey and Washoe counties, with a total population of 565,106, of which 425,309 are 18 years of age or older. Reno is in Washoe County.

The most recent 2010 census data supports the government's argument that division 2, which includes Clark County, is more racially and ethnically diverse than the other two divisions. For example, the population of division 2 is 73.9% white as opposed to 89% white for division 1 and 87.4% white for division 3 which includes Washoe County where the Reno courthouse is located. The black or African American population of division 1 is 0.9%, 10.8% for division 2, and 1.9% for division 3.  The Hispanic or Latino population for division 1 is 13.6%, 15.0% for division 2 and 9.9% for division 3.

Division 2, where the Las Vegas courthouse is located, has a much larger and diverse population and jury pool than the other 2 divisions of the District of Nevada.  Additionally, the Reno courthouse is approximately 450 miles north of Las Vegas.  The size and characteristics  of the community militate in favor of a trial in Las Vegas.

### B.  Nature and Extent of the Media Coverage

It is undisputed that the April 2014 conduct charged in the superseding indictment has received widespread media coverage in Las Vegas, and nationwide. Some of has been inflammatory.  Payne is correct that there has been widespread media coverage of Senator Reid's

statements to the media and on the Senate floor referring to Cliven Bundy and those involved in the April 12, 2014 events as "domestic terrorists."  Payne also correctly points out the media coverage occurring primarily in June 2014, reported that Jared and Amanda Miller, the two individuals who murdered two police officers and a bystander, had been at the Bundy ranch during some of the time relevant to the charges in the superseding indictment.  The motion also correctly points out that one of Cliven Bundy's video statements was included in a television commercial supporting Reuben Kihuen's 2016 political campaign for Congress against incumbent Cresent Hardy.  In one commercial, Kihuen showed a snippet of a video in which Cliven Bundy stated he "often wondered" whether [African Americans] "were better off as slaves picking cotton."

There has also been significant media coverage in Las Vegas of the events and prosecutions resulting from the takeover of the Malheur Wildlife Refuge this case in January 2016.  Seven of the defendants charged in the superseding indictment in this case, including Payne, were also charged and prosecuted in the District of Oregon.  The court notes the media also widely reported that the seven defendants who were tried in September and October of this year were acquitted.

However, the majority of the of the coverage has been factual rather than editorial.  Cliven Bundy and sons Ammon and Ryan have given a number of interviews stating their views.  They have many supporters who have been vocal in their support.  Senator Reid commented on the Senate floor that they included some of his colleagues.  Some of the publicity has been highly critical of the BLM, other federal agencies and the federal government's western land management policies.  At least 3 Nevada state legislators have publically supported the Bundys and their supporters. At least 2 separate bills were introduced in the last session of the Nevada Legislature designed to limit or eliminate the authority of the federal authorities within the state.  One such bill was called the Cliven Bundy bill.  One legislator, and radio talk show host, was quoted as asking why the local county sheriffs weren't arresting federal law enforcement officers, she referred to as "thugs" for impersonating police officers. A July 3, 2014 article in the Las Vegas Review Journal, the paper with the highest circulation in the state, reported the views of former Clark County Sheriff that Bundy should be held accountable.  However, in the same article the

former sheriff was also highly critical of the BLM who he reportedly blamed for ignoring his advice, dismissing his warnings, and lying about their operation.

During oral argument on December 9, 2016 counsel for Payne acknowledged that the peak periods for coverage related to the Bunkerville and the Oregon case occurred in April 2014 and February 2016. Arguably, the most inflammatory and potentially prejudicial coverage concerned the June 2014 murders of two Las Vegas Metropolitan Police Department police officers and a bystander. A number of media accounts reported the two killers, Jared and Amanda Miller, had been at the Bundy ranch during the events charged in the indictment. News accounts also reported interviews with Cliven Bundy indicating that they had been asked to leave. This coverage occurred almost entirely in June 2014, although there are a couple of year end articles referring to the murders as among the top local stories of 2014.

 More recent coverage has been factual and the editorials and letters to the editor have greatly diminished. The media has attended hearings in Las Vegas and reported on written orders entered by the court. Most of this coverage has been factual. Payne's motion and supporting exhibits do not contain examples of coverage of evidence that would likely be inadmissible at trial. At the December 9, 2016 hearing counsel for the government affirmatively represented the government had no intention of attempting to introduce evidence linking the Millers to any of the defendants.

Based on the record before the court, the second *Skilling* factor does not establish a presumption of prejudice. As the Supreme Court explained in *Skilling*, juror exposure to pretrial publicity, and the prominence of a case does not necessarily produce prejudice, and "jury *impartiality* does not require *ignorance*." 561 U.S. at 360 (emphasis in original).

**C. Passage of Time between Coverage and Trial**

This prosecution follows on the heels of a two-year investigation. The crimes charged primarily occurred in March and April of 2014, although the superseding indictment charges an ongoing conspiracy through the date of the indictment.  Initial charges were brought in February 2016. The defendants have now been severed into 3 groups for trial. The first trial in this case is set for February 6, 2017, and expected to last 3-4 weeks. The second trial, in which Payne is

grouped, is scheduled to begin 30 days from completion of the first trial.   With the exception of references to Cliven Bundy in the lead up to the November 2016 election, the overwhelming amount of publicity this case has received occurred more than 2 years ago.  Given the substantial passage of time between the vast majority of the coverage and trial, the third *Skilling* factor does not support a finding of presumed prejudice.

The presumption of prejudice is "rarely applicable" and reserved for the most extreme situations. *Croft,* 124 F 3d 1109, 1115. (9th Cir. 1997). On this record, the court finds that Payne has not met his burden of showing that this is such an extreme case that it must presume prejudice based on prejudicial pretrial publicity.

Having reviewed and considered the matters,

**IT IS ORDERED** that:

1. Payne's Motion for Order Transferring Jury Trial to a Different Venue, or Alternatively, to Conduct the Jury Trial in Reno, Nevada (ECF No. 750) is **DENIED.**

2. The Joinders (ECF Nos. 755, 772, 778, 841, 854, 879, 911) are **GRANTED**

DATED this 20th day of December, 2016.


PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE