UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                            Plaintiff,<br><br>    v.<br><br>AMMON E. BUNDY,<br><br>                           Defendant. | Case No. 2:16-cr-00046-GMN-PAL<br><br>**ORDER**<br>**-and-**<br>**REPORT OF FINDINGS AND**<br>**RECOMMENDATION** |

Before the court is Defendant Ammon E. Bundy's ("Ammon Bundy") Motion to Dismiss the Indictment for Destruction of Evidence or in the Alternative for a Remedial Jury Instruction (ECF No. 833) which was referred for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB1-4 of the Local Rules of Practice.  The court has considered the Motion, Supporting Declaration of Keith Gordon, the Motions for Joinder by Stewart, Mel Bundy, Payne, McGuire, Parker, Cliven Bundy, Woods, and O'Shaughnessy (ECF Nos. 859, 860, 861, 873, 883, 890, 899, 904), the Government's Response (ECF No. 948), Supporting Declaration of Kent Kleman, Sealed Exhibit (ECF No. 949), and Ammon Bundy's Reply (ECF No. 1021).

## BACKGROUND

### I.     The Indictment

Defendants Ammon Bundy and 18 co-defendants are charged in a Superseding Indictment (ECF No. 27) returned March 2, 2016.  Ammon Bundy is charged in 16 counts with:

- Count One – Conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371.  This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- Count Two – Conspiracy to impede or injure a federal officer in violation of 18 U.S.C. § 372.  This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- **Count Three** – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred sometime between March of 2014 and March 2, 2016.

- **Count Four** – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- **Count Five** – Assault on a federal officer in violation of 18 U.S.C. § 111(a)(1), (b) and§ 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Six** – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Seven** – Threatening a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B) and § 2. This charge arises from conduct that allegedly occurred on April 11, 2014.

- **Count Eight** – Threatening a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Nine** – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Ten** – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 6, 2014.

- **Count Eleven** – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 9, 2014.

- **Count Twelve** – Obstruction of the due administration of justice in violation of 18 U.S.C. § 1503 and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Thirteen** – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly occurred between April 2, 2014, and April 9, 2014.

- **Count Fourteen** – Interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and § 2. This charge arises from conduct that allegedly on April 12, 2014.

- **Count Fifteen** – Use and carry of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c) and § 2. This charge arises from conduct that allegedly occurred on April 12, 2014.

- **Count Sixteen** – Interstate travel in aid of extortion in violation of 18 U.S.C. § 1952 and § 2. This charge arises from conduct that allegedly occurred sometime between April 5, 2014 and April 12, 2016.

The Superseding Indictment (ECF No. 27) in this case arises out of a series of events related to a Bureau of Land Management ("BLM") impoundment of Cliven Bundy's cattle following a two-decade-long battle with the federal government. Beginning in 1993, Cliven

Bundy continued to graze cattle on land commonly referred to as the "Bunkerville Allotment" without paying required grazing fees or obtaining required permits. The United States initiated civil litigation against Cliven Bundy in 1998 in the United States District Court for the District of Nevada. The court found that Cliven Bundy had engaged in unauthorized and unlawful grazing of his livestock on property owned by the United States and administered by the Department of the Interior through the BLM. The court permanently enjoined Cliven Bundy from grazing his livestock on the Allotment, ordered him to remove them, and authorized the BLM to impound any unauthorized cattle. Bundy did not remove his cattle or comply with the court's order and injunction. The United States went back to court. Subsequent orders were entered in 1999 and 2013 by different judges in this district permanently enjoining Bundy from trespassing on the Allotment and land administered by the National Park Service ("NPS") in the Lake Mead National Recreation Area[1], ordering Bundy to remove his cattle, and explicitly authorizing the United States to seize, remove, and impound any of Bundy's cattle for future trespasses, provided that written notice was given to Bundy.

