IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16CR00046 |
| | ) | |
| RYAN BUNDY, | ) | |
| | ) | |
| et al., | ) | |
| Defendants. | ) | |

DECLARATION OF BRAND THORNTON

I, Brand Thornton do solemnly swear that the following facts are true under penalty of perjury.

1. My name is Brand Thornton and I am from Las Vegas, Nevada. My address is 6329 Beige Bluff in Las Vegas. My phone number is 702-300-3171.
2. Approximately two to four weeks after the so-called standoff on April 12, 2014 I received a phone call from a person saying he was with "Long Bow Productions." The individual indicated that "Long Bow Productions" wanted to interview me on camera regarding events at the Bunkerville area on April 12, 2014.
3. "Long Bow Productions" said they would have a studio set up at the Wynn Casino in Las Vegas, Nevada. I agreed to go to be interviewed.
4. It was in the evening. I sat in the lobby of the Wynn Casino for about 45 minutes. At that time I concluded that I had been set up.
5. I got hold of Wynn security and asked them to escort me to my truck.
6. Right about that time a woman approached and called me by name. She was an attractive woman wearing zebra-pattern tights. She had beautiful blond hair and was wearing makeup.

7. Upon seeing her I decided to go with her. We took an elevator to a high floor in the Wynn resort.
8. We went into a room where there was a fully-equipped film studio. There was professional lighting. In the room was another attractive woman and three men. One of the men had a long ponytail.
9. I was offered a beer and I said O.K. as I was nervous.
10. I sat down in a chair and the attractive woman began treating me like a celebrity. She began patting my face with a powder to 'take the shine off.' She was very close to my face.
11. Beer hits me very fast and I had already finished the beer by the time the interview began.
12. The man asked me what my fee was for being interviewed. I responded that I just wanted to fix America's problems and didn't want any money. They insisted that they needed to pay me; so they handed me one dollar.
13. I was offered paperwork and I signed it.
14. They offered me a second beer and I'm pretty sure I turned it down.
15. The interview began and it focused on the events of the confrontation with the BLM weeks earlier. It was a man doing the interview.
16. Several segments of the interview were rehearsed for the camera.
17. They asked me an odd question about whether I would have shot federal agents. They seemed put off when I responded that I would not have shot federal agents. As I recall I said I would rather be shot than take anyone else's life. There seemed to be a lull in the interview and some blank looks on their faces. It seemed like they were trying to get a different answer.
18. The interviewer asked several questions about who the 'leaders' were on April 12. They specifically asked about leadership by Pete Santilli and Lt. Col Roy Potter. I told them I had only just met Pete Santilli and didn't see him organize anything and that Potter had remarked that the whole situation seemed disorganized.
19. The interviewer was very interested in who was involved in organization and communication.
20. The entire episode lasted about two hours.
21. I later learned that Longbow Productions was an undercover FBI operation. I feel that I was tricked and lied to, as the group misrepresented themselves. Additionally it seemed the group was trying to manipulate my answers.
22. The "Longbow Productions" group was also at the Bundy standoff anniversary in April 2015. They didn't seem to be hanging together, though; they were mingling and still doing their undercover investigation a year later.

Signed under penalty of perjury, *[signature]*

Dated 12-31-16