ryan-c: family of Bundy
In care of postal address:
Post Office Suite  7447
Bunkerville, Nevada
Email: C4CFForall@gmail.com
Cell Phone: (435) 701-1013

Sui Juris

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>RYAN C. BUNDY<br><br>      Defendant. | Case No. 2:16-cr-00046-GMN-PAL<br><br>Judge: Gloria Navarro<br>Hearing:  January 8, 2018<br>Courtroom – 7C<br><br>**AMENDED MANDATE FOR DISMISSAL OF SUPERSEDING INDICTMENT** |

### Amended Mandate for Dismissal of Superseding Indictment

COMES NOW ryan-c: family of Bundy (hereafter ryan-c:) in/on behalf of the defendant, RYAN C BUNDY; mandating this Court under its manifest duty *"to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct."* (U.S. v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2008), citing U.S. v. Simpson, 927, F.2d 1088, 1090 (9th Cir. 1991) and grant an immediate dismissal with prejudice of the superseding indictment in the afore-captioned cause.

Executed on December 29, 2017.

                                           */s/ Ryan c.*
                                           ryan-c: family of Bundy
                                           In care of postal address:
                                           Post Office Suite  7447
                                           Bunkerville, Nevada
                                           Email: C4CFForall@gmail.com
                                           Cell Phone: (435) 701-1013

# I.

## BRIEF PROCEDURAL HISTORY

On December 20, 2017, Jury Trial, Day 16, in Case No. 2:16-cr-46-GMN-PAL, UNITED STATES OF AMERICA versus CLIVEN D BUNDY, RYAN C BUNDY, AMMON E. BUNDY, and RYAN W. PAYNE. Chief Judge GLORIA M. NAVARRO ordered a mistrial, further directing the parties to submit briefs in support of their mandates to dismiss the matter with prejudice on the date and time set-certain January 8, 2018. ryan-c: of the Bundy family hereby submits his Mandate for an Immediate Dismissal of the Superseding Indictment, with prejudice, based upon the following argument of points and authorities.

# II.

## ARGUMENT OF POINTS AND AUTHORITIES

The Order of the Court of December 20, 2017, as stated in the accompanying "REPORTER'S TRANSCRIPT OF PROCEEDINGS" (hereafter "RTOP"), EXHIBIT A, provides for a "mistrial" based upon various provisions of applicable legal standards and authorities as stated by the Court. ryan-c: hereby incorporates, as though restated herein in its entirety, all provisions of law and legal standards, and authorities expounded by and through the Order of the Court, Jury Trial, Day 16, in Case No. 2:16-cr-46-GMN-PAL, UNITED STATES OF AMERICA versus CLIVEN D BUNDY, RYAN C BUNDY, AMMON E. BUNDY, and RYAN W. PAYNE.

First, Judge Gloria M. Navarro "declared" a mistrial based upon "manifest necessity". See "RTOP", Page 16-23, Line 16, and Page 16-24, Line 4. However, Navarro failed to poll the parties pursuant to and in conjunction with Fed. R. Crim. P. Rule 26.3, and any such Order lies contrary to ryan-c: consent, at least his consent minus any comment and input on the propriety of the order. See Ryan Bundy's Affidavit in Support of this Mandate.

Second, a Complete dismissal with prejudice is necessary due to stated facts in the Court's Order that the prosecution "subvert[ed] the due process rights that the defendants are guaranteed by the Constitution" and also the "Sixth Amendment right to confront adverse witnesses." See <u>US v. Chapman,</u> 524 F. 3d 1073, 1084 - Court of Appeals, 9th Circuit 2008. See, "<u>RTOP", Page 23, Line 17-18,</u> "...because of the Brady violations because they are constitutional due process violations".

## A.

### ryan-c: was prepared, but denied, an opportunity to comment, and state his objection as to his consent for mistrial.

At the hearing of December 20, 2017, Jury Trial, Day 16, in Case No. 2:16-cr-46-GMN-PAL, United States of America versus CLIVEN D BUNDY, RYAN C BUNDY, AMMON E. BUNDY, and RYAN W. PAYNE, Judge GLORIA M. NAVARRO "Declared" a mistrial on grounds of "manifest necessity". NAVARRO's Order states her reliance and alignment with <u>US v. Chapman,</u> 524 F. 3d 1073 - Court of Appeals, 9th Circuit 2008 and other authorities in reaching her conclusions.  However, in regards to a mistrial, <u>Fed R. Crim. P., Rule 26.3,</u> provides in pertinent part:

**Federal Rules of Criminal Procedure 26.3. Mistrial**

"Before ordering a mistrial, the court must give each defendant and the      government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."

Judge Gloria Navarro failed to provide ryan-c: any such opportunity. ryan-c: stood up near the conclusion of the hearing, and was fully prepared to state an objection, and/or comment as to his consent to a mistrial; but Ms. Navarro denied his request to speak further regarding the matter.  <u>"RTOP" Page 16-36, Lines 6-9.</u>

Additionally, as in <u>Chapman</u>, the government's case to date had been weak, entirely reliant upon perjured testimony, and the defendants would suffer substantial prejudice if the case were retried because "the government and its witness[es] will not make [the same]

mistake[s] again." The government should not be permitted "to try out its case identifying any problem area[s] and then correct those problems in a retrial." US v. Chapman, supra, at 1080.

An example of the effect of the aforementioned underlying prejudice is demonstrated based upon the recent discovery of further Brady violations. See ryan-c:'s Notice of Yet Another Brady and Giglio Violation and Motion to Dismiss filed December 19, 2017. (ECF No. 3038)  While ryan-c: relied upon the existence of his fathers "Vested Stock Water Rights", and the letters which were provided from the State of Nevada, Division of Water Resources in establishing additional Brady and Giglio violations, the subsequent realization of the perjured testimony of Mary Jo Rugwell as to her knowledge of the existence of these "Vested Rights" being likewise exposed, cannot be allowed to give the prosecution an advantage in retrying this matter in violation of ryan-c:'s Constitutional rights.

**Restatement of directive by ryan-c: that the court take judicial notice:**  "NOTICE EXISTENCE OF VESTED WATER RIGHTS BELONGING TO CLIVEN BUNDY, REGISTERED WITH NEVADA STATE", (ECF No. 3034). That the Court must take notice of the fact that there are 11 Proof's of Appropriation of Vested Stock Water Right Numbers; V08974, V08975, V08976, V08977, V08978, V08979, V08980, V08981, V08982, V08983, V08984. There are also letters from Mary Jo Rugwell dated September 30, 2008, and a return correspondence from the State of Nevada, Division of Water Resources dated October 10, 2008.  There is also a letter from State of Nevada, Division of Water Resources, addressed to Michael M McGreer dated October 1, 2014. There is additional correspondence between Michael M. McGreer to the State of Nevada Division of Water Resources dated February 21, 2016, and return correspondence from State of Nevada Division of Water Resources to Michael M. McGreer dated March 27, 2016.

The aforementioned documents are on file in this matter and may be Judicially noticed from within the Court record, or from their filed location with the State of Nevada, Division of Water Resources.

Based upon this stated Argument of Points and Authorities ryan-c: submits that a dismissal with prejudice of the superseding indictment is not only proper, but necessary "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." (U.S. v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2008), citing U.S. v. Simpson, 927, F.2d 1088, 1090 (9th Cir. 1991), and hereby directs this Court for an immediate dismissal with prejudice of the superseding indictment in the afore-captioned cause.

## **B.**

## **ryan-c: Moves This Court for A Dismissal of the Superseding Indictment, With Prejudice**

The second prong under Chapman provides for dismissal of the indictment for one of two reasons:

"[First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation.  [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers".  US v. Chapman, at 1084, Id.