On February 17, 2014, the BLM entered into a contract with a civilian contractor in Utah to round up and gather Bundy's trespass cattle. BLM developed an impoundment plan to establish a base of operations on public lands near Bunkerville, Nevada, about 7 miles from the Bundy ranch in an area commonly referred to as the Toquop Wash. On March 20, 2014, BLM also entered into a contract with an auctioneer in Utah who was to sell impounded cattle at a public sale. Bundy was formally notified that impoundment operations would take place on March 14, 2014. The following day, Bundy allegedly threatened to interfere with the impoundment operation by stating publicly that he was "ready to do battle" with the BLM, and would "do whatever it takes" to protect "his property." The superseding indictment alleges that after being notified that BLM intended to impound his cattle, Bundy began to threaten to interfere with the impoundment operation, and made public statements he intended to organize people to come to Nevada in a "range war" with BLM and would do whatever it took to protect his cattle and property.

---

[1] By 2012, Bundy's cattle had multiplied and he also began grazing his cattle on land administered by the NPS in the Lake Mead National Recreation Area without obtaining grazing permits or paying grazing fees.

1     The superseding indictment alleges that, beginning in March 2014, the 19 defendants

2  charged in this case planned, organized, conspired, led and/or participated as followers and

3  gunmen in a massive armed assault against federal law enforcement officers to threaten, intimidate,

4  and extort the officers into abandoning approximately 400 head of cattle owned by Cliven Bundy.

5  The removal and impoundment operation began on April 5, 2014.  On April 12, 2014, defendants

6  and hundreds of recruited "followers" executed a plan to recover the cattle by force, threats, and

7  intimidation.  Defendants and their followers demanded that officers leave and abandon the cattle

8  and threatened to use force if the officers did not do so.  The superseding indictment alleges armed

9  gunmen took sniper positions behind concrete barriers and aimed their assault rifles at the officers.

10  Defendants and their followers outnumbered the officers by more than 4 to 1, and the potential

11  firefight posed a threat to the lives of the officers, as well as unarmed bystanders which included

12  children.  Thus, the officers were forced to leave and abandon the impounded cattle.

13     After the April 12, 2014 confrontation with federal officers, the superseding indictment

14  alleges that the leaders and organizers of the conspiracy organized armed security patrols and

15  check points in and around Cliven Bundy's Bunkerville ranch to deter and prevent any future law

16  enforcement actions against Bundy or his co-conspirators, and to protect Bundy's cattle from

17  future law enforcement actions.

18  **II.     The Parties' Positions**

19     **A. The Motion to Dismiss**

20     Ammon Bundy seeks an order dismissing the superseding indictment for destruction of

21  evidence, or in the alternative, a remedial jury instruction.  The motion claims that on April 12,

22  2014, after Sheriff Doug Gillespie announced that the impoundment operations were to cease, the

23  BLM left the Toquop Wash.  It left behind large trash bags full of thoroughly shredded documents

24  which were subsequently retrieved.  The documents were thoroughly shredded, but shredded

25  segments remained which confirm that they were once government documents.  Ammon Bundy

26  argues that the government's destruction of the documents is a due process violation which

27  mandates dismissal if the government acted in bad faith, and the government was aware of the

28  apparent exculpatory value of the evidence at the time it was lost or destroyed.  Additionally, he

1   acknowledges he must show that the missing evidence is of such a nature that he would be unable

2   to obtain comparable evidence by other reasonably available means.  If the missing evidence is

3   shown to be "potentially useful" rather than demonstratively exculpatory, Bundy must show bad

4   faith on the part of the government before dismissal is warranted.

5          In this case, the court should dismiss the indictment, Ammon Bundy argues, because the

6   government knew charges were coming, but intentionally destroyed documents that could have

7   exonerated him.  The documents the government shredded were voluminous.  They were authored

8   in the course of the BLM operation that resulted in this case, and therefore necessarily contained

9   written statements of potential government witnesses.  Bundy argues that the likelihood that they

10  contained exculpatory material is high, the likelihood that they contain impeachment material is

11  higher, and that it is a certainty the documents were potentially useful.  The shreds that were

12  recovered indicate that hand-written notes by potential witnesses were among the documents that

13  were destroyed.  These documents are lost forever.  The government was aware of the exculpatory

14  value of the documents when they were destroyed, and Ammon Bundy cannot obtain comparable

15  evidence.  The indictment must therefore be dismissed.