Judge Gloria Navarro has authority and duty to dismiss the indictment pursuant to either/or of the aforementioned reasons, as witnessed by and through her Order of December 20, 2017, where she repeatedly noted violations that "subvert[ed] the due process rights that

the defendants are guaranteed by the Constitution" and also the "Sixth Amendment right to confront adverse witnesses." US v. Chapman, Id. (emphasis added). Judge Gloria Navarro concluded that these violations, while reviewed individually, provided "collectively" under "Kyles v. Whitley", that each and every violation was "willful", resulting in "multiple Brady violations". See "RTOP", Page 16-22, Line 8. These Violations will forever prejudice these men from receiving a fair trial.

Whereby ryan-c: submits that Judge Gloria Navarro has a duty under Chapman to hold that there was irrefutable "outrageous government conduct", as well as a duty to ultimately dismiss the Superseding Indictment (ECF #27) "based on the totality of the proceedings before it, that the Assistant U.S. Attorney [Steven W. Myhre] acted flagrantly, willfully, and in bad faith"; that he had made "affirmative misrepresentation[s] to the court"; that the defendants would be prejudiced by a new trial; and that no lesser sanction could adequately remedy the harm done[,] *** after witnessing firsthand the AUSA's misrepresentations." Chapman, Id.

While the Chapman Court held that a dismissal was proper under the lesser standard of the District Court's "supervisory powers", ryan-c: submits, this case rises to a much higher level, a level of gross systematic and perpetual prosecutorial corruption, gross prosecutorial misconduct and gross malpractice that exceeds, "outrageous government conduct" Chapman Id.  Lead prosecutor AUSA Stephen W. Myhre is demonstrating a continued disregard for applicable law in prosecution of these cases, resulting in persecution of the individuals as named (Chapman and now Bundy). Whereby; this Court has a duty to sanction accordingly,

6

including immediate dismissal of this case, with-prejudice, due to the "outrageous government conduct" by the lead Prosecutor in this matter, Steven W. Myhre, and others.

"The United States Attorney is the representative not of an ordinary party to a controversy; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one". (Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935).

Steven Myhre, a morally bankrupt man and ABA BAR attorney, has shown himself in this case, as well as the Chapman case, to be a lawyer without "integrity" (ABA Ethics Codes 1-1).  Rather than to rely on competence Myhre has resorted to engage himself in "illegal and morally reprehensible conduct" (ABA Ethics Codes 1-5).  His willful actions of fraud and concealment are evidence that his "respect for the law" is lower than a "platitude" (ABA Ethics Codes 1-5).

Additionally, Steven Myhre, is in violation of each of the AMERICAN BAR ASSOCIATION's Disciplinary Rules, DR 1-102(A), Misconduct, "A lawyer shall not: Violate a disciplinary rule; Circumvent a disciplinary rule through actions of another; Engage in illegal conduct involving moral turpitude; Engage in conduct involving dishonesty, fraud,

deceit, or misrepresentation; Engage in conduct that is prejudicial to the administration of

justice; Engage in any other conduct that adversely reflects on his fitness to practice law"

### **CONCLUSION**

Based upon the aforementioned provisions of applicable law and legal standard, the

Court has a duty to dismiss with prejudice the Superseding Indictment.

Executed on the 29th of December, 2017

*/s/ Ryan c.*
ryan-c: family of Bundy
In care of postal address:
Post Office Suite  7447
Bunkerville, Nevada
Email: C4CFForall@gmail.com
Cell Phone: (435) 701-1013

* * * *

ORDER TO FOLLOW

ryan-c: family of Bundy
In care of postal address:
Post Office Suite  7447
Bunkerville, Nevada
Email: C4CFForall@gmail.com
Cell Phone: (435) 701-1013
Sui Juris

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:16-cr-00046-GMN-PAL |
| Plaintiff, | **ORDER** |
| v. | |
| RYAN C. BUNDY | |
| Defendant. | |

**ryan-c: family of Bundy**, in/on behalf of the defendant, RYAN C BUNDY, having filed a Mandate to Dismiss with Prejudice the Superseding Indictment in the above captioned matter, the Court having reviewed the Mandate, attachments thereto, matters of Judicial Notice and based upon the entire record on file, hereby enters its Order, Findings of fact, and Conclusions of Law.

## Findings of Fact

1.   The Bundy family continues to ranch and has ranched, and  on the Bunkerville/Gold Butte Range since 1877; and,

2.   The Cliven Bundy family possess  prescriptive rights to the beneficial use of the grazing forage as well as  vested rights to the water(s) in the Bunkerville/Gold Butte Range since 1877 uninterrupted; and,

3.    Cliven D Bundy owns Vested Rights for Stock Watering purposes on the Bunkerville/Gold Butte Range ownership is  recorded with "the State of Nevada, Division of Water Resource".; and,

4.    These Vested Rights belonging to Patriarch Cliven D Bundy are memorialized in/on the public record with "the State of Nevada, Division of Water Resources"; evidence of Appropriation of Vested Stock Water Rights Numbers see: V08974, V08975, V08976, V08977, V08978, V08979, V08980, V08981, V08982, V08983, V08984; and,

5.    All agencies, including but not limited to the Bureau of Land management, are aware of the eleven (11) Vested Rights for Stock Watering purposes on the Bunkerville/Gold Butte Range belonging to Patriarch Cliven D Bundy as on record with "the State of Nevada, Division of Water Resources" by and through constructive notice; notice to the principal is notice to the agent and notice to the agent is notice to the principal.

**Conclusions of Law**

1.    Pursuant to and in conjunction with the Order of the Court of December 20, 2017, the Court finds there are multiple Brady violations. <u>Brady v. Maryland</u>, 373 US 83 - Supreme Court 1963

2.    Pursuant to and in conjunction with the Order of the Court of December 20, 2017, the Court finds there are multiple Giglio violations.  <u>Giglio v. United States</u>, 405 US 150 - Supreme Court 1972

3.    Pursuant to and in conjunction with the Order of the Court of December 20, 2017, and the aforementioned Brady and Giglio violations, the Court further finds the Brady and

Giglio violations "subvert[ed] the due process rights that the defendants are guaranteed by the Constitution" and also the "Sixth Amendment right to confront adverse witnesses."

US v. Chapman, 524 F. 3d 1073, 1084 - Court of Appeals, 9th Circuit 2008

**Whereby**, based upon this Court's finding of  "flagrant prosecutorial misconduct[,]" the Court exercises its duty "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." US v. Chapman, Id. at 1085

**IT IS THEREFORE ORDERED** that ryan-c: family of Bundy's Mandate to Dismiss with prejudice the Superseding Indictment is hereby granted.

**IT IS FURTHER ORDERED** that a certificate of appeal-ability is **DENIED**.


DATED:  January _____, 2018.

_____
GLORIA M. NAVARRO
United States District Judge
District of Nevada

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

The undersigned hereby certifies that she served an electronic copy of the above and foregoing **MANDATE FOR DISMISSAL OF SUPERSEDING INDICTMENT AND ORDER** by electronic service (ECF) to all counsel of record on December 29, 2017.