16         If the court does not find that the government acted in bad faith, a remedial jury instruction

17  is required to hold the government accountable.  Bad faith is not required for the court to give a

18  remedial jury instruction.  Here, the documents were shredded while in the government's custody

19  in disregard for Ammon Bundy's rights and interests.  The government failed to adhere to establish

20  standards of care, and the destruction of the documents was deliberate.  As a result, Ammon Bundy

21  has been prejudiced because the evidence no longer exists by other reasonably available means.

22  The state of mind of the agents during the events charged in the superseding indictment is crucial

23  to allegations of assault and intimidation of the very government agents who shredded the

24  documents.  Accordingly, if the court finds there was no bad faith, a remedial jury instruction is

25  warranted.

26         The motion is supported by exhibits showing trash bags full of shredded documents and a

27  BLM memo, which was apparently produced in discovery in this case.  The memo demonstrates

28  that BLM recognized the right to peacefully gather and protest under the First Amendment.

However, it also demonstrates that BLM concluded that peaceful protests had crossed into illegal activity. The memo outlines alleged illegal activity and demonstrates that the government anticipated that charges would be brought. The motion is also supported by the declaration of Keith Gordon, who avers he is a licensed private investigator retained by Ammon Bundy's counsel in this case. Declaration (ECF No. 833-3) ¶ 2. On August 18, 2016, he traveled to Bunkerville, Nevada to review, scan, and photograph the contents of various dumpsters left behind by BLM after they abandoned their impoundment operations on April 12, 2014. *Id.* ¶ 3. He avers on information and belief the dumpsters were empty when Virgin Valley Disposal provided them to the BLM on April 14, 2014, and that all of the contents recovered from the dumpsters were deposited there by BLM agents or other federal agencies. *Id.* ¶¶ 4–5. On information and belief, "the contents recovered from the dumpsters have been carefully and securely stored under lock and key since April 2012 and remain in the same state as when they were recovered." *Id.* ¶ 6. He took the photographs that are attached to Ammon Bundy's motion to dismiss. *Id.* ¶¶ 7–8.

**B. The Government's Response**

The government opposes the motion arguing it is based on unsupported claims that shredded documents left behind when the BLM was forced to abandon the impoundment site were potentially useful to the defense or contain written statements from law enforcement reflecting their state of mind. The government attaches the declaration of Bureau of Land Management Assistant Special Agent in Charge ("ASAC") Kent Kleman, and an FD-302 summary ("302") of an interview of a Deputy Chief Ranger involved in the impoundment operations on April 12, 2014, as Exhibit B to the government's response. The government argues that the declaration and 302 make clear that documents were shredded at the impound site on April 11 and 12, 2014, as a result of an imminent assault on the site and immediate need for officers to prevent disclosure of law enforcement sensitive information to persons engaged in criminal activity.

The government argues that Bundy has failed to establish that any of the documents that were shredded are the least bit helpful to him, or that any of the unidentified documents are not otherwise obtainable from another source. Finally, the government argues Bundy fails to show

/ / /

1    that officers were not executing their duties by shredding the unidentified documents under the

2    circumstances created by the defendants' criminal activity.

3         Ammon Bundy cannot show that the documents that were shredded were potentially useful,

4    or the two requirements to establish a due process violation, *i.e.*, bad faith on the part of law

5    enforcement, or that the missing evidence is of such a nature that he would be unable to obtain

6    comparable evidence by other reasonably available means.  Rather, Bundy only speculates that the

7    shredded documents were potentially useful, which is legally insufficient.   The government

8    maintains that whatever was shredded in this case was not exculpatory as shown by the declaration

9    of ASAC Kleman.  The shredded material consisted almost entirely of: (1) law enforcement's non-

10   discoverable personal information; and (2) confidential, non-discoverable operations plans for the

11   impoundment operation.  The documents were shredded 22 months before those who shredded

12   them knew who was going to be indicted or which crimes they were going to be charged with.

13   Therefore, Bundy cannot show that the officers acted in bad faith.  Bundy also cannot establish

14   that the agents deliberately shredded documents that they knew on April 11–12, 2014, would be

15   exculpatory.  To prevail on a bad faith destruction case, a defendant must show that the exculpatory

16   value was apparent before destruction.  The declaration and supporting 302 establish that the

17   documents were shredded pursuant to a duty to protect personal and confidential information from

18   falling into the hands of unauthorized persons who, at the time, were also engaged in criminal

19   activity.