*/s/ Maysoun Fletcher*

# REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Jury Trial, Day 16 - Case No. 2:16-cr-46-GMN-PAL**

**United States of America**

**versus**

**Cliven Bundy, Ryan Bundy, Ammon Bundy, and Ryan Payne.**

**EXHIBIT A**

—2:16-cr-46-GMN-PAL—

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,        )   CASE NO. 2:16-CR-46-GMN-PAL
                                      )
4                  Plaintiff,         )   LAS VEGAS, NEVADA
                                      )   DECEMBER 20, 2017
5          vs.                        )   8:30 A.M.
                                      )   COURTROOM 7C
6   CLIVEN D. BUNDY (1),              )
    RYAN C. BUNDY (2),                )   JURY TRIAL, DAY 16
7   AMMON E. BUNDY (3),               )
    RYAN W. PAYNE (4),                )
8                                     )
                   DEFENDANTS.        )
9   _____)
                                      )
10                                    )

11

12                  REPORTER'S TRANSCRIPT OF PROCEEDINGS

13              BEFORE THE HONORABLE GLORIA M. NAVARRO,
                  UNITED STATES DISTRICT CHIEF JUDGE

14

15  APPEARANCES:
    FOR THE PLAINTIFF:

16

            **STEVEN W. MYHRE, AUSA**
17          **DANIEL SCHIESS, AUSA**
            **NADIA JANJUA AHMED, AUSA**
18          United States Attorney's Office
            501 Las Vegas Boulevard South, Suite 1100
19          Las Vegas, Nevada 89101
            (702) 388-6336
20   (continued next page)

21

22  Court Reporter:     Patricia L. Ganci, RMR, CRR, CCR 937
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada 89101
24                      PG@nvd.uscourts.gov

25  Proceedings reported by machine shorthand.  Transcript produced
    by computer-aided transcription.

```
                   ─2:16-cr-46-GMN-PAL─
```

 1 | APPEARANCES CONTINUED:

 2 | For Defendant Cliven D. Bundy:

 3 | **BRET O. WHIPPLE, ESQ.**
   | **JUSTICE LAW CENTER**
 4 | 1100 S. 10th Street
   | Las Vegas, Nevada 89104
 5 | (702) 257-9500

 6 | For Defendant Ryan C. Bundy:

 7 | **RYAN C. BUNDY**
   | **PRO SE**
 8 | 2190 East Mesquite Ave.
   | Pahrump, Nevada 89060

 9 | **MAYSOUN FLETCHER, ESQ.**
10 | **THE FLETCHER LAW FIRM**
   | 5510 South Fort Apache, Suite 5
11 | Las Vegas, Nevada 89104
   | (702) 835-1542

12 | For Defendant Ammon E. Bundy:

13 | **DANIEL HILL, ESQ.**
14 | **HILL LAW FIRM**
   | 228 S. 4th Street, 3rd Floor
15 | Las Vegas, Nevada 89101
   | (702) 848-5000

16 | **J. MORGAN PHILPOT, ESQ.**
17 | **JM PHILPOT LAW**
   | 1063 E. Alpine Drive
18 | Alpine, Utah 84004
   | (801) 891-4499

19 | For Defendant Ryan W. Payne:

20 | **BRENDA WEKSLER, ESQ.**
21 | **RYAN NORWOOD, ESQ.**
   | **FEDERAL PUBLIC DEFENDER'S OFFICE**
22 | 411 E. Bonneville Avenue, Suite 250
   | Las Vegas, Nevada 89101
23 | (702) 388-6577

24 |

25 |

───────────── 2:16-cr-46-GMN-PAL ─────────────

1          LAS VEGAS, NEVADA; WEDNESDAY, DECEMBER 20, 2017; 8:30 A.M.

2                              --oOo--

3                     P R O C E E D I N G S

4          THE COURT:  Thank you.  You may be seated.

5          COURTROOM ADMINISTRATOR:  This is the time set for Jury

6   Trial, Day 16, in Case No. 2:16-cr-46-GMN-PAL, United States of

7   America versus Cliven Bundy, Ryan Bundy, Ammon Bundy, and Ryan

8   Payne.

9          Counsel, please make your appearances for the record.

10         MR. MYHRE:  Good morning, Your Honor.  Steven Myhre,

11  Nadia Ahmed, and Dan Schiess on behalf of the United States.

12         THE COURT:  Good morning.

13         MR. WHIPPLE:  Good morning, Your Honor.  Bret Whipple

14  on behalf of Mr. Cliven Bundy.

15         THE COURT:  Good morning.

16         MR. RYAN BUNDY:  Good morning.  Ryan C., madam, of the

17  Bundy family here by special appearance, with Maysoun Fletcher

18  assisting.

19         THE COURT:  Good morning.

20         MR. HILL:  Good morning, Your Honor.  Dan Hill along

21  with Morgan Philpot on behalf of Ammon Bundy.

22         THE COURT:  Good morning.

23         MS. WEKSLER:  Good morning, Your Honor.  Brenda Weksler

24  and Ryan Norwood on behalf of Mr. Payne.

25         THE COURT:  Good morning.

1          The Court has received all of the documents regarding

2    the motion, response, replies, sur-reply, and response to

3    sur-reply.  And the Court is going to be providing its decision

4    orally to save time rather than trying to perfect a written

5    order.

6          I do want to just make a preliminary note that, as

7    always, please remember that it is not appropriate to express

8    your opinion either verbally or through body language.  This is

9    a courtroom and not a sporting event, and any disrespectful or

10   distracting, inappropriate outbursts or body language will be

11   justification for the Court's security officers or the marshals

12   to remove you from the courtroom and you may not be able to

13   reenter the courtroom.

14         All right.  Well, there is two different sets of

15   motions.  The first one is Defendant Ammon Bundy's second motion

16   for mistrial, which is No. 2856, and also Mr. Payne's motion to

17   dismiss, which is No. 2883 and 2906.

18         (Court conferring with court reporter.)

19         THE COURT:  All right.  If the folks in the back row,

20   if you can't hear me at any point, please raise your hand

21   because I'm being told that the microphone is coming in and out.

22         All right.  So first let's begin with the Brady legal

23   standard.  Under Brady, prosecutors are responsible for

24   disclosing evidence that is both, number one, favorable to the

25   accused and, number two, material either to guilt or to

1    punishment.  And this is based on the United States versus

2    Bagley, B-A-G-L-E-Y.  Evidence is material if there is a

3    reasonable probability that the disclosure of the evidence would

4    have changed the outcome of the case.  A reasonable probability

5    is a probability sufficient to undermine confidence in the

6    outcome.

7         Because the definitions of materiality as applied to

8    appellate review are not appropriate in the pretextual pretrial

9    discovery context, the Court does rely on the plain meaning of

10   the evidence favorable to the accused, as discussed in Brady.

11   The meaning of favorable is not difficult to determine in the

12   Brady context.  Favorable evidence is that which relates to

13   guilt or punishment and which tends to help the defense by

14   either bolstering the defense case or by impeaching prosecution

15   witnesses, and this is pursuant to Giglio.

16        The Court notes that, again, in the pretrial context it

17   would be inappropriate to suppress evidence because it seems

18   insufficient to alter a jury's verdict.  And, further, the

19   government, where doubt exists as to the usefulness of the

20   evidence, is to resolve such doubts in favor of full disclosure.

21   And this is pursuant to U.S. v. Van Brandy, citing Goldberg.

22        Thus, the government is obligated to disclose all

23   evidence relating to guilt or punishment which might reasonably

24   be considered favorable to the defendant's case, citing United

25   States v. Sudikoff, which is a Central California case.

─ 2:16-cr-46-GMN-PAL ─

1       Brady asks the question whether the evidence is
2   favorable -- whether evidence is useful, favorable, or tends to
3   negate the guilt or mitigate the offense.  These are semantic
4   distinctions without difference in a pretextual context -- in
5   pretrial context.  And I'm citing United States v. Acosta, a
6   District of Nevada case.
7       Therefore, when determining whether the prosecution has
8   violated its pretrial or trial obligations, as opposed to post
9   trial, the Court evaluates whether the evidence is favorable to
10  the defense, whether it is evidence that helps bolster the
11  defense case or impeach the prosecutor's witnesses, and the
12  evidence need not be admissible so long as it is reasonably
13  likely to lead to discoverable evidence.  And this is citing
14  U.S. v. Price.
15      The failure to turn over such evidence violates due
16  process, citing Wearry v. Cain.  Wearry is W-E-A-R-R-Y, versus
17  Cain, C-A-I-N, 2016 U.S. Supreme Court case.
18      Someone has a cell phone on.  Please turn it off.
19  Thank you.  Nope, it's back on.  All right.  Thank you.
20      The prosecutor's duty to disclose material evidence
21  favorable to the defense is applicable, even though there has
22  been no request by the accused, and it encompasses impeachment
23  evidence as well as exculpatory evidence, citing Strickler v.
24  Greene.
25      In the case of the late disclosure of favorable

1  evidence, the Court looks at whether the evidence was revealed

2  in time for the defendant to make use of it, citing Bielanski v.