20        The government contends that the documents were shredded pursuant to the requirements

21   of the Criminal Justice Information Act, which protects all data necessary for law enforcement

22   including biometric, identity, history, person, organization, property, and case/incident data from

23   disclosure.  The shredded documents contained personal information about government employees

24   and contractors, including cell phone numbers and addresses.  The shredded documents also

25   contained confidential law enforcement information such as tactics and radio frequency lists.

26        The government also argues that Bundy is not entitled to a destruction of evidence jury

27   instruction.  In the Ninth Circuit, such instructions are given only where the government's culpable

28   conduct outweighs the prejudice suffered by the defendant.  Bundy has not established the factors

the court is to consider. The government maintains that it acted in good faith pursuant to legitimate law enforcement duties. The government represents that most of the shredded material is duplicative.

The declaration of Kent Kleman avers that he is a criminal investigator for the Bureau of Land Management who is currently an Assistant Special Agent in Charge, and has been employed in federal law enforcement for 20 years. Declaration (ECF No. 948-1) ¶ 1. In May 2014, he was assigned to participate in the investigation of Cliven Bundy and others who were involved in the assaults of federal law enforcement officers in April 2014, near Bunkerville, Nevada. *Id.* ¶ 2. He was not present in Bunkerville, Nevada during any of the events he was investigating, but has continued to work on this investigation since May 2014. *Id.* He reviewed Bundy's motion and attached exhibits. *Id.* ¶ 3. He spoke to several federal employees who were present during the cattle impound operation, including the lead radio dispatcher and several members of law enforcement command staff. *Id.* He also reviewed a written report of one of the federal law enforcement command staff that describes the destruction of information at the incident command post in April 2014. *Id.* He determined that federal employees were involved in shredding documents at the command post during the impoundment operation. *Id.* ¶ 4.

Two categories of documents were shredded. Law enforcement dispatch printouts and duplicate daily incident progress summary documents were shredded daily. *Id.* ¶ 4(A). Duplicate copies of potential threat information and other informational bulletins that were disseminated to law enforcement officers on site regarding the buildup of Cliven Bundy's armed followers were shredded daily. *Id.* Summaries/briefing documents regarding the progress of the impoundment that were generated and disseminated in printed format were shredded. *Id.* Second, starting on the night of April 11, 2014, there was a hurried shredding effort of duplicate copies of the impound operations plan, maps and papers containing personal information of government employees and contractors associated with the impoundment operation. *Id.* ¶ 4(B). The documents were shredded in response to information received by law enforcement officers that led them to believe the command post was in imminent danger of being overrun by armed followers of Cliven Bundy. *Id.* The command post trailers were filled with duplicate copies of the plans, maps, and personal

information used in conducting the impoundment operation, and the officers believed they had an obligation to protect this information from falling into the hands of those who actively oppose the impoundment operation.  The shredding began the night of April 11, 2014, and continued until the officers were forced to abandon the command post on the afternoon of April 12, 2014.  *Id.*  This shredding was done by dispatch personnel and senior members of the law enforcement command staff.  *Id.*

He examined Exhibit A to Bundy's motion to dismiss which shows photographs of a bag of shredded documents, and remnants of shredded papers with partial or complete words, phrases, and numbers on them.  *Id.* ¶ 5.  Based on his knowledge of the case, he recognized many of the specific words, phrases and numbers as names of federal officer participants, officer team assignments, officer cell phone numbers, and references to radio frequency lists.  *Id.*  This information was contained in a confidential operations plan that not only detailed how the government planned to carry out the cattle impoundment, but also included detailed personal information of government employees and contractors involved.  *Id.*  The government considers the master planning document to be confidential as it contains sensitive information about officer identities and law enforcement tactics.  *Id.* ¶ 6.  The fact that he could locate words and numbers from the operation plan from photographs and Exhibit A independently corroborates the statements of employees he spoke with who stated the documents they were shredding were mostly duplicate copies of the operations plan.  *Id.* ¶ 7. Law enforcement dispatch information is required to be shredded pursuant to U.S. Department of Justice policy regarding security requirements of Criminal Justice Information ("CJI") *Id.* ¶ 8.  The policy requires that CJI be accessed only by authorized individuals, and identifies shredding or incineration as the only two acceptable methods of destruction once the information is no longer needed in physical form.  *Id.*