3  County of Kane.  And Bielanski is spelled B-I-E-L-A-N-S-K-I.

4       Brady evidence can be handed over on the eve of trial

5  or even during trial so long as the defendant is able to use it

6  to his or her advantage, citing United States v. Warren,

7  W-A-R-R-E-N.

8       For claims under Brady, the prosecutor's personal

9  knowledge does not define the limits of constitutional

10 liability.  Brady imposes a duty on prosecutors to learn of

11 material exculpatory and impeachment evidence in the possession

12 of other agencies as well.  Brady suppression occurs when the

13 government fails to turn over even evidence that is known only

14 to police investigators and not to the prosecutors themselves,

15 citing Youngblood v. West Virginia, which is quoting Kyles v.

16 Whitley, and also Browning v. Baker.

17      The prosecutor will be deemed to have knowledge of and

18 access to anything in the possession, custody, or control of any

19 federal agency participating in the same investigation of the

20 defendant, citing United States v. Bryan, B-R-Y-A-N, Ninth

21 Circuit case.

22      Exculpatory evidence cannot be kept out of the hands of

23 the defense just because the prosecutor does not have it, where

24 an investigating agency does.  That would undermine Brady by

25 allowing the investigating agency to prevent production by

―――― 2:16-cr-46-GMN-PAL ――――

 1   keeping a report out of the prosecutor's hands until the agency

 2   decided the prosecutor ought to have it, and by allowing the

 3   prosecutor to tell the investigators not to give him certain

 4   information on material unless he asks for them.  And this is

 5   citing United States v. Blanco, B-L-A-N-C-O.

 6          So the Brady violation has three elements.  The first

 7   is that there must be evidence that is favorable to the defense

 8   either because it is exculpatory, helps bolster the defense, or

 9   impeach.  Number two, the Government must have willfully or

10   inadvertently failed to produce the evidence and, three, the

11   suppression must have prejudiced the defendant.  And prejudice

12   exists when the government's evidentiary suppression undermines

13   confidence in the outcome of the trial.  This is citing Milke v.

14   Ryan, M-I-L-K-E, v. Ryan, Ninth Circuit case (2013).

15          So the Court is now going to address each piece of

16   untimely evidence individually and discuss whether or not a

17   Brady violation has been found.  First, I'm grouping together

18   the information relating to the surveillance camera.  So there

19   are two specific articles here.  First is the FBI Law

20   Enforcement Operation Order, specifically on page 7, and there's

21   also an FBI 302 report prepared by the FBI about an interview

22   with Egbert.

23          The Court does find that this information is favorable

24   to the accused and potentially exculpatory.  It does bolster the

25   defense and is useful to rebut the Government's theory.  The

1  evidence of a surveillance camera, its location, the proximity

2  to the home, and that its intended purpose was to surveil the

3  Bundy home as opposed to incidentally viewing the Bundy home,

4  this information potentially rebuts the allegations of the

5  defendants' deceit which is repeated in the superseding

6  indictment numerous times, including the conspiracy count as an

7  overt act in allegations number 59, 84, 88, and 92 regarding

8  false representations that were alleged about the Bundys being

9  surrounded, about the BLM pointing guns at them, and using

10  snipers.

11         The Court does find that this information was provided

12  untimely and should have been provided by October 1st, which is

13  30 days before trial.  The Law Enforcement Operation Order is

14  dated March 28th, 2014, and was available prior to the discovery

15  deadline of October 1st.

16         Now, the Court also finds that the disclosure was

17  willful.  And, remember, it doesn't matter for this purpose

18  whether it's willful or inadvertent, but the Court does analyze

19  that and wants to provide that information to the parties.  The

20  Court does find that it was a willful disclosure/suppression of

21  this potentially exculpatory, favorable, and material

22  information because all of the documents were prepared by the

23  FBI.  The operation order was prepared by the FBI on March 28th

24  of 2014, and the FBI 302 report about the interview with Egbert

25  was prepared by the FBI.  And it reveals that the FBI SWAT team

 1  placed the surveillance camera, repaired it, relocated it, and

 2  that the FBI monitored the live feed from the camera.

 3          Also, the U.S. Attorney's Office was aware of the

 4  camera, at least the latest information based on the Ryan Bundy

 5  interview, and did not follow-up or provide any information

 6  about the reports or the recording that was created.  "The

 7  recording" being the notes; not a video recording in the sense

 8  of a tape that can be replayed.  But this information that was

 9  created from the camera view was not provided.  And, further,

10  the Government falsely represented that the camera view of the

11  Bundy home was incidental and not intentional, and claimed that

12  the defendants' request for the information was a fantastic

13  fishing expedition.

14          As to the prejudice, the Court does find that this

15  suppression has undermined the confidence in the outcome of the

16  case; that the Defense represents that they would have proposed

17  different jury questions for voir dire; and they would have

18  exercised their peremptory challenges differently; and provided

19  a stronger opening statement.  The Court notes that Ammon Bundy

20  did not provide an opening statement so that would not apply to

21  him, but the other defendants did.

22          (Court conferring with court reporter.)

23          THE COURT:  The next group is the BLM, and I have in

24  quotations which I realize you can't see, snipers.  Whether or

25  not they're snipers or not, whether they're called snippers,

—2:16-cr-46-GMN-PAL—

1  technically snipers, or not is not the material question here.

2  The claims made on the -- in the superseding indictment about

3  the defendants falsely representing snipers is the question and

4  whether or not there were individuals who could have reasonably

5  appeared to be snipers whether or not, in fact, they were.

6          So here we have the FBI 302 about BLM Special Agent

7  Delmolino, and the FBI prepared it.  That was prepared by FBI

8  Agent Willis and drafted March 3rd of 2015, but not provided to

9  the Defense until November of 2017.  There was also new 302s

10  provided recently on December 15th of 2017.  Again, these 302s

11  are created by the FBI.  The first one is a February 9th, 2015,

12  302 about BLM Special Agent Felix observing the LPOP and then a

13  May 14, 2014, 302 report created by the FBI about BLM Racker and

14  whether or not he was assigned to an LPOP, Listening Post

15  Observation Post.

16          (Court reporter clarification.)

17          THE COURT:  I'm sorry.  The parties use these acronyms,

18  and now I have picked them up.  And I apologize that I'm using

19  letters instead of words.

20          So the Court does find that this information provided

21  in those documents is favorable to the accused and potentially

22  exculpatory.  It does bolster the defense and is useful to rebut

23  the Government's theory.  For example, the March 3rd, 2015, 302

24  prepared by the FBI provides information regarding BLM

25  individuals wearing tactical gear, not plain clothes, carrying

—2:16-cr-46-GMN-PAL—

1  AR-15s assigned to the LPOP on April 5th and 6th of 2014, which

2  bolsters the defense because it potentially rebuts the

3  indictment's allegations of overt acts, including false

4  pretextual misrepresentations that the Government claims the

5  Defense made about snipers, Government snipers, isolating the

6  Bundy family and defendants using deceit and deception to

7  normally recruit gunmen.

8       This information was provided untimely.  Should have

9  been provided by October 1st, 30 days before trial.  And the

10  Court does find that the suppression was a willful failure to

11  disclose because the FBI created these documents.  They were

12  aware of the evidence and chose not to disclose it.  And they

13  were not provided until 11/7/17.  And the AUSA, in fact, was

14  present during the March 3rd, 2015, interview documented by FBI

15  Agent Willis.

16       And as to the FBI 302 dated February 9th of 2015 about

17  Felix and the March 14th, 2014, FBI report about Racker, these

18  were newly provided December 15th of 2017, far after the October

19  1st deadline, despite the fact they were created much earlier.