With respect to other documents that were shredded, he learned it was done because the documents contained personal information about government employees and contractors such as cell phone numbers and addresses, and confidential law enforcement information such as tactics and radio frequency lists.  *Id.* ¶ 9.  Some shredded pieces of paper in the photos "appear to have handwriting on them as opposed to typed words generated on a computer printout."  *Id.* ¶ 10.  He

"was not able to determine what those hand-written papers were or what was written on them." *Id*. Officers and dispatchers who shredded the documents did not receive a subpoena to preserve documents or to preserve them prior to shredding them on April 11–12, 2014.  *Id.* ¶ 12.  His investigation of Bundy's motion reveals that the document shredding by government officials was not conducted in bad faith or to hide exculpatory information that would have been useful to the defense.  *Id.*  It was done pursuant to long-established policies regarding protection of law enforcement sensitive information.  *Id.*

### C. Ammon Bundy's Reply

The reply argues the government failed to address all of the documents the evidence shows were shredded, misconstrued the standard for bad faith, and incorrectly heightened Ammon Bundy's burden to an impossible bar.  First, Bundy argues that the government ignores what everyone agrees were destroyed—handwritten notes coming from the BLM's base camp.  Agent Kleman concedes he was not able to determine what those handwritten papers were from, or what was written on them.  Therefore, Ammon cannot be faulted for being unable to detail the contents of the notes.  Kleman was somehow able to track down and speak to individuals who shredded documents.  The court can infer the notes were potentially useful, and the contents of the notes can be explored more fully at an evidentiary hearing.  The reply argues that the government cannot destroy notes by percipient witnesses made during the alleged crime so early that no one ever knows definitively what was in them other than the authors, and then shrug the destruction off "because the defendant cannot meet some particularized burden invented by the government."

Second, Bundy argues that Special Agent Kleman's affidavit states only that most of the shredded documents were non-discoverable, duplicate documents.  Only an evidentiary hearing will establish whether this is true.  Third, the government's reliance on the Criminal Justice Information Service Security Policy lacks merit.  Nothing in the policy specifies that the documents needed to be shredded at the time they were shredded at the BLM's base camp.  The court should therefore dismiss the indictment because the government knew charges were coming, and intentionally destroyed documents that were potentially useful to the defense.  Although the documents were shredded before the indictment was returned, and the government "waited an

eternity" before seeking an indictment, its delay does not justify the destruction.  The BLM's own internal memoranda during the protest indicated a belief that the protestors had engaged in criminal activity.  Ammon Bundy claims that the shredded hand-written notes contained witness statements, which would ordinarily be statements under Jencks, *Brady* and *Giglio*.  The notes could also have been potentially invaluable impeachment material as they may have reported the witnesses' state of mind during the very time the notes were produced.  Ammon Bundy is not able to obtain comparable evidence by other reasonably available means.

In the alternative, Bundy requests a remedial jury instruction.  He points out that the Ninth Circuit has held that a defendant is not required to show bad faith to be entitled to a remedial jury instruction.  Rather, the court engages in a balancing test.  The court must balance the quality of the government's conduct against the degree of prejudice to the accused, with the government bearing the burden of justifying its conduct and the accused demonstrating prejudice.  The reply argues that the government has not met its burden because the BLM had a "veritable village" at the impoundment site, had at least 10 trailers, 10 tents, and countless vehicles, and was escorted away from the wash by LVMPD vehicles.  Under these circumstances, the government cannot justify why the documents were not simply transported away from Bunkerville with everything else.

More importantly, the security policy forbade the agents from shredding hand-written notes unless they were copies.  There is no substitute for the hand-written notes, and Ammon Bundy has lost untold impeachment materials. He is entitled to vigorously cross-examine all witnesses with their prior statements.  The court should therefore dismiss the superseding indictment for due process violations, or in the alternative, give a remedial jury instruction.  The reply also requests that the court conduct an evidentiary hearing on the motion because the motion is supported by sufficient contested facts, that if true, would entitle him to relief.