20       The Court does find that there is prejudice; that the

21  suppression has undermined the confidence in the outcome of the

22  trial; that the Defense represents that they would have proposed

23  different questions for the jury voir dire, exercised their

24  challenges differently, and provided a stronger opening

25  statement.  This suppression prevented the Defense from using

—2:16-cr-46-GMN-PAL—

1  the information about these snipers or alleged snipers or

2  appearance of snipers in their opening arguments.  And it is

3  useful to rebut elements in the indictment.  Therefore, the

4  Court finds that this information does undermine the outcome of

5  the case in favor of the Defense.

6       The next group is the unredacted FBI TOC log.  The

7  Court does find that this is favorable information, potentially

8  exculpatory.  It bolsters the defense and is useful to rebut the

9  Government's theory.  More specifically, it provides information

10 about the family being surveilled by a camera, and specifically

11 lists three log entries using the word "snipers," including

12 snipers being inserted and that they were on standby.

13      This information, had it been timely provided, would

14 have been potentially useful to the Defense to rebut the

15 indictment's overt acts, specifically the allegations regarding

16 false pretextual misrepresentations being made by defendants

17 about Government snipers isolating the Bundy family.  This

18 should have been provided by October 1st, which was 30 days

19 before trial, but it was not.

20      The Court does find that the suppression was willful.

21 It was a failure to disclose the information knowing that this

22 information existed, again, because the Government claims that

23 it was an inadvertent failure to disclose because the report was

24 kept on a thumb drive inside the TOC vehicle and was not turned

25 over to the prosecution team.  So the "prosecution team" being

—2:16-cr-46-GMN-PAL—

1   the U.S. attorneys, the prosecutors.

2          However, the law is clear that the Government is still

3   responsible for information from the investigative agencies, in

4   this case the FBI.  The FBI created the documents, was aware of

5   the evidence, chose not to disclose it.  It was not provided

6   until November 17th of 2017.  And the Court finds further

7   evidence of willfulness in the fact that the FBI 302 about Brunk

8   that was created by FBI Agent Pratt on April 14th of 2014

9   mentions a BLM sniper, but then 10 months later in February,

10  February 6th of 2015, the FBI -- Agent Willis drafted a new

11  report, a new 302 report, to clarify that Brunk had never said

12  he was a spotter for the sniper.  And the AUSAs, the

13  prosecutors, were present at this later interview which was

14  documented specifically to be held for the purpose of clarifying

15  the earlier interview answers and whether or not the word

16  "sniper" had been used.

17         This coupled with the Government's strong insistence in

18  prior trials that no snipers existed justifies the Court's

19  conclusion that the nondisclosure was willful.

20         The Court also finds that there was prejudice and that

21  the suppression does now undermine the confidence in the outcome

22  of the trial.  The Defense represents they would have proposed

23  different voir dire questions, exercised their challenges

24  differently, and provided a stronger opening statement.  In

25  fact, the Defense specifically -- and I'm not going to quote,

—2:16-cr-46-GMN-PAL—

1  but specifically notes which potential jurors provided specific

2  answers that would have been viewed and weighted differently by

3  the Defense and how they would have exercised their challenges

4  differently.  Likewise, the Defense states that it would have

5  created a stronger opening statement with this information had

6  it been timely provided.

7          The suppression did prevent the Defense from using the

8  information about the snipers in the opening statement and

9  rebutting elements of the indictment, and the information, the

10  Court finds, does undermine the outcome of the case in favor of

11  the Defense.

12          Also part of the sniper allegations is an FBI 302

13  prepared regarding Delmolino.  This one is dated November 20th

14  of 2017, and the Court does not find this to be Brady.  There's

15  also maps created during the interview, and because they were

16  created during the interview on the 20th and provided

17  immediately thereafter, the Court does not find those to be

18  Brady information that was untimely provided.

19          There were, however, maps provided on December 15th of

20  2017.  These are maps that were in existence for dates in

21  question.  These do appear to be Brady information.  They do

22  appear to have been withheld willfully and they do prejudice the

23  Defense.

24          Likewise, there's a 302 about Swanson that was prepared

25  by the FBI.  It's dated November 20th of 2017.  It clarifies the

—2:16-cr-46-GMN-PAL—

1  role that was assigned to Swanson and that it was different from

2  that that was reflected originally in the organizational chart.

3  And the Court does not find this to be Brady information.

4        Moving on now to the subject of threat assessments.

5  There was a threat assessment that was provided.  However, there

6  are numerous other threat assessment reports that were not

7  provided.  We have the 2012 FBI BAU Threat Assessment; also 2012

8  Southern Nevada Counterterrorism Threat Assessment; the third

9  one is the March 24th, 2014, FBI order; fourth, we have the Gold

10  Butte Impoundment Risk Assessment; and the BLM OLES Threat

11  Assessment.

12        The Court does find that these provide information that

13  is favorable to the accused and potentially exculpatory.  The

14  information does bolster the defense and is useful to rebut the

15  Government's theory.

16        Specifically, turning first to the 2012 FBI BAU Threat

17  Assessment.  That document provided favorable information about

18  the Bundys' desire for a nonviolent resolution.  The 2012

19  Southern Nevada Counterterrorism Threat Assessment noted that

20  the BLM antagonizes the Bundy family, giving the community an

21  unfavorable opinion of the Federal Government, and that they are

22  trying to provoke a conflict, and that the likelihood of

23  violence from Cliven Bundy is minimal.

24        The March 24th, 2014, FBI order relies on the 2012

25  assessment that the Bundy family was not violent, but if backed

 1  into a corner, they could be.

 2         And the Gold Butte Impoundment Risk Assessment lists a

 3  strategic communication plan to allow the BLM and the NPS, the

 4  National Park Service, to educate the public and get ahead of

 5  negative publicity.  The failure of the BLM to implement this

 6  plan bolsters the Defense theory that even if the information

 7  received by Mr. Payne from the Bundy media campaign was

 8  incorrect, that no alternative information was available for him

 9  to discover the truth directly from the Government.

10         And, finally, the undated BLM OLES Threat Assessment

11  drafted between 2011 and 2012 discusses the nonviolent nature of

12  the Bundy family, quote, Will probably get in your face, but not

13  get into a shootout, end quote.

14         All of this information undermines the Government

15  theory and the witness testimony about whether the Bundys

16  actually posed a threat in relation to the 2012 and 2014 cattle

17  impoundment operations and whether the BLM acted reasonably.  It

18  is both exculpatory evidence and potentially impeachment

19  information, and it was not provided before October 30th of

20  2017.

21         The Court does find that there was a willful failure to

22  disclose the information.  Most, if not all, of this information

23  was in the possession of the FBI.  It was difficult to

24  understand why this -- these would not be seen as material by

25  the Government since it was referenced in the 2014 FBI BAU that

—2:16-cr-46-GMN-PAL—

1   was timely disclosed.  Therefore, this information was in the

2   hands of the FBI, even when it's not authored by the FBI,

3   because it's mentioned by the FBI in its own report.

4        Regardless, these documents also were requested by the

5   defendants in an e-mail dated July 5th, 2017, and later again

6   during trial and after the testimony by Ms. Rugwell.  And the

7   Government's response was that this information was not

8   material.

9        The Court also finds that there's prejudice and that

10  the suppression has undermined the confidence in the outcome of

11  the trial.  The defendant does represent that this information

12  would have been used to cross-examine Ms. Rugwell; that there

13  would have been proposed different questions for the jury voir

14  dire; the exercise of the peremptory challenges would have been

15  completed differently; and this also provides a stronger opening

16  statement that they were prevented from giving, using

17  information about snipers in their opening arguments and

18  rebutting elements of the indictment.  And this information does

19  undermine the outcome of the case in favor of the Defense.