## **DISCUSSION**

### I.    **Applicable Law**

In *California v. Trombetta*, 467 U.S. 479, 486 (1984), the Supreme Court addressed, for the first time, "the government's duty to take affirmative steps to preserve evidence on behalf of a

criminal defendant."  It held that the Due Process Clause requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense."  However, it held that the government's failure to preserve evidence amounts to a due process violation only if the evidence that was not preserved: (1) "possesses an exculpatory value that was apparent before the evidence was destroyed"; and (2) was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means."  *Id.* at 489.  Applying this two-part test, the Supreme Court held that the Due Process Clause did not require the state to preserve breath samples for later defense testing in order to introduce the results of breath analysis tests at a drunk driving trial.

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court held that if the prosecution merely fails to preserve evidentiary material that was "potentially useful evidence," due process is not violated unless a criminal defendant can show bad faith on the part of the police. In *Youngblood*, the defendant was charged with child molestation, sexual assault and kidnapping and claimed his due process rights were violated because police failed to refrigerate a sexual assault victim's clothing containing semen samples during the six weeks between the crime and defendant's arrest.  The Supreme Court held that the Due Process Clause did not require the state to preserve semen samples that might have been useful to prove that the defendant was not the assailant, even though the defendant's primary defense was that the victim mistakenly identified him as the assailant.  The *Youngblood* decision reiterated that the good or bad faith of the state is irrelevant in a case in which the prosecution fails to disclose material exculpatory evidence.  *Id.* However, it concluded that the Due Process Clause requires a different result when the state fails to preserve evidentiary material that could have been subjected to tests, "the results of which might have exonerated the defendant."  *Id.*  The court concluded that the failure of police to preserve such "potentially useful evidence" did not constitute denial of due process "unless a criminal defendant can show bad faith on the part of the police."  *Id.* at 58.

In *Illinois v. Fisher*, 540 U.S. 544, 547 (2004), the Supreme Court clarified that the "applicability of the bad faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's case, but on the distinction between

'material exculpatory evidence' and 'potentially useful evidence'." Where the government fails to preserve evidence that is only "potentially useful," no due process violation occurs unless a defendant shows the government acted in bad faith. The *Fisher* decision explained that the reason the Supreme Court had adopted the bad faith requirement was "to limit the extent of the police's obligation to preserve evidence to reasonable grounds and confine it to that class of cases where the interests of justice most clearly require it." *Id.* (internal citations omitted).

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012), involved a prosecution for bulk cash smuggling and failing to file financial reports on exporting monetary instruments. Border patrol officers found $500,00 in cash in a box in the back of the defendants' vehicle during a secondary border screening. The Ninth Circuit held that the government's failure to preserve the box containing the money and the cash did not violate the defendant's due process rights. The defendants applied for and received an order to preserve the box containing the money and the cash before trial. The defendants filed a motion to dismiss because the cash and box were not preserved. The district court held a hearing and denied the motions concluding that the evidence was not exculpatory. The Ninth Circuit affirmed finding that the box and the cash within it were not materially exculpatory, and that the exculpatory nature of the money or the box was not apparent to the officers at the time they failed to preserve. Because the evidence was not materially exculpatory, the defendants were required to show bad faith. The Ninth Circuit upheld the district court's determination that there was no bad faith because the evidence had been lost before any motions were made. Although the Ninth Circuit believed it might have been a better practice for the government to have retained both the box and the cash for the defendants to test, it found the destruction was not bad faith, which requires more than mere negligence or recklessness. *Id.* at 1150 (citing *United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011)).

## II.    Analysis

Here, the government concedes that it engaged in hurried shredding activities on the evening of April 11, and on the day of April 12, 2014, before BLM personnel left the incident command post. Special Agent Klemon's conducted an investigation when this motion was filed and spoke to law enforcement personnel involved in the shredding. According to Kleman's

declaration and investigation, the shredding was done because law enforcement feared the impoundment site was about to be overrun by armed supporters of Cliven Bundy.  Special Agent Kleman's declaration describes what was destroyed and the reasons for the destruction of the documents.  The vast majority of these documents consist of duplicate copies of the confidential operations plan and other confidential law enforcement sensitive information including the identity, phone numbers and addresses of law enforcement personnel and contractors assisting in the impoundment operation.