20       Next we have the Internal Affairs information.  This

21  was information that originally was misidentified as being an

22  OIG report.  This was information that came to light through

23  another document wherein in a meeting it is memorialized that

24  someone had requested -- well, that someone had noted that there

25  was a prior OIG report that made reference to specific

1  information.  And the Government has found, in fact, that it was

2  not an OIG report; that it was an Internal Affairs document

3  based on an allegation provided.

4       The Court does find that this information in the

5  Internal Affairs report is favorable to the accused; that it is

6  potentially exculpatory; it does bolster the defense; and is

7  useful to rebut the Government's theory.  This particular

8  information -- Internal Affairs report documents that

9  Special-Agent-In-Charge Dan Love requested for the FBI to place

10  a surveillance camera.  The report allegedly also suggests that

11  there was no documented injury to the tortoises by grazing, and

12  this information would have been useful to potentially impeach

13  Ms. Rugwell who testified that there had been a detrimental

14  impact on the desert tortoise habitat.

15       The Court also finds that this information was

16  willfully suppressed, despite representations by the Government

17  that this report was an urban legend and a shiny object to

18  distract the Court.  The report does exist.  Now, the Court does

19  note that the Government did provide the information, did locate

20  it, despite the fact that it was misnamed.  The Government,

21  however, did know right away that it was misidentified by Dan

22  Love as an OIG report, which has not been explained, and it did

23  not explain how Dan Love knew about the Internal Affairs report.

24       This information, the Court finds, was available to the

25  Government, and even if it was inadvertently suppressed, it

—2:16-cr-46-GMN-PAL—

 1  would still meet the Brady standard.

 2        The report was 500 pages long and not disclosed until

 3  December 8th of 2017.  The Court does find that there is

 4  prejudice to the Defense due to the late and untimely

 5  disclosure.  The suppression has now undermined the confidence

 6  in the outcome of the trial for the same reasons previously

 7  stated.

 8        So, in summary, the Defense provides in their document,

 9  which is a response to the sur-reply, No. 3027, a table of

10  evidence that was produced between December 12th and December

11  15th of 2017.  Also they represent that since October 10th of

12  2017 the Defense has received 3,300 pages of discovery, and even

13  excluding the OIG reports which amount to approximately 2,000

14  pages, that the Defense has still had to review over 1,000

15  pages.

16        The Court does find that there are numerous other

17  documents which were provided timely such as the 302 created by

18  FBI Special Agent Gavin.  This is dated November 10th of 2017

19  and was provided as soon as created.  The same for the 302

20  created by the FBI regarding BLM Special Agent Scott Swanson.

21  That report is dated November 20th, 2017, and was provided as

22  soon as created.  Also there is a 302 by the FBI regarding BLM

23  Special Agent Delmolino.  That document is dated November 20th

24  of 2017 and was provided as soon as it was created.  And there

25  are also FBI notes that were created in preparation for the

2:16-cr-46-GMN-PAL

 1    testimony of Mary Jo Rugwell, and these are Jencks material.

 2         There still seems to be outstanding discovery.  I

 3    noted, trying to match up from the different documents, that the

 4    name of the individual who prepared the TOC log which was

 5    requested on November 13th and again on November 14th of 2017

 6    does not appear to have been provided.  Also information

 7    regarding the other BLM officers assigned to do security in a

 8    car south of the Bundy house is mentioned by the FBI's 302 about

 9    Special Agent Swanson, that information does not appear to be

10    provided.

11         But I understand that during this break information has

12    been provided by the Government to the Defense.  So it might be

13    that we are not keeping up with how many --

14         MS. WEKSLER:  Judge, so that the record is clear, that

15    information has been provided.

16         THE COURT:  Thank you.  That was what I was -- as I was

17    going through, I was thinking, Well, maybe it has been by now,

18    but I didn't have proof of that yet.  So I wanted to make note

19    of it.  So thank you for that representation.

20         So, the effect of this suppressed information.  The

21    suppressed evidence is considered collectively; not item by

22    item.  I did consider it item by item or subject by subject so

23    that I could better under -- better understand and interpret and

24    analyze whether it was Brady and whether it was timely provided.

25    In determining its materiality pursuant to Kyles v. Whitley, we

2:16-cr-46-GMN-PAL

1    do look at it collectively and I did try to group them.

2           The Defense represents that since October 10th of 2017

3    they have been provided this 3,300 pages of discovery; not all

4    of it qualifies as Brady or Giglio information.  However, the

5    Government's failure to timely disclose the evidence reviewed by

6    the Court is prejudicial in light of the information's

7    importance to the Defense strategy.  And the Court does find

8    that there have been multiple Brady violations.

9           So in fashioning a remedy for these Brady violations,

10   the Court does consider a number of different options.  First of

11   all, allowing the defendant to recall the Government witnesses

12   that have already testified so that they have the opportunity to

13   impeach these witnesses with newly-disclosed information.

14          The Court is worried about the jury's memory and the

15   jury's confusion as a result of the recalling witnesses, but

16   recalling of witness would be an appropriate remedy.  However,

17   the remedy would not cure the prejudice claimed by the

18   defendants regarding the jury voir dire questions that were not

19   asked, the peremptory challenges that would have been exercised

20   differently, and the strength of the opening statements which

21   could have been more unequivocal.  Therefore, recalling the

22   prior witnesses is an impractical remedy and not sufficient to

23   cure the prejudice.

24          The second remedy that the Court analyzed is a

25   continuance to allow the defendants time to review all of this

—2:16-cr-46-GMN-PAL—

1   newly-discovered evidence.  Again, the continuance would likely

2   not be sufficient of a remedy.  The continuance would most

3   likely require a new jury to be empanelled as a result of the

4   delay and the length of this particular trial as opposed to in

5   other trial situations where a continuance would be more

6   appropriate.

7         In this case the jury was pre-vetted for a particular

8   amount of time, and they were amenable to making themselves

9   available for this amount of time.  We gave them specific

10  parameters and calendar dates.  Therefore, a continuance would

11  effectively lead to a mistrial.  Furthermore, this does not

12  suffice to cure the prejudice claimed by the defendants

13  regarding the voir dire questions, the peremptory challenges,

14  and the opening statements.

15        The last option that the Court looks at is the mistrial

16  option.  And the mistrial could be in this case declared both

17  because of the Brady violations because they are constitutional

18  due process violations, but also the manifest necessity

19  exception applies whenever the judge believes to a high degree

20  that a new trial is needed.  And I am quoting from Chapman.

21        Based on evidence presented in the record and the

22  information determined to be a Brady violation, the Court does

23  regrettably believe that a mistrial in this case is the most

24  suitable and the only remedy that is available.  In this case

25  the Court does find that a fair trial at this point is

—2:16-cr-46-GMN-PAL—

1  impossible with this particular jury and that a mistrial is

2  required to at least a high degree of necessity, quoting Arizona

3  v. Washington.  And it is hereby ordered that the defendants'

4  request for a mistrial is granted based on manifest necessity.

5       The joinders to the motion, to Motion No. 2856, are

6  granted to the extent that they are requesting the same relief.

7  For example, Motion for Joinder 2865 is granted.  There is a

8  Joinder No. 2907 which requests other information in addition to

9  the mistrial, and so that inform -- that request is not granted,

10  but to the extent that the joinder in 2907 asks for the same

11  relief, then the joinder's relief is granted.  Also, there's a

12  Motion for Joinder No. 2925 that is granted.

13       There is a joinder to 2609, which is Joinder No. 2924,

14  and that is granted.  And then there's a Motion for Joinder

15  No. 2916 which also supplements and provides new information.

16  So 2916 is granted to the extent that it requests the same

17  remedy as 2609; but not otherwise.

18       So the Court is going to call the jury back in at 1

19  o'clock, which is when they are scheduled to be here and ...

20       (Court conferring with courtroom administrator.)

21       THE COURT:  Okay.  So the jury is here now.  So I will

22  call them in and advise them of the mistrial, thank them for --

23  not right now, though.