Some of the photographs supporting this motion contain scraps of handwritten material which appear to contain some handwriting.  Special Agent Kleman "was not able to determine what those handwritten papers were from or what was written on them."  The photos of the shredded scraps taken by Bundy's defense investigator show bits of handwriting.  The photographs of the shredded documents do not show enough handwriting to support the conclusion that the shredded materials consisted of handwritten notes or written statements of witnesses.  There are a few small bits of paper that look like parts of handwritten words or initials.  However, neither the photographs, nor the supporting declaration of Bundy's investigator, establish that handwritten notes, let alone handwritten percipient witness statements, were shredded.

Bundy's suggestion that the shredded materials contained written statements of witnesses because documents were authored by BLM personnel involved in the course of the BLM operation is pure speculation.  His suggestion that handwritten notes may have contained indications of the state of mind of agents during the events, which may be exculpatory, is also purely speculative.  Bundy has not met his burden of establishing the government knew the documents that were shredded just before the command post was abandoned had apparent exculpatory value at the time the materials that were shredded.  Special Agent's Kleman's declaration attests that the documents that were shredded were duplicate copies of the operations plan, and other sensitive law enforcement information.

Bundy has also not shown that the documents that were shredded were potentially useful to his defense, or that he is unable to obtain comparable evidence by other reasonable means.  He will be able to cross-examine any witness the government calls at trial and inquire whether the

witness made any handwritten notes or statements, whether they were preserved, and if so, what they were, whether they were kept or preserved, and if not, why not.  His motion, which is supported by the declaration of a defense investigator who obtained the shredded documents 28 months after they were shredded based on the investigator's "information and belief" that the bags were kept securely under lock and key by an unidentified source and "remain in the same state" is also not sufficient to warrant an evidentiary hearing.  He has not established contested issues of fact that warrant taking testimony from all of the senior dispatch personnel, and senior members of law enforcement command staff involved in shredding the documents the night before and day BLM abandoned the site on the theory that only an evidentiary hearing will establish the truth of Special Agent Kleman's sworn declaration.

With respect to his request for a remedial jury instruction, the Ninth Circuit has held that if the government was negligent in failing to preserve exculpatory evidence, a defendant may be entitled to an adverse inference instruction. *United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013). There, the defendant was stopped at the border in a Jeep crossing from Tijuana into San Diego County.  During a secondary inspection, an inspector noticed the engine manifold appeared to be hand cut.  Cocaine and heroin worth $160,000 were found hidden inside the manifold by a contract mechanic.  The case agent took photographs of the engine area of the car and the packages containing the drugs.  However, the photographs were of poor quality.  The drugs and their packages were preserved.  Five days after the defendant's arrest, his counsel requested that the government preserve evidence seized from the Jeep.  The government indicated it would do so until counsel could arrange for an inspection of the evidence.  Counsel also obtained a court order for the government to preserve the vehicle.  While the Jeep was in custody of the Department of Homeland Security, it was forfeited and sold the day after the order was signed.   A year later, counsel for the defendant requested an opportunity to inspect the vehicle.  Newly appointed counsel became aware that the Jeep had been sold and filed a motion in limine for sanctions for destruction of evidence.  The district court denied the motion to dismiss and alternative request for an instruction to the jury that defense counsel had not had an opportunity to inspect the vehicle because the government failed to preserve it in violation of a court order.

On appeal, the Ninth Circuit affirmed denial of the motion to dismiss finding the district court did not clearly err in finding that the government did not act in bad faith by destroying the evidence.  The exculpatory value of the Jeep was not obvious, and although the government was negligent in failing to preserve the evidence, the defendant was unable to establish that the government's action rose to the level of bad faith required for dismissal under *Youngblood*.  However, the Ninth Circuit clarified that, although bad faith must be shown to warrant dismissal on due process grounds, this is not the correct legal standard for a remedial jury instruction.