24       COURTROOM ADMINISTRATOR:  Okay.

25       THE COURT:  Sorry.

```
───────────────── 2:16-cr-46-GMN-PAL ─────────────────
```

1       And thank them for their service, but first I want to

2  set the timeline here.  So I do need briefing on whether the

3  mistrial should be with or without prejudice.  I am going to set

4  a calendar call and a trial date because the Speedy Trial Act

5  does require that a mistrial [sic] be held within 70 days of the

6  declaration of a mistrial.  So I will set a calendar call and a

7  trial date.

8       Aaron, do you have that?

9       COURTROOM ADMINISTRATOR:  Yes, Your Honor.  Calendar

10  call will be Thursday, February 15th, 2018, at 9 a.m. in this

11  courtroom, 7C.  And trial will be Monday, February 26th, 2018,

12  at 8:30 a.m., also in this courtroom, 7C.  And all trial

13  documents will be due Thursday, February 8th, 2018.

14       THE COURT:  All right.  So the trial is scheduled to

15  begin Monday, February 26th, 2018, at 8 a.m.

16       COURTROOM ADMINISTRATOR:  8:30 a.m., Your Honor.

17       THE COURT:  I'm sorry.  8:30 a.m.  And calendar call

18  will be February 15th at 9 a.m.

19       COURTROOM ADMINISTRATOR:  Correct, Your Honor.

20       THE COURT:  And then the parties will be given a week

21  to address whether the mistrial should be with or without

22  prejudice.

23       Aaron, do you have a date for that?

24       COURTROOM ADMINISTRATOR:  I do, Your Honor.  For the

25  response, that would be December 29th, 2017.

2:16-cr-46-GMN-PAL

1          THE COURT:  All right.  So end of business, 5 p.m.,

2    December 29th, 2017.  I just need -- not having response, reply,

3    sur-reply back and forth.  Just tell me everything you want me

4    to know before 5 p.m. December 29th, 2017, regarding the legal

5    standard I should use, the information I should consider, how I

6    should consider it, interpret it, analyze it, evaluate it, what

7    the results should or shouldn't be, any information that you

8    want to provide to that effect.

9          MS. WEKSLER:  Your Honor, what I would request is

10   given -- I mean, the way that I'm reading the Court's ruling is

11   that it's following the Chapman model to decide whether

12   dismissal should be appropriate or not.  The Court mentioned it

13   in terms of mistrial with prejudice which would be essentially

14   the same thing as dismissal with prejudice in this case.

15   Because the Court needs to find whether the Government has acted

16   with flagrant misconduct, and that is in fact the standard, we

17   believe that a certain number of evidentiary hearings need to

18   take place because that would inform the Court's decision

19   regarding dismissal in this case.

20          So we would request in addition to the briefing

21   schedule that's been set out for -- or excuse me -- in addition

22   to the calendar call and trial dates that have been set out, a

23   schedule for evidentiary hearings and briefing on a specific

24   number of matters that have -- some of which have been briefed;

25   some of which have not.  Specifically, we have disclosures that

——— 2:16-cr-46-GMN-PAL ———

 1   have taken place regarding the Wooten memo, regarding a variety

 2   of different things.  Some of which have been briefed; some have

 3   not, which I think would inform the flagrant misconduct prong

 4   that the Court has to analyze in terms of dismissal.

 5            THE COURT:  All right.  Well, that information can be

 6   provided in the brief that's due December 29th, 2017.  I am also

 7   going to set a hearing.

 8            Aaron, do you have that date?

 9            COURTROOM ADMINISTRATOR:  I do, Your Honor.  That will

10   be Monday, January 8th, 2018, at 9 a.m. in this courtroom, 7C.

11            THE COURT:  So Monday, January 8th, 2018, is the date

12   set for the Court to provide its either order in regards to

13   whether or not the mistrial should be with or without prejudice

14   or to conduct any other hearing, whether it be an evidentiary

15   hearing or oral argument hearing.  And the Court will advise the

16   parties as soon as it receives the briefs so that it can provide

17   information to the jury -- to the parties so the parties can be

18   prepared if we need to extend the hearing date from January 8th

19   to a different date depending on what the Court determines.

20   Then we can also do that as well and consider other dates as

21   availability for witnesses, if witnesses need to be called.

22   That is not the inclination of the Court at this point.

23            The Court is aware that there is information that needs

24   to be provided about the conduct, and that's why I did go into

25   more detail on whether or not the Court found willful

1  suppression as opposed to inadvertent suppression.  As Brady

2  makes clear, and it's all the line of cases, in determining

3  whether or not there is a Brady violation, it doesn't matter

4  whether the suppression was willful or inadvertent.  But I did

5  make those findings because I think that it does help to clarify

6  the next step of whether or not the mistrial should be with or

7  without prejudice.

8          Mr. Schiess?

9          MR. SCHIESS:  Your Honor, the Court in its order has

10 described or stated a couple of items that the Court relied

11 upon, one, the maps that were disclosed on December 15th.  We

12 have not had a chance to respond to those.  So I'm wondering --

13 as well as the Court referred to the OIG/Internal Affairs

14 record.  What I'd like to do is just to make sure that those are

15 part of the record so that we can use those in part with the

16 response, if that's permissible from the Court.

17         THE COURT:  When you say you want to make sure that

18 they're part of the record, and you're asking for my permission

19 to do what?

20         MR. SCHIESS:  I just want a clarification that when we

21 file our response or our discussion to the Court that we're able

22 to refer to these items as part of the basis for the analysis.

23 So to make sure that we -- that they're at least lodged in the

24 record so that we can address them.

25         THE COURT:  Well, you have the right to file on the

—2:16-cr-46-GMN-PAL—

1  docket anything that you wish to file.  But that brings up

2  another issue that I also wanted to address, which is that of

3  how much information is being filed under seal, probably under

4  an abundance of caution because of the protective order filed in

5  this case which was filed in order to protect individuals who

6  had been receiving threats and who the Government represented

7  and the Court believed were in danger of receiving more threats

8  if the information was made publicly available.  There had

9  already been many instances on public media about information

10 regarding these individuals, and the Court did find that it was

11 appropriate and necessary to grant that protective order.

12         However, I think that there is much more information

13 that is being filed under seal than need be.  I understand that

14 because this has been a flurry of information that's being

15 provided that it's quicker and easier and safer to just file

16 everything under seal.  So I appreciate that, that you're being

17 careful and erring on the side of caution.  But now that we have

18 more time, now that we've -- you have the Court's ruling, I am

19 going to ask you to go back and look at those documents that

20 have been filed under seal and refile them publicly with

21 whatever redactions need to be made more specifically.

22         Some of these documents were very long.  So, again, I

23 understand why they were filed completely under seal in order to

24 make the deadline and not accidently divulge something.  But the

25 practice of this Court has always been that if you need to file

2:16-cr-46-GMN-PAL

 1   something under seal, you file it under seal, and then the part

 2   that doesn't need to be under seal is filed publicly with

 3   whatever redactions are necessary.  So sometimes it's names of

 4   children, some -- and this is both in criminal cases and civil

 5   cases.  You file a redacted and an unredacted copy.  The

 6   redacted copy is filed publicly, and the unredacted copy is

 7   filed under seal so everyone can see the entirety of the

 8   document.

 9        So I'm going to ask the parties to go back and look at

10   those and refile as many of them as possible without redaction,

11   but some of those still may need some redaction and so that

12   those redactions need to be made.  If there is a question as to

13   whether a redaction should or shouldn't be made, the parties

14   should be able to get-together and discuss it, and if not, then

15   the Court will address it.

16        There is a pending motion by an intervenor that the

17   Court did provide standing to file a motion to intervene.  Did

18   you set a hearing date for that yet, Aaron?

19        COURTROOM ADMINISTRATOR:  Your Honor, we did discuss

20   setting that at the exact same time as the current hearing of

21   January 8th.  Did you still want to do that or should we do that

22   separately?

23        THE COURT:  I think we can still do that.  Is that a 9

24   a.m.?

25        COURTROOM ADMINISTRATOR:  Yes, Your Honor.  And, Your

 1   Honor, does that ruling also grant the Document No. 3018 which

 2   is the request for hearing made by the intervenors?

 3         THE COURT:  Yes.  So that request for a hearing by the

 4   intervenors is granted, and the hearing date will be the same,

 5   January 8th of 2018 at 9 a.m.  If that hearing date changes for

 6   any reason because of documentation provided by the defendant

 7   and the Government in response to the question of whether or not

 8   the mistrial should be with or without prejudice, we'll still

 9   keep that hearing date for the intervenors' motion.  So,

10   regardless, we'll still have a hearing on January 8th at 9 a.m.

11         All right.  Mr. Ryan Bundy?

12         MR. RYAN BUNDY:  Yes, I find it appropriate at this

13   time to modify the conditions of release; that all of the

14   defendants be released on their own recognizance without

15   electronic monitoring, only signing a promise to appear.  In the

16   light of the Government's misconduct, and there's not been any

17   shown here by the Defense, that I think that conditions should

18   be changed.  Mr. Cliven Bundy should be released.  I also

19   believe that this greatly affects the outcome of the previous

20   trials and that also Todd Engel and Greg Burleson should also be

21   released, as well as Jerry Delemus.

22         THE COURT:  All right.  Well, I appreciate your request

23   and I anticipated as such.  Unfortunately, the Pretrial Office

24   is not aware of my ruling nor is anyone.  You are all the first

25   ones to hear it.  I even saw another judge in the elevator

—2:16-cr-46-GMN-PAL—

1  today, and that judge does not know my ruling either.  So the

2  Pretrial Office does not have this information, has not had the

3  opportunity to determine whether or not your request is

4  appropriate, but -- so I -- I believe that the correct course

5  here is for you to make that request of the Pretrial Office.  If

6  they agree, they can submit it in writing for me to approve.  If

7  they disagree, then we can set it for a hearing to determine

8  whether it is appropriate or not.

9        The point that I want to make clear here is that the

10 Court is not determining or making a finding in any way that the

11 information that was suppressed is, in fact, exculpatory or that

12 the defendants are, in fact, not guilty or that any of the

13 allegations in the superseding indictment are completely false.

14 That is not the Court's position.  It's not my technical

15 position.  It's not a factual decision for the Court to make.

16 It's for the jury to make.

17        To try to put it as simply as possible, the Defense has

18 a right to information so that it can provide it to the -- to

19 the jury so that the jury can decide what the facts are, who to

20 believe, who not to believe, how much weight to give the

21 evidence, what really happened, was it a crime or not.  So I am

22 not making any decisions by finding that this information is

23 helpful and potentially exculpatory or potentially useful.  I

24 believe it's very useful and very material, but that does not

25 mean that I am making a finding that all the allegations are

1  rebutted or that the jury would have believed this new helpful

2  information or not.  So the weight of the evidence has not

3  changed in my mind as to -- in regards to this particular

4  hearing as opposed to in the past.

5          So we'll go ahead now -- Aaron, you can go ahead and

6  bring in the jury.  And we'll advise them of the change in

7  circumstance and thank them.

8          COURTROOM ADMINISTRATOR:  All rise.

9          (Whereupon jury enters the courtroom at 9:28 a.m.)

10          THE COURT:  All right.  Everyone may be seated.

11          We're joined by the jury and we welcome them back.

12  Good morning, ladies and gentlemen.  We do appreciate you being

13  here.  We appreciate your patience with us.  There are things

14  that have come up, as I'm sure you assumed that there was a

15  continuance for some reason.  And that reason being that we do

16  have more information that has been made available to the

17  parties.  The Court has provided continuances to determine

18  whether they can have sufficient time to review that information

19  incorporated into the case, whether there are any other problems

20  that have arisen because of the information being provided later

21  than expected.  And the Court has found that it is not possible

22  for us to go forward with the case having -- the parties having

23  received all of this information at this time.

24          So I apologize that I have had to declare a mistrial,

25  which means that we will not be going forward with this

 1   particular jury, with you all, for this case.  It has been a
 2   treat to have you all on this case.  We have other issues with
 3   jurors once in a while, and we haven't had any with you, even
 4   though I think we found out on the first day that there was
 5   about five smokers on this jury, which is sometimes a problem,
 6   but didn't even turn out to be.  You all have been very patient,
 7   very cooperative, with all of the different doors and passages
 8   and getting in and out of here to the smoking section, and being
 9   kept in that little room for such a long period of time while we
10   talked about important things here in court.
11          And we really appreciate you setting aside so much of
12   your time to be available for this trial.  We gave you the
13   timeline.  We asked you to reschedule your life, your home life,
14   your work life, your duties and responsibilities so that you
15   could be here.  Some of you had to rearrange your work
16   schedules, your work shifts, so that you could be available for
17   this trial.  And we cannot thank you enough for making that
18   sacrifice to be able to provide the parties with a fair jury so
19   that they could have their decision and their case resolved.
20          So I do appreciate you very much.  All of the parties
21   appreciate you very much.  We are going to be considering other
22   issues before we decide whether to empanel another jury.
23          In the past, the order that I have provided to you was
24   that you were not to discuss this case with anyone nor permit
25   anyone to discuss it with you.  You are now relieved of that

1  requirement which means that you may discuss this case with each
2  other, with others.  You may allow others to discuss it with
3  you, but it's important to note that you are not required to
4  discuss it with anyone if you don't want to.  So if anyone asks
5  you any questions that you don't want to answer, that's fine.
6  Judge said I don't have to answer any questions I don't want to.
7          If you do want to answer questions, if you do want to
8  speak to your spouses, your work colleagues, your kids, your
9  neighbors about your experience, you are free to do so, but
10 not -- but you're not required to do so.  All right?
11         So we'll go ahead and stand for the jury so they may go
12 back in the jury room and collect their things and --
13         MR. RYAN BUNDY:  Madam?
14         THE COURT:  Yes.
15         MR. RYAN BUNDY:  I would just like to personally thank
16 them if you would allow me.
17         Jury, thank you for being here.  I just want you to
18 know that I appreciate your time and your service.  Thank you.
19         THE COURT:  As do all of the individuals here
20 appreciate your service.  The parties will be available to speak
21 with you if you would like to speak with them and -- and if they
22 want to speak with you, but you're not required to do so.  We'll
23 make that available.
24         All right.  So thank you very much.
25         A JUROR:  Merry Christmas.

—2:16-cr-46-GMN-PAL—

1          THE COURT:  Merry Christmas.

2          MR. RYAN BUNDY:  Merry Christmas.

3          (Whereupon jury leaves the courtroom at 9:33 a.m.)

4          THE COURT:  All right.  So the Court's in recess until

5   Monday, January 8th, at 9 a.m.

6          MR. RYAN BUNDY:  Madam, may ...

7          (Court conferring with courtroom administrator.)

8          MR. RYAN BUNDY:  Madam, may I suggest ...

9          THE COURT:  I'm not going to take any more information

10  at this time.  You can provide the briefs.

11         MR. RYAN BUNDY:  Thank you.

12         (Whereupon the proceedings concluded at 9:34 a.m.)

13                        --oOo--

14              COURT REPORTER'S CERTIFICATE

15

16      I, PATRICIA L. GANCI, Official Court Reporter, United

17  States District Court, District of Nevada, Las Vegas, Nevada,

18  certify that the foregoing is a correct transcript from the

19  record of proceedings in the above-entitled matter.

20

21  Date:  December 20, 2017.

22                              /s/ **Patricia L. Ganci**

23                              Patricia L. Ganci, RMR, CRR

24                              CCR #937

25