In determining whether a remedial jury instruction should be given, courts must balance "the quality of the Government's conduct" against "the degree of prejudice to the accused." *Id.* at 1173.  The government bears the burden of justifying its conduct, and the defendant bears the burden of demonstrating prejudice. *Id.*  In evaluating the government's conduct, the court should inquire: (1) whether the evidence was lost or destroyed while in the government's custody; (2) the government acted in disregard for the interests of the accused; (3) whether the government was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions; (4) if the acts were deliberate, whether they were taken in good faith or with reasonable justification; and (5) whether government attorneys prosecuting the case participated in the events leading to the loss or destruction of the evidence. *Id.*

The *Sivilla* court found that the evidence was destroyed while in the government's custody and the government was negligent in failing to adhere to reasonable standards of care in its prosecutorial functions.  The prosecutor had promised to protect the evidence, but failed to take any affirmative action to do so.  In assessing the prejudice to the defendant, the Ninth Circuit directed the trial courts to evaluate a wide number of factors including: (1) the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; (2) the probative value and reliability of the secondary or substitute evidence; (3) the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; and (4) the probable effect on the jury from the absence of the evidence, including dangers of unfounded speculation and bias that might result to the

1   defendant if adequate presentation of the case requires explanation about the missing evidence.

2   *Id.* at 1173–74.

3          Because the defendant sought to use his inspection of the Jeep to rebut the prosecution's

4   argument that he must have known that the drugs were in the Jeep because of how long and

5   involved a process it was to remove them from the car, the court found prejudice.  The government

6   introduced testimony of an officer to prove this point.  The photographs were the only substitute

7   evidence available to rebut the arguments and were inadequate because they were of poor quality.

8   The Ninth Circuit found that any expert witness presented with only the photographs would have

9   concluded next to nothing could be determined from them.  The defense's expert witness for

10  hidden compartments in vehicles needed access to the vehicle itself rather than poor quality

11  photographs to present the defendant's only defense that he did not know the drugs were in the

12  car. Thus, the Ninth Circuit found the prejudice to the defendant was significant, and that a

13  remedial jury instruction was warranted.  It reversed in part, and remanded the case for a new trial

14  with instructions to grant the defendant a remedial jury instruction.

15         Here, it is undisputed that the documents were shredded while in the government's custody,

16  and that the documents were deliberately shredded.  However, the declaration of Special Agent

17  Kleman provided a reasonable and legitimate reason for shredding the documents, which were

18  duplicate copies of the operations plan and other sensitive law enforcement confidential

19  information including the identity and contact information for law enforcement officials and

20  contractors involved in the impoundment operation.  Shredding is one of two approved methods

21  of destroying CJI information pursuant to DOJ policy. There is no evidence the documents were

22  shredded in violation of any prosecutorial policy or standards.  Although the parties dispute who

23  was at fault for the events leading up BLM abandoning the site, no one disputes that BLM

24  abandoned the impoundment site because it was in imminent danger of being overrun.  In short,

25  the court finds the government has met its burden of justifying its shredding of the documents.

26         Bundy has not established that the shredded documents were central to his case or

27  important in establishing the elements of the crimes with which he is charged.  His arguments that

28  because the documents that were shredded were authored by BLM agents and therefore are

necessarily witness statements that might be exculpatory in that they might contain evidence of the state of mind of government officials is based on *ipse dixit* and unsupported.  He will be able to cross examine witnesses who testify in this case and present evidence that documents were shredded.  The court finds he has not met his burden of establishing prejudice.  However, the court will recommend denial of his motion for an adverse inference instruction without prejudice should further investigation or evidence developed during trial support one.

Accordingly,

**IT IS ORDERED:** the Motions for Joinder by Defendants Stewart, Mel Bundy, Payne, McGuire, Parker, Cliven Bundy, Woods, and O'Shaughnessy (ECF Nos. 859, 860, 861, 873, 883, 890, 899, 904) are **GRANTED**.

**IT IS RECOMMENDED** that Ammon Bundy's Motion to Dismiss the Indictment for Destruction of Evidence (ECF No. 833) be **DENIED without prejudice** to requesting a remedial adverse inference instruction should further investigation or evidence developed during trial support one.

DATED this 30th day of December, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE